**Nos. 24-1140, 24-1206, 24-1234**

**IN THE**

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

VERSATA SOFTWARE, INC., fka Trilogy Software, Inc.,
VERSATA DEVELOPMENT GROUP, INC., TRILOGY, INC.,
*Plaintiffs-Appellants*,

v.

FORD MOTOR COMPANY,
*Defendant-Cross-Appellant*.

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 2:15-cv-10628, Hon. Matthew F. Leitman

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS VERSATA SOFTWARE, INC., VERSATA DEVELOPMENT GROUP, INC., AND TRILOGY, INC.

Dan K. Webb
Matthew R. Carter
Samuel Zuidema
Monica T. Kociolek
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600

Jeffrey A. Lamken
*Counsel of Record*
Michael Gregory Pattillo, Jr.
Jennifer Elizabeth Fischell
Lois Ahn*
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

*Counsel for Plaintiffs-Appellants Versata Software, Inc., Versata Development Group, Inc., and Trilogy, Inc.*

*(Additional Counsel Listed on Inside Cover)*

Jaye Quadrozzi
YOUNG, GARCIA & QUADROZZI, PC
27725 Stansbury Boulevard
Suite 125
Farmington Hills, MI 48334
(248) 353-8620

Steven J. Mitby
MITBY PACHOLDER JOHNSON PLLC
1001 McKinney Street, Suite 925
Houston, TX 77002
(713) 234-1446

Eugene Alexis Sokoloff
Thomas P. Schubert
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
(312) 450-6700

Sharoon Saleem
JONES & SPROSS, PLLC
1605 Lakecliff Hills Lane, Suite 100
Austin, TX 78732
(713) 446-0217

** Admitted only in New York; practice limited to matters before federal courts and federal agencies*

*Counsel for Plaintiffs-Appellants Versata Software, Inc., Versata Development Group, Inc., and Trilogy, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1140, 2024-1206, 2024-1234

**Short Case Caption** Versata Software, Inc. v. Ford Motor Company

**Filing Party/Entity** Versata Software, Inc., Versata Development Group, Inc., Trilogy, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/12/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Versata Software, Inc. | | Versata Enterprises, Inc. (parent of Versata Software, Inc.); Trilogy, Inc. (parent of Versata Enterprises, Inc.); ESW Capital, LLC (parent of Trilogy, Inc.) |
| Versata Development Group, Inc. | | Versata Enterprises, Inc. (parent of Versata Development Group, Inc.); Trilogy, Inc. (parent of Versata Enterprises, Inc.); ESW Capital, LLC (parent of Trilogy, Inc.) |
| Trilogy, Inc. | | ESW Capital, LLC (parent of Trilogy, Inc.) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# ADDENDUM TO CERTIFICATE OF INTEREST

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

**Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C.**: Justin Y. Chen; Scott W. Clark

**Ahmad, Zavitsanos & Anaipakos, PC**: Amir H. Alavi

**Ahmad Zavitsanos & Mensing, P.L.L.C.**: Jane Langdell Robinson

**Alavi & Anaipakos PLLC**: Demetrios Anaipakos; Masood Anjom; Michael D. McBride

**AZA**: Iftikhar Ahmed; Michael Jason Ballard; Reed Neal Smith

**The Drew Kim Law Firm, PLLC**: Kyung Kim

**Lanny J. Davis and Associates**: Lanny Jesse Davis

**Law Office of Kyril Talanov**: Kyril V. Talanov

**McDowell Hetherington, LLP**: Matthew Thomas Caldwell

**Winston and Strawn LLP**: John E. Drosick; Sarah Krajewski; Brian J. Nisbet

**Young & Associates**: Rodger D. Young

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 3

STATEMENT OF THE ISSUES ..... 3

STATEMENT OF THE CASE ..... 4

I. Factual Background ..... 4

A. Ford's "Billion-Dollar" Configuration Problem ..... 4

B. Versata's Configuration Software ..... 6

C. The MSSA ..... 8

D. Versata Discovers Ford's Misappropriation and Breach ..... 9

II. Pre-Trial Proceedings ..... 10

A. The District Court Restricts Versata's Trade-Secret Damages Theories ..... 10

1. The Court Bars Unjust-Enrichment Damages ..... 11

2. The Court Excludes Two Trade-Secret Royalty Models ..... 13

B. The Court Excludes Versata's Contract-Damages Expert ..... 15

III. Trial and Verdict ..... 16

A. The Jury Awards $22 Million for Ford's Misappropriation of Three ACM Trade Secrets ..... 16

B. The Jury Awards $82 Million for Ford's Multiple Breaches of Contract ..... 18

IV. Post-Trial Proceedings ..... 19

A. The District Court Zeroes Out Versata's $22-Million Trade-Secret Award .....20

B. The District Court Reduces Versata's $82-Million Contract Damages Award to $3 .....21

SUMMARY OF ARGUMENT .....22

STANDARD OF REVIEW .....25

ARGUMENT .....25

I. The District Court Abused Its Discretion by Limiting Versata's Trade-Secret Damages .....26

A. The Court Erred in Ruling That Unjust-Enrichment Damages Are Unavailable as a Matter of Law .....26

1. The District Court Had No Discretion To Deny Versata Its Statutory Choice of Remedy .....27

2. The District Court Fundamentally Misunderstood the Purpose of Unjust-Enrichment Damages .....31

B. The Court's Other Objections to Elson's Unjust-Enrichment Opinion Do Not Withstand Scrutiny .....34

1. Elson Properly Quantified the Unjust Enrichment Caused by Ford's Misappropriation of Each Asserted Secret .....34

2. Malek's Report Offered Ample Support for Elson's Conclusions .....38

3. Elson Was Entitled To Rely on the Best Data Available .....41

C. The District Court Abused Its Discretion by Limiting Versata's Reasonable-Royalty Theories .....42

II. The District Court Erred in Slashing the Jury's Trade-Secret Damages Award from $22 Million to Nothing .....46

A. Ample Evidence Supports the Jury's $22 Million Award .....47

B. The Court's Rationales for Rejecting the Jury's Trade-Secrets Royalty Award Fail ....................50

III. The District Court Erred in Slashing the Jury's Breach-of-Contract Award from $82 Million to $3 ....................54

A. Ample Evidence Supports the Jury's Contract-Damages Award .......55

B. The District Court's Rationales for Rejecting the Jury's Contract-Damages Award Fail ....................57

1. The District Court's "Overcompensation" Objection Departs from the Record and Defies Reasonable Inferences ....................58

2. The District Court's Specialized-Proof Rationale Is Legally Incorrect ....................62

3. The Jury's Lost-Profits Award Was Not "Unfair" ....................64

CONCLUSION ....................66

ADDENDUM ....................Appx1

STATUTORY ADDENDUM .................... S.Add.1

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Advance Sign Grp. v. Optec Displays, Inc.*,
722 F.3d 778 (6th Cir. 2013) ....................47, 50

*Allison v. Chandler*,
11 Mich. 542 (1863) ....................62

*Am. & Foreign Ins. Co. v. Bolt*,
106 F.3d 155 (6th Cir. 1997) ....................65

*Andler v. Clear Channel Broad., Inc.*,
670 F.3d 717 (6th Cir. 2012) ....................39

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2006) ....................43, 45

*Barnes v. Owens-Corning Fiberglas Corp.*,
201 F.3d 815 (6th Cir. 2000) ....................53

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) ....................53, 54

*BP1, LLC v. Coventry Real Est. Fund II, LLC*,
No. 312579, 2014 WL 4723146 (Mich. Ct. App. Sept. 23, 2014) ....................64

*Callender v. Myers Regul. Co.*,
230 N.W. 154 (Mich. 1930) ....................57

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*,
53 F.4th 368 (6th Cir. 2022) ....................31, 34, 50

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*,
150 F.3d 1354 (Fed. Cir. 1998) ....................56

*Coleman v. Johnson*,
566 U.S. 650 (2012) ....................51, 53

*Corl v. Huron Castings, Inc.*,
544 N.W.2d 278 (Mich. 1996) ....................55

*Davidson v. Gen. Motors Corp.*,
357 N.W.2d 59 (Mich. Ct. App. 1984) .......... 59

*Doe v. Henry Ford Health Sys.*,
865 N.W.2d 915 (Mich. Ct. App. 2014) .......... 57

*Dorris v. Absher*,
179 F.3d 420 (6th Cir. 1999) .......... 25

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
100 F.3d 462 (6th Cir. 1996) .......... 55

*Fera v. Vill. Plaza, Inc.*,
242 N.W.2d 372 (Mich. 1976) .......... 47, 55

*Garretson v. Clark*,
111 U.S. 120 (1884) .......... 36

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
7 F.4th 1320 (Fed. Cir. 2021) .......... 61

*Godwin v. Ace Iron & Metal Co.*,
137 N.W.2d 151 (Mich. 1965) .......... 47, 55

*Goodwin, Inc. v. Coe*,
233 N.W.2d 598 (Mich. Ct. App. 1975) .......... 55, 56, 57

*In re Hanford Nuclear Rsrv. Litig.*,
292 F.3d 1124 (9th Cir. 2002) .......... 34

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*,
706 N.W.2d 843 (Mich. Ct. App. 2005) .......... 63

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001) .......... 43

*JAC Enters. of Kawkawlin, LLC v. DeHate*,
No. 319792, 2015 WL 1651084 (Mich. Ct. App. Apr. 14, 2015) .......... 54

*Jahn v. Equine Servs., PSC*,
233 F.3d 382 (6th Cir. 2000) .......... 42

*Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*,
464 F.3d 1339 (Fed. Cir. 2006) ....................................................................34

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
588 F.3d 908 (6th Cir. 2009) ........................................................................25

*Lorenz Supply Co. v. Am. Standard, Inc.*,
300 N.W.2d 335 (Mich. Ct. App. 1980).......................................................54, 62

*McLean v. 988011 Ontario, Ltd.*,
224 F.3d 797 (6th Cir. 2000) ........................................................................41

*Mid-Mich. Comp. Sys., Inc. v. Marc Glassman, Inc.*,
416 F.3d 505 (6th Cir. 2005) ..................................................................*passim*

*Moyer v. Shampo*,
98 N.W.2d 631 (Mich. 1959)........................................................................57

*Muskegon Agency, Inc. v. Gen. Tel. Co. of Mich.*,
85 N.W.2d 170 (Mich. 1957).....................................................................62, 63

*Noble v. Brinker Int'l, Inc.*,
391 F.3d 715 (6th Cir. 2004) ........................................................................25

*Nusbaum v. Enlighten Fam. Chiropractic, LLC*,
No. 19-cv-10223, 2023 WL 319782 (E.D. Mich. Jan. 19, 2023).......................64

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
575 F.2d 1152 (6th Cir. 1978) ...............................................................42, 45, 46

*People v. Bailey*,
873 N.W.2d 855 (Mich. Ct. App. 2015).......................................................63, 64

*People v. Oros*,
917 N.W.2d 559 (Mich. 2018)......................................................................62

*Popovich v. Sony Music Ent., Inc.*,
508 F.3d 348 (6th Cir. 2007) ........................................................................50

*Price Bros. Co. v. Phila. Gear Corp.*,
629 F.2d 444 (6th Cir. 1980) ........................................................................61

*Raytheon Co. v. Indigo Sys. Corp.*,
895 F.3d 1333 (Fed. Cir. 2018) ....................................................................3

*Res. Point LLC v. Addolux LLC*,
No. 338338, 2018 WL 4579725 (Mich. Ct. App. Sept. 20, 2018)......................56

*Russo v. Ballard Med. Prods.*,
550 F.3d 1004 (10th Cir. 2008) ......................................................27, 28, 31, 32

*Schulz v. Pa. R.R. Co.*,
350 U.S. 523 (1956)...........................................................................................49

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ......................................................................39, 41

*Sea-Land Servs., Inc. v. Gaudet*,
414 U.S. 573 (1974)...........................................................................47, 53, 55

*Severn v. Sperry Corp.*,
538 N.W.2d 50 (Mich. Ct. App. 1995)...............................................................59

*Silberstein v. Pro-Golf of Am., Inc.*,
750 N.W.2d 615 (Mich. Ct. App. 2008)..............................................................55

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
926 F.2d 1161 (Fed. Cir. 1991) ..........................................................................50

*Stimac v. Wissman*,
69 N.W.2d 151 (Mich. 1955)...............................................................................56

*Stonemen Grp., Inc. v. Metalforming Techs., Inc.*,
362 F. Supp. 2d 896 (E.D. Mich. 2005) ..............................................................63

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931)...........................................................................................54

*Taylor v. TECO Barge Line, Inc.*,
517 F.3d 372 (6th Cir. 2008) ..............................................................................47

*Tec Air, Inc. v. Denso Mfg. Mich. Inc.*,
192 F.3d 1353 (Fed. Cir. 1999) ..........................................................................36

*Tisdale v. Fed. Express Corp.*,
415 F.3d 516 (6th Cir. 2005) ....................25

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995) ....................47, 50, 54

*United States v. L.E. Cooke Co.*,
991 F.2d 336 (6th Cir. 1993) ....................41

*United States v. Randall*,
No. 23-5144, 2023 WL 6389604 (6th Cir. Oct. 2, 2023) ....................39

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
342 F.3d 1298 (Fed. Cir. 2003) ....................32

*Univ. Comp. Co. v. Lykes-Youngstown Corp.*,
504 F.2d 518 (5th Cir. 1974) ....................31

*Ventas, Inc. v. HCP, Inc.*,
647 F.3d 291 (6th Cir. 2011) ....................64

*Versata Software, Inc. v. Internet Brands, Inc.*,
902 F. Supp. 2d 841 (E.D. Tex. 2012) ....................37

*Versata Software, Inc. v. SAP Am., Inc.*,
717 F.3d 1255 (Fed. Cir. 2013) ....................36, 40

*Vitro Corp. of Am. v. Hall Chem. Co.*,
292 F.2d 678 (6th Cir. 1961) ....................30

## STATUTES

18 U.S.C. § 1836(b)(3)(B)(i) ....................11, 26, 28

18 U.S.C. § 1836(b)(3)(B)(i)(II) ....................34

18 U.S.C. § 1836(b)(3)(B)(ii) ....................11, 26, 28

28 U.S.C. § 1291 ....................3

28 U.S.C. § 1295(a)(1) ....................3

28 U.S.C. § 1331 ....................3

28 U.S.C. § 1338(a) .......... 3

28 U.S.C. § 1367(a) .......... 3

Mich Comp. Laws § 445.1904 .......... 11, 26, 28, 34

Utah Code Ann. §13-24-4 .......... 28

**OTHER AUTHORITIES**

1 D. Dobbs, *Law of Remedies* (2d ed. 1993) .......... 31, 32

*Restatement (Second) of Contracts* (1981) .......... 62, 65

*Restatement (Third) of Restitution & Unjust Enrichment* (2011) .......... 32

*Restatement (Third) of Unfair Competition* (1995) .......... 28, 32

## STATEMENT OF RELATED CASES

No appeal has previously been taken from the proceedings below. There is no case known to be pending in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

# INTRODUCTION

Versata solved Ford's "billion-dollar" vehicle-configuration problem: Versata created a software platform that saved Ford well over $100 million dollars per year in manufacturing, parts, and personnel costs. For nearly a decade, Ford paid Versata over $10 million annually to license that software. But Ford eventually decided that, rather than renew the parties' agreement, it would secretly steal Versata's confidential information and reverse-engineer Versata's software to build its own "like-for-like replacement." Ford has reaped the benefits of that "replacement" software since 2015, while cheating Versata out of royalties.

Versata sued for trade-secret misappropriation and breach of contract. A jury found Ford liable on both counts and awarded Versata over $100 million in damages. The trial court upheld the jury's liability findings. And it acknowledged that Versata had proved it "suffer[ed] damages" from Ford's misconduct. Appx122. The court recognized that, without Ford's misappropriation and contract breach, "Ford would have had no choice but to renew, and would have renewed," the parties' license agreement, Appx122—the last version of which required Ford to pay $14.95 million annually. The court, however, ruled that Versata should only receive ***$3***—almost enough for a cup of coffee—in damages. That flawed decision was the final blow in a cascade of rulings that improperly limited Versata's recovery for Ford's wrongdoing.

Before trial, the district court barred Versata from seeking damages measured by Ford's unjust enrichment—even though federal and state statutes expressly authorized Versata to recover such damages. In the court's view, the unjust-enrichment measure did not "fit" this case. That was error. Congress and Michigan's legislature made a judgment that unjust-enrichment damages are an appropriate "fit" for trade-secrets cases; the court had no authority to countermand that determination.

Versata then presented reasonable-royalty models. But the court rejected any estimate that deviated at all from the parties' prior license agreements. That defies Sixth Circuit law, which requires experts to account for the full value of rights the defendant obtained by misappropriation. Versata was entitled to a royalty that accounted for more than just the licensing fees it lost—Versata was entitled to a royalty that reflected the value of Ford using Versata's trade secrets to reverse-engineer and permanently replace Versata's software, something the licensing agreement prohibited.

Versata nevertheless prevailed at trial. The jury found that Ford had misappropriated three of the four asserted trade secrets and breached the parties' contract. It awarded over $22 million for the misappropriation. Yet the court ***zeroed out*** that number because it thought Versata had not shown ***precisely*** how long it would have taken Ford to develop the subset of secrets the jury found misappropriated. The

court slashed the jury's $82 million contract-damages award to ***$3*** for similar reasons, believing Versata had not shown ***precisely*** what it lost from Ford's breach.

That was error. There could be no dispute that Ford's theft caused Versata tens of millions of dollars of injury. The district court had no warrant to throw out Versata's damages award ***entirely*** because, in its view, Versata had not proven its damages with mathematical precision. Michigan law recognizes that such demands are unattainable. A plaintiff need only prove damages to a reasonable certainty. Versata more than met that standard. Any risk that the jury's award might have slightly overcompensated Versata (and it did not) falls on Ford as the proven wrongdoer.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331, 1338(a), and 1367(a). It entered final judgment on November 15, 2023. Appx159-60. Versata timely filed notices of appeal. Appx42510-12; Appx42520-22. This Court has jurisdiction under 28 U.S.C. §§1291 and 1295(a)(1) because patent claims in the case were "dismissed with prejudice." *Raytheon Co. v. Indigo Sys. Corp.*, 895 F.3d 1333, 1339 (Fed. Cir. 2018); Appx41267-68.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in barring Versata from pursuing statutory unjust-enrichment damages for its trade-secret-misappropriation claims and

instead limiting Versata to pursuing reasonable-royalty damages based solely on the parties' licensing history.

2. Whether the district court, having upheld the jury's finding that Ford misappropriated Versata's trade secrets, erred in reducing the jury's $22-million damages award for that misappropriation to $0.

3. Whether the district court, having upheld the jury's finding that Ford breached its contract with Versata, erred in reducing the jury's $82-million damages award for that breach to $3.

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND

This case is about Ford's theft of trade secrets that were at the heart of Versata's automobile-configuration software, in violation of the express terms of the parties' contract.

#### A. Ford's "Billion-Dollar" Configuration Problem

Auto manufacturers offer hundreds of possible features and options for each vehicle model, allowing customers to specify everything from engine type to wheel design. Appx56153 (18:10-20). But configuring cars presents "special challenges," Appx56153 (18:4-19:4), because not all options work with each model—or each other. Configuration software allows manufacturers to create rules that govern "what can go with what," ensuring that only buildable vehicles can be ordered.

Appx56160-61 (49:20-50:1); Appx55790 (11:16-12:6); Appx56152-53 (17:19-18:3).




Appx67466. Defining the workable combinations of options requires tens of thousands of rules, producing countless "unique individual configurations." Appx56153 (19:13-20). Writing those rules, and validating the resulting configurations, requires high-performance software. Appx56153 (18:10-19:4).

In the late 1990s, Ford was "plagued" by a "massively complex" configuration problem. Appx55996-97 (102:18-103:5); Appx56000-01 (106:24-107:9). "[S]low" and "antiquated," Ford's existing vehicle-configuration system lacked "automated consistency checking," "didn't generate buildables," and "didn't allow multiple users" within Ford "to collaborate" on rule changes. Appx56000 (106:3-16); Appx56155 (27:21-28:20); *see* Appx56158 (39:18-40:20); Appx56378 (75:4-76:6); Appx56168 (79:16-80:14); Appx56367 (31:24-32:7). Its system was error-

prone and labor-intensive, "cost[ing] Ford $1 billion per year." Appx80378-80; Appx55854 (62:8-65:20); *see* Appx86856; Appx55856-57 (72:14-76:17).

**B. Versata's Configuration Software**

Founded in 1989, Versata Software, Inc. (formerly "Trilogy") developed techniques that slash configuration-rule processing times. Appx55789-90 (9:20-12:6); Appx55792 (20:9-21:22). Versata quickly became a leading configuration-software provider in many industries, including transportation, telecommunications, and healthcare. Appx55793-94 (25:17-26:14); Appx56154 (22:9-25).

To solve its configuration problem, Ford turned to Versata. Appx55816 (114:21-115:14); Appx55996-97 (102:18-103:5); Appx55999-6000 (105:9-106:16). During the early 2000s, Versata developed a comprehensive configuration system. It included software called Automotive Configuration Manager ("ACM"), delivered in 2000, and another program called Materials Cost Analytics ("MCA"), delivered in 2005. Appx56012-13 (118:11-119:10); Appx56121 (13:10-18); Appx56092-93 (129:19-130:22).

***ACM*** encompassed three, interdependent trade secrets: Grid, Buildability, and Workspaces.

**Grid**. Grid provides ACM's "dynamic user interface"—what users interact with when using the software. Appx56328 (50:3-17); *see* Appx56161 (52:14-23). The Grid interface displays "complex rule information in a flexible and graphical"

way, enabling users to understand relationships between rules and to identify and correct errors. Appx56163 (58:9-59:14); Appx56168 (78:23-79:4).

**<u>Buildability</u>**. Buildability is ACM's "core computing brain." Appx56168 (79:16-25); *see* Appx56328 (50:18-51:3). It enables "billions of combinations" to be analyzed in real-time, Appx56161 (52:24-53:5); Appx56333 (72:24-73:15), using complex algorithms that determine how "rules interact" to create "buildable combinations of features," Appx56168 (79:16-25). Buildability thus can "filter unbuildable rules from the model," "generate reports of buildable[ ]" combinations, and "maintain a consistent buildable picture" of a vehicle line. Appx56171 (91:7-17).

**<u>Workspaces</u>**. Workspaces facilitates collaboration by enabling Ford employees, "writing rules all over the world," to simultaneously "make edits within their own workspace or sandbox, and then merge" them, error-free. Appx56172 (94:25-95:14); *see* Appx56161 (53:6-14).

***MCA***, by contrast, leverages ACM's configuration data to provide insight into parts costs. Appx56161-62 (53:15-54:4); *see* Appx56173 (101:7-18). Used with ACM, MCA made parts forecasts "automated and accurate." Appx56328 (51:16-17); *see* Appx56174 (102:19-103:20).

Ford's implementation of Versata's software was a success—Ford described Versata as "[a] new star in our sky." Appx80428; *see* Appx55850 (46:24-48:11). By December 2001, Versata had modeled every Ford vehicle line in ACM.

Appx56026-27 (132:9-133:22). ACM became Ford's "global master system" for product-definition information, which Ford "continue[d] to praise" for more than a decade. Appx56159 (42:3-43:21). Ford recognized that, if ACM crashed, "critical financial analysis systems" would "come to [a] grinding halt." Appx80863. MCA alone allowed Ford to reduce cash reserves by $100 million. Appx56174 (102:19-103:20); *see* Appx56328 (51:16-23).

### C. The MSSA

In 2004, Ford and Versata entered into the Master Subscription and Services Agreement. Appx55807 (79:11-80:10); Appx55818 (123:22-124:4); Appx55863 (98:24-99:15); Appx71621-36. Under the MSSA, Versata licensed its confidential software, including ACM and the later-developed MCA, to Ford for an annual fee exceeding $10 million dollars. Appx55807 (79:11-80:10). Under the MSSA and related agreements, Versata provided Ford consulting and maintenance services, including "fix[es]" for "occasion[al]" "support issue[s]," Appx56159 (43:22-44:9), and "extended" support for out-of-date software Ford still wanted to use, Appx56522-23 (8:17-10:25); Appx71646-47.

Because the business arrangement required Versata to entrust Ford with its core confidential information, the MSSA contained critical protections for Versata's trade secrets. Appx56174 (104:10-17); Appx56328-29 (52:23-54:2); *see* Appx56090-91 (121:11-122:12). The MSSA prohibited Ford from copying or disclosing Versa-

ta's "confidential information," Appx71625—its "crown jewels," Appx55864-65 (105:17-108:11). The MSSA also prohibited Ford from "reverse engineer[ing] the Software or Confidential Information." Appx71622; *see* Appx55866 (110:4-112:1). Such reverse-engineering would enable Ford to "reproduce" Versata's proprietary software. Appx55866 (112:14-22). The MSSA also permitted Versata to "enter Ford's premises to verify Ford's compliance" with the MSSA on 30 days' notice, including to confirm whether Ford stopped using the software when its license expired. Appx71624; Appx71627; Appx55867-68 (116:20-118:10).

### D. Versata Discovers Ford's Misappropriation and Breach

By 2014, after years of operating under the MSSA, Ford was paying Versata nearly $15 million annually for ACM, MCA, and related services. Appx56470 (51:11-16). That fall, Versata proposed a fee increase in which Ford would pay $17 million per year starting in January 2015. Appx56320 (18:22-20:23); *see* Appx56280-82 (117:13-123:13); Appx56470 (50:22-53:15). Ford declined the offer. Appx56282 (123:14-22).

In December 2014, Versata learned that Ford planned to replace ACM and MCA with its own configuration software, including a program called PDO, Appx56289 (151:15-153:6); Appx56474-76 (68:14-76:17); Appx56485 (111:22-112:9), which Ford had secretly been developing since 2011, Appx56560 (44:1-3). PDO was a "classic[ ] example of reverse engineering." Appx56331 (64:1-4). Ford

developers had used Versata's confidential documentation and files to replicate ACM's features, including Grid, Buildability, and Workspaces, as well as MCA's proprietary features. *See, e.g.*, Appx56329-32 (54:21-69:9); Appx56367 (30:15-31:12); Appx56377 (71:5-72:7); Appx56383 (94:2-95:1); Appx56387 (110:21-111:15).

## II. PRE-TRIAL PROCEEDINGS

The MSSA expired in January 2015. Appx56282 (123:7-10); Appx56485 (111:1-3). Shortly thereafter, Ford filed a declaratory judgment action in the U.S. District Court for the Eastern District of Michigan, seeking a declaration that it had not violated the MSSA or infringed or misappropriated Versata's intellectual property. Appx1012-22 (¶¶61-109). Versata counterclaimed, asserting patent, copyright, trade-secret, and breach-of-contract claims. *See* Appx7084-104 (¶¶96-197). The case was later narrowed to claims for breaching the MSSA and trade-secret-misappropriation claims under the federal Defend Trade Secrets Act and Michigan's Uniform Trade Secrets Act. *See* Appx97-104.

### A. The District Court Restricts Versata's Trade-Secret Damages Theories

Ford moved to exclude Versata's trade-secret damages expert, Craig Elson, under *Daubert*. The district court granted the motion, but later allowed Elson to file a supplemental report, which it admitted in part. Appx57-67; Appx94-95.

1. *The Court Bars Unjust-Enrichment Damages*

The DTSA and MUTSA allow trade-secret plaintiffs to recover "damages ***for any*** unjust enrichment caused by the [defendant's] misappropriation." 18 U.S.C. § 1836(b)(3)(B)(i)-(ii); Mich. Comp. Laws § 445.1904. Elson's report calculated Ford's unjust enrichment—the benefit to Ford—based on the operational costs Ford avoided by misappropriating ACM and MCA, including reduced recall and warranty expenses, personnel hours, and parts spending. Appx9366-78. Elson estimated that Ford's unauthorized use of Versata's trade secrets saved it $134 million per year. Appx9417-18. Depending on the damages period—defined as how long it would have taken Ford to develop equivalent software without misappropriation—Versata's unjust-enrichment damages were between $909 million and $1.363 billion. Appx9426-27; *see* Appx9419-21.

Versata's technical expert, Dr. Sam Malek, opined that each trade secret was "independently necessary" to achieve the software's functionality. Appx11937-39 (¶¶ 443-454). Malek explained that ACM could not operate without the Grid, Buildability, and Workspaces all working together. Appx11752-53 (¶ 51); Appx11937-39 (¶¶ 443-452). ACM allowed Ford to save on recalls, warranty repairs, mis-builds, and personnel costs. Appx9419 (tbl.15); Appx9427 (tbl.21). And ACM and MCA, working in combination, reduced Ford's parts costs. Appx11919-23 (¶¶ 380-391); Appx9419 (tbl.15); Appx9427 (tbl.21).

**Table 15**

| Linkage of Trade Secrets to Identified Cost Savings Cateogries | | | | |
|---|---|---|---|---|
| | Cost Savings Category | | | |
| Trade Secrets | Recalls/Warranties /Misbuilds | Parts | Personnel | Prototype |
| The Grid | X | X | X | X |
| Buildability | X | X | X | X |
| Workspaces | X | X | X | X |
| MCA | | X | | |

Appx9419 (tbl.15).

The district court excluded Elson's opinions. Appx1-54. It held that Versata's unjust-enrichment damages theory was "not an appropriate fit for this case." Appx22-23. In the court's view, allowing Versata to recover more than its annual license fees would "confer upon Versata a huge and undeserved windfall." Appx23. The court restricted Versata to a "reasonable royalty model of damages that is based upon the parties' relevant business history." Appx29; *see* Appx25-27 & n.7.

The court also found Elson's unjust-enrichment model "unreliable." Appx30-37. It criticized Elson for supposedly not distinguishing between benefits attributable to Versata's trade secrets and benefits attributable to other elements of the software Ford copied. Appx30-31; Appx34-35. It also faulted Elson for offering a "***single*** amount of damages" rather than assigning separate values to each asserted trade secret. Appx31-34. Finally, the court thought Elson relied on "outdated and potentially irrelevant data" in calculating Ford's savings from misappropriating Versata's trade secrets. Appx35-37. Because the court had found unjust-enrichment

damages unavailable regardless, it did not grant Versata leave to amend Elson's report on that theory—although it allowed a supplemental report to address other purported defects, with "strict" instruction that Versata confine itself to a reasonable-royalty model. Appx26973.

2. *The Court Excludes Two Trade-Secret Royalty Models*

After the *Daubert* ruling, Versata filed supplemental reports addressing the court's objections to its other damages models. Appx19-20. Elson's supplemental report presented three reasonable-royalty scenarios based on the *Georgia-Pacific* factors. Appx28361-76(¶¶147-189). Each reflected a "hypothetical negotiation in 2011 between Ford and Versata related to Versata's license of the asserted trade secrets to Ford." Appx28376(¶190).

The first scenario reflected a "base royalty rate" for the damages period. Appx28376-77(¶¶191-193). The base royalty secured a "restricted use" license for ACM and MCA, tracking the terms of the MSSA until 2015 and the $17-million contract Versata had proposed. Appx28376-77(¶¶191-193). Because this royalty covered the rights Ford paid for until 2015, Elson offset his damages calculation by crediting the payments Ford had made. Appx28376(¶191).

The second and third scenarios, by contrast, accounted for the "expanded license rights" Ford obtained by reverse-engineering Versata's software and using Versata's secrets to build PDO—uses forbidden by the parties' historical licenses.

Appx28378-82 (¶¶ 194-202). Elson explained that in a hypothetical, *ex ante* negotiation, Ford would have paid a premium for those additional rights, which would allow Ford to use Versata's software to build a permanent replacement system. Appx28364-67 (¶¶ 160-166); *see* Appx28378-82 (¶¶ 194-202). Elson estimated that Ford saved between $113.2 and $177.4 million by misappropriating Versata's trade secrets instead of developing PDO from scratch. Appx28351-52 (¶ 121). Elson concluded that Ford would have been willing to pay between $126.7 and $169.9 million for a license that allowed it to copy Versata's secrets while continuing to use Versata's software until PDO was ready. Appx28378-82 (¶¶ 194-202).

The court initially excluded all of Elson's new opinion but, after Versata moved for reconsideration, admitted one of Elson's three reasonable-royalty models. Appx35755-74; Appx87-95. The court acknowledged that all three models addressed its apportionment concerns. Appx94-95. And it permitted Versata to proceed with Elson's first scenario, which calculated a royalty "based solely on the parties' licensing history." Appx94-95.[1] But the court excluded Elson's second and third models because they "included additional damages related to the value to Ford of using the trade secrets"—*e.g.*, the value of using Versata's trade secrets to develop Ford's replacement software. Appx94-95.

[1] Versata also submitted a report by Seth Krauss, who performed an apportionment analysis that Elson incorporated. Appx27848 (¶¶ 38-39); Appx28372-73 (¶¶ 184-187); Appx28376-82 (¶¶ 190-202).

### B. The Court Excludes Versata's Contract-Damages Expert

The court denied Ford's pretrial motion to bar Versata from presenting any evidence of breach-of-contract damages. Appx38652-67. Versata had argued that its contract damages could be based on evidence that "Ford would have paid at least $17 million per year"—the amount Versata had offered for a new contract—"to continue to use Versata's software" if Ford had not already breached the contract and developed its replacement software. Appx38652-53. The court found that theory adequately supported and disclosed. Appx38653-60; Appx38664.

The court nonetheless excluded a report by Renee McMahon (who replaced Elson after he fell ill) refining that damages theory. Appx40554; Appx40011 & n.2. McMahon subtracted $1.1 million from the $17-million annual license fee to account for Versata's "average expenses" under the MSSA "from 2011 through 2014." Appx39928-32 (¶¶27-37); Appx39939-40 (¶60) & n.42. She assumed those expenses remained constant, whether Ford paid $17 million or the alternate annual contract prices she proposed ($14.95 million or $10.95 million). Appx39925 (¶19) & n.6; Appx39932 (¶37); Appx39940 (¶61). The court offered two reasons for exclusion: The calculations, in the court's view, amounted to a previously undisclosed "lost profits" theory, Appx55674 (89:2-13); and McMahon had not calculated damages separately for each of the contract breaches Versata alleged. Appx39903; Appx39908; Appx40554; Appx55671-77 (86:18-92:8).

## III. TRIAL AND VERDICT

After a 15-day trial, the jury rendered a verdict for Versata on virtually all its claims. It found that Ford breached the MSSA's confidentiality, reverse-engineering, and inspection and restricted-use provisions. Appx98-99. The jury also found that Ford misappropriated the three ACM trade secrets (Grid, Buildability, and Workspaces). Appx100-02. The jury rejected the trade-secret misappropriation claim for MCA. Appx103-04; Appx108.

### A. The Jury Awards $22 Million for Ford's Misappropriation of Three ACM Trade Secrets

Based on the court's pre-trial rulings, Versata's trade-secret-misappropriation damages theory was limited to a reasonable royalty that reflected the parties' licensing history under the MSSA.

Versata's technical expert, Malek, explained that it would have taken Ford approximately 8.3 years to develop software equivalent to ACM and MCA without stealing Versata's trade secrets. Appx56387-89(111:16-119:8). Versata's apportionment expert, Seth Krauss, testified to the value of the Grid, Buildability, and Workspaces secrets as a percentage of the ACM software, and the asserted MCA trade secret's value as a percentage of the MCA software. Appx56177(117:2-13); Appx67482-83. Based on that evidence, Versata's damages expert, McMahon, calculated potential royalty amounts for each asserted secret. Appx56557-62(32:8-50:6); *see* Appx67719-25.

McMahon offered three hypothetical "royalty base" amounts—$17 million, $14.95 million, or $10.95 million—based on the parties' licensing history. Appx56559-60 (38:12-42:16); Appx56562 (50:7-52:12). She then apportioned those amounts among the asserted secrets using Krauss's analysis. Appx56560-61 (44:18-48:19). That yielded an annual royalty of roughly $6 to $10 million for the ACM secrets, and as much as $2 million for MCA. Appx56557-62 (32:8-52:12); *see* Appx67722-25. McMahon posited a hypothetical license term of five years (the 8.3 years Malek estimated Ford would need to complete PDO without using Versata's trade secrets, less the three years Ford had paid license fees under the MSSA). Appx56560 (42:18-44:17). The resulting reasonable-royalty damages for the ACM trade secrets totaled $30.179 million if the jury selected a $10.95-million base rate; $44.465 million in the $14.95-million scenario; or $50.494 million in the $17-million scenario. Appx56561-62 (49:20-52:12); Appx67723-25. A royalty for the alleged MCA trade secret added up to $9.433 million. Appx56561-62 (49:20-50:3); Appx67723.

Ford's damages expert followed a similar methodology, but opined that just $3 million would be enough to compensate for Ford's misappropriation of the three ACM secrets, with an additional $389,900 for MCA. Appx56806-08 (100:13-106:6).

The jury awarded Versata $22,386,000—$8 million less than the minimum Versata asked for—in damages for Ford's misappropriation of all three ACM trade secrets (the Grid, Buildability, and Workspaces). Appx100-03(¶¶3,8,13).

### B. The Jury Awards $82 Million for Ford's Multiple Breaches of Contract

Versata also presented evidence of breach-of-contract damages. Ford had paid Versata more than $150 million over the course of their long relationship, including $14.95 million in 2014 alone. Appx55797(41:19-25); Appx56558-59(36:3-38:4); Appx56562(50:20-51:3); Appx67716-17. The jury heard that Ford was "dependent" on Versata's software when Versata offered a $17-million "take it or leave it" proposal for a new contract starting in 2015. Appx56477(78:3-16); Appx56320(19:3-20:14); *see* Appx56280-83(117:14-126:6); Appx56470(50:22-53:22). The leader of Ford's secret PDO development project testified that Ford "needed" to relicense ACM by 2015 as a "backstop" in case it did not finish PDO before the contract expired. Appx56282-83(122:20-126:6). Ford "couldn't afford to have Versata walk away." Appx56283(126:3-6).

The jury also heard evidence allocating the $14.95 million Ford paid in 2014 among ACM, MCA, and related services and fees. The first $10.95 million covered Ford's "base license fees" for ACM and MCA, which were $8.45 and $2.5 million, respectively. Appx56576(12:5-13:20); *see* Appx56805(96:10-97:4); Appx56810 (114:1-115:8). The remaining $4 million secured "support services" and non-

termination protections. Appx56533 (52:5-17); Appx56577 (15:14-16:15); Appx56805 (96:18-97:4); *see* Appx71646-47.

In closing, Versata's counsel explained the options for calculating damages, including the $17 million contract Ford would have had to accept had it not misappropriated and reverse-engineered Versata's software, or the $14.95 million value of the annual contract in 2014. Alternatively, he explained, the jury could calculate "another number" if it subtracted any expenses Versata would have incurred for supporting the software: "If you take out basically what are called support and maintenance payments, the number could come down to 10.95 [million] for 2014." Appx57008 (126:9-24). Versata asked the jury to multiply an annual royalty by 7.5 years, the period from the start of Ford's misappropriation through trial. *See* Appx57007-08 (124:14-127:3).

The jury awarded Versata $82,260,000 in contract damages, with varying amounts allocated to each category of breach. Appx98-99 (¶¶2, 4, 6). The award represents approximately $10.97 million for each year of the 7.5-year period that Ford breached the MSSA.

## IV. POST-TRIAL PROCEEDINGS

The district court upheld the jury's verdict that Ford misappropriated Versata's trade secrets and breached the MSSA. *See* Appx119-22; Appx132-43. But it slashed Versata's damages from $104,646,000 to $3. Appx154.

### A. The District Court Zeroes Out Versata's $22-Million Trade-Secret Award

The court zeroed out the entire $22,386,000 trade-secret-misappropriation award. Appx157. The court did not dispute that the evidence showed Ford misappropriated Versata's ACM secrets. Appx132-143. Nor did it dispute that the misappropriation seriously harmed Versata. But it held that the jury had no way to calculate ***precisely*** the reasonable-royalty damages attributable to the ACM secrets alone—without MCA—so Versata was entitled to ***nothing***. Appx145.

The jury instructions required that royalties be "limited to the amount of time . . . it would have taken Ford to independently develop" the misappropriated secrets. Appx56986(38:22-39:16). Malek had testified that it would have taken Ford 8.3 years to develop ***all*** the alleged trade secrets. *See* p. 16, *supra*. The court, however, accepted Ford's argument that there was a "***complete lack of evidence***" concerning "how long it would have taken Ford to develop just the three" misappropriated ACM trade secrets (and not MCA). Appx150; Appx153.

The court rejected Versata's argument that the jury could infer that time-period from the evidence. The jury, Versata pointed out, could have started with Malek's 8.3-year period for both ACM ***and*** MCA, then subtracted from that the time it had taken Versata to develop MCA—explained by Nate Little, a Versata fact witness—leaving only ACM-related development time. Appx57153-54(85:21-86:16); Appx42085. But in the court's view, Little's testimony concerning how long

it took Versata to develop MCA in the early 2000s did not "shed[ ] any light on how long it would have taken ***Ford*** to develop the same trade secret" years later. Appx152.

### B. The District Court Reduces Versata's $82-Million Contract Damages Award to $3

The court also reduced the jury's $82,260,000 award for breach-of-contract damages to a nominal $3. Appx154. The court acknowledged that Versata "***did*** show that Ford's [contract] breaches caused it (Versata) to suffer damages," but held that the jury could not calculate the ***amount*** of damages with "reasonable certainty." Appx122-32.

First, the court held that jurors could not determine damages from the fact testimony and evidence in the record. Instead, contract damages required a specific "witness" to identify "a particular amount," or "documents reflecting a calculation." Appx123. Without that evidence, the court held, the jury had "no way" to calculate damages. Appx123.

Second, the court concluded that Versata's proposed damages figures "over-compensated" Versata because none deducted performance costs that Versata would have incurred absent a breach. Appx123-29. Citing only the McMahon report—which it had excluded from evidence—the court stated that those costs were not a "mere *de minimis* expense." Appx128; *see* Appx125 n.3; Appx128-29 & n.4. The court rejected Versata's argument that the jury could have inferred that $4 million—

the difference between the $14.95-million annual fee, which required Versata to perform support services, and the $10.95-million "base license"—reasonably approximated Versata's costs. Appx57141-42 (36:5-38:3); Appx126-29. The court stated that Versata "was obligated to perform" some "support" services even under the "base license." Appx128. Because the court thought the base-license-fee theory might result in ***some*** non-*de minimis* "overcompensation of Versata," Appx128-29, it reduced the award from $82,260,000 to $3, Appx154.

Third, the court held, *sua sponte*, that it "would be unfairly prejudicial to Ford" to consider any theory that accounted for performance costs because Versata "never disclosed" such a "theory of contract damages during discovery." Appx130-31. Ford had made no such argument.

The court entered a final order and judgment. Appx159-60. This appeal followed.

## SUMMARY OF ARGUMENT

**I.** The DTSA and MUTSA expressly authorize Versata to recover unjust-enrichment damages for Ford's misappropriation of its trade secrets. The district court had no warrant to foreclose Versata from seeking such damages based on its subjective view that they are not a good "fit" for this case. No authority suggests unjust-enrichment damages are improper whenever the parties have a licensing history. The court's reasoning, moreover, misapprehends the purpose of unjust-

enrichment damages. The court thought unjust-enrichment damages would give Versata a "windfall." But the whole point is to deny wrongdoers their ill-gotten gains, even if those gains exceed the plaintiff's losses. The court's ruling erroneously granted the wrongdoer—Ford—a windfall instead.

That alone requires reversal; the record shows that, absent the court's erroneous view that it could exclude unjust enrichment altogether, any other purported errors would have been easily corrected. But the court's alternative grounds for excluding Versata's unjust-enrichment theories lack merit regardless. The court faulted Versata's expert, Elson, for failing to "apportion" Ford's cost savings. But Elson, supported by Versata's technical expert, showed each trade secret was independently necessary to achieve the cost savings Versata claimed as damages, making apportionment unnecessary. The court also criticized Elson's data as "outdated." But data quality goes to weight, not admissibility.

The court also erred in excluding two of Elson's reasonable-royalty theories because they were not limited to the royalty Ford would have paid for licensing Versata's software as in the parties' prior agreements. A reasonable royalty should account not just for Ford's use of Versata's software as under past licenses, but also for the value of all rights Ford misappropriated. That includes the right for Ford to use Versata's confidential information to develop its own replacement software, a right it did not have under the prior agreements.

**II.** Under the limited reasonable-royalty theory Versata was allowed to present at trial, the jury awarded $22 million for Ford's trade-secret misappropriation. The district court zeroed that out. Never disputing the trade secrets had value, the court held that the jury lacked enough evidence to calculate the precise duration of an appropriate royalty, measured by the time it would have taken Ford to independently develop the subset of trade secrets the jury found misappropriated. But ample evidence supported the jury's calculation—including evidence that it would have taken Ford roughly as long as it had taken Versata to develop those trade secrets. The court declared that evidence insufficient only by reweighing evidence and resorting to extra-record speculation.

**III.** The jury also awarded $82 million for Ford's breaches of its contract with Versata. The district court slashed that award, too, reducing it to a nominal $3, because the jury purportedly lacked evidence to calculate Versata's contract-performance costs. That usurped the jury's role. The damages verdict was eminently reasonable, almost exactly matching Versata's most conservative calculation. The jury's award reflected an approximation of Versata's costs supported by the evidence. The court rejected that evidence by demanding precision the law does not require and invoking arguments Ford never raised.

## STANDARD OF REVIEW

This Court reviews the trial court's determination of the types of damages available under a statutory provision *de novo*. *Dorris v. Absher*, 179 F.3d 420, 426-27 (6th Cir. 1999). Exclusion of expert testimony is reviewed for abuse of discretion, which exists if the decision is based "'on an erroneous view of the law or a clearly erroneous assessment of the evidence.'" *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009).

JMOL orders are reviewed *de novo*. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). A jury's verdict must be upheld unless, "'viewing the evidence in the light most favorable to the non-moving party,'" no "reasonable mind[]" could accept the result. *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005).

## ARGUMENT

There is no dispute that Ford misappropriated Versata's trade secrets and used them to develop its own replacement software. Nor is there dispute that misappropriation harmed Versata grievously—and benefited Ford enormously. The district court did not find otherwise. But it nevertheless overturned the jury's verdict of more than $100 million, second-guessing the jury's calculations and reducing the award to just $3. That decision reflects legal error. But the court's dismemberment of Versata's damages case began well before trial. The law expressly allowed Ver-

sata to seek unjust-enrichment damages. The court, however, limited Versata to damages based on what Ford had previously paid to license the secrets it later stole. That error alone requires reversal and a new damages trial.

## I. THE DISTRICT COURT ABUSED ITS DISCRETION BY LIMITING VERSATA'S TRADE-SECRET DAMAGES

Michigan's Uniform Trade Secrets Act (MUTSA) and the federal Defend Trade Secrets Act (DTSA) permit victims of trade-secret theft to recover "unjust enrichment" damages—an amount that includes not only the victim's losses, but also any benefits the perpetrator reaped because of its wrongdoing. No authority supports the district court's decision to let Ford retain its ill-gotten gains just because Ford once licensed Versata's software before deciding to steal Versata's trade secrets instead.

### A. The Court Erred in Ruling That Unjust-Enrichment Damages Are Unavailable as a Matter of Law

The DTSA and MUTSA are clear: Victims of trade-secret theft are entitled to recover "actual loss[es]" resulting from the misappropriation "***and*** the unjust enrichment caused by misappropriation" not otherwise reflected in actual losses. Mich. Comp. Laws § 445.1904 (emphasis added); *see* 18 U.S.C. § 1836(b)(3)(B)(i)-(ii) (similar). Consistent with those statutes, Versata sought to recover the benefits Ford enjoyed from stealing Versata's trade secrets. The district court, however, held that unjust enrichment was "not an appropriate fit for this case" because it would

award Versata more as compensation for the ***theft*** of its trade secrets than the price at which it had been willing to ***license*** those secrets to Ford. Appx22. Versata, it decreed, had no "right to unjust enrichment damages under circumstances like those here." Appx74.

That was error. The DTSA and MUTSA allow plaintiffs to pursue unjust-enrichment damages, full stop. Courts have no discretion to override those statutes based on their own preferences about what "fits" a particular case. And the district court's assessment of "fit" fundamentally misunderstands the purpose of unjust-enrichment damages.

1. *The District Court Had No Discretion To Deny Versata Its Statutory Choice of Remedy*

The district court barred Versata from "seek[ing] damages based upon the alleged value of benefits obtained by Ford through its use of the relevant software," Appx29, asserting that "the best measure of the damages owed to a plaintiff in a misappropriation case" are the parties' "'established royalties,'" Appx24. That contravenes the DTSA and MUTSA.

*Russo v. Ballard Medical Products*, 550 F.3d 1004 (10th Cir. 2008), is on point. There, plaintiff Russo had been willing to accept less than $3 million to license his trade secrets to defendant Ballard. *Id.* at 1008-09. The jury, however, "award[ed] him $17 million in unjust enrichment damages," based on Ballard's "ex-pected net profits" from selling the product Ballard developed using secrets misap-

propriated from Russo. *Id.* On appeal, Ballard urged the same rule the district court adopted here: that "unjust enrichment damages are inappropriate" where a "plaintiff was willing to license his or her idea" for less. *Id.* at 1020. In "these circumstances," Ballard maintained, "the district court should have allowed Mr. Russo to recoup only royalty, not unjust enrichment, damages." *Id.* at 1021.

In an opinion by then-Judge Gorsuch, the Tenth Circuit explained that the "problem with Ballard's argument is that the Utah legislature has rejected it." 550 F.3d at 1021. Under Utah's version of the UTSA, "a plaintiff has the express choice of seeking unjust enrichment damages to remedy trade secret misappropriation." *Id.* The court was not "free to substitute [its] judgment for that of the Utah legislature." *Id.* Just so here. Like Utah's statute, the DTSA and MUTSA give plaintiffs the option of seeking unjust-enrichment damages.[2] The district court here was not free to substitute its judgment for that of the Michigan legislature and Congress any more than the district court was in *Russo*.

The district court's holding also defies misappropriation principles generally. *See Russo*, 550 F.3d at 1021 (citing *Restatement (Third) of Unfair Competition* § 45 cmts. d, g (1995)). A "misappropriation claim involves an allegation of theft, and it

---

[2] Each statute says damages include (1) the "actual loss caused by" misappropriation "and" "unjust enrichment" beyond actual loss, or, (2) "[i]n lieu of" other amounts, damages "measured by imposition of liability for a reasonable royalty." 18 U.S.C. § 1836(b)(3)(B)(i)-(ii); Mich. Comp. Laws § 445.1904; Utah Code Ann. § 13-24-4.

is not unknown to require a thief to return not only what was stolen, but any additional consequential profits he or she reaped as a result of his or her wrongful actions." *Id.* Indeed, that is the whole point of unjust-enrichment damages. *See* pp. 31-32, *infra*.

Even the cases the district court invoked refute its ruling. *See* Appx24-27; Appx71-73. For example, *Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510 (6th Cir. 2005), rejected the notion that unjust-enrichment damages are unavailable if they exceed a reasonable royalty (which is why *Russo* invokes *Mid-Michigan* as support). It held the opposite: The jury there was instructed that it should award a reasonable royalty ***only if unjust-enrichment damages*** were "***inadequate*** to fully compensate" the plaintiff. *Id.* (emphasis added). Unjust enrichment was an appropriate remedy ***so long as***—not unless—***it exceeded*** a reasonable royalty. The Sixth Circuit confirmed that instruction was "consistent with" the materially identical trade-secrets provisions at issue there. *Id.*

The district court cited *Mid-Michigan* for the proposition that past licenses are the best measure of misappropriation damages. Appx25-26. That is not what *Mid-Michigan* says. The decision says that a reasonable royalty is "***one*** appropriate measure of damages." 416 F.3d at 510 (emphasis added). And it agreed that the parties' licensing history was the best evidence of ***that*** measure, ***under the circumstances***. *Id.* at 510-11. But the court never suggested that the parties' licensing history barred

unjust-enrichment damages. Indeed, even for "reasonable royalty" measures, *Mid-Michigan* makes clear that prior license prices are not dispositive: The question is what the defendant would have paid for what it "'wrongfully ***obtained*** from the plaintiff,'" which may not be what it previously ***licensed***. *Id.* at 511 (emphasis added); *see* pp. 42-46, *infra*.

Nor does *Vitro Corp. of America v. Hall Chemical Co.*, 292 F.2d 678 (6th Cir. 1961), stand for the proposition that "'established royalties'" are the "'best evidence'" of misappropriation damages. Appx24 (quoting 292 F.2d at 683). *Vitro* did not address the ***right to unjust-enrichment damages*** that the DTSA and MUTSA created and codified; those statutes came long after *Vitro* was decided. In *Mid-Michigan*, the Sixth Circuit made clear that *Vitro* means only that "'[t]he actual value of what has been appropriated is always the ultimate in appraisement'" of a ***reasonable royalty***. *Mid-Michigan*, 416 F.3d at 510-11 (quoting *Vitro*, 292 F.2d at 683). The court concluded that the parties' licensing history was not "a clearly excessive estimation" of what the defendant "would have paid" for what it stole. *Id.* at 511. *Vitro*'s view that a prior license is the "best" evidence of reasonable-royalty

damages provides no support for barring Versata from pursuing statutory unjust-enrichment damages.[3]

2. *The District Court Fundamentally Misunderstood the Purpose of Unjust-Enrichment Damages*

Ford saved scores of millions by stealing Versata's trade secrets. The district court thought it could prohibit Versata from seeking that amount because it exceeded the $17 million annual license Versata proposed. Appx21; Appx9358. Awarding unjust-enrichment damages, in the court's view, would give Versata "a huge and undeserved windfall." Appx23.

*Russo* rejected an indistinguishable argument, and rightly so. It does not merely overrule the legislative judgment that parties are entitled to unjust-enrichment damages. It also defies the whole purpose of unjust-enrichment damages. *Russo*, 550 F.3d at 1021. As a leading treatise explains, unjust enrichment seeks to "recaptur[e] the gains the defendant secured" through its misappropriation. 1 D. Dobbs, *Law of Remedies* §4.1(1) (2d ed. 1993) ("Dobbs"). Unjust enrichment looks to "'the benefits, profits, or advantages gained by the defendant in the use of the trade secret.'" *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 390-91 (6th Cir. 2022). The law expressly permits recovery of unjust-

[3] *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974), is similarly inapposite: It did not address a statutory right to unjust-enrichment measures and would not be binding in the Sixth Circuit regardless.

enrichment damages regardless of whether the "defendant's gains" from misappropriation "***exceed*** the plaintiff's losses." Dobbs § 1.1 (emphasis added); *see Restatement (Third) of Restitution & Unjust Enrichment* § 3 cmt.b, § 42 cmt.g, § 51 cmt.a (2011) ("*Restatement*"). Versata had every right to "claim whichever remedy"—actual damages or unjust enrichment—"is more advantageous." Dobbs § 4.1(1).

The district court's contrary reasoning thus defies myriad authorities—judicial precedent, the *Restatement*, and prominent treatises—expressly recognizing that unjust enrichment ***is*** available where the defendant's gain exceeds the "value of a license authorizing the defendant's conduct." *Restatement* § 3 cmt.c. Ford, "as the party that acted wrongfully, . . . assume[d] the risk" that unjust-enrichment damages would put Versata "in a much better position" than "a licensing agreement." *Russo*, 550 F.3d at 1021; *accord Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298, 1311 (Fed. Cir. 2003).

Any other rule "would provide an inadequate incentive to lawful behavior." *Restatement* § 3 cmt.c. If misappropriating a trade secret cost no more than licensing it, potential licensees would have "a dangerous incentive" to "take without asking"—knowing that, if caught, the worst that could happen is they would be ordered to pay the license rate. *Id.* cmt.c. "The objective of [unjust enrichment] is to frustrate any such calculation." *Id.*; *see Russo*, 550 F.3d at 1021 (similar, citing *Restatement (Third) of Unfair Competition* § 45 cmt.g).

Nor was there merit to the district court's suggestion that the parties' licensing history "demonstrate[d] Versata's belief that there was nothing ***unjust*** about Ford's receipt of the software's benefits so long as Ford paid Versata, at most, $17 million per year to license the software." Appx23. That makes no sense. The negotiated license fee came with conditions, including critical limitations on what Ford could do with Versata's software and for how long. The parties' agreement expressly prohibited Ford from making any use of Versata's concepts or source code, including through reverse-engineering Versata's software. Appx71622 (¶ 1.7). The license price thus did not account for Ford using Versata's core corporate secrets to build a like-for-like replacement of the software and using Versata's technology unencumbered and in perpetuity. The court's effort to confine Versata to the rates set forth in a license agreement ***Ford deliberately breached*** gave a windfall to Ford.

* * * * *

The district court's defiance of the DTSA and MUTSA requires reversal. Although the court excluded Elson's report "for reasons beyond [his] use of an unjust enrichment damages model," Appx84, Elson addressed those issues to the court's satisfaction in his supplemental report, Appx94-95. Only the court's erroneous refusal to allow Versata to seek unjust-enrichment damages prevented Elson from similarly revising his unjust-enrichment model. Versata is entitled to be placed in the same position it would have occupied ***absent*** the court's legal error. A remand,

with instructions that "[t]he parties should also be allowed to supplement their expert reports" before conducting a new damages trial, is warranted. *In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1139 (9th Cir. 2002); *cf. Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 464 F.3d 1339, 1344 (Fed. Cir. 2006) (directing trial court to consider stricken supplemental expert report).

### B. The Court's Other Objections to Elson's Unjust-Enrichment Opinion Do Not Withstand Scrutiny

Regardless, the district court's other objections to Elson's unjust-enrichment opinion misapplied governing law, ignored or misunderstood Elson's testimony, and overstepped the court's gatekeeping role.

#### 1. *Elson Properly Quantified the Unjust Enrichment Caused by Ford's Misappropriation of Each Asserted Secret*

The district court faulted Elson for offering a single damages figure, rather than assigning separate values to each asserted secret, and for failing to exclude "cost savings that Ford achieved" using "Versata's other intellectual property," such as features protected by "copyrights and patents." Appx31; Appx33-34. But Elson did exactly what the law requires: He quantified the "unjust enrichment caused by [Ford's] misappropriation" of the asserted trade secrets. *Caudill*, 53 F.4th at 391; 18 U.S.C. §1836(b)(3)(B)(i)(II); Mich. Comp. Laws § 445.1904.

Elson quantified three categories of savings Ford enjoyed: avoided recalls, warranty repairs, and mis-builds (together, "R/W/M" costs); reduced personnel

hours; and parts costs. Appx9418-20. He then relied on Versata's technical expert, Malek, to link those "quantified cost savings benefits" to the "misappropriated Versata trade secrets." Appx9418. Malek explained that ACM and its component secrets were alone responsible for reducing Ford's recall, warranty, mis-build, and personnel costs. Appx11750-52 (¶¶44-47); Appx11937-39 (¶¶443-454). MCA, when used in conjunction with ACM, reduced Ford's parts costs. Appx11918-19 (¶¶376-379); *see* Appx9418-19 & tbl.15; Appx11937-38 (¶¶443, 448).

**Table 15**

| Linkage of Trade Secrets to Identified Cost Savings Cateogries | | | | |
|---|---|---|---|---|
| | Cost Savings Category | | | |
| Trade Secrets | Recalls/Warranties /Misbuilds | Parts | Personnel | Prototype |
| The Grid | X | X | X | X |
| Buildability | X | X | X | X |
| Workspaces | X | X | X | X |
| MCA | | X | | |

Appx9419 (tbl.15); *see* Appx11937 (¶443).[4] Elson calculated Ford's recall, warranty, and mis-build savings were $359.5-$539.3 million, and its personnel savings were $40.7-$61.1 million, over the relevant period. Appx9427 (tbl.21). Elson calculated the "parts cost savings" made possible by MCA and ACM at an additional $509-$763 million. *Id.*; *see* Appx9419-20 (tbls.15-16).

[4] Malek's report also linked ACM to savings in building prototypes. Appx11937-38 (¶¶443, 447). Elson declined to assign any value to this category because he was unable to substantiate those savings to his satisfaction. Appx9412.

No further apportionment was needed. As Elson explained, each trade secret was "a condition precedent to achieving the corresponding benefits"—Ford could not have obtained any of the claimed savings without using each of the asserted ACM secrets. Appx9418. The software's value, and Ford's demand for a like-for-like substitute, rested ***entirely*** on the asserted secrets. Where, as here, a product's protected elements "create[ ] the basis for customer demand" or "substantially create[ ] the value" of a product's components, there is no obligation to apportion value to its other elements. *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013); *see Garretson v. Clark*, 111 U.S. 120, 121 (1884); *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1362 (Fed. Cir. 1999).

Elson's opinion rested on a straightforward premise: The software Ford copied—ACM and MCA—could not function without the misappropriated secrets. *See* Appx9418. Malek had shown that ACM depended on three of the four secrets—the Grid (the interface that allowed users to view, edit, and create rules), Buildability (which analyzed the rules and told users which configurations could be built), and Workspaces (which allowed multiple users to collaborate). *See* Appx11752-53 (¶51); Appx11937-39 (¶¶443-52).

Without the rules created or edited in the Grid, there would be nothing to analyze with Buildability. Appx11825-26 (¶184); Appx11852 (¶¶241-42). Without Buildability, the Grid would not show users the effect of edits they made or warn

them when they wrote unbuildable rules. Appx11852(¶¶241-42). And without Workspaces, users could not create or edit rules without risking potential chaos if unbuildable rules were propagated throughout the company. Appx11892(¶326); Appx11894(¶331).

Versata's MCA software, in turn, could not function without ACM (or the Grid, Buildability, and Workspaces secrets needed for ACM to work). Although MCA was a separate program, it depended on vehicle-configuration data generated by ACM. Appx11918-21(¶¶376-382, 385); Appx11923(¶¶390-391). Ford's IT staff recognized that Ford's ability to perform parts forecasting and costing with MCA would "'come to a grinding halt'" if Ford lost access to ACM. Appx11924 (¶393).

A jury could readily "conclude that the trade secrets were the basis for" ACM and MCA's "core features," and that Ford's unjust enrichment was "therefore entirely attributable to the trade secrets." Appx14621 (quoting *Versata Software, Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841, 857 (E.D. Tex. 2012), *aff'd* 550 F. App'x 897 (Fed. Cir. 2014)). Whatever role Versata's non-trade-secret property played in the software, it had no independent value for Elson to apportion.

The same was true of Versata software programs included in Ford's license, but not at issue in this litigation. The court criticized Elson for referring generally to savings Ford obtained using "Versata Technology," a term that encompassed

ACM and MCA, as well as two related programs. Appx34-35. But neither of those two related programs independently contributed to the savings Versata claimed as damages. *See* Appx9348; Appx9353 n.22; Appx9419 (tbl.15). Elson underscored the point in his reply report, explaining that the data underlying his cost-savings calculations were "specifically related to" "ACM, and/or to functionality," like MCA's parts-forecasting capabilities, "that was enabled by ACM." Appx15015-16.[5]

2. *Malek's Report Offered Ample Support for Elson's Conclusions*

The district court acknowledged that apportionment would be satisfied through a showing that "each of the trade secrets was independently necessary" to achieve the claimed cost savings. Appx33-34. But it held that Elson could not rely on Malek for that showing because Malek's analysis was "wholly conclusory," comprising "a single sentence." Appx34.

The court simply overlooked Malek's actual reasoning. The ***sentence*** the district court cited was "conclusory" ***because it expressed Malek's conclusion***. That conclusion was based on hundreds of paragraphs analyzing the relationships among

[5] The court's criticism of Elson's references to the " 'At Issue Technology' " cannot justify exclusion either. Appx35 n.10. Elson defined "At Issue Technology" to include both the "Versata Technology" and Ford's PDO. Appx9348 n.3. That did not mean Elson included benefits Ford obtained using ***original*** technology it invented—Malek explained that PDO was a carbon copy of Versata's software. Appx11752-55 (¶¶48-59). Like Versata's product, PDO owed whatever benefits Ford gained from its use to Versata's trade secrets.

the software's trade-secret elements and their role in making the software work. *E.g.*, Appx11802(¶150) (the Grid's "'[rule] splaying is extensively used'" with Workspaces); Appx11828(¶192) ("Buildability . . . is the engine behind ACM and virtually all of its capabilities"); Appx11908-12(¶¶358-59, 364) (Workspaces enables "views" that the Grid allows users to consider side-by-side); Appx11776-78(¶¶106-108); Appx11816(¶172); Appx11829(¶195); Appx11852(¶¶241-42); Appx11865(¶270); Appx11920(¶381); Appx11927(¶404).

Malek's underlying ***analysis*** was anything but "conclusory." It is an abuse of discretion to reject an expert's opinion as insufficient where the report fully addresses the point at issue, but the district court simply "overlook[s]" it. *United States v. Randall*, No. 23-5144, 2023 WL 6389604, at *4 (6th Cir. Oct. 2, 2023); *see Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012).

Alternatively, the district court was "not persuaded" that each asserted secret was "'independently necessary to the functionality of the software'"; in its view, Malek had not sufficiently explained "how the three trade secrets that come from the ACM software are 'independently necessary' for the MCA software to function or vice versa." Appx34 (quoting Appx11939(¶454)). That fares worse still.

That the court was not "***persuaded***" by Malek's opinion is not grounds for ***exclusion***. A court may not "'exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *In re Scrap Metal Anti-*

*trust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). It was not Versata's burden, at the *Daubert* stage, to "persuade" the court that the various asserted secrets enabled specific savings; causation " 'is a classical jury question.' " *SAP*, 717 F.3d at 1264.

Malek did explain—based on facts a ***jury*** could find persuasive—"how the three trade secrets that come from the ACM software are 'independently necessary' for the MCA software to function" and "vice versa." He testified that the Grid, Buildability, and Workspaces were each independently necessary for ACM and that ACM, in turn, was necessary for MCA to work. *See* pp. 36-37, *supra.* MCA was "integrated with ACM and uses ACM data to forecast materials costs and parts orders." Appx11752-53 (¶51). That is why Ford recognized that its ability to use MCA for forecasting would "come to a grinding halt" if Ford lost access to ACM. Appx11924 (¶393). Malek also explained how MCA was necessary to take full advantage of the data ACM produced. Appx11918-20 (¶¶376-382); Appx11921 (¶385); Appx11923 (¶¶390-391).

Ford was free to dispute Malek's analysis at trial. But the district court's failure to acknowledge that analysis does not render Malek's (or Elson's) opinions inadmissible.

3. *Elson Was Entitled To Rely on the Best Data Available*

Finally, the district court rejected Elson's testimony because it was partly based on Versata's projections of Ford's savings, which the court deemed "outdated and potentially irrelevant." Appx35. That, too, was error.

First, the kind of reasoning the court used—assuming that "erroneous data . . . necessarily produced an erroneous conclusion"—goes to the "***credibility and accuracy***" of an expert's opinion, ***not*** its admissibility. *Scrap Metal*, 527 F.3d at 529. Supposed "'weaknesses in the ***factual*** basis of an expert witness' opinion,'" as opposed to flaws in methodology, are not a basis for exclusion. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (emphasis added). Rather, "it is up to opposing counsel to inquire into the expert's factual basis" at trial. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993).

Second, Elson used the best data available. Ford "steadfastly contended that it ***never attempted*** to specifically quantify the actual savings realized as a result of the Versata Technology." Appx9371-72; *see* Appx9388-89. As a result, Versata's (pre-litigation) projections—based primarily on Ford's own data—offered the "most comprehensive source of information." Appx9372-73.

Ford's bad record-keeping does not make Elson's opinion "unreliable." "*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the

facts of the case at hand." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000). Excluding an expert's testimony on the grounds that his "analysis was hampered by" the defendant's own "lack of records"—as the district court did here—is "patently unfair," and warrants reversal. *Id.*

### C. The District Court Abused Its Discretion by Limiting Versata's Reasonable-Royalty Theories

Having improperly prevented Versata from seeking unjust-enrichment damages, the district court then prevented Versata from presenting evidence of a reasonable royalty. Versata's damages expert was prepared to testify how much Versata would have sought, and how much Ford would have paid, for what Ford misappropriated—the right to use Versata's trade secrets to build its own substitute system that it could use, royalty-free, in perpetuity. *See* Appx28364-67 (¶¶ 160-166); Appx28376-82 (¶¶ 190-202).

The court acknowledged that Elson's supplemental opinion addressed any concerns about apportionment. Appx87. It nonetheless barred Elson from presenting any theory not "based ***solely*** on the parties' licensing history." Appx95 (emphasis added); *see* Appx29 & n.8. It thus limited Versata to the "normal, routine royalty" Ford would have paid for licensing ***absent*** its misappropriation—precisely the approach the Sixth Circuit has long rejected. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978).

1. "[R]easonable royalty damages are not calculated in a vacuum without consideration of the infringement being redressed." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006). "A reasonable royalty award attempts to measure a hypothetically agreed value ***of what the defendant wrongfully obtained*** from the plaintiff." *Mid-Michigan*, 416 F.3d at 511 (emphasis added). Sixth Circuit law expressly provides that such a royalty must account not merely for what Ford "would have paid in exchange" for ***limited use*** of Versata's software, as in prior years, but also for any misappropriated rights the license did not provide—including "the right to rely on the [software's] protected contents ***to develop its [own] software***." *Id.* (emphasis added). The district court barred Elson from presenting the exact theory *Mid-Michigan* endorses.

Applying the "*Georgia-Pacific* factors relevant to a determination of a reasonable royalty rate," *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001), Elson started with the parties' licensing history, Appx28361-76(¶¶147-189). He acknowledged that was evidence of the price Ford might have paid for a ***similar*** license. Appx28361-62(¶¶149-151). But that price reflected "various limitations and restrictions" attached to Ford's prior licenses, "which were economically significant." Appx28364-65(¶161). "For example, the existing license ***prohibited*** Ford from copying, reverse engineering, or misappropriating the software, Versata's manuals, or any Versata confidential information"—

in short, ***all the things the jury found that Ford did***. Appx28364-65 (¶161) (emphasis added). Accordingly, to "measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff," *Mid-Michigan*, 416 F.3d at 511, Elson had to estimate the price of a hypothetical license "that would have afforded Ford the right to utilize and incorporate Versata's trade secrets and patents into the development of its PDO software," Appx28364-65 (¶161).

Versata, Elson explained, "would command a premium for a license that allowed Ford to use its trade secrets to copy or reverse engineer Versata's software" and replace Versata. Appx28366 (¶164); *see* Appx28378 (¶¶194-195). And Ford would have been willing to pay that premium to avoid the higher cost of developing an alternative without the benefit of Versata's secrets. Appx28343 (¶102); Appx28351-53 (¶¶119-124); Appx28380-81 (¶¶200-201). By stealing Versata's secrets, Elson estimated Ford saved between $113.2 and $177.4 million it otherwise would have expended to develop a non-infringing alternative. Appx28353 (¶124). Elson calculated that a license that ***allowed*** Ford to use Versata's trade secrets for that purpose, and allowed Ford to use Versata's software until PDO was ready, would have been worth between $126.7 and $169.9 million. Appx28378-81 (¶¶194-201).

2. The district court's decision to "not allow Versata to present damages testimony to the jury that goes beyond" the "parties' licensing history," including

evidence "related to the value to Ford of using the trade secrets to create its own automotive configuration software," Appx95, thus defies precedent. In *Mid-Michigan*, the Sixth Circuit acknowledged that prior licenses may be a useful "benchmark." 416 F.3d at 512. But it held that a hypothetical license ***must*** account for the "'value of what the defendant wrongfully obtained'"—including the value of "the right to rely on" the "protected contents" of a plaintiff's misappropriated software "***to develop its [own] software***." *Id.* at 511 (emphasis added); *see Applied Med. Res.*, 435 F.3d at 1362 (royalty must be "tied" to "the infringement being redressed"). It was an abuse of discretion to exclude testimony that performs precisely the analysis *Mid-Michigan* requires.

The district court's approach also makes no sense. Ford's misappropriation gave it the ability to use trade secrets in ways prior licenses ***prohibited***. The misappropriation gave Ford ***perpetual*** ownership of a replacement that incorporates Versata's trade secrets, not just a time-limited, restricted license to use Versata's software as in prior agreements. The court's equation of Ford's rights under prior licenses with the much broader rights Ford misappropriated is like equating renting a home with owning that home outright. The two are not the same.

For that reason, the Sixth Circuit has rejected any effort to calculate a reasonable royalty "as the equivalent of ordinary royalty negotiations among truly 'willing'" parties, as if the misappropriation "never happened." *Panduit*, 575 F.2d

at 1158 (Markey, C.J., sitting by designation). That is an "injustice." *Id.* at 1159. It gave Ford a "'heads-I-win, tails-you-lose' position": If Ford prevailed at trial, it would pay nothing; if it lost, it "could count on paying only the normal, routine royalty" it should have paid in the first place. *Id.* at 1158. Allowing that result would encourage others to follow Ford's example, taking far more than what they paid for, safe in the knowledge that the courts would allow them to keep any benefits. Reversal is warranted.

## II. THE DISTRICT COURT ERRED IN SLASHING THE JURY'S TRADE-SECRET DAMAGES AWARD FROM $22 MILLION TO NOTHING

The jury found that Ford misappropriated three asserted trade secrets and awarded Versata $22 million in damages. Appx100-02. The district court upheld the jury's liability finding, expressing no doubt that Versata suffered millions of dollars of damages. Ford had paid Versata $8.45 million in "base" license fees attributable to ACM for just the final year of the prior MSSA. *See* p. 18, *supra*. Yet the court reduced the award to ***zero***.

The jury here was instructed that Versata had to prove the royalty it would have earned for each misappropriated trade secret based on the time Ford would have needed to develop those secrets without stealing them. Appx56986(38:22-39:16). The jury had no trouble finding Versata met that burden. But the court held that Versata was entitled to ***no*** damages because the evidence did not show precisely how long it would have taken Ford to develop the ACM trade secrets. Appx153.

Plaintiffs, however, need only provide sufficient evidence for the jury to make "a ***reasonable estimate*** of the extent of [the plaintiff's] harm." *Fera v. Vill. Plaza, Inc.*, 242 N.W.2d 372, 373-74 (Mich. 1976) (emphasis added). "[W]here injury to some degree is found, [Michigan courts] do not preclude recovery for lack of precise proof. [They] do the best [they] can with what they have. [They] do not, 'in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable.'" *Godwin v. Ace Iron & Metal Co.*, 137 N.W.2d 151, 156 (Mich. 1965); *see also Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 590 (1974) (eschewing "'mathematical precision'"). The jury had ample evidence to reasonably estimate how long it would have taken Ford to develop its software without stealing the ACM secrets.

### A. Ample Evidence Supports the Jury's $22 Million Award

A court's review of a jury's damages award on JMOL "is extremely deferential." *Advance Sign Grp. v. Optec Displays, Inc.*, 722 F.3d 778, 787 (6th Cir. 2013). The verdict "must stand," *id.*, so long as it falls "within the range encompassed by the record as a whole," *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995); *accord Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 387 (6th Cir. 2008). Here, Ford and Versata presented dueling estimates for the three ACM trade secrets (Grid, Buildability, and Workspaces) the jury found misappropriated. The jury's award was well within the range the trial evidence supported—it was roughly

half-way between Versata's high estimate of $50 million for ACM secrets alone, Appx56561-62(47:5-52:12), and Ford's proposed reasonable-royalty figure of $3 million, Appx56806(100:23-101:23).

The jury was instructed that "reasonable royalty damages must be limited to the amount of time . . . it would have taken Ford to independently develop" the misappropriated "trade secrets." Appx56986(38:22-39:16). The parties' experts provided a sound methodology and evidentiary basis for applying that instruction. Versata's expert, McMahon, used Krauss's apportionment analysis to determine an annual royalty value for each trade secret. She opined that the three ACM secrets together were worth $6 to $10 million per year. Appx56557-62(32:8-52:12); Appx67722-25. Never disputing that the secrets had value, Ford's expert offered a lower figure—$3 million per year. Appx56807-08(104:22-106:6); Appx67738. The district court faulted none of that.

The evidence also showed how long it would have taken Ford to develop the asserted secrets absent misappropriation. McMahon relied on Malek's calculation that it would have taken Ford 8.3 years to develop all secrets. Appx56560(42:18-43:21); *see* Appx56387-89(111:16-119:8). Ford's experts thought it would be closer to "four-and-a-half." Appx56806(100:13-101:9).[6] While the jury declined to find

[6] Both McMahon and Ford's damages expert, Julie Davis, adjusted Ford's development time downwards to arrive at a final damages period. McMahon, crediting

MCA was a trade secret, there was ample evidence that allowed the jury to isolate, from Malek's 8.3-year-period, the time allocable to the ACM trade secrets alone.

For example, Versata witnesses Little and Krauss testified that it took Versata somewhere between 1.5 and 3 years to develop MCA. Appx56093 (133:8-11); Appx56121 (13:10-18); Appx56174 (102:2-5). The jury could "fairly" "infer[ ]" that Ford's development time would have been similar. *Schulz v. Pa. R.R. Co.*, 350 U.S. 523, 526 (1956). The evidence showed, among other things, that Ford and Versata had similar capacities to staff software-development teams. *See, e.g.*, Appx56738 (8:1-23); Appx56747 (42:6-7) ("[a]pproximately 70" Ford developers worked on PDO); Appx56158 (38:6-7) ("about a hundred [Versata] developers" worked on ACM). The jury could subtract the 1.5- to 3-year MCA development time from Malek's 8.3-year estimate of Ford's total development time, leaving the time necessary to create an ACM equivalent—roughly 5 to 7 years.

The jury's award of $22 million, roughly half-way between the parties' competing estimates, is consistent with that evidence. Its award corresponds, for example, to a 4-year period at slightly more than $5 million per year; or to a slightly shorter period at a slightly higher royalty. The selection of that figure was well within the jury's prerogative: It was free to "reject" the "figures proffered by the

---

Ford for years it had paid licensing fees while misappropriating, arrived at a 5-year period. Appx56560 (42:18-44:17); Appx67720. Davis's adjustments resulted in a 1-year term. Appx56806 (100:13-101:9).

litigants" and "substitute an intermediate figure as a matter of its judgment from all of the evidence." *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991); *see Popovich v. Sony Music Ent., Inc.*, 508 F.3d 348, 359-60 (6th Cir. 2007) (damages upheld when "substantially below" party estimate). Because the jury's award is comfortably "within the range encompassed by the record as a whole," *Unisplay*, 69 F.3d at 519, it must stand.

### B. The Court's Rationales for Rejecting the Jury's Trade-Secrets Royalty Award Fail

The district court never suggested that the jury's award—"far less than the total amount" Versata requested, *Caudill*, 53 F.4th at 389—was so excessive as to "shock the conscience," *Advance Sign*, 772 F.3d at 787. And it identified no basis for inferring juror "mistake." *Id.* The court nevertheless wiped out the jury's award, stating there was a "***complete lack of evidence***" on "how long it would have taken Ford to develop just the three ACM trade secrets" the jury found misappropriated (*i.e.*, excluding MCA). Appx150; Appx153. But there plainly ***was*** evidence on that issue. *See* pp. 48-49, *supra*. The court's reasons for rejecting that evidence do not withstand scrutiny.

The court did not question Versata's valuation of the royalty ***rate*** for each ACM trade secret; it quibbled only with evidence of the royalty ***term***. Malek's 8.3-year calculation for the time it would take Ford to "develop all four" secrets, it held, did not give the jury any "way to reliably determine how long it would have taken

Ford to develop the three (out of the four) trade secrets that it found to have been misappropriated," making "any development-time figure" for ACM alone "pure speculation." Appx145.

The court acknowledged Versata's argument that the jury could calculate the time needed to develop the three misappropriated ACM secrets by starting with the time needed to develop both ACM and MCA, and then subtracting the time needed to develop MCA. Contrary to its "complete lack of evidence" statement, Appx150, the court conceded that Versata presented evidence the jury might have used in such a calculation—evidence of "how long it may have taken ***Versata*** to develop MCA." Appx152. But it denied that Versata's development time "shed[] any light on how long it would have taken ***Ford*** to develop the same trade secret." Appx152.

That reasoning is "flawed because it unduly impinged on the jury's role as factfinder." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). Juries have "broad discretion in deciding what inferences to draw," so long as they are "'reasonable.'" *Id.* There was ample evidence—including that Versata and Ford had comparable resources to devote to development—to infer that Ford's development time would be similar to Versata's. *See* p.49, *supra*. The court cited ***no*** contrary evidence. The court's ***only*** record cite was to Malek's report—which, the court conceded, "***did*** seem to suggest" Versata's development time and "the time it would have taken Ford" were "link[ed]." Appx152 n.9 (emphasis added).

As for the time it took Versata to develop MCA, the court posited there was "a timing problem" because Versata developed MCA six years before Ford's misappropriation. Appx152. "[S]ix years," the court mused, "seems to be a 'lifetime' in the rapidly-evolving world of software innovation." Appx152-53. By ***assuming*** intervening advances in technology, the court speculated that Ford would have developed an MCA equivalent faster in 2006 than Versata did in 2001. There was no basis in the record for that speculation, much less for speculating that Versata's and Ford's development times would differ so significantly that the jury could not reasonably assess the damages period. Nor did Ford make that argument at trial. The court simply assumed—without evidence—that the development periods would differ, disregarding the actual trial evidence.

Even if Ford would have had a faster development time for MCA, that would mean only that the jury ***undercompensated*** Versata. Malek posited that it would have taken Ford 8.3 years to develop ***all*** of the trade secrets. If developing MCA would have taken less time than estimated, the misappropriated ACM secrets would comprise a larger percentage of the 8.3-year period, increasing Versata's royalty. An over-estimate of the MCA development period thus would shorten the royalty period for the misappropriated ACM components—all to Ford's benefit. The district court's speculation, which at most could suggest damages were too ***low***, did not justify ***eliminating*** Versata's damages award entirely.

The court posited that Versata might have put on different evidence "relevant to calculating Ford's development time," such as "counting lines of code" for ACM as opposed to MCA, Appx152, and using that numerator with Malek's 8.3-year period as the denominator. It is hard to see how such theoretical methods could provide better evidence for estimating Ford's development time than the actual time it took Versata to develop the software. Regardless, speculation about different evidence provides no reason to "set aside the jury verdict" where, as here, a reasonable jury could reach the result it did based on the actual trial evidence. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 821 (6th Cir. 2000).

The "deferential standard" that governs JMOL "does not permit the type of fine-grained factual parsing in which the [district court] engaged." *Coleman*, 566 U.S. at 655. That applies even more strongly because Ford "by [its] own wrong has prevented a more precise computation" of damages ***by misappropriating***. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). Without a portal to an alternate universe, there is no certain way to know how long Ford would have labored to develop ACM independently. The court's "'[i]nsistence'" that Versata could have provided exact proof of that counter-factual world is "'illusory.'" *Sea-Land*, 414 U.S. at 590.

* * * * *

There was no uncertainty "as to the ***fact*** of damage" from Ford's trade-secret misappropriation. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931) (emphasis added). If there was any "uncertainty" as to the precise "***extent*** of the damage," that cannot justify throwing out the jury's damages award ***entirely***. *Id.* (emphasis added); *see Bigelow*, 327 U.S. at 265-66; *JAC Enters. of Kawkawlin, LLC v. DeHate*, No. 319792, 2015 WL 1651084, at *3 (Mich. Ct. App. Apr. 14, 2015). Michigan law holds that any risk of " 'uncertainty is cast upon the wrongdoer, not the injured party.' " *Lorenz Supply Co. v. Am. Standard, Inc.*, 300 N.W.2d 335, 340 (Mich. Ct. App. 1980). Because the jury's verdict was within a reasonable range supported by the record, it should be affirmed. *Unisplay*, 69 F.3d at 519.

## III. THE DISTRICT COURT ERRED IN SLASHING THE JURY'S BREACH-OF-CONTRACT AWARD FROM $82 MILLION TO $3

The jury found that Ford breached the MSSA, and awarded Versata $82,260,000 in breach-of-contract damages. Appx98-99. The district court again agreed that Versata had established liability. And it acknowledged that Versata "***did*** show that Ford's breaches caused it (Versata) to suffer damages." Appx122 (emphasis added). But the court slashed the jury's award to ***$3*** because, in its view, Versata's evidence was not sufficient to prove ***precisely*** how many millions Ford's conduct cost Versata. Appx122.

Once again, the court demanded "mathematical precision" the law eschews. *Godwin*, 137 N.W.2d at 156; *see Sea-Land*, 414 U.S. at 590. Under Michigan law, a plaintiff need only provide evidence sufficient to make "a reasonable estimate of the extent of [the plaintiff's] harm." *Fera*, 242 N.W.2d at 373-74. Versata more than met that standard. The jury's award fell "reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation" for Ford's breach of the MSSA; it "should not" have been disturbed. *Silberstein v. Pro-Golf of Am., Inc.*, 750 N.W.2d 615, 626 (Mich. Ct. App. 2008).

### A. Ample Evidence Supports the Jury's Contract-Damages Award

"The remedy for breach of contract is to place the nonbreaching party in as good a position as if the contract had been fully performed"—*i.e.*, to make that party "whole." *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278, 280 (Mich. 1996). That measurement includes "damages for loss" caused by the breach, less "any saving to the injured party" from being relieved of further performance obligations after the breach. *Goodwin, Inc. v. Coe*, 233 N.W.2d 598, 602-03 (Mich. Ct. App. 1975); *see DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 473-74 (6th Cir. 1996).

Versata presented ample evidence for the jury to perform that basic arithmetic. Versata showed that, absent Ford's breach of contract, Ford "would have had no choice but to renew, and would have renewed, the MSSA." Appx122. Versata offered the jury an estimate of what Ford would have paid for the renewed MSSA,

ranging from $10-$17 million per year. Appx57007-08(124:4-127:6). Versata asked the jury to multiply those figures by the 7.5 years (from the MSSA's expiration to trial) during which Ford received contract benefits without paying the contract price. Appx57007-08(124:4-127:6); Appx56588(61:6-10) (use continuing "to today"). The resulting range was $82.125-$127 million. The jury's $82.26-million verdict fell at the very bottom of that range.

That award was amply supported by "evidence of [the parties'] previous dealings." *Res. Point LLC v. Addolux LLC*, No. 338338, 2018 WL 4579725, at *3 (Mich. Ct. App. Sept. 20, 2018); *see Stimac v. Wissman*, 69 N.W.2d 151, 155 (Mich. 1955); *cf. Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1359 (Fed. Cir. 1998). The jury could have inferred from the parties' prior dealings that Ford would have paid ***at least*** as much to renew the MSSA as it was paying at the time it breached the contract—$14.95 million per year. *See* pp. 9-10, *supra*.

Versata also provided the jury an evidentiary basis to "deduct[]" any "saving[s]" to Versata from not having to perform after the breach. *Goodwin*, 233 N.W.2d at 602-03. The past-dealings evidence showed that $10.95 million of the $14.95 million Ford paid Versata went towards the "base license fee"—*i.e.*, the right to use Versata's software "***without*** any of the support or services or extra extras" Versata would have provided Ford, or "other amounts" that were "routinely agreed between the parties." Appx56576(12:8-13:20) (emphasis added); *see* Appx56805

(96:14-97:4) (Ford's expert). Because the software had already been developed, there would be no significant costs to Versata in giving Ford a naked license at $10.95 million per year. The $4 million difference between the base and total license thus reflected a reasonable measure of the costs Versata would have incurred under any future license. Appx57008(126:13-127:3). By "tak[ing] out" that $4 million, Appx57008(126:22-127:3), the jury could arrive at a reasonable estimate of the benefit "which plaintiff might have realized" had the parties "perform[ed]," *Callender v. Myers Regul. Co.*, 230 N.W. 154, 155 (Mich. 1930); *Goodwin*, 233 N.W.2d at 602-03.

The jury appears to have performed essentially that calculation. Its $82,260,000 million award, divided by the 7.5-year damages period, amounted to ***$10.968*** million per year—almost ***precisely*** the $10.95-million annual base license fee, without the additional $4 million for support or services or other expenses Versata might have saved. That result rested on a "sound evaluation" of the parties' past dealings, which offer more than "reasonable certainty" that the awarded sum reflected Versata's actual damages. *Moyer v. Shampo*, 98 N.W.2d 631, 632 (Mich. 1959); *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 922 (Mich. Ct. App. 2014).

### B. The District Court's Rationales for Rejecting the Jury's Contract-Damages Award Fail

The district court threw the jury's damages award out on JMOL nonetheless. Appx132. The court acknowledged that Versata "***did*** show that Ford's breaches

caused it (Versata) to suffer damages." Appx122 (emphasis added). But it held that Versata "did not present sufficient evidence to permit the jury to quantify those damages," Appx122, because the jury supposedly "had ***no evidence*** concerning Versata's costs," Appx127 (emphasis added).

Again, the district court's assertion there is "no evidence" is wrong: The court itself "admitted[ ]" that an award "based upon the base license fee of $10.95 million per year" would be "closer to a proper award of Versata's net revenue" than other proposed measures of contract damages. Appx128. So the court went ***outside*** the trial record to contradict the trial record and jury's determination, demanding specialized proof the law does not require.

1. *The District Court's "Overcompensation" Objection Departs from the Record and Defies Reasonable Inferences*

The district court's insistence that Versata's $10.95 million "base license" theory would "overcompensat[e]" Versata, by failing to account for Versata's costs, Appx128-29, oversteps proper bounds on JMOL. If anything, the $10.95 million base-license theory overestimated Versata's ***costs***—not Versata's ***damages***.

Versata's theory treated the ***entire*** $4 million difference between the $14.95 million price of a license with support services and the $10.95 million price of a base license without support services as costs and expenses Versata avoided when Ford breached. But that $4 million included significant ***profits*** Versata would have earned on support services covered by the $14.95 million license. For example, it included:

- A $2 million annual fee specifically for "Extended Support and Enhancement Services." Appx71646; *see* Appx56577 (15:14-16:15). Far from being an at-cost figure, Ford considered it "***aggressive***." Appx57026 (200:1-6) (emphasis added).

- A $1-million-per-year "non-termination fee," Appx56805 (96:14-22); Appx71646-47, which compensated Versata for a waiver of its rights to terminate the contract and ***imposed no performance costs***, Appx71646-47; *see* Appx56533 (52:12-17).[7]

The true amount of avoided costs was thus ***less*** than $4 million. Moreover, the use of past licensing data (the $14.95 million) also meant Versata's "method of calculating damages was weighted on the conservative side" because the value of the license increased over time. *Severn v. Sperry Corp.*, 538 N.W.2d 50, 55 (Mich. Ct. App. 1995); *see* Appx55797 (41:10-25); Appx56558-59 (36:3-38:11); Appx67716-17. If the $4 million figure was "inaccurate," it was because it ***overestimated*** Versata's costs and artificially ***reduced*** its damages. *Davidson v. Gen. Motors Corp.*, 357 N.W.2d 59, 61 (Mich. Ct. App. 1984).

Ford did not object or argue at trial that the $10.95-million base license fee included unquantified support costs. The jury thus had no reason to believe that fee was anything other than a naked license. But the district court insisted that Versata's theory did not account for all of its costs. Even "though the base license" at $10.95 million "required Versata to provide less service and support," the court stated, "it did require Versata to provide ***some*** level of technical support." Appx128. Digging

[7] The last $1 million went to a "maintenance fee." Appx57162 (12:13-13:16).

for evidence to undermine the jury's verdict, the court found one sentence from the MSSA, which allegedly required Versata to "perform 'support and enhancement services,'" even under the "base license." Appx128 (quoting Appx71630). The jury, however, was not required to find that provision materially affected the damages calculation, especially absent any evidence suggesting it was material.

Moreover, even if the jury believed the "support and enhancement" provision applied, it could have found that the $4-million proxy already covered any additional costs it imposed. *See* pp. 58-59, *supra*. And there was good reason to think that provision did ***not*** apply: Undisputed testimony about the invoices from 2014 showed that the $10.95-million base rate was "***without any*** of the support or services," which were "***not included***." Appx56556-57 (29:7-30:24) (emphasis added); Appx56576 (12:8-23) (emphasis added). Ford's expert agreed the $10.95-million figure "***takes out*** . . . services and support and maintenance." Appx56805 (96:23-97:4); *see* Appx56804 (90:7-92:2) (distinguishing "software license fees" for the "real software" from "additional fees charged for things like consulting services or support" and the "non-termination" fee).

With no record support for its over-compensation theory, the court went beyond the evidence the jury saw at trial. It stated that "even Versata's own damages expert, Renee McMahon, estimated . . . that Versata would have incurred $1.1 million in 'incremental expenses' under the 'base' license." Appx128. But the court

had ***precluded*** McMahon from offering that opinion at trial. Appx125 n.3; Appx128-29. That barred the court from relying on that testimony to reject the jury's verdict: When a court "review[s] the jury's verdict for substantial evidence based upon the record," it "cannot hunt outside the record to find evidence to try to contradict the verdict." *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1336 (Fed. Cir. 2021); *see Price Bros. Co. v. Phila. Gear Corp.*, 629 F.2d 444, 447 (6th Cir. 1980).

Regardless, the McMahon report offers the district court's ruling no support. McMahon's calculation of the $1.1 million in costs was based on Versata's "average expenses" under the MSSA "***from 2011 through 2014***," Appx39939-40(¶60) (emphasis added)—the period during which Versata ***was*** providing Ford support, including "extended" support for which Ford was paying a ***separate*** fee ($2 million annually by 2014). Appx56522-23(7:24-10:25); Appx71646-47. McMahon applied that same figure to ***each*** of the hypothetical license prices she calculated—$17, $14.95, and $10.95 million—on the theory that the contractual services would "continue[]" in the same manner, and all that would change was the price. Appx39925(¶19). She did not opine that Versata would be contractually obligated to provide such support under a "base" license theory. And even if there were conflicting evidence regarding Versata's performance costs, "it is ***the jury's*** function

to weigh competing evidence." *People v. Oros*, 917 N.W.2d 559, 568 (Mich. 2018) (emphasis added).

Regardless, even if marginal concerns about overcompensation remained—and none did—that cannot justify throwing out the verdict. Any risk of "'uncertainty is cast upon the wrongdoer, not the injured party.'" *Lorenz*, 300 N.W.2d at 340. Michigan law holds it is "'better to run a slight risk of giving somewhat more than actual compensation, than to adopt a rule'" that will "'preclude the injured party from the recovery of a large proportion of the damages he has actually sustained from the injury.'" *Muskegon Agency, Inc. v. Gen. Tel. Co. of Mich.*, 85 N.W.2d 170, 174 (Mich. 1957) (quoting *Allison v. Chandler*, 11 Mich. 542, 554 (1863)); *see Restatement (Second) of Contracts* § 352 cmt.a (1981).

The district court defied those settled principles here, cutting an $82 million verdict to $3 for fear that there might be some marginal costs beyond $4 million that could not be "'measured with certainty.'" *Lorenz*, 300 N.W.2d at 340. That warrants reversal.

2. *The District Court's Specialized-Proof Rationale Is Legally Incorrect*

The district court also faulted Versata for "present[ing] its theory of contract damages to the jury in the closing argument by its attorney." Appx123. In the court's view, because Versata did not have a "***witness***" identify "a particular amount of contract damages," or present "documents reflecting a calculation of its breach of

contract damages," "the jury had no way to calculate Versata's claimed breach of contract damages with reasonable certainty." Appx123 (emphasis added); *see* Appx126; Appx132.

The court's sole authority for those requirements was a district court case stating that "'[a] plaintiff must produce a ***method*** by which damages can be calculated with reasonable certainty.'" Appx123 (quoting *Stonemen Grp., Inc. v. Metalforming Techs., Inc.*, 362 F. Supp. 2d 896, 902 (E.D. Mich. 2005)). But nothing requires the method be presented via the testimony of a single witness or a document laying out the calculation. What matters is that "a reasonable ***basis*** for computation ***exists***." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 852 (Mich. Ct. App. 2005) (emphasis added). In "'estimat[ing]'" damages, "'[j]uries are allowed to act upon probable and inferential, as well as direct and positive proof.'" *Muskegon Agency*, 85 N.W.2d at 174. Such proof existed here: Direct and indirect evidence showed Versata's actual damages based on the parties' prior dealings. *See* pp. 55-57, *supra*.

The district court's view that Versata's "contract damages case crossed the line . . . to speculation," Appx132, because Versata explained the calculations using trial evidence, is contrary to law and logic. Attorneys are "generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v. Bailey*, 873 N.W.2d 855, 865 (Mich. Ct. App. 2015).

The jurors, moreover, were "permitted to view evidence in light of their common knowledge or experience." *Bailey*, 873 N.W.2d at 865. The parties' "history" of dealing here was clear enough that laypersons could "extrapolate profitability." *BP1, LLC v. Coventry Real Est. Fund II, LLC*, No. 312579, 2014 WL 4723146, at *12 (Mich. Ct. App. Sept. 23, 2014); *see Nusbaum v. Enlighten Fam. Chiropractic, LLC*, No. 19-cv-10223, 2023 WL 319782, at *3 (E.D. Mich. Jan. 19, 2023) (claim not "speculative" just for lack of expert guidance). Versata's damages calculation required only "'simple arithmetic'": Subtract $4 million in costs from the $14.95 million license fee, then multiply by the damages period. *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 328 (6th Cir. 2011). A third-grader could do that math, whether an attorney or an expert presented it.

3. *The Jury's Lost-Profits Award Was Not "Unfair"*

Finally, the district court stated, in a sentence, that "it would be unfairly prejudicial to Ford to uphold the contract damages award on [a lost-profits] basis" because Versata "never disclosed" such a "theory of contract damages during discovery." Appx130-31. Piecing together footnotes elsewhere in the decision, the court apparently believed that, because a lost-profits theory was not disclosed in discovery, "Ford never conducted discovery into Versata's costs," Appx125 n.3, and so Ford, "through no fault of its own, is in no position to challenge the level of Versata's costs," Appx129 n.4.

But Ford never suggested—at trial or on JMOL—that it was prejudiced by Versata presenting its $10.95 million base-license theory to the jury. *See* Appx56535 (61:15-22) ("not arguing" about the "14 or the 10.95"). Instead, the court interposed the argument, unbidden, on Ford's behalf. That is error. "[A]llowing a judge to *sua sponte* raise a new issue post-verdict, and proceed to overturn a jury verdict on that basis contravenes the dictates of Rule 50(b)." *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159 (6th Cir. 1997).

Besides, there was no unfairness. Versata made clear from the start that it was seeking damages based on what Ford would have paid under a new contract. *See* Appx38653-58 (citing, *e.g.*, Appx28376 (¶¶ 190-192); Appx38280-81; Appx38355-56). It is hornbook law that ***any*** measure of contract damages "based on [plaintiff's] expectation interest" must be offset by "any cost or other loss that he has avoided by not having to perform." *Restatement (Second) of Contracts* § 347. Ford had all the advance notice it needed to take discovery on Versata's costs, whether or not Versata sought lost profits.

Versata's theory presented none of the complications often presented by lost-profits theories. Lost profits are generally consequential damages, involving theorization about (for example) lost sales to independent third parties. That is very different from standard breach damages that, like Versata's theory, look to lost payments by a counterparty under the contract itself. And the theory advanced at trial

did not rely on evidence that would require discovery: Ford was aware—and indeed argued at trial—that $10.95 million of the 2014 payments was the base license fee, and that $4 million was for fees and services that would compensate Versata for performance costs. *See* pp. 56-57, *supra*. If Ford wanted a different deduction, it was free to use anything McMahon said to examine her at trial; it did not.

The jury followed its instructions, relied on evidence no one objected to, and reached an eminently reasonable verdict. To say that verdict was "unfair" defies credulity. To overturn it as a matter of law when no party raised the issue demands reversal.

## CONCLUSION

This Court should reverse the district court's exclusion of Versata's unjust-enrichment damages theory for trade-secret misappropriation and remand with instructions for the district court to accept supplemental expert reports and conduct a new trial on trade-secret damages. Alternatively, this Court should reinstate the jury's award of trade-secret damages. This Court should also reinstate the jury's damages award for breach of contract.

March 12, 2024

Respectfully submitted,

/s/ Jeffrey A. Lamken

Jeffrey A. Lamken
*Counsel of Record*
Michael Gregory Pattillo, Jr.
Jennifer Elizabeth Fischell
Lois Ahn*
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

Eugene Alexis Sokoloff
Thomas P. Schubert
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
(312) 450-6700

Sharoon Saleem
JONES & SPROSS, PLLC
1605 Lakecliff Hills Lane, Suite 100
Austin, TX 78732
(713) 446-0217

Dan K. Webb
Matthew R. Carter
Samuel Zuidema
Monica T. Kociolek
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600

Jaye Quadrozzi
YOUNG, GARCIA & QUADROZZI, PC
27725 Stansbury Boulevard
Suite 125
Farmington Hills, MI 48334
(248) 353-8620

Steven J. Mitby
MITBY PACHOLDER JOHNSON PLLC
1001 McKinney Street, Suite 925
Houston, TX 77002
(713) 234-1446

** Admitted only in New York; practice limited to matters before federal courts and federal agencies*

*Counsel for Plaintiffs-Appellants Versata Software, Inc., Versata Development Group, Inc., and Trilogy, Inc.*

# **ADDENDUM**

## ADDENDUM – TABLE OF CONTENTS

Page

Opinion and Order Granting Ford's Motion To Exclude the Trade Secret Damages Opinions of Craig Elson (July 9, 2018) (Dkt. 507) .......... Appx1

Opinion and Order Granting in Part and Denying in Part Versata's Motion for Reconsideration (Jan. 22, 2020) (Dkt. 724) .......... Appx55

Jury Verdict Form (Oct. 26, 2022) (Dkt. 1004) .......... Appx97

Opinion and Order Granting Ford's Motion for Judgment as a Matter of Law (May 1, 2023) (Dkt. 1054) .......... Appx105

Order Modifying the Court's Order Granting Ford's Motion for Judgment as a Matter of Law (June 8, 2023) (Dkt. 1063) .......... Appx156

Final Judgment (Nov. 15, 2023) (Dkt. 1121) .......... Appx159

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR COMPANY,

Plaintiff,

v.

VERSATA SOFTWARE, INC. *et al.*,

Defendants.
______________________________________/

Case No. 15-cv-10628
(*consolidated with Case No. 15-11624*)
Hon. Matthew F. Leitman

**FILED UNDER SEAL**

**OPINION AND ORDER (1) GRANTING PLAINTIFF'S MOTIONS TO EXCLUDE THE EXPERT TESTIMONY OF JAMES MARTIN (ECF #348), THE EXPERT TESTIMONY OF CHRISTOPHER BOKHART (ECF ## 346, 351), THE TRADE SECRET DAMAGES OPINIONS OF CRAIG ELSON (ECF ## 347, 349), AND THE COPYRIGHT INFRINGEMENT OPINIONS OF DR. SAMUEL MALEK (ECF ## 344), AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MONTY MYERS (ECF # 352)**

## I

In 1998, Plaintiff Ford Motor Company hired Defendants Versata Software, Inc., Versata Development Group, Inc., and Trilogy, Inc. (collectively, "Versata") to develop computer software that would allow Ford to more efficiently configure the millions of cars it manufactures each year. Versata created that software, called "ACM," and it licensed ACM and other related software to Ford for millions of dollars per year in licensing fees. In 2014, Ford and Versata could not agree on the terms of a renewed software license, and Ford developed its own automotive configuration software. Ford called its replacement software "PDO." Versata insists

that when Ford created PDO, Ford copied and stole many proprietary features of Versata's software. Ford denies those allegations.

On February 19, 2015, Ford filed this action. Ford seeks a declaratory judgment that it did not infringe and/or misappropriate certain of Versata's patents, copyrights, and trade secrets. (*See* Sec. Am. Compl., ECF #226.) Versata has filed counterclaims for infringement of the same patents and copyrights and misappropriation of the same trade secrets. (*See* Ans. and Counterclaims, ECF #244.) Versata seeks over one billion dollars in damages. (*See id.*)

Currently before the Court are four motions filed by Ford and one motion filed by Versata requesting the exclusion, in whole or in part, of the testimony of five expert witnesses. The motions are:

- Ford's motion to exclude the testimony of damages expert James Martin (ECF #348);
- Ford's motion to exclude the testimony of patent damages expert Christopher Bokhart (ECF ## 346, 351);
- Ford's motion to exclude the trade secret damages opinions of expert Craig Elson (ECF ## 347, 349);
- Ford's motion to exclude the copyright infringement opinions of expert Dr. Samuel Malek (ECF #344); and
- Versata's motion to exclude the rebuttal testimony of expert Monty Myers (ECF #352).

The Court held a hearing on all of these motions on April 24, 2018. (*See* 4/24/18 Hearing Tr., ECF #472.) For the reasons that follow, the Court **GRANTS** Ford's motions and **GRANTS IN PART AND DENIES IN PART** Versata's motion.

## II

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FRE 702.

District courts have "broad discretion as [] 'gatekeeper[s]' to determine the admissibility" of expert testimony. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). Among other things, district courts must determine whether an expert is sufficiently qualified. "A witness is [not] an expert simply because he claims to be."

*Id.* at 577. Instead, the proponent of expert testimony must "qualify [its] expert with reference to his 'knowledge, skill, experience, training or education.'" *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th. Cir. 2007) (quoting FRE. 702). Courts must then "determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony." *Berry v. Crown Equipment Corp.*, 108 F.Supp.2d 743, 749 (E.D. Mich. 2000).

In addition, courts must "determine whether [expert] evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th. Cir. 2012) (quoting *v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). "The relevance requirement ensures that there is a 'fit' between the testimony and the issue to be resolved by the trial. The reliability requirement is designed to focus on the methodology and principles underlying the testimony." *Greenwell v. Boatwright*, 184 F.3d 492, 496-97 (6th. Cir. 1999) (internal citation omitted). "An expert who presents testimony must 'employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Newell Rubbermaid*, 676 F.3d at 527 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The proponent of expert testimony has the burden of "establish[ing] its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline, Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n. 10). "Red

flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid*, 575 F.3d at 527. "No matter which factors are used" to determine the admissibility of expert testimony, "the key question remains the same: Does the expert possess 'specialized knowledge' that will aid the trier of fact in determining a fact in issue, and is the proposed testimony the product of sufficient research that was conducted pursuant to reliable methods?" *Saginaw Chippewa Indian Tribe of Michigan v. Granholm*, 690 F.Supp.2d 622, 635 (E.D. Mich. 2010).

**III**

**A**

The Court first turns to Ford's motion to exclude the testimony of James Martin, a financial expert whom Versata retained to provide background support for its damages theory. (*See* Martin Mot., ECF #348) Martin is a corporate consultant and accountant for Cendrowski Corporate Advisors, a financial and litigation consulting firm based in Bloomfield Hills, Michigan. (*See* Martin Rpt., ECF #350 at Pg. ID 18196.) Martin graduated with an accounting degree from Eastern Michigan University in 1995, and he obtained a Masters of Science degree in Accounting Information Systems from Eastern Michigan University in 1997. (*See id.*) He is a

Certified Management Accountant, Certified Internal Auditor, and Certified Fraud Examiner. (*See id.*)

In Martin's expert report, he explained that after Ford began using Versata's ACM (and related) software, Ford experienced substantial cost savings from a decrease in errors during production:

> Based on analysis of publicly available data, contemporaneous news reports, and research reports, product definition errors experienced by Ford Motor Company were reduced significantly after the implementation of the ACM system.
>
> The reduction of product definition errors resulted in cost savings to Ford in the area of parts cost savings, warranty claims, and reduction in recall campaigns.
>
> Additionally, Ford's Six Sigma analysis of the ACM implementation showed a significant reduction of vehicle configuration errors over the prior system, confirming tremendous benefit was realized by Ford.

(*Id.* at Pg. ID 1817.)

Martin also offered an "overview of the automobile manufacturing process" and explained "the potential business benefit of an accurate configuration management process" in the automotive industry. (*Id.* at Pg. ID 18178-84.) Finally, Martin described how a reduction in product errors could save automotive manufacturers substantial time and money from reduced product recalls, warranty claims, and mistakes during production. (*See id.* at Pg. 18187.)

**B**

Ford asserts that the Court should exclude Martin's testimony on several grounds. (*See* Martin Mot., ECF #348; Martin Reply Br., ECF #452.) Ford argues, among other things, that much of Martin's proposed testimony adds nothing to, and is cumulative of, the data upon which he relies. Ford also says that many of the sources that Martin based his opinions on are irrelevant and unreliable. Finally, Ford challenges Martin's qualifications. The Court shares Ford's view that Martin's testimony is inadmissible, and it will therefore preclude Martin from testifying at trial.

**C**

The Court declines to admit Martin's proposed testimony that Ford experienced fewer product definition errors and achieved cost savings after Ford implemented ACM because that testimony is cumulative of Versata's other evidence, is not proper opinion testimony or testimony based upon specialized knowledge, and would not be helpful to the jury. As Versata acknowledged at the *Daubert* hearing, much of Martin's proposed testimony about error rates and cost savings consists of restating data that is available in publicly-available documents (and other documents) that may be admitted at trial. This proposed testimony reporting cost savings and other benefits to Ford neither consists of opinions nor is it based upon specialized knowledge, and thus it is not admissible under Federal

Case: 24-1140 Document: 18 Page: 93 Filed: 03/12/2024

Rule of Evidence 702. Moreover, Martin's testimony reporting this data would be cumulative of the underlying documents and evidence from which the data come, and the Court is convinced that the jury could understand the underlying data – which does not appear to be highly technical in nature – without the need for Martin to present the data orally. Martin's proposed testimony would therefore be needlessly cumulative of other evidence and would not assist the trier of fact. *See Bowman v. Corrections Corp. of America*, 350 F.3d 537, 547 (6th Cir. 2003) (affirming exclusion of expert testimony and recognizing that "[a] district court is free to exclude any expert testimony [...] if the testimony is cumulative or redundant under Fed.R.Evid. 403") (internal quotation marks omitted).

In addition, the Court is not persuaded that Martin gathered all of the data he reported in reliable manner. For example, in an effort to "estimate Ford's success" in reducing the number of product recalls it experienced after it implemented ACM, Martin "located a website with recall data by model year. From [that] data, [Martin] created a summary of recall campaigns by model and year." (Martin Rpt., ECF #350 at Pg. ID 18188.) Martin contended in his report that this "data show[s] a decrease in the average number of recalls per model year after the vehicles were configured in ACM." (*Id.*) But the "website" Martin "located" was not the website for the National Highway Traffic Safety Administration (the "NHTSA"). Instead, it was a website called "FordProblems.com" which is operated by a private company,

"Autobeef, LLC." As Versata acknowledged during the *Daubert* hearing, the website has a "critical" "view" of Ford. (4/24/18 Hearing Tr. at 157-58, ECF #472 at Pg. ID 39225-26.) And there is no evidence in this record that Martin made any effort to verify the data reported on this anti-Ford website.[1] Martin therefore did not engage in a reliable method of gathering and reporting data when – without undertaking any independent verification efforts – he relied, at least in part, on data reported by a website that, as Versata recognized, "doesn't think very highly of Ford." (*Id.* at Pg. ID 39226.)

For all of these reasons, the Court declines to admit Martin's testimony concerning cost savings and reduced product definition errors.

**D**

Versata contends that, at a minimum, the Court should allow Martin to present general, background testimony, including an "overview of [the] automobile manufacturing process" and the "role" and benefits of "configuration management" in automotive manufacturing. (Martin Rpt., ECF #350 at Pg. ID 18178-84.) The Court concludes that Martin is not qualified to offer this testimony.

[1] On its home page, FordProblems.com purports to report recall information from NHTSA's website, but there is no evidence in this record that Martin ever cross-checked the FordProblems.com data with official statistics from the NHTSA. And once Martin saw on FordProblems.com's home page that it was merely reporting information from NHTSA, he should have ceased reliance on FordProblems.com and gone directly to the authoritative NHTSA website.

Martin is not an engineer, nor has he ever been directly involved in the automotive manufacturing process. He is an accountant with both undergraduate and graduate degrees in accounting. (*See id.* at Pg. ID 18196.) He also has three specialized certifications, but they are in accounting or finance; none relate to manufacturing. (*See id.*) And Martin has spent most of his career working as an accountant or in other related financial positions.

Versata insists that Martin is qualified, in part, because he "has over ten years of direct automotive sector experience working for two of the 'Big 3' automotive manufacturers." (Versata Resp. Br., ECF #410 at Pg. ID 23611-12.) But that experience was not centered around the manufacturing process. For example, Martin's work at Chrysler Corporation focused on "[d]ealer development, financial anlaysis[,] and capital lending." (Martin Rpt., ECF #350 at Pg. ID 18196.) Martin also acted as a "liaison" between Chrysler's information technology staff and its finance staff. (*See id.*) This experience does not qualify Martin to offer expert testimony about the automotive manufacturing process.

Versata further maintains that Martin is qualified because he has worked on at least one accounting project that related to automotive manufacturing and because he attended "high level, 'meet the engineer' type seminars" that provided him a sufficient background to "understand[] the financial implications of product definition errors in the automotive industry." (Versata Resp. Br., ECF #410 at Pg.

ID 23611.) But the Court is not convinced that these isolated, "high level" experiences, some of which took place more than fifteen years ago, qualify Martin to provide background testimony about automotive manufacturing. The Court therefore declines to allow Martin to offer background testimony about the automotive industry and the manufacturing process generally.

**IV**

**A**

The Court next addresses Ford's motion to exclude the testimony of patent damages expert Christopher Bokhart. (*See* Bokhart Mot., ECF #346.) Bokhart is a Vice President of Charles River Associates, a global consulting firm. (*See* Bokhart Rpt., ECF #346-25 at Pg. ID 17696.) Bokhart has "over 30 years of experience in intellectual property (IP) and business valuation," and "he assists companies and counsel in transactional, strategy, litigation, and financial reporting matters involving patents, trademarks, trade secrets, copyrights, and business interests." (*Id.* at Pg. ID 17696.)

Versata hired Bokhart to provide expert testimony with respect to "the amount of economic damages due to Versata as a result of Ford's alleged infringement of the patents-in-suit."[2] (*Id.* at ¶2, Pg. ID 17649.) Bokhart used a "reasonably royalty"

[2] Bokhart has not offered any opinions "as to Versata's claims against Ford related to trade secret misappropriation, copyright infringement, or breach of contract." (Bokhart Rpt. at ¶2, ECF #346-25 at Pg. ID 17649.)

model of damages. He determined the reasonably royalty by constructing a hypothetical negotiation between Ford and Versata to license the relevant patents. (*See id.* at ¶12, Pg. ID 17651.) Bokhart concluded that this hypothetical negotiation would result in "ongoing annual lump sum payments [from Ford to Versata] of $14 million." (*Id.*) Bokhart calculated this amount based principally on (1) prior negotiations between Ford and Versata and (2) software and patent licensing agreements between a Versata affiliate and Boeing that Bokhart believed were comparable to the hypothetical license between Ford and Versata. (*See id.* at ¶148, Pg. ID 17693.)

**B**

Ford moves to exclude Bokhart's testimony because his "proffered reasonable royalty opinion is neither reliable nor relevant." (Bokhart Mot., ECF #346 at Pg. ID 17502.) Among other things, Ford argues that Bokhart "fail[ed] to apportion damages to the patents that remain at issue" in this action. (*Id.* at 17501.) Ford insists that because Bokhart did not "separate out the value of the six patents-in-suit from the unasserted patents, trade secrets, and copyrights," his reasonable royalty analysis is invalid and unreliable. (*Id.*) Ford further maintains that Bokhart's reliance on the Boeing license agreements in his royalty calculation was unreliable because Bokhart did not sufficiently analyze whether the Boeing licenses were comparable to the

hypothetical license between Ford and Versata. (*See id.* at 17510-14.) The Court agrees and therefore will preclude Bokhart from testifying at trial.

**C**

**1**

Upon a finding of patent infringement, a "court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer. 28 U.S.C. § 284. "The most common method for determining a reasonable royalty is the hypothetical negotiation approach, which attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (internal quotation marks omitted).

"No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features. Indeed, the Supreme Court long ago observed that a patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.'" *Id.* (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). In other words, where, as here, "the accused technology does not make up the whole of the accused product," "apportionment" between the patented and unpatented features of the product "is required." *Finjan, Inc. v. Blue*

Case: 24-1140 Document: 18 Page: 99 Filed: 03/12/2024

*Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018). *See also Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (noting that damages under Section 284 "must reflect the value attributable to the infringing features of the [accused] product, and no more").

In light of these settled rules, patent damages experts must apportion claimed damages between patented and unpatented features of an allegedly-infringing product. Indeed, "to be admissible, all expert damages opinions must separate the value of the allegedly infringing features [of the accused product] from the value of all other features [of that product]." *Commonwealth*, 809 F.3d at 1301 (citing *VirnetX*, 767 at 1329). *See also Nortek Air Solutions, LLC v. Energy Lab Corp.*, 2016 WL 3856250, at *4 (N.D. Cal. July 15, 2016) (excluding expert patent damages testimony because expert "did not engage in any apportionment or attempt to separate the value of the patented features from the unpatented features"); *Helios Software, LLC v. Awareness Technologies, Inc.*, 2015 WL 12806482, at *5 (D. Del. Apr. 13, 2015) (excluding expert patent damages testimony due to failure to apportion and holding that "[b]ecause it is uncontested that the accused products comprise both patented and unpatented features, [the expert] needed to apportion profits and damages between the patented and unpatented features of the accused product to render a reliable damages analysis").

**2**

In this case, Bokhart did not attempt to satisfy the apportionment requirement even though he concedes that the accused software at issue is comprised of both patented and unpatented features. (*See* Bokhart Dep. at 83-84, ECF #346-24 at Pg. ID 17638-39.) Indeed, Bokhart testified that he never "segregat[ed] … [the] value only to [the] patents [at issue]." (*Id.* at 84, Pg. ID 17639.) Because Bokhart did not apportion Versata's alleged damages attributable from the asserted patents from the damages attributable to the unpatented features of Versata's software, he did not apply the correct legal standard when conducting his analysis. The Court therefore excludes his opinions. *See Commonwealth*, *Nortek Air*, and *Helios Software*, *supra*.

**3**

The Federal Circuit recognizes a "narrow" exception to the apportionment requirement known as the "entire market value" exception, *Commonwealth*, 809 F.3d at 1301-02, but that exception does not apply here. Under the "strict requirements" of this exception, "[a] patentee may assess damages based on the entire market value of the accused product *only where* the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Virnetx*, 767 F.3d at 1326 (quoting *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013) (emphasis in original)). In this case, Bokhart has conceded that he did not conduct an entire market value analysis. (*See* Bokhart

Case: 24-1140 Document: 18 Page: 101 Filed: 03/19/2024

Dep. at 15, ECF #346-24 at Pg. ID 17621). Therefore, the entire market value exception does not apply, and Bokhart was required to apportion damages.

**4**

Versata contends that Bokhart's analysis fits into a second exception to the apportionment requirement. Versata says that under this second exception, an expert need not apportion damages where he uses a comparable license to "arriv[e] at his reasonabl[e] royalty opinion." (Versata Resp. Br., ECF #412 at Pg. ID 23720.) Versata finds this exception in the Federal Circuit's decision in *Commonwealth*, *supra*.

The Court does not believe that *Commonwealth* excuses Bokhart's failure to apportion damages. In *Commonwealth*, the Federal Circuit explained that a royalty rate may be based on a comparable license so long as (1) "the licenses employed are sufficiently comparable" and (2) the valuation analysis "accounts for the differences in the technologies and the economic circumstances of the parties." *Commonwealth*, 809 F.3d at 1303. But the court did *not* say that apportionment is unnecessary when a royalty rate is determined in this way. On the contrary, the Federal Circuit in *Commonwealth* stressed that the damages model used by the district court in that case – of which the Federal Circuit approved – "did not violate apportionment principles" because that model "built in apportionment." *Id.* at 1303. It did so by focusing on prior negotiations that "centered on … the value of the asserted patent,

and no more." *Id.* (internal quotation marks omitted). *Commonwealth* therefore does not stand for the proposition that an expert may avoid apportioning damages if the expert uses a comparable-license analysis to determine the reasonable royalty rate. And Versata has not cited any other binding or published authority that stands for that proposition. The Court remains convinced that Bokhart was required to apportion the damages claimed here.

Furthermore, even if Bokhart was not required to apportion damages because he used the comparable-license approach, the Court would still exclude Bokhart's testimony because he did not reliably employ that approach. He failed to show – indeed, did not even attempt to show – that the Boeing licenses that he relies upon are sufficiently comparable to the hypothetical Ford-Versata license at issue here. Bokhart did not analyze, among other things, (1) the similarity of the technologies at issue, (2) any indicia of economic comparability between the licenses, and (3) any alleged differences between the Boeing agreements and the hypothetical Ford agreement. Instead, his analysis of the Boeing licenses consisted of nothing more than a recitation of the factual background of the Boeing negotiations and the general terms of those licenses. (*See* Bokhart Rpt. at ¶¶ 111-116, 147, ECF #346-25 at Pg. ID 17682-83, 17692). That is not enough to reliably establish that the Boeing

licenses are sufficiently comparable to the hypothetical license here.[3] *See Commonwealth*, 809 F.3d at 1303 n.2 (noting that the Federal Circuit has "often excluded proffered licenses as insufficiently comparable").

Bokhart's failure to explain how the Boeing licenses are sufficiently comparable to the hypothetical license here was no mere trivial oversight. As Ford has demonstrated, that there are numerous potentially important differences between the respective licenses. First, the Boeing licenses concerned different software – a standardized, pre-existing software called SalesBuilder. (*See id.* at ¶111, Pg. ID 17682.) The hypothetical license here, in contrast, relate to ACM and a second software program called MCA, which were specifically created for Ford. Second, the Boeing licenses were negotiated at different time periods (1994 and 2006) than the hypothetical negotiations between Ford and Versata. And finally, the Boeing

[3] Bokhart's failure to analyze the comparability of the licenses at issue here contrasts sharply with the comparability analysis found sufficient in *Intel Corp. v. Future Link Sys., LLC*, 2017 WL 2482881 (D. Del. June 1, 2017) – a decision upon which Versata relies. In *Intel Corp.*, the court allowed an expert to testify as to damages under the comparable-license approach without apportioning damages where the expert carefully demonstrated that the "licensed patents had 'extraordinarily similar technology' to the technology of the patents being asserted [in that case]," and where he "also identified indicia of economic comparability between the comparable license agreements and the hypothetical licenses involved [], as well as any effect of alleged differences between them." *Id.* at *2. Even if this Court agreed with the *Intel Corp.* court that apportionment is not necessary where an expert employs a comparable-license approach (which the Court does not), the Court would still exclude Bokhart's testimony because he did not conduct the type of comparability analysis deemed sufficient in *Intel Corp.*

negotiations and licenses involve different patents than the hypothetical Ford-Versata negotiations. Given these potentially important differences between the Boeing licenses and the hypothetical Ford-Versata license, it was incumbent upon Bokhart to explain why he could rely on the Boeing licenses as sufficiently reliable comparators. His failure to do so renders his comparable-license analysis unreliable.

For all of the reasons stated above, the Court excludes Bokhart's report and his testimony at trial.

**V**

**A**

The Court now turns to Ford's motion to exclude the trade secret damages opinions of James Elson. (*See* Elson Mot., ECF #347.) Like Bokhart, Elson is a Vice President of the consulting firm Charles River Associates. (*See* Elson Rpt. at ¶1.2, ECF #347-4 at Pg. ID 17831.) Elson has "substantial prior experience performing valuation and damages-related analyses, including analyses performed in connection with the assessment of damages in the context of complex commercial disputes." (*Id.*)

Versata hired Elson to "assess Versata's damages … as measured by the economic benefits enjoyed (and reasonably expected to be enjoyed prospectively) by Ford … as a result of Ford's alleged trade secret misappropriation." (*Id.* at ¶1.1, Pg. ID 23611.) Stated another way, Versata hired Elson to quantify the extent to

which Ford has been unjustly enriched as a result of Ford's alleged misappropriation of Versata's trade secrets.

Elson first determined that Ford's use of Versata's technology – which included Versata's trade secrets – saved Ford $134 million per year. (*See id.* at ¶¶ 5.2, 5.8, Pg. ID 17861, 17901.) Elson then determined that based on these savings, Ford owes Versata (1) $485.7 million in unjust enrichment damages for Ford's use and alleged misappropriation of its trade secrets during the time period from January 14, 2015, through August 31, 2018 (the date when Elson assumed trial would conclude[4]) and (2) an additional $423.3 million to $877.8 million in unjust enrichment damages that could extend through the year 2026 "depending on the assumed amount of time required by Ford (post-trial) to develop and implement replacement functionality in a non-infringing way." (*Id.* at ¶2, Pg. ID 17833.) Thus, Elson concluded that Versata is entitled to over $1 billion in unjust enrichment, trade secret misappropriation damages.

Elson's estimate of $134 million per year in unjust enrichment damages far eclipses the amount that Versata actually required Ford pay in order to reap the benefits of the software that included Versata's alleged trade secrets. Over the course of the parties' relationship, Ford paid Versata approximately $20 million,

[4] At the time Elson drafted his expert report, it was possible that this case would proceed to trial in the time-frame Elson referenced. This case is now unlikely to proceed to trial until 2019.

including expenses, to develop the MCA and ACM software programs and between $5.25 million and $12.95 million per year to license the software programs. (*See* ECF #347-3 at Pg. ID 17824; ECF #347-8 at Pg. ID 17948; ECF #347-12 at Pg. ID 17964; ECF #347-19 at Pg. ID 17987; ECF #347-20 at Pg. ID 17990.) Then, in 2014, during negotiations for a renewed software license, Versata offered to license ACM and MCA to Ford for an additional five years at a licensing fee of $17 million per year. (*See* ECF #347-21 at Pg. ID 17992.) Thus, while Elson opined that Ford unjustly benefited from the use of Versata's software and technology in an amount equal to $134 million per year, Versata licensed its software to Ford (and offered to continue licensing its software to Ford) for a fraction of that amount.

**B**

Ford moves to exclude Elson's trade secret damages opinions. (*See* Elson Mot., ECF #347.) Ford argues, among other things, that Elson's opinions are unreliable and inadmissible because he "failed to … apply the proper measure of damages." (*Id.* at Pg. ID 17787.) According to Ford, the value of Versata's trade secrets was set by the parties' prior licensing negotiations and agreements, and the "royalty rate" established between the parties "should be used as the basis for trade secret damages." (*Id.* at Pg. ID 17796.) Ford insists that Elson's unjust enrichment damages model is fundamentally flawed because it yielded a damages calculation "13 times higher than the rate the parties agreed upon." (*Id.* at Pg. ID 17806.) Ford

further maintains that Elson "failed to limit [his] damages [calculation] to the asserted trade secrets," that Elson wrongly "base[d] his opinion on unverified, outdated data," and that Elson's "hypothetical future unjust enrichment damages" are speculative and unreliable. (*Id.* at Pg. ID 17787.) The Court agrees and will therefore exclude Elson's trade secret damages opinions.

**C**

**1**

**a**

The Court excludes Elson's proposed testimony because he applied a damages model that is not an appropriate fit for this case. As noted above, Elson purported to measure the unjust enrichment to Ford from its use of the software that included the trade secrets at issue.[5] Under Elson's damages model, the unjust enrichment to Ford equals the value of the benefits Ford received – such as cost savings – from its use of Versata's software. He pegged the unjust enrichment at $134 million per year.

That cannot possibly be a reasonable measure of unjust enrichment damages here. Simply put, the model is flawed because it measures Ford's enrichment rather

[5] As discussed in more detail in section V(C)(2) below, a substantial flaw in Elson's analysis is that he accounts for damages related to Ford's use of Versata's *software* writ large, instead of the damages related to Ford's use of the *trade secrets* at issue here.

than Ford's *unjust* enrichment. Indeed, the whole point of Versata's software was to confer upon Ford important and valuable benefits, including costs savings and increased manufacturing efficiencies, in exchange for payment of the license fee. Versata touted its software to Ford precisely because it allowed Ford to reap these benefits. And Versata believed that it was "just" for Ford to receive those benefits in exchange for far less than $134 million per year. In fact, Ford and Versata's licensing history (described above) demonstrates Versata's belief that there was nothing *unjust* about Ford's receipt of the software's benefits so long as Ford paid Versata, at most, $17 million per year to license the software.

The Court rejects Elson's damages model because it would award Versata far more than the fair price it deemed Ford should pay in exchange for the software's benefits. As a result, the jury's reliance on the model would confer upon Versata a huge and undeserved windfall.[6]

[6] Versata highlights that during its relationship with Ford, it received from Ford far more than just software licensing fees. Versata notes that from 2000-2015, Ford paid an additional $270 million for "consulting and support work." (Versata Resp. Br., ECF #416 at Pg. ID 24720.) Versata contends that over its fifteen-year relationship with Ford, it received a total of roughly $420 million in compensation from Ford (consisting of the license fees plus fees for numerous other services). (*See id.*) If Versata's numbers are correct, Ford paid Versata an average of $28 million per year ($420 million divided by fifteen years) to obtain the benefits of Versata's software and services. That amount pales in comparison to the $134 million per year that Versata seeks under Elson's unjust enrichment model of damages and further underscores the unreasonableness of awarding damages under that model here.

**b**

In order to avoid such a windfall, Versata's trade secret damages in this case must be measured with reference to the parties' licensing history. This measure of damages in widely accepted in trade secret misappropriation cases. Indeed, in "most cases," the "proper measure" of trade secret misappropriation damages involves "calculat[ing] what the parties would have agreed to as a fair price for the licensing the defendant to put the trade secret to the use the defendant at the time the misappropriation took place." *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974). As the Sixth Circuit has explained, the "best evidence" of the value of misappropriated trade secrets – and thus the best measure of the damages owed to a plaintiff in a misappropriation case – are the "established royalties" and/or "agreement[s] in principle" between the parties to license those secrets. *Vitro Corp. of America v. Hall Chemical Co.*, 292 F.2d 678, 683 (6th Cir. 1961).

The Sixth Circuit's decision in *Vitro Corp.* confirms that Versata's trade secret misappropriation damages are properly measured with reference to the parties' licensing history. In *Vitro Corp.*, a declaratory judgment defendant and the plaintiff had agreed in principle that the defendant would to allow the plaintiff to use the defendant's proprietary reclamation process in exchange for a $100,000 one-time payment and a yearly payment of at least $50,000 for a period of six years. *Vitro*

*Corp.*, 292 F.2d at 680. Before the agreement could be finalized, the plaintiff's "chemists spent approximately one week" at the defendant's laboratory, during which time the defendant "fully disclosed his process" to the plaintiff's scientists. *Id.* The negotiations between the parties broke down before the agreement could be completed, and the defendant later accused the plaintiff of stealing the secret process. *See id.* at 681. After judgment was entered in favor of the declaratory judgment defendant, the trial court turned to the issue of damages. The court assigned that task to a special master, and he "determined that the proper method [of determining the damages owed to the defendant] … was an 'established royalty' computation and that this royalty would be determined by using the minimum amounts established by the parties themselves in the 'agreement in principle.'" *Id.* at 682.

On appeal, the plaintiff "vigorously urge[d] that it was erroneous for the master to base his award on the 'agreement in principle.'" *Id.* The Sixth Circuit rejected that argument. It held that the "best evidence" of the value of the trade secrets, and thus the damages owed to the plaintiff as a result of the misappropriation, was "the payments agreed upon in the 'agreement in principle.'" *Id.* The court therefore affirmed the use of the value the parties had agreed upon as the basis for the defendant's trade secret damages.

The Sixth Circuit reached a similar result in *Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505 (6th Cir. 2005). In *Mid-Michigan*, the

plaintiff licensed certain software to the defendant for use in the defendant's pharmacies. *See id.* at 507. Years later, the plaintiff accused the defendant of stealing and reconstructing the source code for that software for defendant's own purposes, and the plaintiff brought a trade secret misappropriation claim. *See id.* at 507-08. The jury later awarded $2 million in damages based on a "reasonable royalty approach" – one that rested, in part, upon the licensing rates previously agreed upon by the parties. *See id.* at 509-10. The defendant challenged the damages award on appeal. The Sixth Circuit upheld the jury's damages award and approved its use of a "reasonable royalty approach." *Id.* at 509-10. The court held that the parties' previous agreements provided sufficient "evidence … that the parties valued the misappropriated trade secrets at $2 million." *Id.* As in *Mid-Michigan and Vitro Corp.*, the proper measure of damages in this case should be based upon the parties' licensing history.[7]

Versata counters that its damages should not be tied to the parties' licensing history. In support, Versata highlights the Sixth Circuit's statement that where, as

---

[7] The Court leaves for another day resolution of whether the relevant licensing history is strictly limited to (1) the license fees previously agreed to by the parties and (2) Versata's final offer to license the software in 2014, or whether the relevant history should be construed more broadly to include fees that Ford agreed to pay for related support and other services throughout the parties' relationship. For the purposes of this ruling, the Court concludes only that Versata's damages model must be tied to the parties' actual prior agreements and negotiations and that Versata may not seek damages based upon the value of benefits Ford obtained by using Versata's software during the period of alleged misappropriation.

here, "the misappropriated trade secrets were not directly used to field competing products, but were used, for example, to save research and manufacturing resources, plaintiffs [] use[] a *number of different methods* of calculation to determine damages." *Avery Dennison Corp. v. Four Pillars Enterprise, Co.*, 45 F. App'x 479, 485 (6th Cir. 2002) (emphasis added). One such method, Versata informs the Court, is awarding damages based upon "the value derived from savings because of increased productivity, or the value derived from savings in research costs." *Id.* at 486 (citing *University Computing*, 504 F.2d at 535-36). But these alternative measures are appropriate only where the trade secret misappropriation damages are not "subject to exact measurement," *University Computing*, 504 F.2d at 539, and the damages here can be measured with exactness. Indeed, as the Fifth Circuit explained in a case on which Versata relies, damages *are* "subject to exact measurement," where, as here, "the parties had previously agreed on a licensing price." *University Computing*, 504 F.2d at 538. Under these circumstances, the substantial flexibility that courts may otherwise have to eschew the reasonable royalty approach and to develop an alternative damages measurement simply does not apply. *See id.* at 538-39.

Notably, Versata does not cite any case in which any court, when presented with the parties' licensing agreements and history, has departed from the reasonable royalty method of calculating damages and has measured damages based upon the

value of benefits obtained by the defendant. Versata cites Sixth Circuit's decision in *Avery Denison*, *supra*, for the proposition that "where a trade secret has not been destroyed and where the plaintiff is unable to prove specific injury, courts measure the value of the secret to the defendant." (Versata Resp. Br., ECF #416 at Pg. ID 24727, quoting *Avery Dennison*, 45 F. App'x at 485). But the alleged trade secrets misappropriated in *Avery Dennison* were not for sale, and there was no licensing history between the parties. Under those circumstances (which differ sharply from those here), the plaintiff's "theories of damages" appropriately "concentrated on the benefits that [the defendant] derived from the use of the secrets." *Avery Dennison*, 45 F. App'x at 486.

Versata further asserts that its damages should not be based on its licensing history with Ford because (1) its previous and proposed license fees accounted for certain strict conditions that the licenses imposed upon Ford and (2) Ford has not been subject to those conditions during the time of its alleged misappropriation. Thus, Versata contends, Ford has obtained more than Versata offered under the previous and proposed licenses, and the parties' licensing history is insufficient to capture Versata's damages. But Versata has not presented any evidence, and the Court has no reason to believe, that during the time of Ford's alleged misappropriation, Ford has violated conditions that would have been included in Versata's proposed license in a manner that has damaged Versata in any material

way.[8] The Court is not convinced that restricting Versata's damages to the parties' licensing history would fail to compensate Versata for conduct by Ford that would have breached conditions of the license proposed by Versata.

Versata also argues that the Court should not tie its damages to the parties' licensing history because its previous licenses and its last-proposed licensing offer to Ford were all limited to a term of years, and by misappropriating the trade secrets, Ford has secured the opportunity to use Versata's software in perpetuity. However, if Versata prevails on its trade secrets misappropriation claim, the Court can protect Versata from Ford's continued use of the trade secrets by issuing injunctive relief.

For all of the reasons stated above, the Court will limit Versata to a reasonable royalty model of damages that is based upon the parties' relevant business history, and the Court will not permit Versata to seek damages based upon the alleged value of benefits obtained by Ford through its use of the relevant software.

---

[8] For example, Versata says that its proposal to Ford contained a condition that Ford not share Versata's software and trade secrets with certain third parties. But Versata has not presented any evidence that Ford has shared the software and/or Versata's trade secrets in a way that is inconsistent with the parties' previous licenses or in a way that has materially injured Versata. Thus, the parties' licensing history is not insufficient on the grounds that it does not compensate Versata for Ford's alleged sharing of Versata's trade secrets.

Case: 24-1140 Document: 18 Page: 115 Filed: 03/19/2024

**2**

Even if the Court had allowed Versata to pursue the unjust enrichment theory of trade secret misappropriation damages proposed by Elson, the Court would still have excluded Elson's testimony on the ground that it is unreliable. The Court reaches that conclusion for at least three reasons.

First, Elson made no effort to apportion Versata's claimed damages between those caused by Ford's alleged misappropriation of trade secrets and Ford's other alleged infringements of Versata's intellectual property. That was a serious error. It is "generally accepted that the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement." *University Computing*, 504 F.2d at 535 (internal quotation marks omitted). *See also Vitro Corp.*, 292 F.2d at 682 ("We had held that the discoverer of a secret suffers damages to the same extent as does the inventor of a patent which had been infringed."). And, as discussed in detail in section IV(C) above, where, as here, accused products are comprised of both protectable and unprotectable features, expert witnesses must apportion damages such that their analysis "reflect[s] the value attributable to the infringing features of the product, and no more." *Commonwealth* 809 F.3d at 1301. *See also Finjan,* 879 F.3d at 1309-10 (Fed. Cir. 2018) (same). Here, it is undisputed that the software programs at issue are comprised of both protectable trade secrets and other, non-trade secret elements

(such as features protected by publicly-registered copyrights and patents). Yet, Elson did not make any effort to separate the cost savings that Ford allegedly obtained through its use of the trade secrets from the cost savings that Ford achieved through its alleged misappropriation and/or infringement of Versata's other intellectual property. Instead, he opined that Ford saved $134 million per year from its use of the software *as a whole*. Elson's failure to apportion damages renders his analysis inadmissible at trial.[9]

Versata counters that Elson was not required to apportion damages because the trade secrets are "not merely one piece of a larger system of products" but are, instead, "the product" at issue. (Versata Resp. Br., ECF #416 at Pg. ID 24724.) The Court disagrees. The "product at issue" here includes trade secrets and non-trade secrets, such as patents, copyrights, and other non-protectable features.

Second, Elson failed to apportion Versata's alleged damages on a trade-secret-by-trade-secret basis. More specifically, instead of calculating how much Ford's use of each specific trade secret damaged Versata on an individual basis, Elson calculated a *single* amount of damages that Versata allegedly suffered from Ford's misappropriation of *all* of the trade secrets at issue. But the jury will have to make

[9] The report and recommendation of the special master in *MSC Software Corp. v. Altair Engineering, Inc.*, 2015 WL 13273227 (E.D. Mich. Nov. 9, 2015), provides a persuasive explanation concerning why a court should exclude testimony by a trade secret damages expert who has failed to apportion his damages calculation in the same manner as Elson.

an independent determination – on a trade-secret-by-trade-secret basis – as to whether Ford misappropriated each of the relevant trade secrets. Elson's all-or-nothing approach thus does not fit well with the jury's task and poses a substantial risk of confusing and/or misleading the jury. Indeed, if the jury were to conclude that Ford misappropriated less than all of Versata's trade secrets (a distinct possibility, if not a likelihood in a hotly-disputed action like this), then Elson's damages calculation would not assist the jury in calculating damages and could only serve to confuse them.

The United States District Court for the Northern District of California confronted the same flaw in *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064 (N.D. Cal. 2005). In *O2 Micro*, the plaintiff accused the defendant of misappropriating eleven distinct trade secrets and sought damages on an unjust enrichment theory. At trial, the plaintiff's expert witness "provided the jury with a damages calculation based on the assumption that all of the trade secrets were misappropriated" *id.* at 1076 – the same 'all or nothing' approach that Elson used here. Following deliberations, "the jury, however, found that only five of the eleven secrets were misappropriated, and that only the misappropriation of one of them resulted in [defendant] being unjustly enriched." *Id.* The jury then awarded the plaintiff $12 million in damages. In a post-trial motion, the defendant moved for judgment as a matter of law on the basis that the plaintiff had failed to sufficiently

Case: 24-1140 Document: 18 Page: 118 Filed: 03/19/2024

prove damages. The court agreed. It held that the expert's failure to provide a reasonable basis to determine damages for each *individual* trade secret rendered the expert's analysis "useless" to the jury:

> After the jury concluded that MPS did not misappropriate all of O2 Micro's trade secrets, Mr. Meyer's expert testimony regarding damages for misappropriation of all trade secret was useless to the jury. The jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages. Thus, the jury's award of unjust enrichment damages was based on speculation and guesswork, not on evidence. The Court grants MPS' motion for judgment as a matter of law that O2 Micro failed to prove unjust enrichment damages for misappropriation of Trade Secret 1.

*Id.* at 1077.

The court's analysis in *O2 Micro* is instructive here. It underscores the problems that may arise when a trade secret damages expert fails to calculate damages on a trade-secret-by-trade-secret basis. By excluding Elson's all-or-nothing damages calculation the Court properly avoids the appreciable risk of running into those problems in this case.

Versata responds that Elson was not required to assign separate values to each trade secret because his analysis assumed that each trade secret was "independently necessary to achieve the benefit of the software" at issue. (Versata Resp. Br., ECF #416 at Pg. ID 24725.) In other words, Versata contends that Elson did not need to allocate damages between the various trade secrets because he concluded that no

matter how many of the secrets Ford misappropriated, Versata's damages would be the same. But Elson lacked reliable support for that conclusion.

As support for that conclusion, Elson cited the opinion of Versata's technical expert, Dr. Malek. (*See*, *e.g*. Elson Rpt. at ¶5.9, ECF #347-4 at Pg. ID 17901, relying upon Dr. Malek report.) But Dr. Malek's conclusion that each of the trade secrets was independently necessary was wholly conclusory. Indeed, his analysis was comprised of a single sentence: "Lastly, each of the trade secrets identified above are independently necessary to the functionality of the software, enabling the realization of the benefits described above." (Malek Rpt. at ¶454, ECF #430-3 at Pg. ID 29669.) It was not reliable for Elson to rely on such a conclusory, unsupported assertion by Dr. Malek.

Moreover, Versata has not persuaded the Court that each of the trade secrets is "independently necessary to the functionality of the software" at issue. The trade secrets at issue come from two *separate* software programs – ACM and MCA. And nether Elson nor Dr. Malek has sufficiently explained how the three trade secrets that come from the ACM software are "independently necessary" for the MCA software to function or vice versa.

Furthermore, Elson's opinion is unreliable because he did not limit his calculations to the relevant trade secrets. As described above, Elson purported to determine the amount that the "Versata Technology" saved Ford. (*See, e.g.*, Elson

Rpt. at ¶ 5.2.2, ECF #347-4 at Pg. ID 17856, "Significant evidence exists in the record to support the fact that Ford enjoyed significant benefits resulting from the Versata Technology.") But Elson defined the term "Versata Technology" to include four different software programs, including programs not at issue in this lawsuit.[10] (*See id.* at ¶1.1, Pg. ID 17831). Elson's opinions are therefore overbroad, unreliable, and not helpful to the trier of fact.

Finally, Elson relied on outdated and potentially irrelevant data. Much of the evidence that forms the basis of Elson's cost savings analysis are studies and marketing materials that were created in 2002 and 2003. That data is nearly fifteen years old, and the Court is not persuaded that Elson reliably relied upon it to calculate cost savings for the years 2015-2026. Elson defended his reliance on that data on the ground that "the appropriate timeframe for conducting an analysis of cost savings associated with technology deployment would be contemporaneous to the timing of the actual implementation of that technology." (Elson Reply Rpt., ECF #416-13 at Pg. ID 25109.) However, that does not explain why the cost savings achieved at the time of implementation carry forward unabated at the same rate for more than a

[10] Elson also repeatedly opined that Ford experienced $134 million per year in cost savings from its use of the "At Issue Technology" (*see, e.g.*, Elson Rpt. at ¶5.8, ECF #347-4 at Pg. ID 17901.) Elson defined the term "At Issue Technology" to include both the Versata Technology and the software that Ford created to replace Versata's software. (*See id.* at ¶1.1, Pg. ID 17831.) Elson made no effort to separate out what software programs, much less what trade secrets, from the broad term "At Issue Technology" caused Ford to experience these cost savings.

dozen years (and potentially up to 25 years). Elson suggests that the initial cost savings became "embedded" in Ford's production process (*Id.* at Pg. ID 25110), but he failed to offer sufficient support for that assertion. Elson simply has not shown how it was reliable for him to calculate damages for the years 2015-2026 based on the old data from 2002 and 2003 referenced in his report. *See Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) (affirming exclusion of expert witness in part because expert relied on "flawed data and impermissible methods" including a "marketing plan" from "a decade-and-a-half ago" without explaining why that data remained relevant).

Moreover, and in any event, several of the 2002-2003 figures on which Elson relied appear to be largely *estimates* and *projections* of *potential* cost savings. (*See id.* at ¶5.2.3, Pg. ID 17859; "The March 2003 Presentation estimated that Ford could avoid approximately $675 million to $925 million in excess annual costs as a result of Global Product Definition ("GPD") / ACM initiatives.") Neither Elson nor Versata has presented sufficient evidence that Ford actually experienced these "estimate[d]" cost savings as a result of its use of the ACM and MCA software.[11] It

[11] As described above, James Martin reported that Ford experienced substantial cost savings in the years after it implemented ACM. But Martin did not opine or present evidence that these cost savings *resulted from Ford's use of ACM*. In fact, Versata specifically disclaimed that Martin had offered such an opinion.

was not reliable for Elson to calculate cost savings based, in fairly substantial part, upon unconfirmed, fifteen year-old *estimates*.

For all of these reasons, the Court would have precluded Elson from testifying at trial even if it had allowed Versata to present to the jury its proposed unjust enrichment damages model.

**VI**

**A**

The Court now turns to Ford's motion to exclude the copyright infringement opinions of technical expert Dr. Samuel Malek. Dr. Malek is a tenured Associate Professor of Software Engineering in the School of Information and Computer Sciences at the University of California, Irvine, and he has a Ph.D. in Computer Science from the University of Southern California. (*See* Malek Rpt. at ¶¶ 14-15, ECF #430-3 at Pg. ID 29470-71.) His "research is in the field of software engineering, and to date [his] focus has spanned the areas of software design and architecture, distributed and embedded systems, smartphone and mobile computing, internet and web technologies, middleware, service oriented computing, autonomic computing, and software dependability and security." (*Id.* at ¶17, Pg. ID 29471.) Dr. Malek also has "several years of experience as a software engineer, software architect, and programmer at a variety of companies" including Boeing and PriceWaterhouseCoopers Consulting. (*Id.* at ¶20, Pg. ID 29473.)

Versata retained Dr. Malek to provide opinions on a variety of subjects relevant to its claims against Ford, including:

- An overview of the technology at issue in this case;
- An overview of Versata's trade secret innovations that were disclosed to Ford;
- Ford's misappropriation of Versata's trade secrets; [and]
- The steps taken by Versata to protect and maintain the secrecy of its trade secrets.

(*Id.* at ¶1, Pg. ID 29469.) Relevant to Ford's motion here, Dr. Malek also opined on "Ford's infringement of Versata's copyrighted software." (*Id.*)

Dr. Malek's copyright opinions take up a small part of his 464-paragraph, 208-page expert report. Dr. Malek began his copyright analysis by identifying the elements of Versata's copyright claims. (*See id.* at ¶33, Pg. ID 29477.) He then said that he "understand[s] that the court will apply a two-step test to determine substantial similarity exists for copyright infringement: (1) determining which aspects of the copyrighted work are protectable and (2) examining the remainder for substantial similarity." (*Id.* at ¶34, Pg. ID 29477.) Next, in the "background" section of the report, Dr. Malek said that from "at least 2012 through at least 2014," Ford "copied" certain files – known as "JAR" files – "from the ACM to the PDO development environment." (*Id.* at ¶70, Pg. ID 29490.) Dr. Malek explained that "JAR files are executable code files that [Versata] delivered [to Ford] as part of the ACM program to enable Ford to implement and install ACM functionality on its

servers." (*Id.* at ¶69, Pg. ID 29489.) According to Dr. Malek, "[t]he only reason why a developer would move the .jar files into a development environment is to use the files for development." (*Id.* at ¶71, Pg. ID 29490.) Dr. Malek said that Ford "deliberately used" the JAR files when Ford developed PDO in order to "help ensure that its PDO software functioned and produced the same results as ACM." (*Id.*)

Finally, in paragraphs 426 through 437 of the report, Dr. Malek provided his opinion that Ford infringed Versata's copyrights with respect to the JAR files. In these two pages, Dr. Malek opined that:

> 426. As described above, Ford made copies of Versata .jar files in its PDO source code repository.
>
> 427. These .jar files would be made available to Ford so that Ford could execute its code. In their ordinary environment, these files do not provide any human-readable information.
>
> 428. Ford began incorporating ACM, MCA, and ACS .jar files into the PDO Accurev environment no later than March 2012. Because during this time Ford was using versions of ACM version 4.23.13, MCA version 2.2, and ACS version 2.2, or earlier releases, I find that the .jar files were likely extracted from these versions of the Versata software.
>
> 429. Additionally, evidence shows that use of Versata's .jar files was prevalent among PDO developers. Of 71 PDO developers who were asked to check their machines for these files, 33 reported that they had Versata .jar files on their computers.
>
> 430. I understand that Ford's license does not allow for Ford to use Versata's .jar files for the purpose of

Case: 24-1140 Document: 18 Page: 125 Filed: 03/12/2024

reverse engineering Versata's software and does not allow for decompiling Versata's code.

431. These .jar files contain Versata's copyrighted code. By being placed in a source code repository, the code for these files becomes human-readable, allowing for the software to be reverse engineered.

432. Additionally, evidence shows that these .jar files were uploaded onto the personal work stations of at least 33 PDO developers.314 At least 13 of these developers wrote source code for PDO: Anna Boballa, Archana Chavalla, Ganesh Alla, Huynh Le, Julie Bernard, Linda Wu, Mel Bali, Rahul Punjala, Sujatha Bagavandoss, Syed Rizvi, Veeral Patel, Venkat Gadwal, and Wanda Gielzecki.

433. Based on analysis of the build configuration files, the following .jar files are associated with the ACM application: trie.jar, cm.jar, acmui.jar, cmresources.jar, acmuiresources.jar, and testscore.zip. The following .jar files are associated with ACS: acs.jar, acs_tests.jar, acs_automation.jar, and the following .jar files are associated with MCA: mca.jar, mcamonitoringtool.jar, trilcommons.jar, mcaresources.zip, mca_test_data.zip, mca_test.jar.

434. Notably, these persons were not active GPD users, and therefore would not have a valid reason to have ACM related .jar files on their workstations.

435. Given the nature of software development, based on this distribution of .jar files and the fact that each developer had at least one ACM jar file on his or her workspace, I conclude that evidence supports a finding that at least each of the 33 PDO developers with Versata .jar files on their computer had an unauthorized copy of ACM software or a discrete component thereof. Each developer had multiple ACM .jar files on their computer. Additionally, based on these files, I find that Ford has

Case: 24-1140 Document: 18 Page: 126 Filed: 03/19/2024

> conducted at least X instances of copyright infringement based on its creation of unauthorized copies of .jar files.
>
> 436. Given this access to Versata's code, a developer could reverse engineer ACM, MCA, and ACS. I understand this would violate the terms of Versata's license to Ford and these copies would therefore be unauthorized.
>
> 437. Having Versata's source code in human readable format would also make building a replacement significantly easier and reduce the amount of time for Ford to develop a replacement. This access would also enable Ford PDO developers to examine the logic behind the ACM code.

(*Id.* at ¶¶ 426-37, Pg. ID 29664-65.)

**B**

Ford moves to exclude Dr. Malek's copyright opinions. (*See* Malek Mot., ECF #344.) Ford principally argues that Dr. Malek's opinions are not based on reliable methods because he failed to apply the proper test for determining copyright infringement. (*See id.* at Pg. ID 17213.) More specifically, Ford asserts that Dr. Malek was required to "filter out the unoriginal, unprotectable elements" from Versata's software as part of his analysis, but he failed to do so. (*Id.* at Pg. ID 17212.) The Court agrees.

**C**

"To establish copyright infringement, a plaintiff must show '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are

original.'" *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). A plaintiff may prove copying in one of two ways. In some cases, there is "direct evidence" of copying and therefore "it [is] a given that the defendant had copied the plaintiff's work." *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). In other cases, where "there is no direct evidence of copying … a plaintiff may establish an inference of copying by showing (1) access to the allegedly-infringing work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Id.* at 854 (internal quotation marks omitted).

Both parties here agree that where there is no direct evidence of copying, a court must conduct what is commonly referred to as a filtration analysis. In that analysis, courts "identify and eliminate those elements [of the disputed work] that are unoriginal and therefore unprotected." *Id.* at 853. Courts engage in a filtration analysis because "[n]ot all copying is actionable," and "it is a constitutional requirement that a plaintiff bringing an infringement claim must prove copying of constituent elements of the work *that are original*." *Id.* (internal quotation marks omitted; emphasis in original).

The parties strenuously disagree as to whether a filtration analysis is necessary where the plaintiff presents direct evidence of copying. Versata insists that a filtration analysis is "not required if there is evidence of direct copying." (Versata

Case: 24-1140 Document: 18 Page: 128 Filed: 03/19/2024

Supp. Br., ECF #502 at Pg. ID 40158.) Versata says that Dr. Malek was not required to conduct a filtration analysis because it (Versata) has presented direct evidence of copying by Ford.[12] Ford counters that "filtering-out unoriginal and unprotectable elements is the first step in *any* copyright infringement analysis, regardless of whether 'direct' or 'indirect' copying is asserted." (Ford Supp. Br., ECF #501 at Pg. ID 40150; emphasis original.) Ford is correct.

The Sixth Circuit's decision in *Kohus* makes clear that a filtration analysis is essential even where there is direct evidence of copying. The court in *Kohus* separately discussed cases involving direct evidence of copying and cases "in which there is no direct evidence of copying." *See Kohus*, 328 F.3d at 853-54. The court discussed cases involving direct evidence of copying first, and the court cited the Supreme Court's decision in *Feist* as a case involving such direct evidence. *See id*. Indeed, the court stressed that in *Feist*, "it was a given that the defendant had copied the plaintiff's work." *Id*. at 853-54. The court observed that in *Feist*, the Supreme Court "filtered out the unoriginal, unprotected elements, and then determined that there was nothing original to be protected." *Id*. at 853. Based upon *Feist* (and while

[12] Ford contends that Versata has not presented sufficient direct evidence of copying and that the Court should thus treat this case as one involving only indirect evidence of copying – *i.e.*, as a case in which a filtration analysis in plainly required. The Court need not determine whether Versata has presented sufficient evidence of direct copying because, even if it has done so, for the reasons explained above, Dr. Malek was still required to conduct a filtration analysis.

Case: 24-1140 Document: 18 Page: 129 Filed: 03/19/2024

discussing cases involving direct evidence of copying), the court concluded that "before comparing similarities between two works a court should first identify and eliminate those elements that are unoriginal and therefore unprotected." *Id.*

The Sixth Circuit's description and discussion of *Feist* and of cases involving direct evidence of copying in *Kohus* leaves no doubt that a filtration analysis *is* required in cases involving direct evidence of copying. District courts in this circuit, including another Judge on this Court, read *Kohus* this same way. *See, e.g.*, *Integrated Bar Coding Systems, Co. v. Wemert*, 2007 WL 496464, at *4 (E.D. Mich. Feb. 12, 2007) (explaining that, under *Kohus*, "the first step is for the court to identify which aspects of the artist's work, if any, are protectible by copyright," and only "[o]nce the non-protectable elements have been filtered out," then the trier of fact turns to the question of whether the plaintiff has "shown[n] evidence of direct, literal copying of the original elements of the work, or raise[d] an inference of infringement by establishing" access and substantial similarity (internal quotation marks omitted)); *Automated Data Soln's Corp. v. Paragon Data Sys.*, 2012 WL 6026137, at *7 (N.D. Ohio July, 2012), *report and recommendation adopted in part* at 2012 WL 6042408, *affirmed* at 756 F.3d 504 (6th Cir. 2014) (recognizing that under *Kohus*, among other cases, "[a] plaintiff alleging copyright infringement of computer software under either a theory of direct copying or by an inference of copying must *initially* identify those elements of its software that are original and thus entitled to

Case: 24-1140 Document: 18 Page: 130 Filed: 03/19/2024

protection, thereby filtering out [unprotectable] elements" of the software" (internal emphasis added)).[13]

In this case, then, Dr. Malek was required to conduct a filtration analysis even though Versata purportedly presented direct evidence of copying, and his analysis was flawed because he did not conduct that essential analysis. He did not make any effort to identify the elements of the software at issue that are not original, nor did he eliminate those unprotected elements before concluding that Ford infringed Versata's copyrights. And his failure to do so was not a *de minimis*, inconsequential error. On the contrary, as Versata concedes, not all parts of the software that it alleges Ford copied is protectable under the relevant copyright laws,[14] and thus it was critical for Dr. Malek to include a filtration step in his copyright infringement analysis.

Because Dr. Malek did not apply the correct legal standard, his copyright opinions are not based on reliable principles and methods, and the Court will exclude them. *See Mayo Clinic v. Elkin*, 2010 WL 5421322, at *6 (D. Minn. Dec. 27, 2010)

[13] The court in *Automated Data* did not cite *Kohus* directly for this proposition. Instead, it cited the Sixth Circuit's later decision in *R.C. Olmstead, Inc. v. CU Interface, LLC,* 606 F.3d 262, 275 (6th Cir. 2010). But the court recognized that the portions of *R.C. Olmstead* on which it relied cited to, and relied upon, *Kohus*. *See Automated Data*, 2012 WL 6026137, at *7.

[14] *See* Seth Kraus Dep. Tr. at 187, ECF #155-2 at Pg. ID 7044, in which former Versata software engineer Seth Krauss acknowledges that the ACM software incorporated publicly-available, "open source" software. *See also* Versata Interrog. Resp., ECF #357-3.

Case: 24-1140 Document: 18 Page: 131 Filed: 03/19/2024

(striking copyright infringement expert and concluding that expert's infringement opinion was "not based on reliable principles" where expert failed to conduct filtration analysis when analyzing copyright claim involving computer software); *cf.* *Olin Corp. v. Lamorak Ins. Co.*, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 17, 2018) ("Expert testimony [] should be excluded when it applies the wrong legal standard"); *United States Gypsum Co. v. Lafarge North America, Inc.*, 670 F.Supp.2d 737, 745 (N.D. Ill. 2009) (excluding expert witness from testifying where expert "applied the incorrect legal standard in formulating damages").[15]

For all of the reasons explained above, the Court concludes that Dr. Malek's copyright infringement opinions are not the product of reliable principles and methods, and those opinions are therefore excluded.

[15] Dr. Malek's failure to conduct a filtration analysis is especially puzzling here because he acknowledged that the Court *would* need to apply that test to Versata's copyright claim. Indeed, in Dr. Malek's expert report, he recognized that the Court would "apply a two-step test" to Versata's copyright infringement claim that included "determining which aspects of the copyrighted work are protectable." (Malek Rpt. at ¶33, ECF #345-1 at Pg. ID 17231.) Moreover, Dr. Malek's suggestion that the Court *would* conduct a filtration analysis conflicts with Versata's current contention that the Court need *not* conduct such an analysis because it has presented direct evidence of copying. These additional red-flags weigh against a finding that Dr. Malek's analysis is reliable.

VII

A

The Court finally addresses Versata's motion to strike portions of the expert opinions of Monty Myers, an expert witness Ford retained to rebut the patent and trade secret opinions offered by Dr. Malek. (*See* Myers Mot., ECF #352.) Myers is the founder and Chief Executive Officer of Eureka Software Solutions, Inc., a "recognized project-oriented, custom software development company based in Austin, Texas." (ECF #415-5 at ¶3, Pg. ID 24324.) During the past thirty-two years, "Eureka has built software products and business solutions for a client list that includes members of the Global 1000, Fortune 500, notable private companies, and numerous high-profile start-up organizations." (*Id.*) Myers has substantial experience "conceiving, planning, architecting, building, and launching software/automation systems configuration management including several projects involving automotive/vehicle configuration functionality." (*Id.* at ¶8, Pg. ID 24326.)

Myers offered his opinions through three different reports: (1) an October 26, 2017, patent rebuttal report (the "Myers Patent Report"), (2) an October 27, 2017, trade secret rebuttal report (the "Myers Trade Secret Report"), and (3) a December 14, 2017, supplemental report (the "Myers Supplemental Report"). In the Myers Patent Report, Myers reviewed the source code for the PDOR1 software. He concluded that PDOR1 does not infringe any of the patents-in-suit. (*See* Myers

Patent Rpt., ECF #353-1.) In the Myers Trade Secret Report, Myers countered Dr. Malek's conclusion that PDOR1 uses trade secrets that belong to Versata. (*See* Myers Trade Secret Rpt., ECF #353-2.) Finally, Myers expressed two opinions in the Myers Supplemental Report. (*See* Myers Supp. Rpt., ECF #353-3.) Both opinions in that report related to Dr. Malek's conclusion that Versata had taken reasonable efforts to maintain the secrecy of its alleged trade secrets, an element of its trade secret claim. First, Myers said that he had found an ACM user guide on the internet, and he opined that Dr. Malek should have considered the public availability of this guide when he concluded that Versata had taken reasonable measures to protect its trade secrets. (*See id.* at Pg. ID 18621.) Second, Myers commented on Versata's alleged failure to produce confidentiality agreements between itself and certain third parties. Myers opined that if Versata did not use confidentiality agreements to protect its trade secrets, that fact would "be an important part of any consideration of the reasonableness of the efforts to maintain the secrecy of any alleged trade secrets." (*Id.* at Pg. ID 18624.) Thus, Myers believed that Dr. Malek should have considered the absence of these agreements when he concluded that Versata took reasonable measures to maintain the secrecy of its trade secrets. (*See id.*)

**B**

**1**

Versata first asserts that Myers provided either no citation or overly-broad citations to the PDOR1 source code that he reviewed in the Myers Patent Report and the Myers Trade Secret Report. (*See* Myers Mot., ECF #352 at Pg. ID 18404-09.) According to Versata, "[t]he failure to Myers to identify the portions of the [source] code upon which he relies renders his opinions unhelpful to the trier of fact." (*Id.* at Pg. ID 18404.) Versata therefore asks that the Court "strike the portions of the [Myers Patent Report and the Myers Trade Secret Report] in which Meyers relies on unidentified source code." (*Id.* at Pg. ID 18401.)

The Court concludes that Myers citations are sufficient. For example, Versata identifies several instances where Myers referred to and cited generally to the PDOR1 source code examined by Dr. Malek. (*See, e.g.*, *id.* at Pg. ID 18407-08.) However, it does not appear unreasonable that Myers, as a rebuttal expert, would review and rely upon the same sections of code as Dr. Malek. And Versata is well aware of what parts of the source code Dr. Malek relied upon. Furthermore, many of Myers' citations that Versata claims were overbroad were simply citations to lines of code that together comprised a particular function. (*See, e.g.*, Myers Rpt. at ¶186 n.21, ECF #352-1 at Pg. ID 18443, citing "FORD-SOURCECODE_086486-489, 412-555" related to PDOR1's consistency checking function.) In other cases, Myers

appears to have reasonably referred to the software generally, and he cited the relevant lines of code that he relied upon. (*See id.* at ¶337 n.115, Pg. ID 18468, citing in an introductory summary paragraph several citations to different lines of code).

In sum, the Court does not believe that Myers' citations to the PDOR1 source code rendered his expert report and testimony unreliable. And to the extent Versata believes that Myers has not reviewed the relevant lines of code, it may elicit that information on cross-examination at trial. For all of these reasons, the Court declines to strike the portions of the Myers Patent Report and the Myers Trade Secret Report that rely upon Myers' review of the PDOR1 source code.

**2**

Next, Versata argues that the Court should strike the opinions that Myers offered in the Myers Supplemental Report. It insists that Myers has failed to provide sufficient information about how he obtained the ACM user guide he claims to have found on the internet and about how the guide became available on the internet. (*See* Myers Mot., ECF #352 at Pg. ID 18410-16.) Versata further maintains that Myers' conclusions with respect to Versata's use of confidentiality agreements is outside of his expertise. (*See id.*) The Court agrees with Versata that Myers' opinions related to the ACM user guide are irrelevant and should be excluded from trial, but it disagrees that it should strike Myers' opinions about the confidentiality agreements.

As to the ACM user guide, Myers has not sufficiently explained how the existence of the guide on the internet creates an inference that Versata did not take reasonable measures to protect its trade secrets. Myers did not explain who uploaded the guide to the internet, how the guide was initially obtained (*i.e.*, was it stolen or was it posted in violation of a confidentiality agreement), or why the guide was uploaded. These subjects are essential to any analysis of whether Dr. Malek should have considered the public existence of this guide when performing his trade secret analysis. Without answers to these questions, the Court cannot conclude that Myers' opinion based on the existence of the user guide on the internet is reliable.

More importantly, Myers did not opine that the user guide actually contained any alleged trade secrets. Myers provided a table that he said "provides examples of whether the ACM User Guide published on the Internet references information *similar to* the information cited by [Dr.] Malek (including user manuals) in his trade secret report." (Myers Supplemental Rpt., ECF #353-5 at Pg. ID 18620; emphasis added.) But information that is merely "similar to" a trade secret is not a trade secret. And if the information in the user guide is not a trade secret, and is instead only "similar to" a trade secret, then Myers' entire analysis and conclusion has no bearing on the trade secret claim in this action. Myers' opinion with respect to the user guide is therefore not useful to the trier of fact and could potentially confuse the jury.

Case: 24-1140 Document: 18 Page: 137 Filed: 03/19/2024

Accordingly, Myers' opinions related to the user guide are unreliable and thus inadmissible.

Next, the Court concludes that Myers has provided a sufficient foundation for his opinion that if Versata did not use confidentiality agreements every time it disclosed its software, that fact is relevant to whether Versata took reasonable measures to protect its trade secrets. Myers' opinion and underlying analysis on this subject is based on his over thirty-years of experience in the software development industry. Myers' long history in the software industry qualifies him to offer opinions on the use of confidentiality agreements in that business. To the extent that Versata believes that Myers' qualifications to offer this opinion are insufficient, it may cross-examine him on this topic at trial.

**3**

Finally, Versata argues that Myers impermissibly relied on evidence outside the record, including an undisclosed product presentation. (*See* Myers Rpt., ECF #352 at Pg. ID 14819-25.) Versata asks the Court to strike the portions of Myers' expert reports that rely on this undisclosed evidence. (*See id.*)

The focus of Versata's complaint in this regard appears to be principally related to a product demonstration provided to Myers but allegedly not disclosed to Versata. (*See* 4/24/18 Hearing Tr. at 177, ECF #472 at Pg. ID 39245.) At the hearing on the expert motions, Ford's counsel stated on the record that the product

demonstration in question was provided to Versata. (*See id.* at 196-97, Pg. ID 39265.) If Ford has indeed produced the demonstration to Versata, then Myers may rely on that demonstration. If the demonstration has not been produced, then Versata would not have had a sufficient opportunity to test the reliability of his opinions based on that demonstration. In that case, Myers would be precluded from relying on the demonstration. At some point before trial, the Court will give the parties an opportunity to present evidence on the question of whether the demonstration was, in fact, produced to Versata, and the Court will make a final determination about whether Myers may rely on that demonstration in his trial testimony.

## VIII

For all of the reasons stated above, **IT IS HEREBY ORDERED** as follows:

- Ford's motion to exclude the expert testimony of James Martin (ECF #348), Ford's motion to exclude the testimony of Christopher Bokhart (ECF ## 346, 351), Ford's motion to exclude the trade secret damages opinions of Craig Elson (ECF ## 347, 349), and Ford's motion to exclude the copyright infringement opinions of Dr. Samuel Malek (ECF #345) are **GRANTED**; and
- Versata's motion to exclude the expert testimony of Monty Myers (ECF #352) is **GRANTED IN PART AND DENIED IN PART** as set forth above.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: July 9, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 9, 2018, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

FORD MOTOR COMPANY,

Plaintiff,

v.

VERSATA SOFTWARE, INC. *et al.*,

Defendants.

Case No. 15-cv-10628
(*consolidated with Case No. 15-11624*)
Hon. Matthew F. Leitman

**FILED UNDER SEAL**[1]

______________________________________________/

**OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR RECONSIDERATION (ECF No. 709) AND (2) TERMINATING AS MOOT FORD'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 707)**

In this action, Plaintiff Ford Motor Company seeks a declaratory judgment that it did not infringe and/or misappropriate certain patents and trade secrets belonging to Defendant software developers Versata Software, Inc., Versata Development Group, Inc., and Trilogy, Inc. (collectively, "Versata"). (*See* Sec. Am. Compl., ECF No. 226.) Versata has filed counterclaims seeking damages related to Ford's alleged misuse of the same patents and trade secrets. (*See* Sec. Am. Counterclaims, ECF No. 244.) The patents and trade secrets at issue relate to two

---

[1] This Opinion and Order is being filed under seal due to the confidential business information that the Court has quoted and referenced. The Court directs the parties to meet and confer and propose a joint set of redactions, if any are required, so that the Court may release a redacted version of this Opinion and Order to the public.

Versata automotive configuration software programs that it previously licensed to Ford – "ACM" and "MCA."

The Court previously entered two orders excluding proposed damages expert testimony offered by Versata. (*See* Opinion and Orders, ECF Nos. 507, 678.) Versata has filed a motion for reconsideration of those orders. (*See* Versata Mot. for Reconsid., ECF No. 709.) That motion is now pending before the Court. Also pending is a motion by Ford for partial summary judgment. (*See* Ford Mot. for Summ. Judg., ECF No. 707). In that motion, Ford argues that in light of the Court's decision to exclude Versata's damages expert testimony, Versata has no evidence of damages, and Versata's trade secret and breach of contract counterclaims thus fail as a matter of law. (*See id.*) The Court held a hearing on these motions on December 11, 2019.

For the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Versata's motion for reconsideration. The Court will permit Versata to present that portion of its proposed expert damages testimony in which its experts offer damages opinions based upon the parties' licensing history and upon Versata's most recent offer to license the at-issue software to Ford. The Court will not permit Versata's damages experts to offer testimony based upon any other theory of damages. Because the Court will allow Versata to present limited expert

testimony related to its claims for damages, the Court will **TERMINATE AS MOOT** Ford's motion for partial summary judgment.

**I**

**A**

Versata proposes to support its claims for patent damages through the expert testimony of Christopher Bokhart. In an expert report dated August 17, 2017, Bokhart measured Versata's claimed patent damages using a "reasonable royalty" model. He determined the reasonable royalty by constructing a hypothetical negotiation between Ford and Versata to license the relevant patents. (*See* Bokhart 2017 Rpt. at ¶12, ECF No. 346-25, PageID.17651.) Bokhart concluded that this hypothetical negotiation would result in "ongoing annual lump sum payments [from Ford to Versata] of $14 million." (*Id.*)

Versata proposes to support its claims for trade secret damages through the expert testimony of Craig Elson. In an expert report dated August 17, 2017, Elson measured Versata's damages based on "the economic benefits enjoyed (and reasonably expected to be enjoyed prospectively) by Ford … as a result of Ford's alleged trade secret misappropriation." (Elson 2017 Rpt. at ¶1.1, ECF No. 347-4, PageID.17831.) Stated another way, in Elson's August 17 report, he attempted to quantify the extent to which Ford has been unjustly enriched as a result of Ford's alleged misappropriation of Versata's trade secrets. Elson first determined that

Ford's use of Versata's technology – which included, but was not limited to, Versata's trade secrets at issue – saved Ford $134 million per year. (*See id.* at ¶¶ 5.2, 5.8, PageID.17861, 17901.) Elson then determined that based on these savings, Ford owes Versata (1) $485.7 million in unjust enrichment damages for Ford's use and alleged misappropriation of Versata's technology during the time period from January 14, 2015, through August 31, 2018 (the date when Elson assumed this trial would conclude[2]) and (2) an additional $423.3 million to $877.8 million in unjust enrichment damages that could extend through the year 2026 "depending on the assumed amount of time required by Ford (post-trial) to develop and implement replacement functionality in a non-infringing way." (*Id.* at ¶2, PageID.17833.) Elson concluded that "Versata's [total] damages related to Ford's alleged misappropriation of Versata's trade secrets" had a present value of between $909 million and $1.363 billion. (*Id.*)

**B**

On February 1, 2018, Ford moved to exclude Bokhart's and Elson's testimony based on their August 17, 2017, reports (*see* Ford Motions, ECF No. 346, 347), and the Court granted those motions (the "First Expert Opinion and Order"). (*See* First Expert Op., ECF No. 507.) The Court first excluded Bokhart's expert testimony

[2] At the time Elson drafted his August 17 expert report, it was possible that this case would proceed to trial in the time frame Elson referenced. This case will likely not proceed to trial until later this year (2020).

related to Versata's claimed patent damages. (*See id.*, PageID.40208-40216.) The Court determined that "patent damages experts must apportion claimed damages between patented and unpatented features of an allegedly-infringing product," and it concluded that "Bokhart did not attempt to satisfy the apportionment requirement even though he concede[d] that the accused software at issue is comprised of both patented and unpatented features." (*Id.*, PageID.40211-40212.) Bokhart therefore did not "apply the correct legal standard when conducting his analysis." (*Id.*, PageID.40212.)

The Court next excluded Elson's expert testimony concerning Versata's alleged trade secret damages. (*See id.*, PageID.40216-40234.) The Court held that Elson "applied [an unjust enrichment] damages model that is not an appropriate fit for this case." (*Id.*, PageID.40219.) The Court explained that Elson's unjust enrichment model was "flawed because it measure[d] Ford's enrichment rather than Ford's *unjust* enrichment." (*Id.*, PageID.40219-20; emphasis in original.) Elson's model failed to appropriately account for the fact that Versata had, in fact, agreed to license the at-issue software to Ford and had recently offered to re-license that software to Ford for amounts that were far less than the amount of Ford's alleged "unjust enrichment." Simply put, the Court "reject[ed] Elson's damages model because it would [have] award[ed] Versata far more than the fair price it deemed Ford should pay" for the benefits of Versata's trade secrets. (*Id.*, PageID.40220.)

The Court concluded that Elson should have "measured" Versata's trade secret damages using a royalty model of damages that was based upon "the parties' licensing history." (*Id.*, PageID.40221.) The Court determined that this model properly measured Versata's claimed damages because it reflected and accounted for the value that both Versata and Ford had actually placed upon the trade secrets at issue.

The Court next concluded that even if it "had allowed Versata to pursue the unjust enrichment theory of trade secret misappropriation damages proposed by Elson, the Court still would have excluded Elson's testimony on the ground that it [was] unreliable." (*Id.*, PageID.40227.) The Court determined that Elson's proposed testimony was unreliable for four reasons. First, Elson "made no effort to apportion Versata's claimed damages between those caused by Ford's alleged misappropriation of trade secrets and Ford's other alleged infringements of Versata's intellectual property," even though it was "undisputed that the software programs at issue are comprised of both protectable trade secrets and other, non-trade secret elements." (*Id.*) Second, "Elson failed to apportion Versata's alleged damages on a trade-secret-by-trade secret basis." (*Id.*, PageID.40228.) Instead, "Elson calculated a *single* amount of damages that Versata allegedly suffered from Ford's misappropriation of *all* the trade secrets at issue." (*Id.*; emphasis in original). The Court held that "Elson's all-or-nothing approach [did] not fit well with the jury's

task and pose[d] a substantial risk of confusing and/or misleading the jury." (*Id.*, PageID.40229.) Third, "Elson's opinion [was] unreliable because he did not limit his calculations to the relevant trade secrets" but, instead, included "four different software programs [in his analysis], including programs not at issue in this lawsuit." (*Id.*, PageID.40231.) Finally, the Court held that "Elson relied on outdated and potentially irrelevant data." (*Id.*, PageID.40232.) More specifically, "[m]uch of the evidence that form[ed] the basis of Elson's cost savings analysis [were] studies and marketing materials that were created in 2002 and 2003," and the Court was "not persuaded that Elson [could] reasonably rel[y] upon that [fifteen-year-old data] to calculate cost savings for the years 2015-2016." (*Id.*) In addition, "several of the 2002-2003 figures on which Elson relied appear[ed] to be largely *estimates* and *projections* of *potential* cost savings" that Ford may experience, and "[n]either Elson nor Versata ha[d] presented sufficient evidence that Ford actually experienced those 'estimate[d]' cost savings as a result of its use of the ACM and MCA software." (*Id.*, PageID.40233; emphasis in original).

**C**

Versata did not move for reconsideration of the First Expert Opinion and Order after the Court issued that decision. Instead, Versata asked the Court for permission to allow Bokhart and Elson "to revise [their] damages model[s] in light of the [First Expert Opinion and Order]." (Versata 7/16/2018 Ltr., ECF No. 514,

PageID.40348.) Versata told the Court that in a proposed supplemental report, Bokhart and Elson would, among other things, (1) "provide reasonable royalty calculations for patent damages and trade secret damages based on the parties' past business relationship" and (2) "address the Court's guidance regarding apportionment [of damages]." (*Id.*, PageID.40352.) Over Ford's objection (*see* Ford Objection, ECF No. 513), the Court granted Versata's request in a written order and gave Versata a second chance to submit admissible damages opinions from Bokhart and Elson. (*See* 9/7/2018 Order, ECF No. 534, PageID.40840-40845.)

**D**

On October 9, 2018, Bokhart and Elson served a combined, supplemental damages expert report (the "Bokhart and Elson Supplemental Report"). (*See* ECF No. 573-2.) In the Bokhart and Elson Supplemental Report, Bokhart and Elson provided revised calculations of Versata's alleged patent and trade secret damages that purportedly reflected a "reasonable royalty based on the parties' business and licensing history." (*Id.* at ¶1, PageID.43162.) Bokhart and Elson also said that their damages calculations were "apportioned to the individual trade secrets [and patents] at issue in this case." (*Id.*) But neither Bokhart nor Elson performed their own, independent apportionment analysis. Instead, they relied entirely on an apportionment analysis performed by former Versata software developer Seth Krauss. (*See, e.g.*, *id.* at ¶186, PageID.43229; *see also id.* at ¶198, PageID.43235,

explaining that Elson "apportioned the total royalty to the asserted trade secrets on the basis of the apportionment analysis performed by Mr. Krauss."[3])

Krauss set forth his apportionment analysis in an October 9, 2018, sworn declaration. (*See* Krauss 10/9/2018 Decl., ECF No. 568-2.) In that declaration, Krauss apportioned "the value or contribution to [Versata's] software of each individual trade secret and patent at issue." (*Id.* at ¶5, PageID.42509.) Krauss did so by using what Versata has called a "real estate" method of apportionment. Broadly speaking, in the computer software litigation context, a "real estate" apportionment methodology involves (1) identifying relevant "real estate" that corresponds to the software and then (2) determining the percentages of that "real estate" that consist of each asserted patent or trade secret. Here, Krauss identified certain technical documents, user guides, and marketing materials for the ACM and MCA software programs, assigned different weights to those documents, and determined what percentage of those documents corresponded to the patents and trade secrets at issue.

Drawing on Krauss' apportionment analysis, Bokhart concluded that Versata was entitled to $12,212,000 in patent royalty damages. (*See* Bokhart and Elson Supp. Rpt. at ¶24, ECF No. 573-2, Pg. ID 43169.) Elson provided three different

[3] *See also* Bokhart and Elson Supp. Rpt. at ¶204, ECF No. 573-2, PageID.43238 ("Similar to the analysis prepared by Mr. Elson, Mr. Bokhart also apportioned the royalty to the amount attributable to the patents at issue, as reflected in the apportionment analysis performed by Mr. Krauss").

"scenarios" with respect to Versata's trade secret damages. Elson's first scenario was based on the royalty that Ford would pay Versata to license the software containing the trade secrets at issue. Elson concluded that, based on the parties' licensing history, Versata was entitled to $53,785,000 in trade secret damages. (*See id.*) Elson's second and third scenarios took into account the developmental costs that Ford avoided by allegedly stealing Versata's trade secrets.[4] (*See id.* at ¶¶ 197, 200, PageID.43235-43236, explaining the two scenarios). In those scenarios, Elson determined that Versata was entitled to either $126,680,000 or $169,882,000 in trade secret damages. (*See id.*)

**E**

In December 2019, Ford moved under Federal Rule of Evidence 702 to exclude testimony based upon both (1) the Bokhart and Elson Supplemental Report and (2) Krauss' apportionment declaration. (*See* Ford Expert Motions, ECF Nos. 568, 573.) The Court granted Ford's motions on July 24, 2019 (the "Second Expert

[4] For Elson's second and third scenarios, in addition to relying on Krauss' apportionment analysis, Elson also relied on an analysis by Versata's technical trade secret expert, Dr. Samuel Malek. As explained in an October 9, 2018, declaration, Dr. Malek estimated the time and expense for Ford to develop an alternative software program to replace ACM and MCA without copying any of Versata's intellectual property. (*See* Dr. Malek 10/9/2018 Decl. at ¶4, ECF No. 578-2, PageID.43454.) Dr. Malek concluded that "the development process for equivalent software … would have required 7-9 years and costed between $143,209,257 and $207,369,144 without utilization of Versata trade secrets and patents." (*Id.* at ¶47, PageID.43482.) These "cost estimates" then became the "foundation[]" of Elson's second and third damages scenarios. (Versata Resp. Br., ECF No. 603, PageID.46720.)

Opinion and Order"). (*See* Second Expert Opinion and Order, ECF No. 678.) The Court first excluded Krauss' apportionment declaration and any testimony based on that declaration. Then, because Bokhart and Elson wholly relied on Krauss for apportionment, the Court excluded Bokhart's and Elson's damages testimony based upon the Bokhart and Elson Supplemental Report. The Court rested its decisions on two independent reasons.

The Court first excluded Krauss' declaration and related testimony because he did not apportion among the correct number of trade secrets at issue. Instead, he "apportioned among just four trade secret 'buckets': The Grid, Buildability, Workspaces, and MCA." (*Id.*, PageID.52169.) The Court explained that apportioning among the four identified "buckets" was insufficient because "Versata has continually asserted that Ford has misappropriated substantially more than four trade secrets." (*Id.*) In reaching this conclusion, the Court rejected Versata's argument that it had "redefined and narrowed the asserted trade secrets" into the four "combination" trade secrets that Krauss identified in his declaration. (*Id.*, PageID.52175.)

The Court also struck Karuss' declaration and related testimony on the "separate and independent[]" ground that his "methodology [was not] reliable." (*Id.*, PageID.52716.) Among other things, the Court concluded that the following factors,

individually and collectively, "weighed against" finding Krauss' methodology reliable:

- Versata had not presented any evidence that Krauss' methodology satisfied any of the factors identified in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (*Id*.);
- "Krauss' methodology for assigning different weights" in his analysis "appear[ed] unduly subjective and arbitrary" and "lack[ed] an objective and reliable basis." (*Id.*, PageID.52177.);
- Krauss "refine[d]" his "model" and "changed how much weight he assigned to various documents" after his initial analysis "did not provide him with what he considered to be acceptable results." (*Id.*, PageID.52177-52178.);
- Krauss "created his methodology specifically for this case." (*Id.*, PageID.52168 n.13.);
- "Versata [did] not present[] any evidence that Krauss sought to verify some of his key assumptions with others who may have had relevant specialized knowledge." (*Id.*, PageID.52178.); and
- Versata did not present the Court any authority in which any court "endorsed an apportionment methodology like the one Krauss used here." (*Id.*, PageID.52179-521780.)

"In sum, Versata [did] not persuade[] the Court that Krauss' methodology [was] a reliable way of apportioning the value of the trade secrets and patents at issue," and the Court therefore excluded his opinions. (*Id.*) And because "Bokhart and Elson

relied entirely on Krauss' apportionment analysis and did not conduct their own apportioning analyses," the Court excluded testimony from Bokart and Elson based upon the Bokhart and Elson Supplemental Report as well. (*Id.*, PageID.52187.)

**II**

On September 6, 2019, Versata filed a motion for reconsideration. (*See* Versata Mot. for Reconsid., ECF No. 709.) The motion takes issue with both the First Expert Opinion and Order – which the Court issued more than a year ago – and the Second Expert Opinion and Order. First, Versata argues that the Court erred in the First Expert Opinion and Order when it limited Versata to damages based on a reasonable royalty. (*See id.*, PageID.53098-53100.) Versata insists that it is entitled to damages based on the unjust enrichment theory of damages that Elson presented in his initial expert report. (*See id.*) Second, Versata says that the Court erred in the Second Expert Opinion and Order when it (1) concluded that Krauss' apportionment analysis was unreliable and (2) then proceeded to exclude the testimony from Bokhart and Elson that relied upon Krauss' apportionment analysis. (*See id.*, PageID.53100-53101.) Versata seeks an order from the Court (1) "reconsidering" the portions of the First and Second Expert Opinion and Orders striking Versata's experts and (2) "clarifying that Versata may show past and future trade-secret damages by multiple methods." (*Id.*, PageID.53098.)

Also on September 6, 2019, Ford filed a motion for partial summary judgment on Versata's trade secret and contract counterclaims. (*See* Ford Mot. for Summ. Judg., ECF No. 707.) Ford argues that "proof of damages is an essential element to [those] claims." (*Id.*, PageID.53001.) And Ford insists that Versata cannot satisfy that element because the Court struck Versata's damages experts and therefore left Versata no "admissible evidence of damages." (*Id.*)

The Court held a hearing on both motions on December 11, 2019. (*See* 12/11/2019 Hearing Tr., ECF No. 723.)

**III**

Motions for reconsideration in this Court are governed by Local Rule 7.1(h). Under that rule, "[a] motion for rehearing or reconsideration must be filed within 14 days after entry of the judgment or order." E.D. Mich. Local Rule 7.1(h)(1). In addition:

> Generally, and without restricting the Court's discretion, the Court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the Court, either expressly or by reasonable implication. The movant must not only demonstrate a palpable defect by which the Court and the parties and other persons entitled to be heard on the motion have been misled but also show that correcting the defect will result in a different disposition of the case.

E.D. Mich. Local Rule 7.1(h)(3). A motion for reconsideration is not a vehicle to rehash old arguments, or to proffer new arguments or evidence that the movant could

have presented earlier. *See Sault Ste. Marie v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998).

**IV**

The Court begins with Versata's request that the Court reconsider three aspects of the First Expert Opinion and Order – the portions that struck Bokhart's and Elson's testimony based upon their first expert reports, prevented Versata from pursuing an unjust enrichment theory of damages, and limited Versata to damages based on the parties' licensing history (*i.e.*, a reasonable royalty model of damages). For several reasons, the Court declines to reconsider those rulings.

**A**

As an initial matter, the Court declines to reconsider any of its rulings in the First Expert Opinion and Order because Versata has requested reconsideration of those rulings far too late. As described in Section (III) above, motions for reconsideration in this Court must be filed no later than 14 *days* after entry of the applicable order or judgment. *See* E.D. Mich. Local Rule 7.1(h)(1). Here, Versata filed its motion for reconsideration nearly 14 *months* after the Court issued the First Expert Opinion and Order. Versata has not presented any satisfactory explanation as to why it waited so long to file its motion for reconsideration.

Instead of filing a timely motion for reconsideration of the First Expert Opinion and Order, Versata requested leave to file supplemental expert reports to

Case: 24-1140 Document: 18 Page: 155 Filed: 03/22/2024

comply with the Court's rulings in that decision. And the Court granted that request over Ford's objection. The parties then spent significant resources on additional expert discovery and motion practice related to Versata's supplemental expert reports. The Court likewise dedicated considerable time to reviewing hundreds of pages of motions, briefs, and exhibits related to the supplemental expert reports. It was Versata's choice to pursue the supplemental expert report route instead of moving for reconsideration in 2018. That decision by Versata imposed real costs on the parties and led to a substantial use of limited judicial resources. Under these circumstances, the Court sees no basis to permit Versata to proceed with its late motion for reconsideration of the First Expert Opinion and Order. Thus, the Court declines to reach the merits of Versata's untimely motion for reconsideration. *See, e.g.*, *Tompkins v. Crown Corr., Inc.*, 726 F.3d 830, 843 (6th Cir. 2013) (affirming district court's denial of motion for reconsideration where motion was not timely filed); *Lauber v. Belford High School*, 2012 WL 12994876, at *1 (E.D. Mich. July 26, 2012) ("The Court summarily denies the second motion for reconsideration as untimely, as the motion was filed more than fourteen days after issuance of the order to which it is directed.").

**B**

Even if the Court was willing look past Versata's tardy filing – and it is not – the Court would not reconsider its ruling that limited Versata's trade secret damages

to a reasonable royalty based on the parties' licensing history. Versata has not persuaded the Court that its ruling is erroneous.

**1**

Courts employ "a number of different methods of calculation to determine damages" in trade secret cases. *Mid-Mich. Comp. Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510 (6th Cir. 2005); *see also Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974) ("[T]he standard for measuring damages [in a trade secret dispute] … is very flexible"). Because "each case is controlled by its own peculiar facts and circumstances," a Court must determine which measure (or measures) of trade secret damages is the best fit for the facts of each case. *University Computing*, 504 F.2d at 538 (quoting *Enterprise Mg. Co. v. Shakespeare Co.*, 141 F.2d 916, 920 (6th Cir. 1944)). And there is ample authority for the proposition that a royalty model of damages is appropriate where, as here, there is a reasonable basis to determine the value that the parties would have placed upon the misappropriated trade secrets. As the Fifth Circuit explained in *University Computing*:

> Because the primary concern in most cases is to measure the value to the defendant of what he actually obtained from the plaintiff, *the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place.*

*Id.* at 539 (emphasis added). Indeed, it is especially appropriate to use a royalty-based model of damages where, as here, the parties have previously agreed upon a license price. *See also Vitro Corp. of Am. v. Hall Chem. Co.*, 292 F.2d 678, 683 (6th Cir. 1961) (explaining that the "best evidence" of the value of misappropriated trade secrets are the "established royalties" and/or "agreement[s] in principle" to license those trade secrets)[5]; *Mid-Mich. Comp. Sys.*, 416 F.3d at 510 (relying on *University Computer* and *Vitro Corp.*, and holding that where defendant used trade secrets to "save research and manufacturing resources," the "reasonable royalty measure adopted by the jury" was an "appropriate measure of damages"); *Biodynamics Techs., Inc v. Chattanooga Corp.*, 658 F. Supp. 266, 270-71 (S.D. Fla. 1987) (holding that "'established royalty' enunciated in an 'agreement in principle' between the parties" set the "fair price" and amount of damages for alleged

[5] Versata insists that *Vitro Corp.* stands for the proposition that a court should use the reasonable royalty measure of trade secret misappropriation damages only as a "last resort." (Versata Mot. for Reconsid., ECF No. 709, PageID.53105.) But that is not how other courts have read *Vitro Corp.*, and that is not how this Court reads that ruling. *See, e.g.*, *Univ. Computing*, 504 F.2d at 538 (citing *Vitro Corp.* for proposition that "in some cases[,] damages will be subject to exact measurement … because the parties had previously agreed on a licensing price as in *Vitro Corp. v. Hall Chemical Co.*"); *Biodynamic Techs., Inc. v. Chattanooga Corp.*, 658 F. Supp. 266, 270 (S.D. Fla. 1987) (citing *Vitro Corp.* for proposition that "[w]here the parties have agreed to the value of the trade secrets, either in a royalty agreement, a licensing contract, or an 'agreement in principle,' such that the damages will be subject to exact measurement, that course should be followed"); *Comp. Assocs. Intern., Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1526-27 (D. Colo. 1993) (citing *University Computing* and *Vitro Corp.* for the "'reasonable royalty' rule[] which most courts now apply in trade secret cases").

misappropriation of trade secrets that "should be followed"); 11 A.L.R.4th 12 (1985), at §2[a] ("In determining the proper measure of damages for misappropriation of a trade secret, the first inquiry of the courts generally has been whether there is any factual basis, such as a royalty agreement or an offer and counteroffer in anticipation thereof, from which one might legitimacy determine the value which the parties themselves actually assigned to the misappropriated information. Where such circumstances exist, the courts usually have drawn upon them in order to measure the plaintiff's damages, calling the award a [royalty].").[6] Based upon this authority (and for all of the reasons explained in the First Expert Opinion and Order), the Court again concludes that a royalty model of damages based upon the parties' licensing history here is the proper measure of damages because it reflects the value that the parties actually placed upon the at-issue trade secrets.

**2**

Versata counters with language from cases and treatises that could be read, when isolated from any context, as supporting the proposition that "a contractually agreed-upon price for licensing trade secrets should not limit a plaintiff's recovery

---

[6] *See also Pioneer Hi-Bred Intern. v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1244 (8th Cir. 1994) (explaining that in trade secret misappropriation cases, a "reasonable royalty theory" of damages is "most appropriate" where "the parties had or contemplated a royalty arrangement").

if the licensee steals the trade secrets." (Versata Mot. for Reconsid., ECF No. 709, PageID.53103-53104, citing authority). But Versata has not cited *any* cases from any court holding that a trade secret plaintiff has a right to unjust enrichment damages under circumstances like those here – where (1) the plaintiff previously licensed software containing the at-issue trade secrets to the alleged misappropriator, (2) the plaintiff again offered to license that software to the alleged misappropriator around the same time as the misappropriation, and (3) the alleged misappropriator is not a competitor and the continued used by the alleged misappropriator would not cause any additional injury in the marketplace. And Versata was unable to identify such a case at the hearing before the Court. (*See* 12/11/2019 Hearing Tr., ECF No. 723, PageID.53821-53822.)

In Versata's briefing, Versata identified the "new case" of *Huawei Technologies Co. v. Yiren Huang*, 2019 WL 2395276, at ** 4-5 (E.D. Tex., June 6, 2019), as one where "the court allowed expert evidence on unjust enrichment, lost profits, profit-margin damages, *and* reasonable royalties, even where prior agreements made a reasonable royalty easy to prove." (Versata Mot. for Reconsid., ECF No. 709, PageID.53104; emphasis in original). But the "prior agreements" in *Huawei Technologies* were *not* between the plaintiff and the alleged misappropriator; they were between the defendant and other non-parties. *See Huawei Techs.*, 2019 WL 2395276, at *4 (describing agreements). Thus, unlike

here, the plaintiff and alleged misappropriator in *Huawei Technologies* had *not* previously negotiated a royalty for use of the allegedly misappropriated trade secrets. Moreover, the parties in *Huawei Technologies* were competitors of one another, another important factor that is absent here. Finally, unlike Versata in this case, the plaintiff in *Huawei Technologies* had not offered to license the trade secrets to the alleged misappropriator around the time of the alleged misappropriation. *Huawei Technologies* thus says little about the appropriate damages model to be applied here.

Versata's reliance on *Keystone Transportation Solutions, LLC v. Northwest Hardwoods, Inc.*, 2019 WL 1770162, at ** 3-5 (W.D. Va. Apr. 22, 2019), is likewise misplaced. In *Keystone*, a district court allowed a jury to consider both unjust enrichment and a reasonable royalty as alternative measures of damages in a trade secret misappropriation case. *See id.* But the parties in *Keystone* had not previously agreed to a license agreement for software containing the trade secrets at issue. Thus, *Keystone* is also materially distinguishable.[7] Versata simply has not cited any

[7] The three other cases cited by Versata are also distinguishable because the parties had not previously agreed upon a license rate, the trade secret owner had not offered to re-license the trade secret around the time of the alleged misappropriation, and/or the alleged misappropriator was not a competitor. *See Hunting Energy Servs., Inc. v. Kavadas*, 2018 WL 4539818, at *22 (N.D. Ind. Sept. 20, 2018) (trade secrets at issue were not licensed to alleged misappropriator); *Capstone Logistics Holdings, Inc. v. Navarette*, 2018 WL 6786237, at ** 5-6 (S.D.N.Y. Dec. 13, 2018) (court did not address royalty measure of damages and trade secrets were not licensed to allege misappropriator); *TLS Mgmt. & Mktg. Servs., LLC v. Mardis Fin. Servs., Inc.*, 2018

Case: 24-1140 Document: 18 Page: 161 Filed: 03/22/2024

case that suggests that its proposed unjust enrichment model of damages must be used in circumstances like those present here – where there is an alleged misappropriation by a non-competitor after the parties had previously agreed upon a license rate and after the trade secret owner had offered to re-license the trade secrets around the time of the alleged misappropriation.

**3**

Versata also says that it should not be limited to a royalty model of damages because it is bringing statutory claims under the federal Defend Trade Secret Act (the "DTSA") and Michigan's Uniform Trade Secret Act (the "MUTSA"). Versata says that the language of these statutes confirms that measures of damages *other than* a reasonable royalty are preferred in trade secret misappropriation cases. The relevant provision of the DTSA provides as follows:

> In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may [….] award –
>
> (i)(I) damages for actual loss caused by the misappropriation of the trade secret; and
>
> (II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

---

WL 3698919, at *18 (S.D. Miss. Aug. 3, 2018) (rejecting royalty model where "[d]efendants [] submitted no evidence proving that the royalty figure involved any (let alone all) of the trade secrets at issue here").

> (ii) *in lieu of damages measured by any other methods*, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.

18 U.S.C. § 1836(b)(3)(B)(i)-(ii) (emphasis added). Likewise, the MUTSA provides in relevant part:

> Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. *In lieu of damages measured by any other methods*, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Mich. Comp. Laws § 445.1904 (emphasis added).

Versata highlights that these two statutes authorize an award of royalty damages "in lieu of" the other specified measures of damages (*i.e.*, unjust enrichment). Versata insists that this phrasing means that a royalty measure of damages should only be used a last resort when the other specified measures cannot be proven. The Court disagrees.

The Court does not read the "in lieu of" language in the DTSA and the MUTSA as creating a preference for one measure of damages model over another. Instead, the most natural reading of the phase "in leu of" is that it creates two

Case: 24-1140 Document: 18 Page: 163 Filed: 03/22/2024

alternative measures of damages (actual losses and unjust enrichment on the one hand, and a reasonable royalty on the other) without expressing a preference for either measure. That reading is confirmed by the definition of "in lieu of," which is "instead of or in place of." Black's Legal Dictionary (11th Ed. 2019).[8] And Versata has not cited a single case or other authority that holds that the phrase "in lieu of" creates a preference between listed alternatives, much less a case that does so while interpreting the DTSA and MUTSA.

Moreover, the commentary to the Model Uniform Trade Secrets Act (the "Model UTSA") – the model act upon which both the DTSA and MUTSA are based[9] – confirms that the "in lieu of" language does not create a hierarchy in which unjust enrichment damages for past conduct are preferred over royalty damages. The Model UTSA, like the DTSA and the MUTSA, allows for the award of a royalty in two circumstances: (1) as a form of damages for past misappropriation and (2) as a form of injunctive relief for the continued use of a misappropriated trade secret in

---

[8] *See also* Merriam-Webster dictionary definition of "in lieu of": "in the place of; instead of." Available at: https://www.merriam-webster.com/dictionary/lieu.

[9] *See, e.g.*, *StoneCoat of Tex., LLC v. ProCal Stone Design, LLC*, 2019 WL 4346538, at *14 (E.D. Tex. Sept. 12, 2019) (noting that the DTSA is "based on the Uniform Trade Secrets Act promulgated by the National Conference of Commissioners on Uniform Laws in 1985 and adopted by 47 states"); *B&P Littleford, LLC v. Prescott Mach., LLC*, --- F.Supp.3d ---, 2019 WL 4746743, at *5 (E.D, Mich. Sept. 30, 2019) ("Both the Federal Defend Trade Secrets Act (DTSA) and the Michigan Uniform Trade Secrets (MUTSA) were modeled on the Uniform Trade Secrets Act (UTSA), which had been adopted in forty-seven states and the District of Columbia by 2016").

Case: 24-1140 Document: 18 Page: 164 Filed: 03/22/2024

the future. *See* Model Unif. Trade Secrets Act § 3 (1985). The commentary to the Model UTSA makes clear that while a royalty *injunction* is available only in limited circumstances, an award of royalty *damages* for past misappropriation is generally available and is not disfavored in any way. The commentary says that "[t]he reasonable royalty alternative measure of damages for a misappropriator's past conduct … *is readily distinguishable* from a … royalty order injunction, which conditions a misappropriator's future ability to use a trade secret upon payment of a reasonable royalty. A … royalty injunction order is appropriate *only in exceptional circumstances*; whereas a reasonable royalty measure of damages *is a general option*." Cmt. to Model Unif. Trade Secrets Act § 3 (1985) (emphasis added). In other words, while the Model UTSA allows royalties in the injunction context only in "exceptional circumstances," it sets no similar prohibition, or order of preference, for royalties as an award of damage for past conduct. Indeed, such royalties are available as a "general option." *Id.*

Furthermore, legislatures have recognized that the "in lieu of" language cited by Versata does not create a damages hierarchy in which royalty damages are a last resort. For example, when the California legislature adopted California's version of the Model UTSA, it intended to favor actual damages and unjust enrichment damages over royalty damages, and it determined that the "in lieu of" language in the model act did not achieve that result. So the legislature specified that courts may

"order payment of a reasonable royalty" only where "neither [actual] damages nor unjust enrichment caused by misappropriation are provable." Cal. Civ. Code § 3426.3(a)-(b). As one California court has explained, this provision "differs" from damages provisions that use the "in lieu of" language – like the damages provisions included in the MUTSA and DTSA – because those other provisions do not "require actual damages and unjust enrichment to be unproveable before a reasonable royalty may be imposed." *Ajaxo Inc. v. E*Trade Fin. Corp.*, 115 Cal.Rptr.3d 168, 179-80 (Cal. App. 4th 2010); *see also Cacique, Inc. v. Robert Reiser & Co, Inc.*, 169 F.3d 619, 623 (9th Cir. 1999) (same). That the California legislature saw the need to modify the "in lieu of" language in order to disfavor royalty damages further confirms that, contrary to Versata's argument, that language does not create a preference for other damages models over royalty models of damages.

Finally, Versata argues that the Court must allow it to pursue unjust enrichment damages because limiting a plaintiff in its position to royalty damages would be insufficient to deter the intentional theft of intellectual property. Again, the Court respectfully disagrees. The DTSA and MUTSA include provisions that are sufficient to deter the theft of trade secrets irrespective of what damages models are available. The DTSA provides that where a "trade secret is willfully and maliciously misappropriated," a court may "award exemplary damages in an amount not more than 2 times the amount of the damages [otherwise] awarded." 18 U.S.C.

§ 1836(b)(3)(C). Likewise, the MUTSA provides that where there is "willful and malicious misappropriation," a court "may award reasonable attorney's fees to the prevailing party." Mich. Comp. Laws § 445.1905. The Court is satisfied that the availability of these additional damages and fees is sufficient to deter willful theft and that deterrence may be achieved even in the absence of unjust enrichment damages.

**4**

There is one small aspect of the legislative history of the DTSA, not cited by Versata, that appears to suggest that at least some in Congress may have intended that royalty damages be available only if other forms of damages could not be proven first. That legislative history appears in the House and Senate reports accompanying the DTSA. Those reports provide that:

> Subparagraph (B) [the damages provision of the DTSA quoted above], drawn directly from [Section 3 of the Model UTSA)], specifies the damage award that a court may issue. Specifically, it authorizes an award of damages for the actual loss and any unjust enrichment caused by the misappropriation of the trade secret, or, in lieu of damages measured by any other method, an award of a reasonable royalty. It is not the Committee's intent to encourage the use of reasonable royalties to resolve trade secret misappropriation. Rather, the Committee prefers other remedies that, first, halt the misappropriator's use and dissemination of the misappropriated trade secret and, second, make available appropriate damages.

[….]

> The Committee notes that courts interpreting the [Model] UTSA's analogous provision have held that the award of reasonable royalties is a remedy of last resort. *See e.g.*, *Progressive Prod., Inc. v. Swartz*, 258 P.[3]d 969, 979–80 (Kan. 2011) (citing the comment to S 2 of the [Model] UTSA and explaining that an award of royalties is reserved for "special situation[s]," including "exceptional circumstances" in which an overriding public interest makes an injunction untenable).

H.R. Rep. 114-529, at *207 and n. 13. *See also* S. Rep 114-220, at *9 and n. 7 (same).

These House and Senate reports do not persuade the Court that it erred when it limited Versata to a royalty model of damages under the DTSA. There is significant reason to question the legal analysis supporting the statement in the reports that royalty damages are available only as a "last resort." The reports acknowledge that the DTSA's damages provision is "drawn directly from" the damages provision of the Model UTSA. As explained in detail above, the Model UTSA allows for the award of royalties in two different situations: (1) as a form of damages for past misappropriation and (2) as a form of injunctive relief for the continued use of a misappropriated trade secret. *See* Model Unif. Trade Secrets Act § 3 (1985). And, as further explained above, while a royalty *injunction* is available under the Model UTSA "only in exceptional circumstances," an award of royalties for past misappropriation is available under that Act as a "general option." Cmt. to Model Unif. Trade Secrets Act § 3 (1985).

The DTSA's legislative reports wrongly conflate these two distinct types of royalty awards. That is clear from the fact that the reports rely upon the Kansas Supreme Court's decision in *Progressive Products* for the proposition that a royalty award should be "a remedy of last resort." *Progressive Products* involved a royalty *injunction* for the future use of a misappropriated trade secret, *not* royalty damages as compensation for past use of that secret. *See Progressive Prods.*, 258 P.3d at 980 ("We remand the case to the district court for the limited purpose of entering an order specifically correlating legal conclusions to facts found in the trial record in a manner consistent with this opinion and relating to the basis for imposing the royalty injunction and other short-term injunctive relief."). Thus, *Progressive Products* says nothing about whether a royalty model of damages for past misappropriation is a "remedy of last resort." And the reports' reliance on that case for the proposition that a royalty model of damages for past misappropriation is disfavored calls into serious question the reports' legal analysis and reliability. The Court is not persuaded that the DTSA's legislative history compels the Court to permit Versata to seek unjust enrichment damages.

**C**

Finally, even if the Court had concluded that it erred when it rejected Versata's unjust enrichment damages model, it still would not reconsider its rulings in the First Expert Opinion and Order excluding Bokhart's and Elson's damages testimony

based upon their first reports. The Court excluded that testimony for reasons beyond Elson's use of an unjust enrichment damages model. As explained above, the Court also struck the testimony of Bokhart and Elson because (1) they failed to properly apportion Versata's claimed damages and (2) Elson based his analysis on outdated and irrelevant data – including projections of potential cost savings that were never verified – and included in his calculations damages based upon Ford's use software programs that are not at issue in this action. These failures provided multiple, *independent* grounds to support the Court's decision to exclude their testimony.

In Versata's motion for reconsideration, it does not address Elson's reliance on outdated and irrelevant data or his inclusion of software programs not at issue in this case. Nor does Versata provide a substantive defense of Elson's and Bokhart's failure to apportion. Instead, Versata insists that apportionment is unnecessary at the *Daubert* stage of the proceedings and that the Court should address the admissibility of their expert damages testimony at trial.

The Court disagrees. Numerous courts have exercised their discretion to exclude expert testimony at either the *Daubert* stage or prior to the start of trial due to the failure to apportion, and the Court is not persuaded that it erred when it did so here. *See, e.g.*, *Omega Patents, LLC v. Calamp Corp.*, 2015 WL 12830496, at *10 (M.D. Fla. Dec. 23, 2015) (excluding expert damages witness at *Daubert* stage due to his failure to reliably apportion damages); *Nilssen v. Motorola, Inc.*, 1998 WL

851493, at *3 (N.D. Ill. Dec. 1, 1998) (excluding expert testimony prior to trial where expert, among other things, based proposed damage award "on more than the trade secret at issue"); *Nortek Air Sols., LLC v. Energy Lab Corp.*, 2016 WL 3856250, at *4 (N.D. Cal. July 15, 2016) (excluding expert patent damages testimony prior to trial because expert "did not engage in any apportionment or attempt to separate the value of the patented features from the unpatented features"); *Helios Software, LLC v. Awareness Techs., Inc.*, 2015 WL 12806482, at *5 (D. Del. Apr. 13, 2015) (excluding expert patent damages testimony at *Daubert* stage due to failure to apportion and holding that "[b]ecause it is uncontested that the accused products comprise both patented and unpatented features, [the expert] needed to apportion profits and damages between the patented and unpatented features of the accused product to render a reliable damages analysis").

Finally, Versata relies on the decision in *Keystone*, *supra*, for the proposition that the court should not consider an expert's failure to apportion at the *Daubert* stage. In that case, the court declined to exclude an expert's testimony based upon his failure to apportion damages among the trade secrets at issue. The court held that exclusion on that basis at the *Daubert* stage was not necessary because it was possible that the jury could ultimately find that *all* of the at-issue trade secrets were misappropriated, and in that event, there would be no need to apportion between trade secrets. The court further explained that it could appropriately cabin the

Case: 24-1140 Document: 18 Page: 171 Filed: 03/12/2024

expert's testimony by instructing the jury to consider it if and only if the jury concluded that the defendant had misappropriated all of the trade secrets at issue. *See Keystone*, 2019 WL 1770162, at *3 (explaining that an expert's testimony that did not apportion between trade secrets "may [be] relevant if the jury finds that [the defendant] did misappropriate all alleged trade secrets" and concluding that "any potential prejudice from [the expert's] expert opinion and testimony—with his lump-sum damages calculation—can be cured by a limiting instruction, if appropriate, to the jury to only consider his opinion if it finds that all information he relied on to make his calculation constitutes a trade secret"). Versata urges the court to follow the approach in *Keystone*.

But the failure of Elson to apportion in his first expert report is materially different than the failure of the expert in *Keystone* to apportion. As noted above, in *Keystone*, it was at least possible that the expert's failure to apportion would never become a problem because there was at least one scenario – a finding that the defendant misappropriated all of the trade secrets – in which apportionment would not be necessary. Here, in contrast, Elson failed to apportion damages between trade secrets, patents, and unprotectible elements of Versata's software, and there is no scenario in which that failure could be irrelevant. For instance, even if the jury found that Ford misappropriated all of Versata's trade secrets, it could not reliably utilize Elson's damages model because it includes damages attributable Ford's use of

Case: 24-1140 Document: 18 Page: 172 Filed: 03/12/2024

intellectual property beyond Versata's trade secrets. Because, unlike in *Keystone*, there is no scenario in which Elson's failure to apportion may not matter, *Keystone* does not support deferring consideration of that failure until after the *Daubert* stage.

For all of the reasons stated above, the Court declines to reconsider its rulings in the First Expert Opinion and Order excluding the initial expert opinions of Bokhart and Elson.

**V**

The Court now turns to Versata's motion for reconsideration of the Court's rulings in the Second Expert Opinion and Order (1) excluding Krauss' apportionment analysis and (2) excluding Bokhart's and Elson's supplemental damages testimony because they rely upon Krauss' apportionment analysis. After careful reflection, the Court will allow Krauss to present his apportionment testimony to the jury. And in light of that decision, and for the reasons stated below, the Court will allow Bokhart and Elson to present damages testimony limited to the reasonable royalty Versata would have received for Ford's use of the trade secrets and patents at issue.

**A**

This case is in a different posture than it was when the Court excluded Krauss' apportionment analysis in the Second Expert Opinion and Order. As explained above, the Court excluded Krauss' apportionment analysis for two reasons. First,

Case: 24-1140 Document: 18 Page: 173 Filed: 03/12/2024

the Court excluded Krauss' testimony because Krauss apportioned Versata's trade secret damages among four trade secrets rather than among the twenty-plus trade secrets asserted by Versata in this action. Second, the Court also excluded Krauss' testimony because his apportionment analysis was unreliable. But Ford is no longer challenging Krauss' testimony on the ground that he apportioned among just four trade secrets. At the hearing on Versata's motion for reconsideration, Ford conceded that it would not object to Versata pursuing the theory that Ford misappropriated only four trade secrets (*i.e.*, the four "buckets" among which Krauss apportioned the value of the trade secrets). (*See* 12/11/2019 Hearing Tr., ECF No. 723, PageID.53887-53888.) Therefore, the first reason upon which the Court excluded Krauss' apportionment analysis no longer justifies excluding his opinion testimony. And after very careful additional consideration, the Court has concluded that its second basis for excluding Krauss' analysis – concerns about its reliability – do not warrant exclusion.

In reviewing its prior analysis of Krauss' apportionment opinions, the Court has focused carefully on the admonition that "[t]here is no defined methodology for allocating damages among trade secrets." *LivePerson, Inc. v. [24]7.ai, Inc.*, 2019 WL 3254226, at *4 (N.D. Cal. July 19, 2019). Indeed, "[t]he Federal Circuit has made clear that there is no single, exacting way to conduct an apportionment analysis, since damages models are fact-dependent." *Intel Cop. v. Future Link Sys.*,

Case: 24-1140 Document: 18 Page: 174 Filed: 03/22/2024

*LLC*, 2017 WL 2482881, at *5 (D. Del. June 1, 2017) (internal quotation marks omitted); *see also Commonwealth Sci & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301-02 (Fed. Cir. 2015) (internal quotation marks and citation omitted) ("[U]nder th[e] apportionment principle, there may be more than one reliable method for estimating a reasonable royalty. This adaptability is necessary because different cases present different facts"); *Bio-Rad Labs, Inc. v. 10X Genomics, Inc.*, 2018 WL 4691047, at *7 (D. Del. Sept. 28, 2018) ("The Federal Circuit does not limit apportionment to specific methodologies, because flexibility is required to determine fact-dependent damages."). At the hearing on the motion for reconsideration, Versata's counsel helped the Court better appreciate the need for a flexible approach to apportionment analysis:

> I've given a lot of thought to why this order was difficult in the context of the case that's presented to the Court. And the reason is, is because in most *Daubert* contexts, we are dealing with a little different problem [than] apportionment. In most *Daubert* contexts, you're dealing with whether an expert applied scientific principles to a scientific problem.
>
> For example, if a doctor tried to come in and testify that smoking doesn't cause cancer, that would be unreliable because there is a huge body of science, peer-reviewed literature and other evidence that shows that smoking causes cancer.
>
> Similarly, if you're dealing with a causation expert and somebody testifies that if a car caught fire because of a gas tank defect and there is a body of literature out there and there is a body of evidence that shows that the car caught

fire because of a problem with the engine, and the engine supplier, then that probably is not admissible because we're talking about a scientific problem and scientific evidence that can be reviewed from a peer-review standpoint.

That's not what's going on here with apportionment. *Apportionment is a judicially-created framework. And it was created by the courts for a very specific purpose which is to try to – try to ascertain the value of a specific trade secret or patent with any larger product when the trade secrets and patents are not sold separately, they are not marketed separately, and they are not valued in the real world separately.* And that's why we don't have any peer-reviewed literature on apportionment.

And I will point out, your Honor, that Ford has not cited any peer-reviewed data, any scientific literature on how you're supposed to do apportionment because this problem does not exist in nature and in the real world. It only exists in litigation.

And that is why the federal circuit treats apportionment differently for *Daubert* purposes than other types of scientific evidence. The federal circuit and the courts following the federal circuit have said over and over that apportionment has to be flexible, it has to be adaptable, it has to be imaginative, and it has to be liberal.

[….]

[C]ourts have gone out of their way to emphasize explicitly that there is no specific-required methodology for apportionment. You have to find a way to award damages in a situation where there is some uncertainty about the value but you have to do it in a way that is tied to the facts of the case. And that is what Mr. Krauss did.

(12/11/2019 Hearing Tr., ECF No. 723, PageID.53858-53860; emphasis added.)

With this need for flexibility firmly in mind, the Court is now persuaded that Krauss' apportionment analysis is sufficiently reliable to be admitted into evidence and relied upon by Versata's other experts. Most importantly, as the Court now better appreciates, the essential foundation of Krauss' analysis is sufficiently reliable. More specifically, Krauss' analysis rests upon the premise that the number of references to trade secrets and patents in a certain set of technical and marketing documents fairly reflects the relative value of those features. And this premise, in turn, is based upon Krauss' first-hand experience. Krauss personally participated in and/or oversaw the drafting of the documents at issue, and, based upon that involvement, he knows that the documents were designed to highlight, proportionately, the most important features of the software. (*See* Krauss Decl. at ¶¶ 6-7, ECF No. 568-2, PageID.42510.) As Versata aptly explained, "when [Krauss] reached his [apportionment] opinions by counting pages in manuals and other technical documents, he did so based on source materials that he was, number one, familiar with at a personal level, and number two, had consulted with both Ford and Versata people at the time these materials were written to make sure that they emphasized the most important aspects of the software." (12/11/2019 Hearing Tr., ECF No. 723, PageID.53861.) Finally, as Versata fairly notes, Ford has not presented persuasive evidence that meaningfully undermines "the fundamental factual premises of Krauss's analysis which is that these page counts were reliable

because they reflect the historical objective of these manuals and technical documents." (*Id.*)

When the Court considers all of the relevant factors, it concludes that Krauss' testimony does have sufficient indicia of reliability to allow the jury to hear and weigh his apportionment testimony. Among other things:

- Krauss has first-hand knowledge that the pages of the documents he reviewed reflect the relative value of the trade secrets and patents at issue;
- Krauss provided a reasonably reliable explanation that justified why he selected the documents that he chose to include in his review. (*See* Krauss Dep., ECF No. 605-2, PageID.47364-47366; Krauss 2/1/2019 Decl. at ¶10, ECF No. 605-1, PageID.47345.); and
- While Krauss did adjust the weight that he assigned certain documents after he determined that the initial weights he provided led to inaccurate results, he offered an explanation that is at least minimally reliable to justify that modification to his methodology. (*See* Krauss 10/9/2018 Decl. at ¶36, ECF No. 568-2, PageID.42526.)

Finally, while Krauss' analysis did not satisfy many of the *Daubert* factors, the Court is now persuaded after additional careful consideration that, in light of the unique features of apportionment, those factors are less relevant here than they may be in the analysis of other expert opinions.

The Court acknowledges that there are several legitimate questions that may be raised about the methodology Krauss used here. As the Court outlined in the Second Expert Opinion and Order, there are ample bases on which to attack Krauss' apportionment analysis. However, on balance, and considering the unique challenges in apportioning damages between trade secrets and patents, the Court concludes that the best course of action is to allow Krauss' apportionment testimony, to permit Ford to vigorously cross-examine him on all of the flaws that may exist in his analysis, and to allow the jury to decide what weight, if any, to provide to that analysis. *See, e.g.*, *Finjan, Inc. v. BlueCoat Sys., Inc.*, 2015 WL 4272870, at *9 (N.D. Cal. July 14, 2015) (noting that expert's "apportionment method may not be perfect, but it reasonably ties the value that Defendant places on product features to the accused products in this case. Any factual challenges to [the expert's] analysis are better presented to the jury").[10]

For all of these reasons, the Court reconsiders its ruling in the Second Expert Opinion excluding Krauss' apportionment testimony.

---

[10] Ford argued at the hearing on Versata's motion for reconsideration that Krauss' apportionment analysis was unreliable because he counted pages in the technical manuals he reviewed as discussing the trade secrets at issue even if those pages only touched on an element of the trade secret, and not the combined trade secret as a whole. Versata vigorously disputes Ford's description of Krauss' analysis. (See Versata Supp. Br., ECF No. 670.) The Court concludes that this is fertile ground for cross examination at trial and is not a basis to exclude Krauss' analysis at this stage of the proceedings

B

In light of the Court's reconsideration of the admissibility of Krauss' apportionment analysis, it must also revisit its earlier decision excluding damages expert testimony by Bokhart and Elson based upon the Bokhart and Elson Supplemental Report.

The Court excluded this testimony by Bokhart on the sole ground that he relied on Krauss' excluded apportionment analysis. Because the Court will now allow Krauss to offer his apportionment analysis at trial, it will likewise allow Bokhart to testify as to the reasonable royalty damages Versata allegedly suffered due to Ford's alleged infringement of the patents at issue.

The Court also excluded this testimony by Elson because he relied on Krauss' apportionment analysis. There is no longer any basis to exclude Elson's testimony on the ground that he relied upon Krauss.

However, even with the admission of Krauss' apportionment analysis, there remains a ground to exclude at least some of Elson's testimony based upon the Bokhart and Elson Supplemental Report. In that report, Elson did not limit his analysis to a royalty model of damages based upon the parties' licensing history. Instead, as explained above, Elson provided three different "scenarios" with respect to Versata's alleged trade secret misappropriation damages. The first "scenario" was a royalty-based model that calculated Versata's damages based on the parties'

licensing history. But the second and third "scenarios" included additional damages related to the value to Ford of using the trade secrets to create its own automotive configuration software. For all of the reasons explained above in Section (IV)(B), and for all of the reasons explained in the First Expert Opinion and Order, the Court remains convinced that a reasonable royalty model of damages that is based solely on the parties' licensing history is the best "fit" for this case, and it will not allow Versata to present damages testimony to the jury that goes beyond that model. Accordingly, the Court will allow Elson to present his first "scenario" to the jury but will exclude him from testifying about the second and third "scenarios" that include damages beyond the parties' licensing history.

**VI**

Ford moved for summary judgment on Versata's trade secret and breach of contract counterclaims on the basis that Versata could not support those claims with any evidence of damages. However, because the Court has reconsidered its decision that Versata cannot present evidence of damages to the jury, Ford's motion is now moot. The Court therefore **TERMINATES** Ford's motion.

**VII**

For all of the reasons stated above, **IT IS HEREBY ORDERED** that:

- Versata's motion for reconsideration (ECF No. 709) is **GRANTED IN PART AND DENIED IN PART** as set forth above; and

Case: 24-1140 Document: 18 Page: 181 Filed: 03/22/2024

- Ford's motion for partial summary judgment (ECF No. 707) is **TERMINATED AS MOOT**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: January 22, 2020

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 22, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERSATA SOFTWARE, INC. *et al.*,

Plaintiffs,

v.

Case No. 15-cv-10628
(*consolidated with Case No. 15-11264*)
Hon. Matthew F. Leitman

FORD MOTOR COMPANY,

Defendant.
_________________________________/

**VERDICT FORM**

Case: 24-1140 Document: 108 Page: 183 Filed: 10/28/2024

## I. Versata's Breach of Contract Claim Against Ford

**A**

1. Did Ford breach the MSSA by misusing and disclosing confidential information?

   Yes X

   No ______

*If you answered yes Question 1, continue to Question 2.*
*If you answered no to Question 1, skip to Question 3.*

2. What amount, if any, fairly compensates Versata for the damages it suffered as a result of the breach listed in Question 1?

   $ 31,350,000

**B**

3. Did Ford breach the MSSA by reverse engineering Versata's software for its own commercial use?

   Yes X

   No ______

*If you answered yes to Question 3, continue to Question 4.*
*If you answered no to Question 3, skip to Question 5.*

4. What amount, if any, fairly compensates Versata for the damages it suffered as a result of the breach listed in Question 3?

   $ 50,160,000

C

5. Did Ford breach the MSSA by refusing to permit Versata to exercise its audit and/or verification rights under the contract, and/or by continuing to use Versata's software without a license and without payment of licensing fees?

Yes [X]

No ______

*If you answered yes to Question 5, continue to Question 6.*
*If you answered no to Question 5, stop here, answer no further questions in this section, and skip to Part II.*

6. What amount, if any, fairly compensates Versata for the damages it suffered as a result of the breach listed in Question 5?

$ 750,000

***Go to Part II.***

**II. Ford's Breach of Contract Claim Against Versata**

7. Did Versata breach Addendum #1 to Subscription Schedule #4 to the MSSA by prohibiting Ford from continuing to use the ACM software from January 15, 2015 to December 31, 2015?

Yes ______

No [X]

*If you answered yes Question 7, continue to Question 8.*
*If you answered no to Question 7, stop here, answer no further questions in this section, and skip to Part III.*

8. What amount, if any, fairly compensates Ford for the damages it suffered as a result of the breach listed in Question 7?

$ [Ø]

***Go to Part III.***

## III. Trade Secret Misappropriation

### A. The Grid

1. Did Versata establish that the Grid was a Versata combination trade secret?

Yes __X__

No ______

*If you answered yes to Question 1, continue to Question 2.*
*If you answered no to Question 1, skip to Question 6.*

2. Did Versata establish that Ford misappropriated the Grid trade secret?

Yes __X__

No ______

*If you answered yes to Question 2, continue to Question 3.*
*If you answered no to Question 2, skip to Question 6.*

3. What amount, if any, fairly compensates Versata for the damages it suffered as a result of Ford's misappropriation of the Grid trade secret?

$ 10,165,000

4. Was Ford's misappropriation of the Grid trade secret willful and malicious?

Yes ______

No __X__

*If you answered yes to Question 4, continue to Question 5.*
*If you answered no to Question 4, skip to Question 6.*

5. What amount, if any, of exemplary damages do you award for Ford's willful and malicious misappropriation of the Grid trade secret? This figure may be up to two times the number you entered for Question 3, above.

$ Ø

## B. Buildability

6. Did Versata establish that Buildability was a Versata combination trade secret?

   Yes X

   No ______

*If you answered yes to Question 6, continue to Question 7.*
*If you answered no to Question 6, skip to Question 11.*

7. Did Versata establish that Ford misappropriated the Buildability trade secret?

   Yes X

   No ______

*If you answered yes to Question 7, continue to Question 8.*
*If you answered no to Question 7, skip to Question 11.*

8. What amount, if any, fairly compensates Versata for the damages it suffered as a result of Ford's misappropriation of the Buildability trade secret?

   $ 4,494,000

9. Was Ford's misappropriation of the Buildability trade secret willful and malicious?

   Yes ______

   No X

*If you answered yes to Question 9, continue to Question 10.*
*If you answered no to Question 9, skip to Question 11.*

10. What amount, if any, of exemplary damages do you award for Ford's willful and malicious misappropriation of the Buildability trade secret? This figure may be up to two times the number you entered for Question 8, above.

$ ____________________

**C. Workspaces**

11. Did Versata establish that Workspaces was a Versata combination trade secret?

Yes __X__

No _______

*If you answered yes to Question 11, continue to Question 12.*
*If you answered no to Question 11, skip to Question 16.*

12. Did Versata establish that Ford misappropriated the Workspaces trade secret?

Yes __X__

No _______

*If you answered yes to Question 12, continue to Question 13.*
*If you answered no to Question 12, skip to Question 16.*

13. What amount, if any, fairly compensates Versata for the damages it suffered as a result of Ford's misappropriation of the Workspaces trade secret?

$ 7,707,000

14. Was Ford's misappropriation of the Workspaces trade secret willful and malicious?

Yes _______

No __X__

*If you answered yes to Question 14, continue to Question 15.*
*If you answered no to Question 14, skip to Question 16.*

15. What amount, if any, of exemplary damages do you award for Ford's willful and malicious misappropriation of the Workspaces trade secret? This figure may be up to two times the number you entered for Question 13, above.

    $ Ø

**D. MCA**

16. Did Versata establish that MCA was a Versata combination trade secret?

    Yes ______

    No X

*If you answered yes to Question 16, continue to Question 17.*
*If you answered no to Question 16, answer no further questions.*

17. Did Versata establish that Ford misappropriated the MCA trade secret?

    Yes ______

    No X

*If you answered yes to Question 17, continue to Question 18.*
*If you answered no to Question 17, answer no further questions.*

18. What amount, if any, fairly compensates Versata for the damages it suffered as a result of Ford's misappropriation of the MCA trade secret?

    $ Ø

19. Was Ford's misappropriation of the MCA trade secret willful and malicious?

Yes ______

No __X__

*If you answered yes to Question 19, continue to Question 20.*
*If you answered no to Question 19, answer no further questions.*

20. What amount, if any, of exemplary damages do you award for Ford's willful and malicious misappropriation of the MCA trade secret? This figure may be up to two times the number you entered for Question 18, above.

$ __Ø__

***You are done.***

Dated: 10-26-22

**s/Jury Foreperson**

**In compliance with the Privacy Policy adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal.**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERSATA SOFTWARE, INC. *et al.*,

Plaintiffs,

v.

FORD MOTOR COMPANY,

Defendant.

Case No. 15-cv-10628
(*consolidated with Case No. 15-11264*)
Hon. Matthew F. Leitman

______________________________________________________/

**OPINION AND ORDER (1) GRANTING FORD MOTOR COMPANY'S MOTION FOR JUDGMENT AS A MATTER OF LAW (ECF No. 1030) AND (2) TERMINATING AS MOOT FORD'S MOTION FOR ORDER REQUIRING PLAINTIFFS TO MAKE AN ELECTION OF REMEDIES (ECF No. 1018)**

In this action, Plaintiffs Versata Software, Inc., Trilogy Development Group, Inc., and Trilogy, Inc. (collectively, "Versata") brought breach of contract and trade secret misappropriation claims against Defendant Ford Motor Company. The case proceeded to trial, and a jury awarded Versata $82,260,000 in breach of contract damages and $22,386,000 in trade secret misappropriation damages. Ford has now moved for judgment as a matter of law in its favor. (*See* Mot., ECF No. 1030.) Ford argues that Versata failed to present sufficient evidence to support (1) the jury's finding of liability on Versata's trade secret misappropriation claims and (2) either of the jury's damages awards.

The Court agrees with Ford that the jury's damages awards are not supported by sufficient evidence. Thus, even though the Court's review of the damages awards is highly deferential, the Court cannot permit those awards to stand. The Court will therefore **GRANT** Ford's motion.[1]

**I**

**A**

Versata is a computer software company based in Austin, Texas. Ford is one of the world's largest automakers. Ford hired Versata to develop computer software that would allow Ford to more efficiently configure the millions of cars that it manufactures each year. Versata created that software and called it "ACM." Versata licensed ACM and other related software (including a software program called "MCA") to Ford through an agreement that was called the Master Subscription and Services Agreement (the "MSSA"). The parties entered into the MSSA in 2004.

[1] During trial, Ford made both an oral motion for judgment as a matter of law and filed a written motion requesting the same relief. (*See* Mot., ECF No. 999, 1001. *See also* Ford's motion for leave to file an oversized brief, ECF No. 998.) The Court did not rule on the motions at that time and instead submitted the case to the jury. (*See* 10/18/2022 Trial Tr., ECF No. 989, PageID.64460.) Those motions were superseded by Ford's post-trial motion for judgment as a matter of law. Accordingly, the Court **TERMINATES** the motions Ford filed during the trial as **MOOT**. Versata also made an oral motion for judgment as a matter of law during trial on Ford's counterclaim for breach of contract. The Court took Versata's motion under advisement and submitted Ford's counterclaim to the jury. (*See* 10/12/2022 Trial Tr., ECF No. 996, PageID.65232.) The jury then ruled in favor of Versata on Ford's counterclaim. Thus, the Court **TERMINATES** Versata's oral motion for judgment as a matter of law without prejudice **AS MOOT**.

Under the MSSA (and subsequent addendums to the MSSA), Ford agreed to pay Versata fees (1) to license ACM and MCA and (2) for support and software enhancement services related to those programs. In the final year of the MSSA, Ford paid Versata $14.95 million to license the software and for certain enhanced support services.

The MSSA was set to expire in 2014. Prior to the expiration of that agreement, the parties attempted to negotiate an extension. Those negotiations were not successful.

Instead of renewing the MSSA, Ford developed and implemented its own automotive configuration software program to replace ACM and MCA. Ford called this software “PDO.” Ford had been working on PDO for several years before the MSSA expired.

**B**

At trial, Versata claimed that Ford breached the MSSA and misappropriated its (Versata’s) trade secrets when Ford developed PDO. Versata told the jury that Ford breached the MSSA in three ways: by misusing and disclosing Versata’s confidential information; by reverse engineering ACM and MCA as part of the effort to develop PDO; and by denying Versata the right to enter Ford’s premises to verify Ford’s compliance with the provisions of the MSSA.

Versata also claimed at trial that Ford misappropriated four of Versata's trade secrets when Ford developed PDO. The four trade secrets were called (1) the Grid, (2) Buildability, (3) Workspaces, and (4) MCA. Each of these trade secrets were combination trade secrets made up of several different elements.

At the conclusion of Versata's case in chief, Ford made an oral motion for judgment as a matter of law. It thereafter filed a written motion seeking the same relief. (*See* Mot., ECF Nos. 999, 1001.) The Court heard argument on the motion, but it did not rule on it at that time. Instead, the Court took the motion under advisement and submitted Versata's claims to the jury. (*See* 10/18/2022 Trial Tr., ECF No. 989, PageID.64460.)

The jury returned a verdict mostly in Versata's favor. (*See* Verdict Form, ECF No. 1004.) The jury first concluded that Ford breached the MSSA in all three ways identified by Versata. It awarded Versata $31,350,000 in damages for Ford's misuse and disclosure of Versata's confidential information; $50,160,000 in damages for Ford's reverse engineering of Versata's software; and $750,000 in damages for Ford's refusal to permit Versata to exercise its verification rights. (*See id.*, PageID.65558-65559.) Next, the jury concluded that Ford misappropriated the Grid, Buildability, and Workspaces combination trade secrets. (*See id.*, PageID.65560-65563.) It awarded Versata $10,185,000 in damages for Ford's misappropriation of the Grid; $4,494,000 in damages for Ford's misappropriation of Buildability; and

$7,707,000 in damages for Ford's misappropriation of Workspaces. (*See id.*) Finally, the jury concluded that Ford did not misappropriate MCA. (*See id.*, PageID.65563.)

On February 17, 2023, Ford filed a renewed motion for judgment as a matter of law. (*See* Mot., ECF No. 1030.) The Court will discuss the bases on which Ford seeks judgment in its favor in substantial detail below.

**II**

Ford brings its motion under Federal Rule of Civil Procedure 50. That rule provides that " [i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party; and grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). The rule further provides that, where, as here, a party files a motion for judgment as a matter of law before the case is submitted to the jury, and the court does not rule on the motion at that time, the party "may file a renewed motion for judgment as a matter of law" after the trial has concluded. Fed. R. Civ. P. 50(b).

The standards governing a Rule 50 motion are well settled. "[J]udgment as a matter of law is appropriate when viewing the evidence in the light most favorable

Case: 24-1140 Document: 18 Page: 195 Filed: 05/02/2024

to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2006) (internal quotation marks omitted). "[T]he verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *Mosby-Meacham v. Memphis Light, Gas, & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018). Moreover, when reviewing such a motion, a "court should not weigh the evidence, evaluate the credibility of the witnesses, or substitute its judgment for that of the jury." *Id.* (internal punctuation omitted).

Finally, a court's review of a jury's damages award under Rule 50 "is extremely deferential." *Mike's Train House*, 472 F.3d at 413 (internal quotation marks omitted). Such an award must stand unless "the award is contrary to all reason." *Id.*

**III**

The Court begins with Ford's motion for judgment as a matter of law on Versata's breach of contract claim. The Court will grant that motion, reduce Versata's contract damages to $1 in nominal damages for each of the three breaches found by the jury, and will enter judgment in favor of Versata on its breach of contract claims in the amount of $3.

Case: 24-1140 Document: 18 Page: 196 Filed: 03/12/2024

### A

Before turning to the merits of Ford's motion, the Court pauses to provide some important context as to how Versata presented its contract damages theory during discovery and how Versata's trial presentation on contract damages differed from its position on contract damages during discovery.

During discovery, Versata said that it would prove its breach of contract damages in two ways, but it did not present either methodology at trial. Versata identified these methodologies in response to an interrogatory from Ford. In that interrogatory, Ford asked Versata to "identify each category of damages Versata [was] seeking (*i.e.*, actual or compensatory damages, unjust enrichment, entitlement to a reasonable royalty, and/or any other form of damages), and further state the theories of recovery, factual support for those theories, and computations of damages within each category, and identify the evidence Versata will rely upon in support." (Versata Supp. Interrogatory Resp., ECF No. 803-15, PageID.56570.)

Versata first responded that "[d]amages calculations and evidence material to those calculations [were] the domain of expert testimony." (*Id.*, PageID.56571.) But Versata did not provide any expert opinions concerning contract damages at that time. Instead, Versata said that it would "supplement its response in accordance with the court's deadline for the submission of expert reports." (*Id.*)

However, Versata's later-served reports from its damages experts said very little about contract damages. Rather, the reports focused almost exclusively on trade secret misappropriation damages. For instance, a 2017 report authored by Dr. Craig Elson, one of Versata's damages experts, devoted 61 pages to Versata's trade secret damages and addressed breach of contract damages in a single footnote. (*See* Dr. Elson Rpt., ECF No. 347-4, PageID.17849-17910.) That footnote stated, in relevant part, that "[q]uantitatively, the damages associated with certain of Versata's breach of contract claims (assuming liability) are subsumed in the trade secret misappropriation damages quantified herein." (*Id.*, PageID.17833 at fn.4.) Likewise, in a second damages report that Dr. Elson jointly authored with Christopher Bokhart (another of Versata's experts) in 2018, the experts addressed Versata's trade secret damages over the course of 52 pages and again addressed Versata's breach of contract damages in a lone footnote. (*See* Dr. Elson and Bokhart Rpt., ECF No. 573-2, PageID.43186-43238.) In relevant part, that footnote said that "if [Ford's] unauthorized use [of Versata's software] is alternatively (or additionally) considered a breach of existing license agreements, reasonable royalty damages as calculated herein would also be reflective of damages under that construct." (*Id.*, PageID.43168 at fn. 11.)

As trial approached, Versata attempted to augment the sparse expert contract damages opinions offered by Dr. Elson and Bokhart. In July of 2022, Versata served

a joint supplemental expert reply report on damages drafted by Bokhart and new Versata damages expert Renee McMahon.[2] In that report, the damages experts presented a never-before-disclosed breach of contract damages model based on Versata's lost profits. (*See* Versata Supp. Reply Rpt., ECF No. 860-2.)

Ford moved to exclude Versata's new lost profits model of contract damages as untimely and unreliable (*see* Mot., ECF No. 860), and the Court granted the motion. (*See* Order, ECF No. 916, PageID.60219.) The Court ruled that because Versata had not previously and timely disclosed the lost profits damages model to Ford, and because there was not time for Ford to conduct new discovery on that damages model prior to trial, Versata could not present that model to the jury. (*See* 9/12/2022 Hr'g Tr., ECF No. 919, PageID.60381-60387.) The Court also held that the lost profits model Versata disclosed was not sufficiently reliable because it did not distinguish between Ford's different alleged breaches of contract and did not "provide the jury any way to calculate damages if it found that Ford breached the contract in some ways, but not in others." (*Id.*, PageID.60385-60386.)

At trial, Versata did not present any expert testimony on contract damages. McMahon provided expert testimony on damages, but she confined her opinions to Versata's trade secret damages. (*See* 10/17/2022 Trial Tr., ECF No. 979,

[2] McMahon replaced Dr. Elson when health challenges prevented Dr. Elson from being available to testify at trial.

PageID.64127.) She did not testify, as Dr. Elson and Bokhart had opined in their earlier reports, that (1) Versata's trade secret damages were "reflective" of its breach of contract damages or (2) Versata's breach of contract damages were "subsumed" within its trade secret damages.

In Versata's second response to Ford's interrogatory about breach of contract damages, Versata said that it would present evidence that "Ford was willing to pay $17 million for a one-year extension of its license to ACM and MCA under the MSSA," and Versata asserted that it was "entitled to recover at least [that] amount for every year or part of a year that Ford continued to use Versata confidential information in violation of its license." (Versata Supp. Interrogatory Resp., ECF No. 803-15, PageID.56571.) In a hearing before the Court, Versata said that evidence of Ford's willingness to pay $17 million per year would come from witness Mike Richards, a former Versata employee. Versata explained that Richards would testify at trial that during negotiations with Ford over the renewal of the MSSA, a representative of Ford told him (Richards) that Ford would agree to pay $17 million for a one-year extension of the MSSA:

> So there will be evidence at trial, it is not in the record, but Mike Richards will testify that in the back and forth discussion that he had with David Baxter, from Ford, that Ford initially rejected the idea of $17 million per year as part of a three or five-year deal, but that when they were talking Baxter, expressed a willingness to consider $17 million for one year, for only one year. He will testify to that. That's why this is a fact issue that depends on the evidence presented at trial.

(4/8/2022 Hr'g Tr., ECF No. 815, PageID.57002.)

But Richards did not offer that testimony at trial. Instead, Richards testified only that Versata had offered to license the software to Ford for $17 million per year and that Versata would not accept any amount less than $17 million per year to license ACM and MCA to Ford. In fact, no witness testified that Ford was willing to pay $17 million per year to renew the MSSA for any period of time.

**B**

The Court instructed the jury on contract damages after the proofs had closed but before the parties presented their closing arguments. The Court told the jury that if it found that Ford had breached the MSSA, it should award damages in an amount that would put Versata in the same – but not a better – position that Versata would have been in if there had been full performance under the MSSA:

> If you find that Ford is liable to Versata for breach of contract, then you must decide the amount of money, if any, to award to Versata as contract damages. If you find that Ford is not liable, then you do not award Versata contract damages.
>
> [….]
>
> The parties seeking damages must prove by a preponderance of the evidence the amount of any damages to be awarded. However, that party does not need to prove its damages with – with mathematical precision because it is not always possible that a party can prove the exact amount of its damages. Therefore, it is necessary only that Versata [] prove its damages to a reasonable certainty or a reasonable probability. However, you may not award damages on the basis of guess, speculation or conjecture.

[….]

> Contract damages are intended to give the non-breaching party the benefit of the party's bargain by awarding it a sum of money that will, to the extent possible, *put it in as good a position as it would have been in had the contract been fully performed*. The non-breaching party should receive those damages naturally arising from the breach. [] *Versata [] can[not] recover a greater amount in damages than it could have gained by the other party's full performance of the contract*.

(10/24/2022 Trial Tr., ECF No. 1006, PageID.65596-65598; emphasis added.)

**C**

During closing arguments, Versata's counsel asked the jury to award Versata $17 million per year as damages for each of Ford's three alleged breaches of contract. He said that $17 million per year was the appropriate amount because the evidence showed that (1) Versata would not accept anything less than $17 million per year to renew the MSSA and (2) Ford had no choice but to accept that offer because it could not survive without Versata's software. (*See id.*, PageID.65690-65692.) As support for his claim that Ford was compelled to accept Versata's $17 million per year offer, counsel cited testimony from Ford employee Dave Baxter that Ford "ha[d] to have [automotive] configuration software" and "didn't think [it was] going to get PDO done in time" to replace ACM and MCA. (*Id.*, PageID.65690-65692.)

Versata's counsel then asked the jury to multiply $17 million per year by seven and one-half years. (*See id.*) That was the amount of time that counsel said

Case: 24-1140 Document: 18 Page: 202 Filed: 05/01/2024

Ford had been in breach of the MSSA. The total amount came to $127,500,000. Counsel asked the jury to award that amount for each of the three individual breaches of contract. (*See id.*, PageID.65692: "I think it's reasonable to conclude that the best evidence of what the license fee would be would be $17 [million] per year times 7.5 years for each breach of contract.") Counsel never attempted to explain for the jury how that damages amount was tied to each individual breach. Instead, he told the jury to award the same $127.5 million amount for all three breaches and not to "worry about rendering duplicative damages" because the Court would adjust the jury's verdict after trial. (*Id.*, PageID.65699.)

In the alternative, Versata's counsel provided the jury with two other amounts that he said the jury could use as Versata's annual damages for each of the three breaches of contract. Those alternative amounts were $14.95 million per year and $10.95 million per year. Counsel told the jury the following about those differing amounts:

> Now, I also, though, recognize that you as the jury, you get to determine this, I don't. And you've heard the evidence. Another number -- so I put -- I put alternative numbers on here if you want to consider it. You can ignore my recommendation, that's up to you. But I think 17 million based on the evidence is the right amount, but another number would be 14.95. That -- you heard that from the evidence from the damage expert, Renee McMahon. This is the total that Ford actually paid for ACM and MCA software in 2014, the last year of the contract. So you would assume that Ford would have been willing to pay the same amount for future years that it paid in 2014, which would be $14.95 million

> Now, if you didn't want to accept that as far as -- there's another number for 2014. If you take out basically what are called support and maintenance payments, the number could come down to 10.95 for 2014. So if you strip out -- but that's not really realistic because if they're going to use our software, they're going to want our -- they're going to want our support and maintenance that they would -- that they paid for every year.

(*Id.*, PageID.65692-65693.)

As noted above, the jury ultimately concluded that Ford breached the MSSA in each of the three ways identified by Versata. It awarded Versata $31,350,000 in damages for Ford's misuse and disclosure of Versata's confidential information; $50,160,000 in damages for Ford's reverse engineering of Versata's software for Ford's commercial use; and $750,000 in damages for Ford's refusal to permit Versata to exercise its verification rights. (*See* Verdict Form, ECF No. 1004, PageID.65558-65559.)

**D**

Ford argues that the Court must set aside the jury's contract damages awards for two reasons: because Versata did not sufficiently prove causation of contract damages and because Versata did not present sufficient evidence to enable the jury to determine its contract damages with reasonable certainty. The Court disagrees with the first contention but agrees with the second. The Court addresses each assertion below.

**1**

The Court begins with the issue of causation. According to Ford, Michigan law requires a plaintiff alleging breach of contract to "establish a causal link between the asserted breach of contract and the claimed damages." (Mot., ECF No. 1030, PageID.66627, quoting *Gorman v. Am. Honda Motor Co.*, 839 N.W.2d 223, 227 (Mich. App. 2013).) And Ford insists that at trial, "Versata did not even try to prove actual contract damages, let alone try to prove a causal link between any alleged breach and damages." (*Id.*, PageID.66628.) More specifically, Ford asserts that "no Versata witness testified that because of the inspection-provision breach, Versata in incurred $X of damages; that as a result of the misuse-provision breach, Versata incurred $Y of damages; or that as a result of the reverse-engineering provision breach, Versata incurred $Z in damages." (*Id.*)

Ford has, indeed, identified a serious problem with Versata's damages case (more on that below), but it is not one of causation. Ford conflates two *separate* components of a breach of contract claim: proof of causation of damages, on one hand, and proof of the amount of damages, on the other hand. The causation component focuses on whether the defendant's alleged breach has resulted in any damage to the plaintiff, while the amount component focuses, as the name suggests, on the quantification of the plaintiff's damages. Because these components are separate, "courts have always distinguished between proof of *causation* of damages

and proof of the *amount* of damages." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (emphasis in original).

Ford has not cited any Michigan authority holding that a plaintiff must present evidence that a particular breach caused a particular dollar amount of damages in order to satisfy its burden *on causation*. The sole Michigan decision it cites as authority for that assertion – *Gorman*, *supra* – does not support it. The plaintiff in *Gorman* brought a breach of warranty claim against an automobile manufacturer and a car dealer. However, the "undisputed evidence show[ed] that defects brought to defendants' attention during the warranty period were repaired within a reasonable period of time and that the vehicle was returned to service without any further complaints from plaintiff." *Gorman*, 839 N.W.2d at 226-27. Because there was "no evidence" that the defendants "failed to honor" the warranty, the Michigan Court of Appeals held that the plaintiff could not prevail on her breach of warranty claim. *Id.*

In the portion of the decision cited by Ford, the Michigan Court of Appeals rejected the plaintiff's argument that she could establish a breach of warranty based upon evidence that she needed to repair her vehicle after the warranty expired:

> Plaintiff's reliance on the vehicle's postwarranty repair history is misplaced because there is no evidence of a causal link between them and an unrepaired defect that plaintiff brought to defendants' attention during the warranty period. In a breach of contract case, the plaintiff must establish a causal link between the asserted breach of contract and the claimed damages. See *Miller–Davis Co. v. Ahrens Constr., Inc. (On Remand),* 296 Mich.App. 56, 71–72, 817 N.W.2d 609 (2012). In this case, there

> is no evidence the same repairs were made during and after the warranty period, and if they were the same, there was no evidence that the postwarranty repairs were not normal maintenance items as opposed to an unrepaired defect, or that the postwarranty repairs were not necessitated by poor workmanship by nonparty Suburban Acura, which performed all the warranty repairs. "'There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only.'" *Kaminski v. Grand Trunk W. R. Co.,* 347 Mich. 417, 422, 79 N.W.2d 899 (1956) (citation omitted). "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Skinner v. Square D Co.,* 445 Mich. 153, 164, 516 N.W.2d 475 (1994). Simply put, the postwarranty repair history creates only speculation and conjecture that defects disclosed to defendants during the warranty period went unrepaired; this is insufficient to create an issue of material fact to survive a motion for summary disposition. *MEEMIC Ins. Co. v. DTE Energy Co.,* 292 Mich.App. 278, 282, 807 N.W.2d 407 (2011).

*Id.* at 227-28 (internal footnote omitted).

As this quoted excerpt makes clear, nothing in *Gorman's* discussion of causation suggests, as Ford seems to contend, that a plaintiff alleging breach of contract must present evidence that a particular breach caused a particular amount of damages. The issue in *Gorman* simply had nothing to do with whether the plaintiff had sufficiently proved the amount of her claimed damages.

In order to satisfy its burden on causation under Michigan law, Versata had to present evidence that its claimed damages arose "naturally [] from [Ford's] breach" of the MSSA. (10/24/2022 Trial Tr., ECF No. 1006, PageID.65598.) Versata carried that burden. Versata sought damages for Ford's non-renewal of the MSSA, and it

presented evidence that those damages arose naturally from Ford's breaches of the MSSA. More specifically, Versata presented evidence that Ford breached the MSSA by disclosing Versata's confidential information to the Ford employees who were developing PDO and by reverse engineering ACM and MCA; that those two breaches allowed Ford to develop PDO as a replacement for ACM and MCA; and that if Ford had not developed PDO, Ford would have had no choice but to renew, and would have renewed, the MSSA. That evidence, when viewed in the light most favorable to Versata, was sufficient to satisfy Versata's burden on the causation element of its breach of contract claim.

**2**

While Versata did show that Ford's breaches caused it (Versata) to suffer damages, it did not present sufficient evidence to permit the jury to quantify those damages in compliance with Michigan law. For that reason, the jury's award of contract damages cannot stand.

**a**

Under Michigan law, "damages are not presumed in relation to contracts." *Doe v. Henry Ford Health System*, 865 N.W.2d 915, 922 (Mich. App. 2014). Instead, a plaintiff alleging breach of contract must "prove the measure of damages with reasonable certainty." *Id.* (internal quotation omitted). "[I]t is not necessary that damages be determined with mathematical certainty." *Chelsea Inv. Grp., LLC*

*v. Chelsea*, 792 N.W.2d 781, 792 (Mich. App. 2010). But "damages that are speculative or based on conjecture are not recoverable." *Id.* Simply put, as this Court explained in *Stonemen Grp., Inc. v. Metalforming Techs., Inc.*, 362 F.Supp.2d 896, (E.D. Mich. 2005), a decision that Versata finds persuasive (*see* Versata Resp., ECF No. 1038, PageID.66774-66775), "[a] plaintiff must produce a *method* by which damages can be calculated with reasonable certainty." *Stonemen*, 362 F.Supp.2d at 902 (emphasis added).

Versata did not do that. Versata's experts never explained to the jury how to calculate the amount of Versata's breach of contract damages. Nor did any lay witness for Versata ever testify that Versata suffered a particular amount of contract damages. In fact, no Versata witness offered even a rough approximation as to the amount of contract damages that Versata suffered. Likewise, Versata did not introduce into evidence any documents reflecting a calculation of its breach of contract damages. Without any of this evidence, the jury had no way to calculate Versata's claimed breach of contract damages with reasonable certainty.

**b**

Instead of presenting testimony from a witness identifying its amount of contract damages, Versata presented its theory of contract damages to the jury in the closing argument by its attorney. As noted above, Versata's counsel asked the jury to award breach of contract damages of $17 million per year for seven and one-half

Case: 24-1140 Document: 14 Page: 209 Filed: 05/01/2024

years based upon the theory that (1) Versata offered to license ACM and MCA to Ford for that amount, (2) Versata was not willing to accept any lower amount to license ACM and MCA to Ford, (3) Ford had no alternative but to accept that amount, and (4) Ford was in breach for 7.5 years.

This model for calculating damages was inconsistent with Michigan law – as reflected in the Court's jury instructions – that an award of contract damages must put the non-breaching party "in as good a position as it would have been in had the contract been fully performed" while not giving that party "a greater amount in damages than it would have gained" absent the breach. (10/24/2022 Trial Tr., ECF No. 1006, PageID.65596-65598.) More specifically, this method necessarily *overcompensated* Versata because it did not account for any of the costs of performance that Versata would have incurred if Ford had accepted its $17 million per year offer and the parties had thereafter performed under the terms of that offer. Stated another way, the $17 million per year would have been Versata's *gross* revenue under the terms of its offer, not Versata's net earnings in the event of full performance under the offer, and Versata's damages model based upon the $17 million per year offer thus sought to recover more from Ford than Versata would have gained absent a breach by Ford. Versata's damages model is therefore inconsistent with Michigan law. *See, e.g.*, *Goodwin v. Coe*, 233 N.W.2d 598, 603 (Mich. App. 1975) (explaining that when calculating breach of contract damages,

"[t]he injured party is not [] entitled to be placed in a better position than he would have been if the contract had not been broken, *i.e.*, the measure of damages is the actual loss sustained by reason of the breach. Thus, deduction of any saving to the injured party must be made.") (internal citations omitted).

The failure of Versata's damages model to account for Versata's costs cannot be dismissed as a minor flaw because Versata had meaningful performance obligations under the terms of its offer. For instance, Versata's offer required Versata to provide "4 managed maintenance releases per year [….,] error resolution and patch releases, [and] customer support services (ticketing system, triage meetings, phone, email, and web based support, etc.)." (Plaintiff's Trial Ex. 537, Bates No. FORD_VERSATA 11619.) Versata's costs in providing these products and services could not have been *de minimis*.[3] By failing to deduct those expenses, Versata's damages model necessarily yielded a damages award that put Versata in a better position than it would have been in had the contract been fully performed.

---

[3] Versata's own damages expert – in an opinion not expressed to the jury (because the Court excluded it, see above at Section (III)(A)) – pegged Versata's annual costs of performance at $1.1 million per year. (*See* McMahon Expert Rpt. at ¶¶ 60-61 and Ex. 5, ECF No. 860-2, PageID.58779-58780, 58809.) Ford would presumably contend that Versata's costs were higher – and thus that Versata's available damages were lower – but Ford never conducted discovery into Versata's costs because Versata did not disclose during discovery any theory of damages that included a consideration of its costs.

Moreover, even if the jury had attempted to correct for the overcompensation inherent in Versata's model, it could not have done so on a reliable basis. That is because Versata did not present the jury with any evidence of any specific cost or expense that it would have incurred when performing under the terms of its offer. Thus, the jury could only have speculated as to the amount of Versata's costs that it would have needed to subtract out of its contract damages awards in order to put Versata in the same position that it would have been in if the parties had performed under Versata's offer. But a damages award may not rest on speculation. *See*, *e.g.*, *Chelsea Inv. Grp.*, 792 N.W.2d at 792. For all of these reasons, Versata's damages model was contrary to Michigan law and could not have been the basis of a proper contract damages award.

Moreover, the two alternative contract damages models proposed by Versata's counsel during his closing argument suffered from the same flaws as the primary model. As noted above, the first of those alternative models called for the jury to award $14.95 million per year for 7.5 years. That is the amount that Ford actually paid Versata in the final year of the MSSA. (*See* 10/17/2022 Trial Tr., ECF No. 979, PageID.64156-64157.) The $14.95 million consisted of the "base" license fee of $10.95 under the MSSA million plus an additional $4.0 million for, among other things, "extended support and maintenance services" provided by Versata. (10/17/22 Trial Tr., ECF No. 985, PageID.64274-64275.) Those extended support

services included "provid[ing] engineers to support" Ford's use of ACM, releasing several software updates each year, agreeing to "investigate" and "provide resolution for Errors identified" in ACM, attending "a weekly meeting with Ford personnel […] to review the status" of its error investigations, and providing Ford "telephone, email, and web-based support." (Addendum #1 to ACM Subscription Schedule #4 of the MSSA, ECF No. 421-1, PageID.26502-26505.) Because the $14.95 million per year figure – like the $17 million per year figure in Versata's primary damages model – included payments for services and support that Versata provided at some cost to itself, that number is a gross revenue number. It is not a net figure that accurately represents the amount that Versata actually gained by performing its obligations during the final year of the MSSA. Thus, as with Versata's primary damages model, any award of damages using the $14.95 million per year figure necessarily would have overcompensated Versata. And, again, the jury could not have corrected for that overcompensation because it had no evidence concerning Versata's costs.

Versata's second alternative damages model called for the jury to award $10.95 million per year in contract damages for 7.5 years. The $10.95 million was the "base" license fee under the MSSA. As its name suggests, the "base" license did not require Versata to provide an enhanced level of service and support to Ford. Thus, Versata's costs under the base license would have been less, and an award

based upon the base license fee of $10.95 million per year – as opposed to an award based upon the alternative figures of $17 million or $14.95 million per year – would admittedly have been closer to a proper award of Versata's net revenue.

But even though the base license required Versata to provide less service and support, it did require Versata to provide *some* level of technical support. For example, under the MSSA's base license, Versata was obligated to perform "support and enhancement services" that included "replicating and diagnosing Errors reported by Ford." (Plaintiff's Trial Ex. 100, Bates No. VRS00004809.) Thus, Versata incurred some costs under the base license, and the base license fee therefore represented gross revenue to Versata rather than net gain. And, once again, because Versata introduced no proof of its costs, the jury had no evidence from which it could have determined Versata's net gain if it (the jury) had used the base license fee as the foundation for its damages award. Furthermore, Versata's costs of performance under the base license – *i.e.,* its cost to correct errors, among other things – cannot be dismissed as a mere *de minimis* expense because Ford presented evidence at trial that it experienced frequent errors while using Versata's software. And even Versata's own damages expert, Renee McMahon, estimated (in her report, but not at trial, *see* footnote three above) that Versata would have incurred $1.1 million in "incremental expenses" under the "base" license. (Ex. 4 to McMahon Expert Rpt., ECF No. 860-2, PageID.58808.) For all of these reasons, if the jury used the base

license fee to calculate Versata's contract damages, that would have resulted in the overcompensation of Versata, and the jury could not have reliably accounted for the overcompensation in its award.[4]

**c**

Versata offers several additional arguments as to why the Court should not disturb the jury's award of contract damages, but none persuade the Court that the award may stand under Michigan law.

Versata initially argues that the Court may uphold the contract damages award on the theory that the jury properly awarded those damages as a "reasonable royalty." (Versata Resp., ECF No. 1038, PageID.66772-66773.) The Court declines to uphold the award on that basis for two reasons. First, it is not clear that Michigan recognizes a reasonable royalty theory of contract damages. *See Innovation Ventures, LLC v. Custom Nutrition Lab'ys., LLC*, 912 F.3d 316, 347 (6th Cir. 2018)

[4] The Court cannot solve the problem created by Versata's use of a gross figure to calculate its contract damages by subtracting from the jury's award of contract damages the $1.1 million per year in costs identified by McMahon in her report. That is because, as explained above in footnote three above, Ford did not conduct any discovery into Versata's costs (because Versata never revealed during discovery a contract damages theory that included consideration of its costs), and thus it would be unfair to Ford treat McMahon's figure as accurate. For much the same reason, the Court may not simply say that Versata's costs under the base license would have been so insubstantial that any award of damages using the base license fee would not materially overcompensate Versata. That, too, would be unfair to Ford given that Ford, through no fault of its own, is in no position to challenge the level of Versata's costs under the base license.

(noting that "no controlling authority from either this court or any Michigan court holds that damages in the form of a reasonable royalty may be assessed in a breach of contract case"). Second (and more importantly), even if Michigan did recognize such a theory of contract damages, the theory would be of no help to Versata here because Versata presented no evidence at trial to support a reasonable royalty theory of contract damages. The only Versata witness who testified about the amount of a reasonable royalty was Versata's damages expert, Renee McMahon, and she said nothing about contract damages. When asked by Versata's counsel "what [she was] here to testify about," McMahon responded "I'm here to talk about Versata's damages associated with trade secret misappropriation[]." (10/17/2022 Trial Tr., ECF No. 979, PageID.64127.) Finally, the Court never instructed the jury that it could award breach of contract damages based on a reasonable royalty model; instead, the Court mentioned reasonable royalty only in its instructions on trade secret damages. For all of these reasons, the jury's contract damages award cannot be sustained as a proper award of reasonable royalties.

Versata next argues that the jury may have properly "followed a lost-profits approach" when calculating breach of contract damages. (Versata Resp., ECF No. 1038, PageID.66774.) This argument fails for at least two reasons. First, Versata never disclosed a lost profits theory of contract damages during discovery, and thus it would be unfairly prejudicial to Ford to uphold the contract damages award on

that basis. Second, Versata did not present sufficient evidence at trial to permit an award of lost profits. Under Michigan law, "[d]amages for lost profits are based on the loss of *net rather than gross profits*. Any other rule would obviously grant the offended litigant a greater sum than he would have earned had the breach not occurred." *Lawton v. Gorman Furniture Corp.*, 282 N.W.2d 797, 801 (Mich. App. 1979) (emphasis added; internal citation omitted). And here, as described in detail above, Versata never presented any evidence of its costs and expenses that would have been essential to a determination of its net profits. For these reasons, the contract damages award cannot be sustained on a lost profits theory.[5]

Finally, Versata argues that even if its evidence at trial left some uncertainty as to the amount of its damages, the Court must nonetheless permit the damages award to stand "because the rule in Michigan is that the risk of uncertainty is cast upon the wrongdoer, not the injured party." (Versata Resp., ECF No. 1038, PageID.66775; internal punctuation omitted; quoting *Stonemen Grp.*, 362 F.Supp.2d at 903.) But the flaw in Versata's contract damages case was not a mere uncertainty as to the amount of its damages. Rather, the flaw was that, as described in detail above, in several key respects Versata's damages case was supported by *no* evidence

[5] Versata counters that under Michigan law, "juries can calculate lost profits in circumstances like these without direct evidence of costs." (Versata Resp., ECF No. 1038, PageID.66774.) But for the reasons explained in detail in Ford's Reply, the cases cited by Versata do not support that proposition. (*See* Ford Reply, ECF No. 1041, PageID.66847-66849.)

– *e.g.*, *no* testimony as to the amount of those damages, *no* documents reflecting the calculation or amount of those damages, and *no* evidence concerning its costs and expenses. Simply put, Versata's contract damages case crossed the line from uncertainty to speculation, and the jury's contract damages award therefore cannot stand.

**d**

Even though Versata failed to prove its actual contract damages with reasonable certainty, it is nonetheless entitled to an award of nominal damages for each of the three breaches of contract found by the jury. *See, e.g., Kolton v. Nassar*, 99 N.W.2d 362, 364 (Mich. 1959) (confirming that a plaintiff who proves a breach of contract becomes "entitled to nominal damages"). The Court will therefore enter judgment in favor of Versata in the amount of $1 for each of the three breaches found by the jury, for a total of $3.

**IV**

The Court next turns to Ford's arguments that it is entitled to judgment as a matter of law on Versata's trade secret misappropriation claims. The Court will address each of Ford's arguments separately below.

**A**

Ford first argues that Versata failed to produce sufficient evidence that it (Versata) disclosed the combination trade secrets to Ford. The Court disagrees.

Case: 24-1140 Document: 18 Page: 218 Filed: 03/21/2024

The Court instructed the jury on Versata's burden of proof with respect to the disclosure issue. It told the jury that "[t]o prove its claim with respect to any one of these alleged combination trade secrets," Versata had to establish, among other things, that it "sufficiently disclosed each of its alleged combination trade secrets to Ford such that Ford had knowledge of each trade secret under the totality of the circumstances. In making this determination, you should consider whether, taking into account all of Versata's relevant disclosures and the circumstances under which they were made, it would be reasonable to infer that Ford had knowledge of each of the alleged combination trade secrets." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65599, 65603-65604.)

Ford says that Versata failed to satisfy its burden of proof on the disclosure issue because "[n]o witness testified that Versata identified the elements of any asserted combination *as a combination* to Ford." (Mot., ECF No. 1030, PageID.66639; emphasis in original). Instead, according to Ford, Versata only "pointed over and over to a mountain of user guides and other documents and asserted that all the elements [of each combination] were [individually] in there somewhere." (*Id.*) Thus, Ford asks, "[h]ow could Ford possibly have known which features were alleged trade secrets and which were not?" (*Id.*, PageID.66640.)

The Court finds real merit in Ford's argument. And if this Court had been sitting as a juror, the Court would have found that Versata did *not* sufficiently

disclose each combination trade secret to Ford for the reasons Ford identified. The Court was convinced during trial, and continues to believe, that Versata did not persuasively establish that it ever meaningfully disclosed the trade secrets – as the combinations identified at trial – to Ford. But this Court's personal view of the disclosure issue is not dispositive. The question before the Court, at this stage of the proceedings, is not whether the Court would have found sufficient disclosure if sitting as a trial juror. Instead, the question is whether the evidence, taken in the light most favorable to Versata, was sufficient to support a finding that Versata disclosed the combination trade secrets to Ford. It was.

The primary evidence that Versata disclosed the combination trade secrets to Ford came from Versata's technical expert, Dr. Samuel Malek. He repeatedly testified at trial that Versata disclosed the trade secrets *as combinations* to Ford through its user guides and presentations to Ford.[6] For example, Dr. Malek testified that Versata "disclose[d] *the entire Grid*, as well as every element of the Grid" to Ford in this manner. (10/13/2022 Trial Tr., ECF No. 974, PageID.63808; emphasis

[6] At the hearing before the Court, Ford's attorney suggested that Dr. Malek was not an expert on the disclosure of trade secrets and that he could not have, and did not, offer any opinions concerning disclosure. But Ford never objected to any of Dr. Malek's testimony concerning disclosure on the ground that it exceeded the scope of his expertise or was improper for any other reason. On the contrary, Ford choose to challenge Dr. Malek's testimony regarding disclosure during cross-examination. (*See*, *e.g.*, 10/13/2022 Trial Tr., ECF No. 972, PageID.63571-63572, 63596-63606, 63611-63612.)

added.) Dr. Malek further testified that Versata disclosed "*Workspaces and the elements* of Workspaces to Ford." (*Id.*, PageID.63871; emphasis added.) And he told the jury that Versata's "user guides and Trie presentations" disclosed "*all of Buildability* to Ford." (*Id.*, PageID.63849; emphasis added.) Additional testimony on the disclosure issue came from former Versata employee Seth Krauss. Versata's counsel asked Krauss, "how did Versata disclose *all of these combination trade secrets, including all of their elements*, to Ford," and Krauss responded that Versata "disclosed [] all of the information in manuals, in technical documentation, our functional walkthroughs, launch acceptance documents, system requirement specifications, presentations […], e-mails that we sent, discussions that we had onsite and the software, itself." (10/11/2022 Trial Tr., ECF No. 968, PageID.63322; emphasis added.) Moreover, Versata presented evidence that its manuals and presentations were given to Ford's engineers and other employees with technical expertise. From all of this testimony and evidence, taken in the light most favorable to Versata, the jury reasonably could have concluded that Versata disclosed the combination trade secrets to Ford in a manner that Ford, through its technically-proficient employees, would have been able to understand.

**B**

Ford next argues that Versata failed to produce evidence that each of its combinations had "synergistic" value – *i.e.*, evidence that each combination trade

secret had a value that was greater than the sum of its parts. (*See* Mot., ECF No. 1030, PageID.66647-66649.) The Court disagrees.

The Court addressed the issue of synergistic value in its instructions to the jury. It told the jury that "[a] combination qualifies as a trade secret only when the combination creates value beyond the sum of its individual parts." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65602.)

Ford says that Versata "offered no evidence that the value of any specific combination of elements [of Versata's asserted trade secrets] exceeded the value of the individual elements" and that "[n]o document [presented at trial] explained that these elements combine[d] to produce a synergistic effect." (Mot., ECF No. 1030, PageID.66647-66648.) Ford insists that "[b]ecause the jury had no evidence that any of Versata's combinations created value beyond the sum of the individual parts, the Court should enter judgment in Ford's favor that Versata did not prove its combinations were trade secrets." (*Id.*, PageID.66649.)

While Versata's witnesses did not use the term "synergistic value" or phrases like "the whole has greater value than the sum of its parts," their testimony was sufficient to support a finding that the combination trade secrets had value beyond the value of their individual elements. Versata's witnesses told the jury that, *when assembled into the combinations in question*, the elements of Versata's trade secrets were *collectively* able to perform complex functions. From that testimony, the jury

could have reasonably inferred that the combination of the elements in each trade secret had value above and beyond the sum total of the value of the elements individually.

Versata witness Seth Krauss provided much of the relevant testimony. He explained that the "components" of the Grid "work[ed] together to provide a valuable technology" by, among other things, providing Ford "a much more intuitive user interface, [] a much faster to use interface, and [… a] user interface that prevented errors from being introduced that would cause a lot of time researching and understanding how to fix in the previous systems that were used [by Ford]." (10/11/2022 Trial Tr., ECF No. 968, PageID.63277-63279.) Krauss likewise told the jury that the "Buildability trade secret" (*i.e.*, the *combination* of the elements of Buildability) was the "core computing brain, the big processor behind many of the key operations in ACM." (*Id.*, PageID.63297.) And he explained how the "elements" of the Buildability trade secret "work[ed] together" to "confer a benefit on Ford":

> [T]he benefit to Ford was the ability, in realtime, during the modelling exercise, to implement these extremely complex operations that would allow models to be created in a manner that matched what they wanted to both engineer and what they wanted to market. Without Buildability, there would have been no capability to provide modelers, at the point of entering data to create models like that, that could go downstream, without lots of quality assurance and verification checks in turn.

(*Id.*, PageID.63301.)

Krauss also provided similar testimony with respect to the Workspaces trade secret. When Krauss was asked to describe how the Workspaces "combination trade secret" allowed Ford to solve problems with its production, he explained that Workspaces "allowed each of the individual users [at Ford] to make edits within their own workspace or sandbox, and then merge those edits together, guarantee that they are consistent, allow users to sync or update their own views as the production workspace changed" in a manner "that guaranteed that no inconsistencies got introduced into production." (*Id.*, PageID.63312.)

In sum, from Krauss' testimony (and other testimony offered by Versata witnesses), the jury could reasonably have concluded that Versata's combination trade secrets had synergistic value because, *when assembled as combinations of the elements*, the trade secrets allowed users of ACM to perform complex operations.[7]

[7] During the hearing before the Court, Ford's counsel offered a helpful example that illustrates how the synergistic value requirement applies in the context of combination trade secrets. Counsel's example involved a bike manufacturer. He said that if the manufacturer placed all of the individual parts of a bike into a box without assembling them into a bike, the value of the contents of the box would be the sum total of the value of each individual part – and no more. But if the bike manufacturer assembled those same parts into a finished bicycle and placed that into a box, then the value of the contents of the box would far exceed the sum total of the value of each individual part. That is because the parts, when assembled into the bike, could perform an important function that the parts, individually, could not perform. This bike analogy helps Versata, not Ford, here because Krauss' testimony, quoted above, shows how the combination of the elements in the Versata trade secrets – like the assembled parts of the bike – worked together to perform functions that the elements, individually, could not have performed.

Case: 24-1140 Document: 18 Page: 224 Filed: 05/01/2024

For all of these reasons, Ford is not entitled to judgment as a matter of law on Versata's trade secret claims on the ground that Versata failed to prove a lack of synergistic value.

**C**

Next, Ford argues that Versata failed to present evidence that it (Ford) "misappropriated every element" of the Grid and Buildability trade secrets. (Mot., ECF No. 1030, PageID.66649-66652.) This argument relies on the Court's instruction to the jury that "[f]or each alleged combination trade secret, Versata must prove that Ford misappropriated *every element of that combination* or else there is no misappropriation of that combination." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65600; emphasis added.) The Court concludes that Versata presented sufficient evidence to satisfy its obligation under this instruction for both the Grid and Buildability combinations.

**1**

The Court begins with the Grid. Ford argues that Versata failed to prove misappropriation of every element of the Grid because Versata did not present evidence that Ford's PDO screens use the "{ALL} notation" – a notation that

Case: 24-1140 Document: 18 Page: 225 Filed: 03/12/2024

appeared as part of the Grid on the ACM screens.[8] (Mot., ECF No. 1030, PageID.66649-66651.) Ford contends that it is, in fact, "undisputed" that "PDO's screens do not use or include an {ALL} notation." (*Id.*, PageID.66650.) The Court disagrees.

While Ford presented some evidence that its PDO screens did not use the "{ALL} notation" (*see, e.g.*, testimony of Ford employee Darlene Coomer denying that PDO used the {ALL} notation at all, ECF No. 991, PageID.64790), Versata presented contrary evidence. For instance, Dr. Malek testified that Ford "cop[ied] the *entire* Grid" *including* "*every element* of the Grid." (10/13/2022 Trial Tr., ECF No. 974, PageID.63808; emphasis added.) Because the "{ALL} notation" was an element of the Grid that appeared on the ACM screens, this testimony supports a finding that the PDO screens used that notation. Dr. Malek also offered even stronger testimony on this point. He testified that "*just like ACM*, PDO also has the All notation." (*Id.*, PageID.63677; emphasis added.) From that testimony, the jury reasonably could have concluded that the PDO screens – "just like ACM" – have the "{ALL} notation."

---

[8] The "{ALL} notation" on the screen was an element of the Grid trade secret in ACM because (1) one of the elements of the Grid was the Dynamic Grid and (2) the Dynamic Grid required the display of the "{ALL} notation." (ECF No. 1002, PageID.65545.)

**2**

The Court next turns to Buildability. According to Ford, Versata failed to prove that Ford misappropriated each element of that trade secret because Versata did not present evidence that PDO utilizes Buildability's "minimize trie" data structure. (*See* Mot., ECF No. 1030, PageID.66651-66652.) Ford says that Versata could not have made that showing because it is undisputed that PDO relies upon "an MDD data structure, not a trie or a minimized trie." (*Id.*, PageID.66651.)

Ford's argument rests upon an unduly cramped understanding of "misappropriation." Ford wrongly assumes that in order to misappropriate Versata's minimized trie, it had to incorporate that structure into PDO. But the Court instructed the jury that "misappropriation" includes using a trade secret to "assist or accelerate [a party's own] research and development." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65604.) And Versata presented evidence from which the jury could have reasonably inferred that Ford used the minimized trie element of Buildability in the process of developing PDO. That evidence came from Dr. Malek. He testified at length about the close similarities between the minimized trie structure of Buildability and the MDD data structure of PDO:

> Q. I would like to talk to you about your investigation now, into Ford's misappropriation of this component, the Trie component. Ford claims that it is using a data structure called an MDD, that's what they call it. What is an MDD?

A. So MDD is a closely related data structure to Trie, because it's also tree-based data structure, and that is a data structure that Ford used for its Buildability analysis.

[….]

Q. Are the data structures very similar?

A. They are. So as I mentioned, MDD and Tries are both very closely related data structures in computer science. Both are tree-based data structures. And once you minimize a Trie, which is what Versata was doing, then what you get is, essentially, an MDD, meaning that a minimized Trie is practically an MDD. And I have -- I'm showing you here a scientific article on the left-hand side, this is PX 885. And on the right-hand side, I'm showing you portions of this article, which is not authored by me, it is authored by other computer scientists, where it describes, in the highlighted text, that a minimized Trie is an MDD.

[….]

Q. Can you tell us, in more detail, why Versata's minimized Trie and Ford's MDD are functionally the same?

A. Sure. So I have prepared this table which walks you through why and how they are similar. So the purple column is the Trie, and the gray column is Ford's MDD. As I said, they are both tree data structures. They both represent families at different levels, so each level of the tree corresponds to one feature family. Then both perform Buildability using set operations, and, specifically, they both represent features in the form of binary data, and that just means they are represented in the form of zeros and ones, and then they do set operations on these binaries, which allow it to be efficient. They both are used for Buildability and they both can be used for Buildability analysis.

[….]

Q. So the Ford's MDD -- what Ford calls the MDD, and Versata's minimized Trie, function in the same way?

A. They do.

[….]

Q. So to sum up, did Ford copy and misappropriate the minimized Trie feature of Buildability?

A. They did.

(10/13/2022 Trial Tr., ECF No. 974, PageID.63817-63821.)

From this and other testimony presented at trial (including the evidence that the developers of PDO had access to ACM's technical manuals), the jury could reasonably have concluded that Ford based its MDD data structure on – and thus misappropriated – Versata's minimized trie design from Buildability. And while Ford presented evidence that PDO (and the MDD component of PDO) were developed independently of Buildability and its minimized trie structure (*see*, *e.g.*, 10/17/22 Trial Tr., ECF No. 985, PageID.64343-64346), the jury was free to weigh the competing evidence and to credit Versata's evidence over Ford's. Thus, for all of these reasons, there was sufficient evidence for the jury to conclude that even if PDO does not include a minimized trie data structure, Ford nonetheless used that structure to assist in the development of PDO and thereby misappropriated that element of Buildability.

**D**

Ford next argues that the jury's award of trade secret damages cannot stand because Versata did not introduce evidence that would enable the jury to calculate

damages if it found, as it did, that Ford had misappropriated less than all of Versata's trade secrets. (*See* Mot., ECF No. 1030, PageID.66652-66653.) The Court agrees.

**1**

At trial, the Court instructed the jury that any award of trade secret damages "must be limited to the amount of time you decide it would have taken Ford to independently develop the alleged combination trade secrets you found were misappropriated." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65605.) This instruction underscores that in order to return a properly-supported award of trade secret damages, the jury needed proof as to how long it would have taken Ford to develop any trade secret that Ford misappropriated. Versata did not provide the jury with that essential evidence.

With respect to the development-time issue, Versata presented testimony from Dr. Malek. He explained that he used two commonly-used software tools to determine how long it would have taken Ford to independently develop Versata's trade secrets. (*See* 10/13/2022 Trial Tr., ECF No. 974, PageID.63890-63894.) These tools estimate how long it would take to develop software products (like Versata's combination trade secrets) by, among other things, counting lines of software code, considering the novelty of the to-be-designed software, and evaluating whether the software would need to perform "mission critical" or "safety critical" functions. (*Id.*) Dr. Malek told the jury that based upon his use of the development-time tools, he

concluded "that without copying Versata's trade secrets, it would have taken Ford approximately 8.3 years to implement an equivalent software as ACM and Versata's MCA." (*Id.*, PageID.63889.) In other words, according to Dr. Malek, it would have taken Ford 8.3 years to develop *all four* of Versata's trade secrets.

But Dr. Malek said nothing about how long it would have taken Ford to develop less than all of the trade secrets. Nor did he tell the jury how long it would have taken Ford to develop any of the trade secrets individually. And he did not give the jury the tools to make those determinations. For instance, he did not tell the jury how many lines of code were in each individual trade secret, nor did he explain how any of the other factors considered by the development-time tools he used would apply to each of the individual trade secrets.

Without this information, the jury had no way to reliably determine how long it would have taken Ford to develop the three (out of four) trade secrets that it found to have been misappropriated. Under these circumstances, any development-time figure used by the jury – after it found that Ford misappropriated the Grid, Buildability, and Workspaces, but *not* MCA – would necessarily have been pure speculation. For that reason, the jury's award of trade secret damages lacks a sufficient evidentiary foundation and cannot stand.

The United States District Court for the Northern District of California reached a similar conclusion under similar circumstances in *O2 Micro Int'l Ltd. v.*

*Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064 (N.D. Cal. 2005). In *O2 Micro*, the plaintiff accused the defendant of misappropriating twelve distinct trade secrets and sought damages on an unjust enrichment theory. Prior to trial, the plaintiff disclosed that its damages expert planned to opine that plaintiff suffered a single amount of damages based upon the defendant's misappropriation of all twelve trade secrets. During a pre-trial conference, the court "warned [the plaintiff] of the dangers of bundling all of its alleged trade secrets damages together." *Id*. at 1086. The court explained that if the jury found that the defendant misappropriated less than all of plaintiff's trade secrets, then the expert's all-or-nothing damages opinion would provide "no basis" for a damages calculation, and plaintiff's damages case would fail as a matter of law. *Id*.

Despite the court's warning, at trial, the plaintiff's expert witness "provided the jury with a damages calculation based on the assumption that all of the trade secrets were misappropriated." *Id.* Following deliberations, the jury "found that only five of the [] secrets were misappropriated, and that only the misappropriation of one of them resulted in [defendant] being unjustly enriched." *Id.* The jury then awarded the plaintiff $12 million in damages. In a post-trial motion, the defendant moved for judgment as a matter of law on the basis that the plaintiff had failed to sufficiently prove damages. The court granted the motion.

The court held that because the plaintiff's expert "took an all-or-nothing approach" that "turned on misappropriation of all the trade secrets without offering the jury a way to attribute value to each individual trade secret," the jury had no evidentiary basis upon which to award damages. *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.,* 53 F.4th 368, 389 (6th Cir. 2022) (describing *O2 Micro*). The court further concluded that the expert's testimony was "useless to the jury" because it forced the jury to use "speculation and guesswork to determine damages":

> After the jury concluded that [defendant] did not misappropriate all of [plaintiff's] trade secrets, [plaintiff's expert's] expert testimony regarding damages for misappropriation of all trade secret was useless to the jury. The jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages. Thus, the jury's award of unjust enrichment damages was based on speculation and guesswork, not on evidence.

*O2 Micro*, 399 F.Supp.2d at 1077. The plaintiff appealed that ruling to the United States Court of Appeals for the Federal Circuit (*see* Brief for O2 Micro Int'l Ltd., *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc*, 2006 WL 3368775 (C.A. Fed. Oct. 23, 2006)), and the Federal Circuit affirmed – albeit without an opinion. *See O2 Micro Int'l Ltd. v. Monolithic Power Sys.*, 221 F. App'x 996 (Fed. Cir. 2007).

The reasoning of *O2 Micro* is sound, and it applies here. First, as in *O2 Micro*, Versata was on notice that pursuing an all-or-nothing approach on damages questions could fatally undermine an award of damages if the jury found that Ford

misappropriated less than all of Versata's trade secrets. Indeed, more than four years ago, the Court excluded opinions by two of Versata's damages experts on the ground that they "fail[ed] to calculate damages on a trade-secret-by-trade-secret basis" and instead used an "all-or-nothing damages calculation." *Ford Motor Co. v. Versata Software, Inc.*, 2018 WL 10733561, at *11 (E.D. Mich. July 9, 2018). In support of that holding, the Court relied heavily upon and followed the decision in *O2 Micro*. *See id*.

Second, like the expert in *O2 Micro*, Dr. Malek provided the jury an "all or nothing" model that left the jury without any evidence from which it could determine how long it would have taken Ford to develop just the three misappropriated trade secrets. Thus, as in *O2 Micro*, the jury's award of damages necessarily rests upon speculation, and Ford is therefore entitled to judgment as a matter of law on Versata's trade secret claims. *Cf. Vertellus Holdings LLC v. W.R. Grace & Co.—Conn.*, 2021 WL 3883597, at *16 (D. Conn. 2021) (collecting cases for proposition that "courts have cautioned that in quantifying damages in one lump sum for all claims, plaintiffs assume risk that the damages calculation could be excluded in its entirety if they are unsuccessful in proving all of their claims," and excluding testimony of damages expert who offered lump sum damages calculation where plaintiffs did not prevail on all claims); *Liveperson Inc. v. [24]7.AI, Inc.*, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018) (excluding expert testimony on trade

secret where expert, among other things, "offer[ed] no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets in the case").

**2**

Versata offers several counterarguments, but none persuade the Court that the jury's trade secret award rests upon a sufficient evidentiary foundation. First, Versata suggests that the Sixth Circuit has rejected the approach of the court in *O2 Micro*. (*See* Versata Sur-Reply, ECF No. 1045, PageID.66911.) In support of that contention, Versata directs the Court to the Sixth Circuit's statement in *Caudill*, *supra*, that *O2 Micro* "is not as persuasive as [the defendant] thinks." *Caudill*, 53 F.4th 389. But the Sixth Circuit meant that *O2 Micro* did not provide persuasive support *for the defendant's position on the facts of that case*, not that the reasoning of *O2 Micro* was unpersuasive. That much is clear from the context of the Sixth Circuit's statement. Immediately after making the statement, the Sixth Circuit highlighted the key difference between the expert's all-or-nothing damages opinion in *O2 Micro* and the expert's damages opinion in the case before it. The court stressed that *unlike* in *O2 Micro*, the plaintiff's expert in the case before it "gave the jury options" that "allowed the jury to calculate the value of Trade Secret 1 even while finding no misappropriation of Trade Secrets 2 and 6." *Id.* Given this context,

the Court declines to read *Caudill* as generally disapproving of the reasoning from *O2 Micro*.

Second, Versata argues that the lack of evidence concerning how long it would have taken Ford to develop less than all of the trade secrets is not fatal because Versata was only required "to prove its damages to a reasonable probability, not mathematical precision." (Versata Resp., ECF No. 1038, PageID.66792.) But the issue here is *not* a lack of "mathematical precision." Instead, the problem here is that there was a *complete lack of evidence* on the critical issue of how long it would have taken Ford to develop less than all of Versata's trade secrets.

Third, Versata argues that the jury heard competing development-time estimates from Dr. Malek and from Ford's technical expert, Monty Myers, and that the jury was free to "land somewhere in between." (*Id.*, PageID.66793.) But that assertion starts from a faulty premise. Contrary to Versata's suggestion, Myers never testified at trial about how long it would have taken Ford to develop all four of Versata's trade secrets (or any of Versata's trade secrets). Ford's damages expert, Julie Davis, predicted that Myers would offer such testimony (*see* 10/22/2022 Trial Tr., ECF No. 994, PageID.64998-65000), but he did not end up doing so. In any event, even if Myers had testified as to how long it would have taken Ford to develop all of Versata's trade secrets, that testimony would not be enough to sustain the jury's trade secret damages award. That testimony, if it had been offered, would suffer

from the same problem as Dr. Malek's development-time testimony: namely, it would not have fit with the jury's finding that Ford misappropriated less than all of Versata's trade secrets. For these reasons, the Court rejects Versata's argument that the jury could have reliably resolved the development-time question by landing "in between" competing expert testimony on that issue.

Finally, Versata argues that the jury did have evidence from which it could have determined how long it would have taken Ford to develop just the Grid, Buildability, and Workspaces. According to Versata, that evidence came from witness Nate Little, a former Versata employee. (*See* Versata Ltr. Br., ECF No. 1047, PageID.66919.) Versata highlights Little's testimony about Versata's development of MCA, the one trade secret that the jury found Ford did not misappropriate. In that testimony, Little told the jury that (1) during the "2003/2004" time frame, he (Little) was "involved in discussions with Ford that led to the development of [MCA]" (10/7/2022 Trial Tr., ECF No. 961, PageID.62510); and (2) MCA launched in the "summer" of 2005. (10/8/2022 Trial Tr., ECF No. 962, PageID.62551.) Versata says that the jury could have concluded from that testimony that it took Versata "1.5-2.5 years" – *i.e.*, the interval between the first discussions about MCA and the rollout of MCA – to develop MCA. (Versata Ltr. Br., ECF No. 1047, PageID.66919.) Versata suggests that the jury could then have concluded that it would taken Ford roughly the same 1.5-2.5 years to develop its MCA equivalent.

Finally, Versata implies that the jury could have subtracted those 1.5-2.5 years from Dr. Malek's 8.3 years (for Ford to develop all four trade secrets) to arrive at a time period of 6.8-7.8 years for Ford to develop just the Grid, Buildability, and Workspaces.

The Court does not believe that Little's testimony gave the jury a reliable foundation on which to determine the time it would have taken Ford to develop the Grid, Buildability, and Workspaces. While that testimony arguably says something about how long it may have taken *Versata* to develop MCA, Versata has not identified any evidence in the trial record suggesting that that information sheds any light on how long it would have taken *Ford* to develop the same trade secret. Moreover, Versata's own expert, Dr. Malek, did not tell the jury that there is any link between Versata's development time and Ford's development time. On the contrary, he identified a number of factors that would be relevant to calculating Ford's development time – *i.e.*, counting lines of code, *etc.* – and did not include Versata's development time in that list.[9]

Moreover, there is a timing problem with Little's testimony. As noted above, Little told the jury that Versata developed the MCA trade secret between 2003-04

[9] In his expert report, Dr. Malek did seem to suggest that there was a link between the time it took Versata to develop its trade secrets and the time it would have taken Ford to develop the same secrets. (*See* ECF No. 430-3, PageID.29670-29671.) But he did not make that point to the jury at trial.

and 2005, but Ford did not begin developing its MCA replacement until six years later, at the earliest. (*See* 10/17/2022 Trial Tr., ECF No. 979, PageID.64149, where McMahon testifies that the "date of [Ford's] first misappropriation" was in October 2011.) Versata has not identified any evidence in the record from which the jury could have determined that the time to develop a software application like MCA in the 2003-2005 time frame provides any reliable guidance as to how long it would take to develop a similar application at least six years later – which seems to be a "lifetime" in the rapidly-evolving world of software innovation. Simply put, Versata has not shown that it presented sufficient evidence to enable the jury to reliably utilize Little's testimony about the time it took Versata to develop MCA to determine Ford's development time for the remaining three trade secrets.

For all of these reasons, Versata did not provide the jury sufficient evidence to determine how long it would have taken Ford to develop just the ACM, Buildability, and Workspaces trade secrets. Without that evidence, there was no reliable foundation for the jury's award of trade secret damages. The Court will therefore grant Ford judgment as a matter of law on Versata's trade secret claims.

**V**

Finally, on December 8, 2022, Ford filed a motion asking the Court to order Versata to make an election of remedy. (*See* Mot., ECF No. 1018.) In that motion, Ford argues that "Versata cannot recover duplicative damages for a singular alleged

Case: 24-1140 Document: 18 Page: 239 Filed: 05/01/2024

harm" – *i.e.*, "Ford's use of Versata's confidential information, including trade secrets, after January 2015 without paying to do so." (*Id.*, PageID.66521.) Ford therefore insists that Versata must "choose either the trade secret misappropriation damages or one of the breach of contract awards, each of which reflect the jury's assessments of the value of Versata's injury caused by Ford declining to enter into a new contract." (*Id.*, PageID.66546.)

In light of the Court's rulings above, the Court **TERMINATES AS MOOT** Ford's motion to require Versata to elect a remedy. There is no longer an election for Versata to make.

## VI

The Court recognizes that, as Versata points out, "[o]verturning a jury verdict is difficult by design." (Versata Resp., ECF No. 1038, PageID.66765.) But here, as explained in detail above, the lack of evidence presented by Versata forced the jury to rest its damages awards on nothing more than speculation. For that reason, the damages awards cannot stand. The Court therefore **GRANTS** Ford's motion for judgment as a matter of law. The Court will enter judgment in favor of Versata on its breach of contract claims in the amount of $3, and it will enter judgment against Versata on its trade secret claims. The Court also **TERMINATES AS MOOT** the additional motions discussed above.

The Court directs Ford to submit a proposed Judgment reflecting the Court's ruling herein by not later than **May 19, 2023**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: May 1, 2023

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 1, 2023, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **Versata Software, Inc. f/k/a Trilogy Software, Inc., Versata Development Group, Inc. and Trilogy, Inc.,**<br><br>*Plaintiffs/ Counter-Defendants,*<br>**v.**<br><br>**Ford Motor Company,**<br><br>*Defendant/ Counter-Plaintiff.* | Case No. 15-cv-10628<br>*(consolidated with Case No. 15-cv-11264)*<br><br>Hon. Matthew F. Leitman |

**ORDER MODIFYING THE COURT'S ORDER GRANTING FORD'S MOTION FOR JUDGMENT AS A MATTER OF LAW (DKT. 1054)**

On May 1, 2023, this Court entered an Order resolving Ford's Rule 50(b) motion for judgment as a matter of law ("JMOL Order"). ECF No. 1054. The JMOL Order stated, "[t]he Court will therefore grant Ford judgment as a matter of law on Versata's trade secret claims." *Id.* at 49. The final paragraph of the JMOL Order provided that "[t]he Court will enter judgment in favor of Versata on its breach of contract claims in the amount of $3, and it will enter judgment against Versata on its trade secret claims." *Id.* at 50."

With the parties' consent, the Court hereby **MODIFIES** those two statements as follows (modifications underlined for identification):

- "The Court will therefore grant Ford judgment as a matter of law as to damages on Versata's trade secret claims," and
- "The Court will enter judgment in favor of Versata on its breach of contract claims in the amount of $3, and it will enter judgment in favor of Versata on its claims for misappropriation of the Grid, Buildability, and Workspaces trade secrets in the amount of $0."

Final judgment will be entered in a separate order.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: June 8, 2023

Consented to this 7th day of June 2023 by:

*/s/ Dan K. Webb*
Dan K. Webb
DWebb@winston.com
Matthew R. Carter
MCarter@winston.com
Samuel M. Zuidema
SZuidema@winston.com
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600

*/s/ John S. LeRoy*
Thomas A. Lewry (P36399)
John S. LeRoy (P61964)
Christopher C. Smith (P73936)
Chanille Carswell (P53754)
Reza Roghani Esfahani (P83787)
**BROOKS KUSHMAN P.C.**
1000 Town Center, 22nd Floor
Southfield, MI 48075
jleroy@brookskushman.com
tlewry@brookskushman.com
csmith@brookskushman.com
ccarswell@brookskushman.com
resfahani@brookskushman.com

Steven J. Mitby
smitby@mitbylaw.com
Timothy Johnson
tjohnson@mitbylaw.com
**MITBY PACHOLDER JOHNSON PLLC**
Telephone: (713) 234-1446

Jaye Quadrozzi
**YOUNG, GARCIA, & QUADROZZI, PC**
27725 Stansbury Blvd., Suite 125
Farmington Hills, MI 48334
Telephone: (248) 353-8620

Sharoon Saleem
**JONES & SPROSS, PLLC**
Sharoon.saleem@jonesspross.com
1605 Lakecliff Hills Ln., Suite 100
Austin, TX 78732-2437

**ATTORNEYS FOR PLAINTIFFS VERSATA SOFTWARE, INC. f/k/a TRILOGY SOFTWARE, INC., VERSATA DEVELOPMENT GROUP, INC., AND TRILOGY, INC.**

James P. Feeney (P13335)
**DYKEMA GOSSETT PLLC**
39577 Woodward Ave, Suite 300
Bloomfield Hills, MI 48304
jfeeney@dykema.com

Jessica L. Ellsworth (D.C. Bar # 484170)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
jessica.ellsworth@hoganlovells.com

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF FORD MOTOR COMPANY**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**Versata Software, Inc. f/k/a Trilogy Software, Inc., Versata Development Group, Inc. and Trilogy, Inc.,**

*Plaintiffs/*
*Counter-Defendants,*

**v.**

**Ford Motor Company,**

*Defendant/*
*Counter-Plaintiff.*

Case No. 15-cv-10628
*(consolidated with Case No. 15-cv-11264)*

Hon. Matthew F. Leitman

## FINAL JUDGMENT

Plaintiffs Versata Software, Inc. f/k/a Trilogy Software, Inc., Versata Development Group, Inc. and Trilogy, Inc. (collectively, "Versata") asserted three claims against Defendant Ford Motor Company ("Ford") for breach of contract and four claims for misappropriation of trade secrets. Ford asserted one claim against Versata for breach of contract.

Based on the record in this case, including the Court's order granting Ford's post-trial Rule 50(b) motion for judgment as a matter of law, ECF No. 1054, as modified by ECF No. 1063, and the Court's order denying Versata's motion for a permanent injunction or, in the alternative, an ongoing royalty, ECF No. 1079, **IT**

**IS HEREBY ORDERED AND ADJUDGED** that final judgment is entered as follows:

- For Versata on its three claims for breach of contract, for which Versata shall recover from Ford nominal damages in the amount of $3;
- For Versata on its claims for misappropriation of the Grid, Buildability, and Workspaces combination trade secrets, for which Versata shall recover from Ford $0 in damages;
- Against Versata on its claim for misappropriation of the alleged MCA combination trade secret;
- Against Ford on its breach of contract claim; and
- Against Versata on its requested permanent injunction or, in the alternative, ongoing royalty.

**IT IS SO ORDERED.**

KINIKIA ESSIX
CLERK OF COURT

By: s/Holly A. Ryan
Deputy Clerk

Approved:

s/Matthew F. Leitman
MATTHEW F. LEITMAN
United States District Judge

Dated: November 15, 2023
Detroit, Michigan

# STATUTORY ADDENDUM

## STATUTORY ADDENDUM – TABLE OF CONTENTS

Page

18 U.S.C. § 1836(b)(3)(B)(i)-(ii) ........ S.Add.1

Mich. Comp. Laws § 445.1904 ........ S.Add.2

**<u>18 U.S.C. §1836</u>**

**Civil proceedings**

. . . .

(b) PRIVATE CIVIL ACTIONS.—

. . . .

(3) REMEDIES.—In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may—

. . . .

(B) award—

(i) (I) damages for actual loss caused by the misappropriation of the trade secret; and

(II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

(ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret . . . .

**<u>Mich. Comp. Laws § 445.1904</u>**

**Recovery of damages for misappropriation; exceptions**

Sec. 4. Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1140, 2024-1206, 2024-1234

**Short Case Caption:** Versata Software, Inc. v. Ford Motor Company

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,998 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 03/12/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken