Nos. 24-1140, 24-1206, 24-1234

IN THE

# United States Court of Appeals for the Federal Circuit

VERSATA SOFTWARE, INC., fka Trilogy Software, Inc.,
VERSATA DEVELOPMENT GROUP, INC., TRILOGY, INC.,

*Plaintiffs-Appellants*,

v.

FORD MOTOR COMPANY,

*Defendant-Cross-Appellant*.

On Appeal from the United States District Court for the Eastern District of Michigan, No. 2:15-cv-10628, Hon. Judge Matthew F. Leitman

## CORRECTED PRINCIPAL AND RESPONSE BRIEF OF DEFENDANT-CROSS-APPELLANT FORD MOTOR COMPANY

JOHN S. LEROY
THOMAS A. LEWRY
CHRISTOPHER C. SMITH
BROOKS KUSHMAN P.C.
1000 Town Center, 22nd Floor
Southfield, MI 48075
(248) 358-4400

JESSICA L. ELLSWORTH
WILLIAM E. HAVEMANN
ERIC ROYTMAN
DANA A. RAPHAEL
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5886
jessica.ellsworth@hoganlovells.com

June 20, 2024

*Counsel for Defendant-Cross-Appellant Ford Motor Company*

# CERTIFICATE OF INTEREST

Counsel for Ford Motor Company certifies the following pursuant to Federal Circuit Rule 47.4:

1. Represented Entities (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

   **Ford Motor Company**

2. Real Party in Interest (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **Not Applicable.**

3. Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **Not Applicable.**

4. Legal Representatives – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   - **Brooks Kushman P.C.**
     - Frank A. Angileri
     - Amy C. Leshan
     - Chanille Carswell
     - Chelsea Elizabeth Pasquali
     - John P. Rondini
     - Reza Roghani Esfahani

   - **Dickinson Wright PLLC**
     - Jonathan D. Nikkila

   - **Dykema Gossett**
     - James P. Feeney

- **Foley & Lardner LLP**
  - Alan J. Gocha

5. Related Cases – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

   **Not Applicable.**

6. Organizational Victims and Bankruptcy Cases – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   **Not Applicable.**

Dated: June 20, 2024

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ....... i

TABLE OF AUTHORITIES ....... v

INTRODUCTION ....... 1

STATEMENT OF RELATED CASES ....... 4

JURISDICTIONAL STATEMENT ....... 4

STATEMENT OF THE ISSUES ....... 5

STATEMENT OF THE CASE ....... 6

A. Versata Designs Product Configuration Software That Becomes Obsolete Over Time ....... 6

B. The District Court Excludes Versata's Initial Expert Damages Model For Conferring An Unjust Windfall On Versata ....... 8

C. The District Court Excludes Versata's Revised Damages Reports ....... 10

D. Versata Changes Its Trade-Secret Theory ....... 12

E. The District Court Rejects Versata's Eleventh-Hour Attempt To Change Its Breach-Of-Contract-Damages Model ....... 14

F. Trial Proceeds And The Jury Renders A Verdict ....... 17

G. The District Court Grants JMOL To Ford Because Versata Failed To Provide Essential Damages Evidence ....... 19

SUMMARY OF ARGUMENT ....... 22

STANDARD OF REVIEW ....... 25

**TABLE OF CONTENTS—Continued**

Page

ARGUMENT ..... 26

I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REJECTING UNJUST-ENRICHMENT DAMAGES THAT WOULD GIVE VERSATA A "HUGE AND UNDESERVED WINDFALL." ..... 26

A. Excluding Versata's Exorbitant Unjust-Enrichment-Damages Model Was Not An Abuse Of Discretion ..... 26

B. Versata's Unjust-Enrichment-Damages Model Was Independently Excludable ..... 35

C. The District Court Acted Well Within Its Discretion In Excluding Two Flawed Reasonable-Royalty Models ..... 43

D. Versata Is Not Entitled To The Remedy It Seeks ..... 46

II. THE DISTRICT COURT CORRECTLY GRANTED FORD JUDGMENT AS A MATTER OF LAW ON DAMAGES ..... 47

A. Versata Offered No Evidence From Which The Jury Could Calculate Contract Damages ..... 48

B. Versata Offered No Evidence From Which The Jury Could Calculate Trade-Secret Damages ..... 55

C. Versata Is Not Entitled To Duplicative Damages ..... 64

III. THE DISTRICT COURT ERRED IN DECLINING TO GRANT JMOL ON TRADE-SECRET LIABILITY ..... 66

CONCLUSION ..... 75

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Allen v. Mich. Bell Tel. Co.*,
232 N.W.2d 302 (Mich. Ct. App. 1975) .......... 54

*ASK Chems., LP v. Comput. Packages, Inc.*,
593 F. App'x 506 (6th Cir. 2014) .......... 42

*Attard v. Citizens Ins. Co. of Am.*,
602 N.W.2d 633 (Mich. Ct. App. 1999) .......... 59

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*,
303 F.3d 1332 (Fed. Cir. 2002) .......... 67

*Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*,
596 F.3d 357 (6th Cir. 2010) .......... 51

*Big Vision Priv., Ltd. v. E.I. DuPont De Nemours & Co.*,
1 F. Supp. 3d 224 (S.D.N.Y. 2014) .......... *passim*

*Callender v. Myers Regul. Co.*,
230 N.W. 154 (Mich. 1930) .......... 48

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*,
53 F.4th 368 (6th Cir. 2022) .......... 57, 66, 67

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
381 F.3d 1178 (Fed. Cir. 2004) .......... 5

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) .......... 36

*Cont. Materials Processing, Inc. v. Kataleuna GmbH Catalysts*,
462 F. App'x 266 (4th Cir. 2012) .......... 51

*EEOC v. Kaplan Higher Educ. Corp.*,
748 F.3d 749 (6th Cir. 2014) .......... 39

**TABLE OF AUTHORITIES—Continued**

Page(s)

*ePlus, Inc. v. Lawson Software, Inc.*,
700 F.3d 509 (Fed. Cir. 2012) ....................................................................37, 42

*Excel Indus. Elecs., Inc. v. Blanco*,
No. 196899, 1998 WL 1991268 (Mich. Ct. App. June 30, 1998)......................60

*Ferguson v. Pioneer State Mut. Ins. Co.*,
731 N.W.2d 94 (Mich. Ct. App. 2006)..............................................................48

*Garrison v. Cassens Transp. Co.*,
334 F.3d 528 (6th Cir. 2003) ..........................................................................25

*Gasoline Prods. Co. v. Champlin Refin. Co.*,
283 U.S. 494 (1931)..........................................................................................47

*Godwin v. Ace Iron & Metal Co.*,
137 N.W.2d 151 (Mich. 1965)..........................................................................59

*Granite Mgmt. Corp. v. United States*,
416 F.3d 1373 (Fed. Cir. 2005) ..........................................................................4

*Heyman v. AR. Winarick, Inc.*,
325 F.2d 584 (2d Cir. 1963) ............................................................................67

*Howe v. City of Akron*,
801 F.3d 718 (6th Cir. 2015) ............................................................................16

*Info-Hold, Inc. v. Muzak LLC*,
783 F.3d 1365 (Fed. Cir. 2015) ........................................................................25

*Info-Hold, Inc. v. Muzak LLC*,
No. 1:11-cv-283, 2013 WL 6008619 (S.D. Ohio Nov. 13, 2013)......................61

*In re Rearden LLC*,
841 F.3d 1327 (Fed. Cir. 2016) ..........................................................................5

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ............................................................................42

## TABLE OF AUTHORITIES—Continued

Page(s)

*Joerger v. Gordon Food Serv., Inc.*,
568 N.W.2d 365 (Mich. Ct. App. 1997) .......... 54

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .......... 37, 38, 42, 44

*Lawton v. Gorman Furniture Corp.*,
282 N.W.2d 797 (Mich. Ct. App. 1979) .......... 48

*LivePerson, Inc. v. [24]7.AI, Inc.*,
No. 3:17-cv-01268, 2018 WL 6257460 (N.D. Cal. Nov. 30, 2018) .......... 58

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005) .......... 51

*Mid-Michigan Comput. Sys., Inc. v. Marc Glassman, Inc.*,
416 F.3d 505 (6th Cir. 2005) .......... *passim*

*Mosby-Meachem v. Memphis Light, Gas & Water Div.*,
883 F.3d 595 (6th Cir. 2018) .......... 25

*MSC.Software Corp. v. Altair Eng'g, Inc.*,
281 F. Supp. 3d 660 (E.D. Mich. 2017) .......... 64

*Neder v. United States*,
527 U.S. 1 (1999) .......... 33, 34

*Newell Cos. v. Kenney Mfg. Co.*,
864 F.2d 757 (Fed. Cir. 1988) .......... 62

*Next Commc'ns, Inc. v. Viber Media, Inc.*,
758 F. App'x 46 (2d Cir. 2018) .......... 73, 74

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) .......... 51

*Nite Glow Indus. Inc. v. Cent. Garden & Pet Co.*,
No. 20-1897, 2021 WL 2945556 (Fed. Cir. July 14, 2021) .......... 62

## TABLE OF AUTHORITIES—Continued

Page(s)

*Northgauge Healthcare Advisors, LLC v. Constellation, Inc.*,
No. 1:21-cv-00373, 2024 WL 1807952 (D. Colo. Apr. 25, 2024)......................58

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
399 F. Supp. 2d 1064 (N.D. Cal. 2005), *aff'd*, 221 F. App'x 996
(Fed. Cir. 2007)..........................................................................57, 58, 61, 63

*Panduit Corp. v. Stahlin Brothers Fibre Works*,
575 F.2d 1152 (6th Cir. 1978) ....................................................................45, 46

*Parus Holdings, Inc. v. Google LLC*,
70 F.4th 1365 (Fed. Cir. 2023) ...........................................................................39

*Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*,
35 F.3d 1226 (8th Cir. 1994) ..............................................................................29

*Pride v. BIC Corp.*,
218 F.3d 566 (6th Cir. 2000) ..............................................................................46

*Russo v. Ballard Med. Prods.*,
550 F.3d 1004 (10th Cir. 2008) ....................................................................32, 33

*Scott v. First S. Nat'l Bank*,
936 F.3d 509 (6th Cir. 2019) ..............................................................................40

*Sea-Land Servs., Inc. v. Gaudet*,
414 U.S. 573 (1974)..............................................................................................60

*Shivers v. Schmiege*,
776 N.W.2d 669 (Mich. Ct. App. 2009).........................................................59, 64

*Sonoma Apartment Assocs. v. United States*,
939 F.3d 1293 (Fed. Cir. 2019) .....................................................................62, 63

*Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
895 F.3d 1304 (Fed. Cir. 2018) ................................................................*passim*

*Thomas v. Hughes*,
27 F.4th 995 (5th Cir. 2022) ...............................................................................29

**TABLE OF AUTHORITIES—Continued**

Page(s)

*TSMC, N. Am. v. SMIC Ams.*,
No. RG06-286111, 2008 Cal. Super. LEXIS 521 (Cal. Super. Ct. Aug. 8, 2008) ....................67

*UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
617 F. Supp. 2d 938 (N.D. Cal. 2007) ....................72

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995) ....................63

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
504 F.2d 518, 535 (5th Cir. 1974) ....................27, 29, 33

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
342 F.3d 1298 (Fed. Cir. 2003) ....................27, 31

*Vt. Microsystems, Inc. v. Autodesk, Inc.*,
138 F.3d 449 (2d Cir. 1998) ....................45

*Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*,
No. 1:18-cv-03298, 2021 WL 3883597 (D. Md. Aug. 12, 2021) ....................58

*Vitro Corp. of Am. v. Hall Chem. Co.*,
292 F.2d 678 (6th Cir. 1961) ....................28, 31, 33

*Vojdani v. Pharmsan Labs, Inc.*,
741 F.3d 777 (7th Cir. 2013) ....................53, 55

*Walton Sch. of Com. v. Stroud*,
226 N.W. 883 (Mich. 1929) ....................48

**STATUTES:**

17 U.S.C. § 504(b) ....................31

18 U.S.C. § 1836(b)(3)(B) ....................26

18 U.S.C. § 1836(b)(3)(B)(ii) ....................22, 26, 30

18 U.S.C. § 1839(5)(B)(ii)(II) ....................66, 68

## TABLE OF AUTHORITIES—Continued

Page(s)

28 U.S.C. § 1295(a)(1) ....................................................................................4

Cal. Civ. Code § 3426.3(b) ..............................................................................31

Mich. Comp. Laws § 445.1902(b)(ii)(B) .....................................................66, 68

Mich. Comp. Laws § 445.1904 ................................................................22, 26, 30

**RULES:**

Fed. R. Civ. P. 37(c)(1) ..............................................................................16, 51

Fed. R. Evid. 702 ...........................................................................................37

**OTHER AUTHORITIES:**

11 A.L.R. 4th 12 (1982), § 2[a] ......................................................................29

1 Dan B. Dobbs, Law of Remedies (2d ed. 1993)
§ 4.1(1) ............................................................................................................34
§ 4.1(2) ............................................................................................................34
§ 4.1(4) ............................................................................................................31

Restatement (Third) of Unfair Competition (1995)
§ 40(b) .............................................................................................................66
§ 45 .................................................................................................................27
§ 45 cmt. g .......................................................................................................29

Trade Secrets Law § 7:21 (2023 update) .........................................................29

11 Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure–Civil § 2814 (3d ed. 2024 update) ...............................................47

## INTRODUCTION

Versata made a series of litigation gambles in the hope of obtaining an undeserved windfall. Those gambles backfired. Versata's principal damages theory was excluded as excessive and unreliable, and its eleventh-hour backup theory, proposed after discovery closed, came far too late. The District Court nonetheless exercised its discretion to allow Versata to present yet another damages theory to the jury after Versata promised it would present competent evidence of damages at trial. But that evidence never materialized, Versata repeated many of the same errors the District Court had already rejected, and the evidence Versata *did* introduce left the jury with no way to arrive at anything resembling a reasonable damages approximation. Versata now asks this Court to give it another damages do-over. This Court should decline the request. The District Court's decisions on damages were correct and necessitated by Versata's repeated failures of proof and overreaching.

Versata principally seeks to revive an exorbitant trade-secret-damages model the District Court excluded before trial. Although Versata offered to license its technology to Ford for $17 million per year for five years starting in 2015, and although Ford rejected that offer as too high, Versata introduced an unjust-enrichment model calculating damages at $134 million per year—*nearly eight times more per year* than the price at which Versata offered to license the technology. The

District Court did not abuse its discretion in finding that these proposed damages were "speculative and unreliable" and "would confer upon Versata a huge and undeserved windfall." Appx21-23. Nor did the court abuse its discretion in requiring Versata to seek damages under a reasonable-royalty model keyed to the parties' actual licensing history, which was objective evidence of how the parties valued the technology.

Versata's argument on appeal—that it has a statutory right to its preferred measure of unjust-enrichment damages—proceeds from a misreading of the statutes in question, both of which unambiguously allow "reasonable royalty" damages "in lieu of damages measured by any other methods"—language Versata wishes away with no analysis (at 28 n.2) in a cursory footnote. In any event, this Court need not address the availability of unjust-enrichment damages, because the District Court properly excluded Versata's unjust-enrichment-damages model based on numerous independent errors. Versata cannot show abuse of discretion as to any of these errors, let alone all of them.

Versata waits until page 46 of its brief to challenge the District Court's grant of judgment as a matter of law to Ford on the damages theories Versata presented to the jury. When Versata finally reaches the issue, its arguments are conspicuously weak. As to breach-of-contract damages, Versata below claimed that it was entitled to damages amounting to the full contract price without subtracting its performance

costs. But Michigan law does not recognize contract-damages based on *gross* revenue rather than *net* profits. As Versata now concedes (at 65), "hornbook law" requires contract damages "be offset" by avoided expenses. Versata below did not introduce any evidence about its costs—indeed, its argument, repeated ad nauseum throughout discovery, was that it did not have to. When it finally acknowledged its error—after discovery closed—and sought to introduce a new damages report accounting for its costs, the District Court properly rejected that eleventh-hour about-face as unfair to Ford, which had conducted no discovery into Versata's costs. Versata does not and cannot argue on appeal that the District Court's exclusion of its last-minute theory was an abuse of discretion. Instead, Versata incorrectly asserts that jurors could have speculated at Versata's costs absent any evidence.

As to trade-secret-misappropriation damages, Versata presented an all-or-nothing theory that gave the jury no way to calculate damages when it returned a verdict finding that Ford did not misappropriate all the alleged trade secrets. Versata's evidentiary failure was particularly unjustifiable given that the District Court excluded Versata's earlier damages models for this exact same reason, citing the exact same precedent. Despite multiple opportunities to prepare a permissible trade-secret-damages model, Versata made the exact same error at trial. Versata did not merely fail to prove damages with mathematical precision; it left the jury to calculate damages based on "pure speculation." Appx145.

The District Court's only error in presiding over this exceptionally complex trial was in being too generous to Versata. No reasonable juror could have found that Ford had knowledge of Versata's alleged combination trade secrets—which were buried piecemeal across thousands of pages of documents, with no way for Ford to distinguish what was protected from what was not. Versata's own employees could not even say what was protected. The District Court found "real merit" in this argument and "was convinced" that Versata never "meaningfully disclosed the trade secrets," but declined to grant judgment to Ford because it believed Ford may have been able to piece together the trade secrets from thousands of pages of documents of software-related materials Versata provided. Appx132-135. That was a discrete but significant error, and if this Court reaches Ford's conditional cross-appeal, it should reverse. Otherwise this Court should affirm in all respects.

## STATEMENT OF RELATED CASES

Ford agrees with Versata's statement of related cases.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over Versata's appeal and Ford's conditional cross-appeal under 28 U.S.C. § 1295(a)(1). Appx42523-42525; *see Granite Mgmt. Corp. v. United States*, 416 F.3d 1373, 1378-79 (Fed. Cir. 2005) (cross-appeal proper when challenging liability). Jurisdiction is proper because Versata's compulsory

patent counterclaims were dismissed with prejudice. Appx27636; Appx28527-28528; Appx41244-41246; Appx41267-41268; *see Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1189-90 (Fed. Cir. 2004); *In re Rearden LLC*, 841 F.3d 1327, 1331-33 & n.2 (Fed. Cir. 2016).

## STATEMENT OF THE ISSUES

**Versata's Appeal**

1. Whether the District Court abused its discretion by barring Versata from pursuing unjust-enrichment damages for trade-secret misappropriation that exceeded by an order of magnitude the price Versata offered Ford to license the same technology.

2. Whether the District Court properly granted Ford judgment as a matter of law on breach-of-contract damages and trade-secret damages where Versata presented no evidence to support a non-speculative damages estimation.

**Ford's Conditional Cross-Appeal**

3. Whether the District Court erred in denying judgment as a matter of law to Ford on trade-secret-misappropriation liability where Versata's only evidence that Ford had knowledge of Versata's combination trade secrets was that components of the combinations were scattered across thousands of pages of documents Ford received over nearly a decade.

## STATEMENT OF THE CASE

### A. Versata Designs Product Configuration Software That Becomes Obsolete Over Time.

In the early 2000s, Ford and Versata collaborated to design and develop custom product-configuration software that would allow Ford to configure vehicles more efficiently—for example, by identifying the compatibility of various vehicle parts or features with particular vehicle lines or trim levels. Based on Ford's detailed requirements, Versata coded a product-configuration software package called "ACM," and later an add-on package called "MCA." In 2004, Ford and Versata signed a Master Subscription and Services Agreement (MSSA) licensing Ford's use of ACM and MCA.

Over time, Versata's software became "outdated" and did "not meet Ford's . . . current needs." Appx57012. The complexity of Ford's newer vehicles began to exceed, and today far exceed, the "performance" limits of the ACM software set forth in the contract. Appx69536. This overwhelmed the ACM software, causing it to take "days" to perform certain tasks. Appx69536. Even after Ford let the software "run for over a week," for instance, it "would often just crash and not return anything." Appx56587-56588. In 2011, Versata declared the ACM software to be "EOL" (end-of-life) and stopped issuing new releases of the software. Appx69537. That year, Ford began to develop its own product-configuration software, called PDO, capable of supporting the complexity of Ford's vehicles. Ford received

multiple patents for its PDO software, which Ford developed using a different architecture. Appx10025; Appx10152-10297.

In 2014, Ford paid Versata $14.95 million for the "ACM and MCA software suite of products." Appx56470-56471; Appx56576; Appx28430. In November 2014, Versata threatened to terminate the MSSA unless Ford agreed to an *increased* price of $17 million per year for a minimum *five*-year term for Versata's "entire package" of products, including ACM, MCA, and other products also no longer at issue. Appx80410-80412. Ford declined to increase the contract price and told Versata that Ford was developing PDO. Appx56470-56476. Versata terminated the MSSA and accused Ford of wrongdoing in creating PDO. Appx56475-56476.

Ford sued Versata in the Eastern District of Michigan seeking a declaratory judgment that Ford had not infringed Versata's intellectual property. Appx1000. Versata brought counterclaims of patent infringement, copyright infringement, breach of contract, and trade-secret misappropriation. Appx7084-7104. The District Court later dismissed Versata's patent claims, Appx41267-41268, and granted Ford summary judgment on the copyright claims, Appx31413-31426.

As to its trade-secret claims, Versata initially claimed that Ford misappropriated twelve stand-alone trade secrets—each of which was a distinct software feature within ACM or MCA. Appx3092. Versata later inflated that allegation to claim that Ford misappropriated "twenty-plus" stand-alone trade

secrets. Appx35755; *see* Appx27979-27991. As to its contract claims, Versata pressed three theories of breach: (1) Ford misused and disclosed Versata's confidential information, (2) Ford reverse-engineered Versata's software, and (3) Ford refused to permit Versata to exercise verification rights under the MSSA after its termination "and/or by continuing to use Versata's software without a license." Appx67370.

When Ford asked Versata in interrogatories to identify the categories of damages Versata would pursue, Versata demurred, insisting that "[d]amages calculations and evidence material to those calculations are the domain of expert testimony." Appx38279-38281; *see* Appx38248-38256.

### B. The District Court Excludes Versata's Initial Expert Damages Model For Conferring An Unjust Windfall On Versata.

In 2017, Versata produced its first expert report on damages, in which Versata's damages expert—Craig Elson—calculated trade-secret-misappropriation damages based on Ford's alleged unjust enrichment. Elson estimated that Ford saved $134 million per year using Versata's software. Appx20; Appx9419-9421. Based on that estimate, he presented a trade-secret-damages model under which Versata could receive more than $1 billion in damages—$134 million per year for as much as a decade after the MSSA expired. Appx20. Elson's trade-secrets damages (in red) were *eleven times greater* than the total amount that Ford *ever* paid Versata (in blue) for multiple software products over 13 years:




Appx9302. Elson addressed breach-of-contract damages only in a footnote, stating that breach-of-contract damages were "subsumed in the trade secret misappropriation damages." Appx9350 n.4; *see* Appx38343-38345.

The District Court excluded the report, explaining that "the model is flawed because it measures Ford's enrichment rather than Ford's *unjust* enrichment." Appx22-23. The parties' licensing history "demonstrates Versata's belief that there was nothing *unjust* about Ford's receipt of the software's benefits so long as Ford paid Versata, at most, $17 million per year to license the software," Appx23—the amount Versata demanded but Ford refused to pay to renew the MSSA. By insisting Versata was entitled to $134 million in annual damages—nearly eight times the price Versata offered to license the technology—Elson's model would "confer upon

Versata a huge and undeserved windfall." Appx23. The District Court thus ruled that Versata's damages should be measured not by reference to Ford's avoided costs, which would be "speculative and unreliable," but "with reference to the parties' licensing history." Appx21-24.

The District Court additionally noted three "independent" reasons why Elson's damages model was inadmissible. Appx84. First, Elson improperly calculated Ford's cost savings for "Versata's *software* writ large," rather than those "related to Ford's use of the *trade secrets* at issue here." Appx22 n.5. Second, Elson "failed to apportion Versata's alleged damages on a trade-secret-by-trade-secret basis." Appx31-32. And third, Elson "relied on outdated and potentially irrelevant data." Appx35.

### C. The District Court Excludes Versata's Revised Damages Reports.

Versata asked for "an opportunity to revise its damages model" to cure the multiple errors the District Court identified. Appx26753. Over Ford's objection that "a party who knowingly pursues fundamentally flawed damages theories is in no position to get a second bite at the apple," Appx26746, the court allowed Versata to prepare supplemental reports, Appx26970-26976.

Versata served three supplemental reports: (1) an apportionment analysis by former Versata employee Seth Krauss purporting to allocate damages among Versata's alleged trade secrets, Appx27829-27851; (2) a trade-secret analysis by its

retained expert Sam Malek, Appx28552-28581; *see also* Appx11735-11942; and (3) Elson's supplemental report quantifying trade-secret damages using a reasonable-royalty model based on Krauss and Malek, Appx28303-28464. Elson's supplemental report again referenced breach-of-contract damages only in a footnote explaining that the report's "reasonable royalty" calculation for trade-secret damages was "reflective" of breach-of-contract damages. Appx28312 n.11. The other two reports said nothing about breach-of-contract damages.

Versata then amended its interrogatory response on breach-of-contract damages, maintaining it was "entitled to the reasonable royalty damages calculated by Mr. Elson" for "continued use of Versata's trade secrets . . . in violation of the license." Appx38355-38357. Versata claimed that Ford had been "willing to pay $17 million for a one-year extension of its license," and that Versata was therefore "entitled to recover at least this amount" for the period "that Ford continued to use" the alleged trade secrets. Appx38356. Versata acknowledged "it was evident" that its contract-damages theory "overlapped with its theory of trade secret misappropriation damages," Appx38392, because both "rest on a $17 million annual license fee," Appx38402.

Ford filed another round of *Daubert* motions to exclude Versata's reports for ignoring nearly all the District Court's directives in its first exclusion order. Appx27792-27801; Appx28268-28299; Appx28529-28547; Appx32341-32343.

The court initially granted those motions. Appx35742-35778. With respect to Krauss's apportionment analysis, the court found that Krauss failed to apportion damages on a trade-secret-by-trade-secret basis. Instead, Krauss took Versata's "twenty-plus" alleged trade secrets, divided them into four buckets, and assigned a value to each bucket, Appx35755, thus improperly apportioning damages among buckets of bundled trade secrets rather than individual trade secrets, Appx35761. The court then excluded Elson's supplemental report because Elson "relied entirely on Krauss' apportionment analysis," Appx35773-35774, and struck Malek's analysis as irrelevant given Elson's exclusion, Appx35774.

### D. Versata Changes Its Trade-Secret Theory.

Left (once again) without expert damages testimony, Versata moved for reconsideration. It acknowledged that Krauss did not apportion damages among the "original[] twenty-plus [trade] secrets" asserted at the outset of litigation. Appx36562 (citation omitted). But Versata argued it changed "the number of trade secrets it asserts and how it classifies them." Appx36562. Rather than alleging twenty-plus stand-alone trade secrets, Versata recharacterized Krauss's four "buckets" as four *combination* trade secrets comprising individual software features Krauss grouped together. Appx36563. Malek labeled the three ACM combinations "Grid," "Buildability," and "Workspaces," and the MCA combination the "MCA" trade secret. Appx54841-54852; *see* Appx11736-11738; Appx56389.

The District Court expressed concern that Versata was defining its trade secrets "backwards." Appx54847. As the court explained, "[t]he client" is supposed to "know[ ] the trade secret" from the outset; a hired-for-litigation expert should not be "tell[ing] [the client] what the trade secret is," Appx54847, and Versata's "experts seem to be describing trade secrets that are different from" those Versata initially identified, Appx54848. But the court permitted Versata's reconstituted trade secrets, Appx38237-38241, and granted Versata's motion for reconsideration as to Krauss's apportionment analysis, Appx87-88.

The District Court also generally admitted Versata's expert reports relying on Krauss. Appx94. As to Elson's supplemental report, the court admitted the first "scenario" "offer[ing] damages opinions based upon the parties' licensing history and upon Versata's most recent" $17-million-per-year offer. Appx56; Appx94-95. But the court excluded the second and third "scenarios" in which Elson sought to increase the royalty rate two- or three-fold to include Ford's supposed "avoided development costs," which violated the court's earlier ruling that it would "not permit Versata to seek damages based upon the alleged value of benefits obtained by Ford." Appx29. As Ford explained, the second and third scenarios conveyed the same undeserved windfall as Elson's original model:




Appx28295.

### E. The District Court Rejects Versata's Eleventh-Hour Attempt To Change Its Breach-Of-Contract-Damages Model.

While Versata reorganized its case to save its experts' opinions as to *trade-secret* damages, it produced no expert opinion on *breach-of-contract* damages beyond Elson's footnotes that the "reasonable royalty" calculation for trade-secret damages "subsume[]" and "reflect[]" breach-of-contract damages. Appx28312 n.11; Appx9350 n.4. Ford thus moved to exclude Versata's breach-of-contract damages as inadequately disclosed and lacking support. Appx38248-38270.

Versata responded that its "breach of contract damages position is simple: Versata seeks at least $17 million dollars for each year Ford breached the parties' agreement." Appx38389. Versata maintained it adequately "provided Ford with the tools to calculate the total amount of damages: a $17 million base license fee per

year multiplied by the number of days between the breach and trial." Appx38405. Versata represented that it would "argue to the jury—and the jury will have to decide if the facts support the argument—that the $17 million per year for the duration of the breach puts it in the same position if the contract was fully performed." Appx38409-38410. Based on these representations, the court denied Ford's motion, concluding that Versata's $17-million-per-year-contract-damages theory was disclosed, if imperfectly. Appx38653-38656.

Until the eve of trial, Versata repeatedly and consistently maintained that the proper measure of breach-of-contract damages was the contract price, which Versata believed should be $17 million per year, even though Ford had rejected that offer. Appx55302; *e.g.*, Appx55354 ("Versata is entitled to get what Ford would have had to pay if they had renewed their license"); Appx55173 (similar); Appx38361-38362 (similar). Right before trial, however, Versata changed course. Versata substituted a new damages expert, Renee McMahon, because Elson was no longer available, and submitted a new report "present[ing] a never-before-disclosed breach of contract damages model based on Versata's lost profits." Appx112-113; Appx39920-39969. Versata sought to abandon its contract-price theory and, for the first time, argued it should receive lost-profits damages equal to its "revenue minus [its] costs." Appx55645; *see* Appx55610-55677.

Ford moved to exclude Versata's lost-profits damages model because Versata never previously argued damages should be calculated this way. Appx39893-39907; Appx40069-40075. The District Court agreed, excluding Versata's last-minute change as a discovery sanction under Federal Rule of Civil Procedure 37(c)(1). Appx55671-55675; Appx40554. The court considered the five factors in *Howe v. City of Akron*, 801 F.3d 718, 747-748 (6th Cir. 2015), for determining "whether a party's omitted or late disclosure is 'substantially justified' or 'harmless,'" and found that (1) Versata's model was a surprise; (2) Ford did "not have a meaningful ability to cure the surprise"; (3) "it would meaningfully disrupt the trial to allow Versata to present this theory," because it would require Ford to explore lost-profits facts "during the trial, on the fly"; (4) "the importance of the evidence here cuts against its admission"; and (5) the court was "not satisfied that Versata has offered a reasonable explanation for not disclosing this earlier." Appx55673-55675.

As the District Court explained, Ford "asked [Versata] ten times for what [its] contract damages were, and [Versata] didn't disclose that [it was] going to do it this way," that is, "tak[ing] the contract price" and "separat[ing] out costs." Appx55645. "While Versata disclosed that it was using a $17 million-a-year figure for contract damages," the court explained that is "not a lost profits damages calculation, it is simply a contract price." Appx55673. The court found Versata's "lack of disclosure [wa]s especially significant" because Ford's discovery requests repeatedly asked

what contract damages Versata was seeking, and Versata only ever disclosed that it sought the contract price. Appx55673. Thus, "Ford never conducted discovery into Versata's costs because Versata did not disclose during discovery any theory of damages that included a consideration of its costs." Appx125 n.3. Versata's opening brief does not contend this exclusion ruling was error.

### F. Trial Proceeds And The Jury Renders A Verdict.

At trial, Versata's experts told the jury that Ford misappropriated four combination trade secrets—Grid, Buildability, Workspaces, and the MCA trade secret—each allegedly comprising specific software features. Appx67765. But many of Versata's high-level employees who implemented and maintained ACM and MCA could not identify the combinations or their components. Kenneth Ratton, Versata's Account Manager, could not remember the features composing Grid, Buildability, and Workspaces. Appx55970-55972. Patrick Nichols, touted as the "inventor" of ACM, guessed that Workspaces had somewhere around a hundred software features, not the three Versata claimed. Appx56074; *see* Appx56074-56081. And "[n]o witness testified that Versata identified the elements of any asserted combination *as a combination* to Ford." Appx133 (quoting Appx41969). Instead, "Versata only pointed over and over to a mountain of user guides and other documents" it gave Ford over the span of nearly a decade "and asserted that all the

elements of each combination were individually in there somewhere." Appx133 (cleaned up); *see* Appx56178.

On trade-secret-misappropriation damages, Versata took an "all-or-nothing approach": Versata calculated damages based on Malek's claim that "it would have taken Ford 8.3 years to develop *all four* of Versata's trade secrets." Appx145; *see* Appx67719-67725; Appx56387-56389; Appx56439-56440; Appx56560-56562. But Versata's witnesses "said nothing about how long it would have taken Ford to develop less than all of the trade secrets." Appx145.

On breach-of-contract damages, "Versata did not present any expert testimony," as McMahon "confined" her testimony to trade-secret damages. Appx113. Further, "no witness testified that Ford was willing to pay $17 million per year to renew the MSSA for any period of time." Appx113-115. Versata instead made its case for contract damages exclusively in its closing argument. Versata's counsel asked the jury to award $17 million per year multiplied by 7.5 years, the time between the MSSA's expiration and trial, and to enter the resulting $127.5 million as damages three times—once for each breach. Appx116-117; Appx57007-57010; Appx67816-67817. Alternatively, "Versata's counsel provided the jury with two other" contract prices: the 2014 contract price of $14.95 million and the 2014 "base software license fee" of $10.95 million. Appx117; Appx57007-57008;

Appx56562. Versata neither suggested the jury subtract Versata's performance costs from any contract price nor offered evidence of what these costs might be.

The jury found that Ford breached the MSSA, and awarded $31,350,000 for "misusing and disclosing confidential information," $50,160,000 for "reverse engineering Versata's software," and $750,000 for refusing the audit "and/or by continuing to use Versata's software without a license." Appx98-99. The jury also found that Ford misappropriated three trade secrets, awarding $10,185,000 (Grid), $4,494,000 (Buildability), and $7,707,000 (Workspaces). Appx100-104. The jury, however, found that Ford did not misappropriate the MCA trade secret, and also rejected Versata's request for exemplary damages. Appx103-104.

### G. The District Court Grants JMOL To Ford Because Versata Failed To Provide Essential Damages Evidence.

Ford moved for judgment as a matter of law (JMOL) on both liability and damages. Appx41946-41983. On liability for trade-secret misappropriation, the District Court found "real merit" in Ford's argument that Versata had not provided adequate evidence of Ford's knowledge. Appx133. "The Court was convinced during trial" "that Versata did not persuasively establish that it ever meaningfully disclosed the trade secrets—as the combinations identified at trial—to Ford." Appx134. But the court declined to grant JMOL because it believed Versata had presented just enough evidence that Ford may have been able to piece together the alleged combination trade secrets. Appx135.

The District Court granted JMOL to Ford both on contract damages and trade-secret damages. The court found that Versata "did not present sufficient evidence to permit the jury to quantify" breach-of-contract damages. Appx122. Versata's experts "never explained to the jury how to calculate" breach-of-contract damages. Appx123. "Nor did any lay witness for Versata ever testify that Versata suffered a particular amount of contract damages," and "no Versata witness offered even a rough approximation as to the amount of contract damages." Appx123. Versata's counsel instead asked the jury during closing arguments to award a per-year contract price of $17 million, $14.95 million, or $10.95 million in damages for each year since Versata terminated the MSSA. Appx123-128. The District Court explained Versata's contract-price damages model was "inconsistent with Michigan law" because it "necessarily overcompensated Versata." Appx124. Had Ford accepted Versata's $17-million-per-year contract offer, that amount would have been Versata's yearly "gross revenue," not its "net earnings." Appx124. The same problem doomed Versata's $14.95 million and $10.95 million alternatives, both of which reflected gross revenue. And "if the jury had attempted to correct for the overcompensation inherent in Versata's model, it could not have done so on a reliable basis" because Versata presented no evidence of the costs it would have incurred. Appx126. The District Court thus reduced Versata's breach-of-contract damages to nominal damages.

The District Court also granted JMOL to Ford on trade-secret damages because Versata had not presented the jury with "essential evidence." Appx144. As the court explained, "to return a properly-supported award of trade secret damages, the jury needed proof as to how long it would have taken Ford to develop any trade secret that Ford misappropriated." Appx144. The court warned Versata years before trial "that pursuing an all-or-nothing approach on damages questions could fatally undermine an award of damages if the jury found that Ford misappropriated less than all of Versata's trade secrets." Appx147-148. Versata, undeterred, nonetheless had its expert opine only that "it would have taken Ford 8.3 years to develop *all four* of Versata's trade secrets." Appx145. Because the jury found Ford misappropriated only three alleged trade secrets, "the jury had no way to reliably determine how long it would have taken Ford to develop the three (out of four) trade secrets." Appx145. Without evidence, "any development-time figure used by the jury . . . would necessarily have been pure speculation." Appx145.

Versata moved post-trial for a permanent injunction against Ford's continued use of the trade secrets. The court denied the motion, finding the "'head start' period"—the time it would have taken Ford to independently develop an alternative without Versata's trade secrets—"has ended." Appx42503-42505.

After Versata appealed, Ford cross-appealed the denial of JMOL on trade-secret-misappropriation liability.

## SUMMARY OF ARGUMENT

I. The District Court did not abuse its discretion in rejecting Versata's unjust-enrichment-damages model for trade-secret misappropriation.

A. The District Court reasonably excluded Versata's proposed damages model seeking eight times the last price for which Versata offered to license the same technology to Ford because it awarded "a huge and undeserved windfall." Appx23. The court instead limited Versata to seeking reasonable-royalty damages keyed to the parties' licensing history, as both relevant statutes allow and a mountain of authority supports. Versata's argument that it has a statutory right to its preferred measure of damages ignores the statutory text allowing reasonable-royalty damages "in lieu of damages measured by any other methods." 18 U.S.C. § 1836(b)(3)(B)(ii); *see* Mich. Comp. Laws § 445.1904.

B. The District Court cited at least three *independent* reasons to exclude Versata's unjust-enrichment model, including its failure to apportion damages between the software's trade-secret and non-trade-secret aspects, failure to apportion damages among the alleged trade secrets, and reliance on outdated and unreliable data. None of these holdings was an abuse of discretion; each is an independent basis to affirm.

C. The District Court likewise did not abuse its discretion when—after allowing Versata to submit supplemental reports correcting its errors—the court

permitted Versata to present one damages scenario keyed to the parties' licensing history but prohibited Versata from presenting two other scenarios repeating the same errors Versata made in proposing unjust-enrichment damages in the first place.

D. Even if Versata prevails, Versata is not entitled to a *third* opportunity to submit expert reports, nor is it entitled to a new trial only on damages given the likelihood that the jury's liability and damages findings were interwoven. Both remedial questions should be left for the District Court to resolve in any remand.

II. The District Court correctly granted JMOL on damages because, despite multiple opportunities, Versata failed to offer evidence from which the jury could calculate damages.

A. Versata's trial theory of contract damages—that Versata was entitled to the entire contract price without deducting performance costs—contravened Michigan law, leaving nominal damages as the only available remedy given Versata's litigation choices. Versata's attempted defense of the jury's contract damages as lost profits is both forfeited and wrong. Versata does not challenge the District Court's pretrial sanction excluding Versata's lost-profits model, and the absence of any evidence at trial as to Versata's expenses meant that any award of lost profits would necessarily be speculative.

B. Versata failed to offer any methodology to calculate trade-secret-misappropriation damages once the jury found misappropriation of less than all

alleged trade secrets. Versata gambled on an all-or-nothing approach that calculated the development time of all alleged trade secrets combined, rather than determining development time for each individual trade secret or offering the jury a method to make that calculation itself. When the jury found that Ford did not misappropriate one of the four alleged trade secrets, there was no evidence from which the jury could estimate damages for the remaining three, requiring the damages award to be set aside.

C. If this Court reverses the District Court's JMOL decisions, to avoid duplicative damages, the Court should remand for Versata to choose either the trade-secret award or one of the three breach-of-contract awards. Ford's motion to require a damages election was mooted by the court's grant of JMOL, but would require resolution if JMOL is reversed.

III. If this Court reverses the District Court's exclusion of Versata's unjust-enrichment theory or its grant of JMOL, the Court should address Ford's conditional cross-appeal and hold that Versata offered insufficient evidence that Ford had knowledge of each alleged combination trade secret. Versata's made-for-litigation trade secrets involved bundles of software features, but Versata provided no evidence that it specifically identified those bundles to Ford. Instead, Versata pointed to thousands of pages of documents it sent Ford over nearly a decade involving many hundreds of software features, and argued that each trade-secret

component was mentioned somewhere within those documents. The District Court found "real merit" to Ford's argument that "Versata did not sufficiently disclose each combination trade secret," and its only reason for denying JMOL was the erroneous belief that Ford could conceivably have pieced together the combinations through Versata's mountain of documents. Appx133-135.

## STANDARD OF REVIEW

This Court applies the law of the regional circuit, here, the Sixth Circuit, on issues not unique to patent claims. *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1371 (Fed. Cir. 2015). The Sixth Circuit reviews a district court's evidentiary rulings, including the decision to exclude expert testimony, for an abuse of discretion. *Id*. The Sixth Circuit reviews a district court's decision to grant or deny JMOL de novo. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018). Courts reverse a jury verdict and grant JMOL when "the evidence presented to the jury was insufficient" to support the judgment. *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003).

# ARGUMENT

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REJECTING UNJUST-ENRICHMENT DAMAGES THAT WOULD GIVE VERSATA A "HUGE AND UNDESERVED WINDFALL."

### A. Excluding Versata's Exorbitant Unjust-Enrichment-Damages Model Was Not An Abuse Of Discretion.

1. As Versata acknowledges (at 26), its trade-secret claims are governed by the Defend Trade Secrets Act (DTSA) and Michigan's Uniform Trade Secrets Act (MUTSA). These statutes provide that trial courts "may" (or "can") award damages in the form of "actual loss" to the plaintiff plus any "unjust enrichment" to the defendant not accounted for in computing actual loss. 18 U.S.C. § 1836(b)(3)(B); Mich. Comp. Laws § 445.1904. Both statutes then provide that "*in lieu of damages measured by any other methods*," damages "may" be measured "by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of a trade secret." 18 U.S.C. § 1836(b)(3)(B)(ii) (emphasis added); Mich. Comp. Laws § 445.1904.

In granting discretion to award damages using either an unjust-enrichment or reasonable-royalty model, the statutes follow the common law, under which courts employ "a number of different methods" to calculate damages. *Mid-Michigan Comput. Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510 (6th Cir. 2005) (citation omitted). The standard for determining appropriate damages "is very flexible" and depends on the "peculiar facts and circumstances" of each case.

*Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535, 538 (5th Cir. 1974) (citation omitted). Courts may select the damages model based on "a comparative appraisal of all the factors of the case," including "the degree of certainty with which the plaintiff has established" its loss or the defendant's gain and "the relative adequacy to the plaintiff of other remedies." Restatement (Third) of Unfair Competition § 45 (1995). "No wooden formulas exist," and damages "shall be determined within the discretion of the trial court on a case by case basis." *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298, 1311 (Fed. Cir. 2003) (citation omitted).

The District Court acted well within its discretion in excluding Versata's proposed model seeking an exorbitant sum of unjust-enrichment damages. Elson, Versata's pre-trial damages expert, calculated Ford's unjust enrichment at $134 million per year—*nearly eight times more than* the $17-million-per-year figure Versata offered Ford to continue licensing the technology after 2015. This "demonstrates Versata's belief that there was nothing *unjust* about Ford's receipt of the software's benefits so long as Ford paid Versata, at most, $17 million per year." Appx22-23. Versata's proposed damages are "speculative and unreliable" and "cannot possibly be a reasonable measure of unjust enrichment damages." Appx21-23. Allowing Versata to seek these damages "would confer upon Versata a huge and undeserved windfall." Appx23.

The District Court instead concluded that Versata's damages "must be measured with reference to the parties' licensing history." Appx24. Because Versata had previously licensed the same technology to Ford and had made another offer to license the technology at the same time as the alleged breach, a reasonable-royalty model was a particularly reliable method of calculating damages. *See* Appx27-28; Appx72-73. Versata's own expert claimed that Versata's licenses to Ford "were highly profitable for Versata," with profit margins "as high as 86.2%." Appx28370. It was not an abuse of discretion to use a reasonable-royalty model keyed to this history, and to decline to award Versata damages many times higher.

Sixth Circuit precedent amply supports this conclusion. In *Vitro Corp. of America v. Hall Chemical Co.*, the Sixth Circuit affirmed the lower court's conclusion that a reasonable-royalty approach "was as close an approach to a fair and just determination of adequate damages as might be relied upon" where the parties had previously reached an "agreement in principle" to license the technology. 292 F.2d 678, 682-683 (6th Cir. 1961). And in *Mid-Michigan*, the Sixth Circuit upheld the use of a reasonable-royalty model where the defendant "did not use the trade secrets" "to field competing products, but instead used them to save research and manufacturing resources" that it would otherwise "have expended to develop" replacement software. 416 F.3d at 510 (citation omitted). A reasonable royalty measure was therefore an "appropriate measure of damages." *Id.*

Other courts agree that "damages may be ascertained with precision when the parties previously agreed on the value of the relevant trade secrets." *Thomas v. Hughes*, 27 F.4th 995, 1009 (5th Cir. 2022) (cleaned up); *see also Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1244 (8th Cir. 1994) ("reasonable royalty" damages are "most appropriate" where "the parties actually had or contemplated a royalty arrangement"); *Univ. Computing*, 504 F.2d at 538-539 ("damages will be subject to exact measurement" where "the parties had previously agreed on a licensing price"). A mountain of additional authority concurs. As one treatise explains, "if the plaintiff has an established royalty licensing the misappropriated trade secret, *that established royalty may be the measure from which reasonable royalty damages may be awarded*." 2 Trade Secrets Law § 7:21 (2023 update) (emphasis added); *accord* 11 A.L.R. 4th 12 (1982), § 2[a] ("courts usually" award royalty damages where "the parties themselves actually assigned" value to the trade secrets). Using a reasonable royalty is especially appropriate where, as here, "it would be inequitable to award the plaintiff" a larger sum. Restatement (Third) of Unfair Competition § 45 cmt. g (1995).

2. Versata concedes (at 25-26) that this Court reviews for "abuse of discretion" the decision to limit Versata to reasonable-royalty damages. Versata's arguments that the District Court abused its discretion are meritless and misleading.

Versata purports to quote the DTSA and MUTSA (at 26) for the categorical assertion that these statutes "entitle[ ]" plaintiffs "to recover actual losses resulting from the misappropriation *and* the unjust enrichment caused by misappropriation not otherwise reflected in actual losses." (cleaned up). This assertion is refuted by the very next sentence of both statutes, which states that "*in lieu of damages measured by any other methods*," damages may be measured "*by imposition of liability for a reasonable royalty*." 18 U.S.C. § 1836(b)(3)(B)(ii) (emphases added); *see* Mich. Comp. Laws § 445.1904. Versata omits this language, burying it in a footnote (at 28 n.2) without explaining how this language could conceivably accord with Versata's theory. Correcting for Versata's selective quotations, the statutes plainly do not *mandate* unjust-enrichment damages in all cases; the statutes instead *permit* these damages in appropriate cases. The statutes alternatively permit reasonable-royalty damages *in lieu of* any other measure.

The bulk of Versata's objections to the District Court's decision are therefore directed at a strawman. The court did not, as Versata suggests (at 27), conclude that the DTSA or MUTSA categorically "barred" Versata from seeking unjust-enrichment damages. The District Court instead concluded that Elson's unjust-enrichment model was "unreliable," "speculative," and not remotely "reasonable," and that a royalty model based on "the parties' licensing history" was more appropriate. Appx22-24. Nothing in the DTSA or MUTSA required the District

Court to abandon its gatekeeping role and allow Versata to present speculative and unreliable damages evidence to the jury.

To the extent Versata argues (at 27) that the DTSA and MUTSA give plaintiffs a "choice of remedy," Versata cites nothing in the text of either to support that theory. Precedent rejects it, making clear that damages in trade-secret cases "shall be determined within the *discretion of the trial court*." *Univ. of Colo. Found.*, 342 F.3d at 1311 (emphasis added; citation omitted); *see Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1325 (Fed. Cir. 2018) (similar); *Vitro*, 292 F.2d at 682-683 (similar); 1 Dan B. Dobbs, Law of Remedies § 4.1(4), at 567 (2d ed. 1993) ("in many cases the measure of benefit . . . will be set by the court"). Where statutes entitle plaintiffs rather than courts to select the damages model, they do so expressly. *E.g.*, 17 U.S.C. § 504(b) ("copyright owner is entitled to recover the actual damages suffered by him . . . and any profits of the infringer"). Nor does either the DTSA or MUTSA express a preference for unjust-enrichment over reasonable-royalty damages. Some states, like California, have modified the Uniform Trade Secret Act to make reasonable-royalty damages available only "[i]f neither damages nor unjust enrichment caused by misappropriation are provable." Cal. Civ. Code § 3426.3(b). That other states "saw the need to modify" the statutory language "to disfavor royalty damages further

confirms" the DTSA and MUTSA do "not create a preference for other damages models over royalty models." Appx80.

Versata's reliance on precedent is unpersuasive. The District Court observed that Versata did not "cite any case in which any court, when presented with the parties' licensing agreements and history, has departed from the reasonable royalty method of calculating damages." Appx27-28. Versata's failure persists on appeal. Versata identifies no trial-court decision declining to use a reasonable-royalty model where the parties previously licensed the technology, let alone an appellate decision reversing use of reasonable-royalty damages in such circumstances.

Versata principally relies on then-Judge Gorsuch's opinion for the Tenth Circuit in *Russo v. Ballard Medical Products*, 550 F.3d 1004 (10th Cir. 2008), which Versata did not cite below. But *Russo* did not, as Versata claims (at 31), reject "an indistinguishable argument." On appeal from a jury award of unjust-enrichment damages, *Russo* rejected the defendant's argument "that unjust enrichment damages are inappropriate as a matter of law for the misappropriation of a trade secret where, as here, the plaintiff was willing to license his or her idea." *Id.* at 1020. That the plaintiff in *Russo* was permitted to seek unjust-enrichment damages does not support Versata's contention that Versata had a right to pursue unjust-enrichment damages that were "speculative and unreliable." Appx21-22. And none of the reasons why the District Court rejected unjust-enrichment damages here existed in *Russo*. The

parties there, unlike here, never previously licensed the technology at issue. *See* 550 F.3d at 1007-08. And the defendant in *Russo* used the trade secret to obtain a patent for a valuable product that went to market, *see id.*, such that—unlike here—calculating unjust-enrichment damages was not speculative.

Versata observes (at 29) that *Mid-Michigan* affirmed an award of reasonable-royalty damages where unjust-enrichment damages were "inadequate." But nothing about that feature of *Mid-Michigan* means that royalty damages are available *only* when unjust-enrichment damages are inadequate or that Versata had a right to pursue an unjust-enrichment theory amounting to "a huge and undeserved windfall." Appx23. Versata's insistence (at 30) that the damages in *Mid-Michigan* were not "clearly excessive" is equally puzzling, given that the District Court here rejected Versata's proposed damages precisely because they *were* clearly excessive.

Versata distinguishes *Vitro* and *University Computing* (at 30-31 & n.3) on the ground that they predated the right to damages "the DTSA and MUTSA created and codified." To the extent Versata suggests courts cannot rely on precedent predating the DSTA's enactment in 2016 or the MUTSA's enactment in 1998, it cites no authority adopting that position—and for good reason. Where a legislature "uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates," that the legislature "means to incorporate the established meaning of these terms." *Neder v. United States*, 527 U.S. 1, 21

(1999) (cleaned up). Both statutes incorporate common-law precepts—which Versata implicitly acknowledges (at 32) when it asks this Court to construe the same statutes by reference to "judicial precedent, the Restatement, and prominent treatises" that likewise predate the statutes.

Versata is correct (at 28-29) that it "is not unknown" to award unjust-enrichment damages under common-law principles, but that conspicuous double-negative only highlights that such damages are discretionary. And while Versata cites (at 32) one (common-law) treatise for the proposition that Versata "had every right to 'claim whichever remedy' " it deemed "more advantageous," the treatise actually says that a plaintiff "*may* be able to claim" the more advantageous remedy, 1 Dan B. Dobbs, Law of Remedies § 4.1(1), at 555 (2d ed. 1993) (emphasis added), while making clear that "[c]ourts refuse to permit" unjust-enrichment damages where such an award "would be unfair or inequitable on the particular facts of the case," *id.* § 4.1(2), at 563.

Versata claims (at 31) that the District Court's decision "defies the whole purpose of unjust-enrichment damages" as deterring unlawful conduct. The District Court properly rejected this argument, noting that the "DTSA and MUTSA include provisions that are sufficient to deter the theft of trade secrets irrespective of what damages models are available," including provisions permitting double-damages awards in cases of willful and malicious violations, and provisions allowing awards

of "reasonable attorney's fees to the prevailing party." Appx80-81 (citation omitted). "[T]he availability of these additional damages and fees" is a sufficient deterrent. Appx81.

### B. Versata's Unjust-Enrichment-Damages Model Was Independently Excludable.

1. Even if the District Court permitted Versata to pursue an unjust-enrichment theory, the court made clear it "would still have excluded Elson's testimony on the ground that it is unreliable." Appx30. The court emphasized "at least three" problems with Elson's report that "provided multiple, *independent* grounds to support" its exclusion. Appx30; Appx84.

*First*, "Elson made no effort to apportion Versata's claimed damages between those caused by Ford's alleged misappropriation of the trade secrets and Ford's other alleged infringements of Versata's intellectual property"—"a serious error." Appx30. It was "undisputed that the software programs at issue" contained many "non-trade secret elements," but "Elson did not make any effort to separate the cost savings that Ford allegedly obtained" by using the alleged trade secrets "from the cost savings that Ford achieved through its alleged misappropriation and/or infringement of Versata's other intellectual property." Appx30-31. As this Court has explained, "to be admissible, all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features."

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).

*Second*, "Elson failed to apportion Versata's alleged damages on a trade-secret-by-trade-secret basis." Appx31. "Elson calculated a single amount of damages that Versata allegedly suffered from Ford's misappropriation" of all alleged trade secrets even though the jury would have to determine "on a trade-secret-by-trade-secret basis" whether Ford misappropriated "each of the relevant trade secrets." Appx31-32. This "all-or-nothing approach" posed "a substantial risk of confusing and/or misleading the jury." Appx32. This Court has vacated damages awards where the plaintiff's calculation similarly "did not distinguish among" multiple grounds, leaving "no basis" to calculate damages after some grounds were rejected. *Tex. Advanced*, 895 F.3d at 1317.

Relatedly, Elson "purported to determine the amount that the 'Versata Technology' saved Ford," but he defined "Versata Technology" to include software programs "not at issue in this lawsuit." Appx34-35. Elson also "repeatedly" referred to Ford's cost savings by reference to the "At Issue Technology"—which included *Ford's* technology—but made "no effort to separate out what software programs, much less what trade secrets" from the "At Issue Technology" caused Ford's alleged savings. Appx35 n.10.

*Third*, "Elson relied on outdated and potentially irrelevant data" because his analysis drew on material that was "nearly fifteen years old." Appx35. "Elson simply has not shown how it was reliable for him to calculate damages for the years 2015-2026 based on the old data from 2002 and 2003." Appx36. Worse, much of Elson's outdated figures "appear to be largely *estimates* and *projections* of *potential* cost savings," making them especially unreliable as evidence of Ford's *actual* savings. Appx36; *see* Fed. R. Evid. 702. And none of the outdated data were directed to the asserted trade secrets, as distinct from the many other software elements.

2. Versata acknowledges (at 39) this Court reviews each basis for exclusion for abuse of discretion, a "highly deferential" standard. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 523 (Fed. Cir. 2012). Versata's brief does not address the District Court's findings error-by-error, making it difficult to understand which arguments Versata presses in defense of which errors. In all events, Versata is wrong as to each error and certainly cannot show an abuse of discretion as to all of them.

Versata argues (at 36) that Elson was not required to apportion damages, relying on the "narrow" exception to the apportionment rule where one component "drives the demand for an entire multi-component product." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). But Versata's claim to meet this exception rests on a logical fallacy. Versata acknowledges (at 36) that it

must show that the technology's value "rested *entirely* on the asserted secrets," and claims to meet that standard because the technology "could not function without the misappropriated secrets." But whether a technology cannot function without a component does not determine whether "the entire value" of the technology is "properly and legally attributable" to that component. *LaserDynamics*, 694 F.3d at 67 (citation omitted). A car cannot drive without tires, but that does not mean the entire value of a car is attributable to its tires. As this Court has explained, it is "not enough to merely show" a misappropriated component "is viewed as valuable, important, *or even essential*" to the broader technology. *Id*. at 68 (emphasis added). That certain features are "essential" to the product's operation or commercial viability is "not tantamount to proof that any one of those features alone drives the market" for the product. *Id.* A "higher degree of proof" about the product's value "must exist." *Id.* Versata has not supplied such proof here.

Versata's argument also fails factually. To support its claim (at 36) that the technology "could not function without the misappropriated secrets," Versata cites Elson's report, but the cited page merely states that Elson "understand[s] from Dr. Malek that each of the trade secrets can be thought of as a condition precedent to achieving the corresponding benefits." Appx9418. Malek's only opinion on the topic, in turn, states in full: "Lastly, each of the trade secrets identified above are independently necessary to the functionality of the software, enabling the realization

of the benefits described above." Appx11939. As the District Court noted, Elson was not entitled "to rely on such a conclusory, unsupported assertion." Appx34.

Versata attempts to rehabilitate Malek by claiming (at 35) that he "explained that ACM and its component secrets were alone responsible for" Ford's savings, citing sixteen paragraphs of Malek's report. *See* Appx11750-11752 (¶¶ 44-47); Appx11937-11939 (¶¶ 443-454). But the only paragraph addressing whether the trade secrets were "alone" responsible for Ford's savings is the conclusory paragraph described above. Versata maintains (at 38) that this paragraph was conclusory "*because it expressed Malek's conclusion*," supposedly based on "hundreds of paragraphs." But nothing else in Malek's testimony justifies Malek's conclusion. Even if some such suggestion were hidden somewhere, this Court should not be forced to "play archaeologist with the record." *Parus Holdings, Inc. v. Google LLC*, 70 F.4th 1365, 1372 (Fed. Cir. 2023) (citation omitted).

Versata takes issue (at 39) with the District Court's statement that it was "not persuaded" that each asserted trade secret was " 'independently necessary to the functionality of the software' at issue." Appx34. But the proponent of expert testimony "bears the burden of proving its admissibility" by a preponderance. *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014). Versata did not come close to meeting that burden. As the District Court explained, the technology includes not only trade secrets, but also "patents, copyrights, and other

non-protectable features." Appx31. While Versata claims (at 37) that the non-trade secrets "had no independent value for Elson to apportion," that claim is flatly contradicted by Versata's own insistence below that "the patents, untethered to the software, would have significant value." Appx28364; *see also* Appx28372 ("there are non-protected elements of ACM and MCA" and "there is other non-asserted intellectual property contributing to the functionality, *and thus the value* of, ACM and MCA" (emphasis added)); Appx28323 (patent claims "create value to Ford").

Versata, moreover, makes no effort to justify Elson's failure to apportion value among *the asserted trade secrets themselves*. When Elson drafted his report, Versata was asserting only individual trade secrets, Appx31, not the combinations it later adopted. The District Court explained that Elson failed to apportion value "on a trade-secret-by-trade-secret basis," and noted that "if the jury were to conclude that Ford misappropriated less than all of Versata's trade secrets," Elson's damages would be useless "and could only serve to confuse" jurors. Appx31-32. Versata's brief offers no defense of Elson's failure to apportion between trade secrets, thereby forfeiting the issue. *See Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019). And Malek's report acknowledges that "[e]ach of the above trade secrets *has value individually*," Appx11825 (emphasis added), again underscoring that the failure to apportion was unjustifiable.

Versata also cannot justify Elson's failure to distinguish between the trade secrets and the "Versata Technology" or the "At Issue Technology." Versata acknowledges (at 37-38) that the "Versata Technology" includes non-trade-secret programs and that Elson did not exclude damages attributable to these programs. Versata justifies this failure (at 38) on the ground that these programs did not "independently contribute[]" to Ford's savings—citing pages of the record saying nothing of the kind. *See* Appx9348; Appx9353 n.22; Appx9419 (tbl.15). These pages instead confirm that the "Versata Technology" includes non-trade-secret material, without addressing whether those features and components contributed to Ford's savings. And Versata admits (at 38 n.5) that the "At-Issue Technology" includes PDO—*a Ford program*. Versata claims (at 38 n.5) that "PDO was a carbon copy of Versata's software," which is flatly untrue. *See* Appx56588 (PDO is "fundamentally different" than Versata's software). In any event, "Elson made no effort to separate out what software programs, much less what trade secrets," were responsible for Ford's asserted cost savings. Appx35 n.10.

Finally, the District Court did not abuse its discretion by preventing Versata from offering an unreliable theory premised on outdated data. This was not a close call. Many of Elson's projections arose from a 2003 document not even directed to the same alleged trade secrets (which Versata did not define until fifteen years later). Appx9393.

Versata's brief does not claim the District Court erred in concluding that the 2003 projections were unreliable. Versata instead mistakenly claims (at 41) that erroneous data goes to credibility rather than admissibility. This Court and the Sixth Circuit have excluded "flawed and unreliable" damages models on similar grounds. *ePlus*, 700 F.3d at 523; *see LaserDynamics*, 694 F.3d at 81 (reversing admission of damages model based on outdated data that was "arbitrary and speculative"); *ASK Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 509-510 (6th Cir. 2014) (rejecting damages model based on materials "produced a decade-and-a-half ago"). While Versata (at 41) relies on *In re Scrap Metal Antitrust Litigation*, the Sixth Circuit there confirmed that expert testimony must rest on "a reliable foundation," 527 F.3d 517, 529-530 (6th Cir. 2008)—exactly what was missing here. And the Sixth Circuit merely could not "say that the district court abused its discretion" in admitting expert testimony, *id.* at 531-532, which underscores the District Court's discretion here. Even if Versata were correct (at 41) that stale and untested *estimates and projections* were "the best data available" of *actual* cost savings fifteen years in the future, Versata bore the burden to establish reliability, and its inability to produce reliable data did not entitle it to rely on unreliable data.

3. Versata asserts (at 33) that Elson's failures were not independent grounds for affirmance because Elson addressed each failure "to the court's satisfaction in his supplemental report." That is false. The District Court made clear that "[t]hese

failures provided multiple, *independent* grounds to support the Court's decision to exclude" Elson's testimony. Appx84. Far from holding that Elson resolved those issues, the court explained "it still would not reconsider" its alternative grounds for rejecting Elson's report because Versata failed to "address Elson's reliance on outdated and irrelevant data," failed to address "his inclusion of software programs not at issue in this case," and provided no "substantive defense of Elson's . . . failure to apportion." Appx83-84.

### C. The District Court Acted Well Within Its Discretion In Excluding Two Flawed Reasonable-Royalty Models.

1. After excluding Elson's testimony, and over Ford's objection, the District Court allowed Elson to prepare a supplemental report proposing a reasonable-royalty model. Appx26970-26976. Elson's supplemental report provided three reasonable-royalty scenarios. The first "calculated Versata's damages based on the parties' licensing history." Appx94-95; *see* Appx28376-28377. The second and third "included additional damages related to the value to Ford of using the trade secrets to create its own automotive configuration software." Appx95; *see* Appx28378-28382. The District Court found only Elson's first scenario sufficiently reliable and non-speculative to be admissible. Appx94-95.

Excluding the second and third scenarios was not an abuse of discretion, as both rested on premises the District Court had already rejected. The court already held it would "not permit Versata to seek damages based upon the alleged value of

benefits obtained by Ford through its use of the relevant software." Appx29. By including Ford's "avoided development costs" as damages, Appx28312-28313; Appx28378-28382, Elson's second and third scenarios violated that holding. These scenarios would have doubled or tripled Versata's damages above the already inflated $17 million per year that Versata demanded (and Ford rejected) for 2015, and thus effectively repeated the errors in Elson's unjust-enrichment theory by incorporating these errors into the royalty it claimed Ford would have paid. Rejecting that gambit comported with precedent and was far from an abuse of discretion. *LaserDynamics*, 694 F.3d at 79 ("Actual licenses" "most clearly reflect the economic value" of the technology).

2. Versata concedes (at 45) review is for abuse of discretion, a standard it cannot meet. Versata argues (at 43) that any reasonable-royalty model should include a premium given that prior licenses contained "various limitations and restrictions" that Ford was able to avoid through misappropriation. The District Court properly rejected this argument, explaining that "Versata has not presented any evidence" that "Ford has violated conditions that would have been included in Versata's proposed license in a manner that has damaged Versata in any material way." Appx28-29 & n.8.

Versata also complains (at 45) that the "misappropriation gave Ford *perpetual* ownership" of replacement technology. But this argument conflicts with Versata's

claim that Ford could have designed its own replacement technology in "8.3 years" "without using Versata's trade secrets." Appx28369; *see Tex. Advanced*, 895 F.3d at 1318 (trade-secret plaintiff's entitlement to relief "ends" after the "limited head-start period"). In any event, the District Court explained it could "protect Versata from Ford's continued use of the trade secrets by issuing injunctive relief" if appropriate. Appx29. The court later rejected injunctive relief for reasons Versata does not contest on appeal. Appx42490-42509.

Citing *Mid-Michigan*, Versata insists (at 43-45) that the royalty should have accounted for the value to Ford of the right to reverse-engineer Versata's software "to develop its own software." (cleaned up). This is a red herring. Elson's model sought to recover the royalty for the full 8.3 year period Versata claimed it would have taken Ford to "independently develop[] its own replacement software *without* infringing Versata's *trade secrets*." Appx28344 (emphasis in original). Elson thus estimated damages for a longer period on the assumption that Ford *would not* reverse-engineer Versata's software. It would make no sense to augment the royalty two- or three-fold on the assumption that Ford *would* reverse-engineer the software. *See Vt. Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir. 1998) (rejecting similar theory because it would "border on the ridiculous").

Versata cites (at 45-46) *Panduit Corp. v. Stahlin Brothers Fibre Works* in declaring the District Court's decision an "injustice," but *Panduit* suggests nothing

of the sort. The Sixth Circuit held that "the primary inquiry" in fixing a reasonable royalty "is what the parties would have agreed upon, if both were reasonably trying to reach an agreement," 575 F.2d 1152, 1163 (6th Cir. 1978) (citation omitted)—exactly the inquiry the District Court undertook here. While *Panduit* warned against setting the penalty for knowing infringement at "only the normal, routine royalty non-infringers might have paid," *id.* at 1158, here the District Court keyed the royalty to $17 million, which was *more than* Ford was willing to pay, making the argument that this figure was too low implausible.

### D. Versata Is Not Entitled To The Remedy It Seeks.

Versata's cursory request (at 66) for "remand with instructions for the district court to accept supplemental expert reports and conduct a new trial on trade-secret damages" is improper.

"[I]t is simply not reasonable after *Daubert* for a party initially to present less than her best expert evidence in the expectation of a second chance to shore up her case after her expert testimony is ruled inadmissible." *Pride v. BIC Corp.*, 218 F.3d 566, 581 (6th Cir. 2000) (cleaned up). The District Court already gave Versata a second opportunity to file damages reports, while recognizing "important policy considerations that weigh against allowing Versata to supplement its expert reports." Appx26974-26975. Versata has not justified its extraordinary request that this Court give it a *third* bite at the apple.

Nor is Versata entitled to a new trial on trade-secret damages without retrying liability. Damages and liability were tried together. The grant of a new trial on damages alone is improper if the question is "interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty." *Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494, 500 (1931). A court should not grant a new trial on damages, for example, "if there is reason to think that the verdict may represent a compromise among jurors" with different views on liability. 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure–Civil § 2814 (3d ed. 2024 update). While no remand is needed if this Court affirms, if this Court reverses on the exclusion of Versata's damages reports, the District Court should be left to evaluate on remand the scope of any new trial.

## II. THE DISTRICT COURT CORRECTLY GRANTED FORD JUDGMENT AS A MATTER OF LAW ON DAMAGES.

After nearly a decade of litigation, numerous attempts at revised expert reports, and a multiweek jury trial, Versata failed to offer the jury any non-speculative basis either for breach-of-contract damages or for trade-secret-misappropriation damages on fewer than all four asserted trade secrets. Because Versata's damages theories required the jury to rely on "pure speculation," Appx145, the District Court properly granted JMOL to Ford.

### A. Versata Offered No Evidence From Which The Jury Could Calculate Contract Damages.

1. At trial, Versata offered only an invalid theory of breach-of-contract damages. The jury was instructed that breach-of-contract damages should put Versata "in as good a position as it would have been in had the contract been fully performed," which meant Versata could not "recover a greater amount in damages than it could have gained by [Ford's] full performance." Appx116 (quoting Appx56984); *see Ferguson v. Pioneer State Mut. Ins. Co.*, 731 N.W.2d 94, 99 (Mich. Ct. App. 2006) (per curiam) (reiterating this rule). Versata was therefore required to prove with reasonable certainty "the difference between the contract-price . . . and the amount which it would have cost [Versata] to perform the contract." *Walton Sch. of Com. v. Stroud*, 226 N.W. 883, 885 (Mich. 1929) (citation omitted).

Versata's trial theory, however, was that it was entitled to the *full* contract price of the never-accepted $17-million-per-year offer, without deducting Versata's performance costs. Appx55751; Appx57008. As the District Court held, this model "necessarily *overcompensated* Versata because it did not account for any of the costs of performance." Appx124. The model was therefore "inconsistent with Michigan law—as reflected in the Court's jury instructions," Appx124—which requires contract damages be "based on the loss of net rather than gross profits." *Lawton v. Gorman Furniture Corp.*, 282 N.W.2d 797, 801 (Mich. Ct. App. 1979); *accord Callender v. Myers Regul. Co.*, 230 N.W. 154, 155 (Mich. 1930).

The "two alternative" prices Versata asked the jury to award "suffered from the same flaws" as the $17-million-per-year request. Appx126-128. The first alternative—$14.95 million per year—was "the total that Ford *actually paid* for ACM and MCA software in 2014, the last year of the contract." Appx57008 (emphasis added). It was thus "a gross revenue number," "not a net figure." Appx127. The same was true of Versata's second alternative—$10.95 million per year, which was the amount Ford actually paid Versata in 2014 for "the base software license fee" for ACM and MCA. Appx56562; *see* Appx57008. This $10.95-million figure reflected Versata's gross "license/subscription revenue," not Versata's net revenue after subtracting costs. *See* Appx28429-28430.

The jury had no way to correct for that overcompensation. The District Court's pretrial discovery sanction barred Versata from attempting at trial to "back out costs and expenses," Appx55673, given that Versata never timely proposed "a contract damages theory that included consideration of its costs," and Ford accordingly "did not conduct any discovery into Versata's costs," Appx129 n.4. Versata was instead bound by its longstanding insistence that contract damages were measured by "what Ford would have had to pay if they had renewed their license." Appx55354. As a result, "even if the jury had attempted to correct for the overcompensation inherent" in Versata's contract-price damages model, "it could not have done so on a reliable basis" and "could only have speculated." Appx126.

The jury's task was especially untenable because, despite Versata's repeated pre-trial assurances, none of Versata's experts, lay witnesses, or trial exhibits "offered even a rough approximation as to the amount of contract damages that Versata suffered," leaving the jury with "no way to calculate Versata's claimed breach of contract damages with reasonable certainty." Appx123; *see* Appx56476-56480; Appx81611-81612.

2. Versata below defended the verdict as permissibly awarding "the *gross profit* Versata would have received." Appx42025 (emphasis added); *see* Appx41726-41729. On appeal, Versata repudiates that position and concedes (at 65) that "hornbook law" requires contract damages "be offset" by avoided expenses. Versata now claims (at 64-65) that the jury's damages award actually measured "lost profits." That revisionist history fails for two reasons.

*First*, "Versata never disclosed a lost profits theory of contract damages during discovery, and thus it would be unfairly prejudicial to Ford to uphold the contract damages award on that basis." Appx130-131. Given the District Court's pretrial ruling barring Versata from presenting evidence of its costs, the District Court explained that "through no fault of its own," Ford could not dispute Versata's claims about its costs, and it "would be unfair to Ford" to treat the jury as having made a guess about Versata's costs. Appx129 n.4.

Versata does not meaningfully challenge the District Court's pre-trial order preventing Versata from offering a lost-profits model, thus forfeiting the issue. *See Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1354 & n.4 (Fed. Cir. 2022). Nor could Versata conceivably show the model's exclusion was an abuse of discretion. *See Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 369 (6th Cir. 2010) (affirming exclusion of lost-profits model not disclosed during discovery). The pre-trial order made JMOL on contract damages inevitable, especially given Versata's failure to introduce any actual evidence of damages at trial. *See MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1356-57 (Fed. Cir. 2005) (no abuse of discretion in excluding damages model that left plaintiff "without evidence of damages" because plaintiff "alone [wa]s to blame for creating this situation"); *Cont. Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 462 F. App'x 266, 282 (4th Cir. 2012) (per curiam) (similar).

Versata suggests (at 65) the jury was entitled to use Versata's $10.95-million figure because Ford never claimed "it was prejudiced." But Ford emphatically argued that Versata was not entitled to contract damages under any figure because its claim "really should be a lost profit theory that Versata never pursued in discovery and never pursued at trial," Appx57136, and that Ford's "whole pretrial prep would have been very different" had Versata timely disclosed a lost-profits contract theory. Appx57137; *see* Appx57138-57139; Appx57164-57165; Appx55613-55622. As to

Versata's assertion (at 59) that Ford never contended "that the $10.95-million base license fee included unquantified support costs," that is because Versata never hinted to the jury that costs were relevant. *See* Fed. R. Civ. P. 37(c)(1). Versata concedes (at 65) that it told the jury "from the start that it was seeking damages based on what *Ford would have paid under a new contract*." (emphasis added). It would be exceptionally prejudicial to conclude the jury may have accounted for costs anyway when Versata's damages theory did not and Ford had no discovery into Versata's costs.

*Second*, setting aside prejudice to Ford, "Versata did not present sufficient evidence at trial to permit an award of lost profits." Appx131. As Versata recognized below, it "makes no sense" to characterize the jury as awarding lost profits, because "the Court *prevented* Versata's expert from presenting a 'lost profits' damages model." Appx42024. The jury had no other evidence of costs because Versata withdrew its request to "present lay witness testimony" regarding "Versata's expenses." Appx40561-40564; Appx41251-41256; Appx55710. Versata never suggested that any of the alternatives it argued to the jury were a net-profit number. And Versata admits on appeal (at 55-56) that each figure was "an estimate of what *Ford would have paid* for the renewed MSSA." (emphasis added). Contrary to Versata's suggestion (at 56), Versata *never* told the jury to deduct costs, and Versata cannot defend the verdict on the theory that the jury may have done so

without being asked or without being provided any evidentiary basis. *See Vojdani v. Pharmsan Labs, Inc.*, 741 F.3d 777, 785 (7th Cir. 2013) ("A damages award the district court has set aside will not be reinstated on appeal based on a theory that was never presented to the jury.").

Versata defends neither its primary $17-million-per-year figure nor its alternative $14.95-million figure, as both plainly include performance costs. Versata defends only its $10.95 million "base license" price, arguing (at 57) that the "$4 million difference between the base and total license" in 2014 "reflected a reasonable measure of the costs Versata would have incurred." The District Court properly rejected this argument. As Versata concedes (at 58-59), Versata's $4-million figure is the amount *Ford paid* Versata for "extra services" in 2014. Appx56620; Appx28338; Appx28429; Appx57162. These were not measures of *Versata's costs to perform*, but were "referring to costs to be paid *by Ford*" for additional services. Appx57141 (emphasis added); *see id.* (Versata conceding the $4-million figure was "the price, . . . not Versata's costs"); Appx42027 (Versata acknowledging that jury lacked "direct evidence of costs").

Versata does not dispute the base license "require[d] Versata to provide some level of technical support" the jury had no way to quantify. Appx128. ACM and MCA were built specifically for Ford, so the base license fee did not involve an off-the-shelf product for which performance costs were minimal. *E.g.*, Appx42028

(Versata conceding that it "hired expensive software engineers and costs go up every year" (quoting Appx56493)); Appx57142-57143. As the District Court explained, "Versata's costs of performance under the base license," which included "its cost to correct errors," "cannot be dismissed as a mere *de minimis* expense because Ford presented evidence at trial that it experienced frequent errors while using Versata's software." Appx128. Indeed, "even Versata's own damages expert" estimated in her trade-secret-damages report "that Versata would have incurred $1.1 million in "'incremental expenses' under the 'base' license." Appx128; *see* Appx39968. While that report was excluded on other grounds, it confirmed that Versata incurred costs even under the base license, and Ford would have "contend[ed] that Versata's costs were higher" than the expert claimed but never had the opportunity to do so. Appx125 n.3.

Contrary to Versata's assertion (at 55), the absence of evidence of Versata's expenses "cannot be dismissed as a minor flaw." Appx125. Lost profits are recoverable only if they are supported by "a reasonable degree of certainty," rather than "conjectur[e] or speculati[on]." *Allen v. Mich. Bell Tel. Co.*, 232 N.W.2d 302, 305 (Mich. Ct. App. 1975). "There is no legal requirement that a jury award damages simply because liability was found." *Joerger v. Gordon Food Serv., Inc.*, 568 N.W.2d 365, 368 (Mich. Ct. App. 1997). Because Versata "presented the jury

with a calculation of [its] gross revenues rather than its profits," a lost-profits "theory is not available to sustain the verdict." *Vojdani*, 741 F.3d at 786.

### B. Versata Offered No Evidence From Which The Jury Could Calculate Trade-Secret Damages.

1. Reasonable-royalty damages are appropriate only for "the period of time it would have taken" a competitor to "recreate" each trade secret independently. *Tex. Advanced*, 895 F.3d at 1317. Thus, to award reasonable-royalty damages, "the jury needed proof as to how long it would have taken Ford to develop any trade secret that Ford misappropriated." Appx144.

The District Court properly instructed the jury that if Versata failed to "prove[ ] its claim for misappropriation of an alleged combination trade secret," the jury "must not consider trade secret damages with respect to that alleged combination trade secret." Appx56986; Appx67383. The jury was also instructed that "reasonable royalty damages must be limited to the amount of time you decide it would have taken Ford to independently develop the alleged combination trade secrets you found were misappropriated." Appx56986.

Despite these instructions, Versata gambled on an all-or-nothing approach to trade-secret damages. Versata's sole witness on the damages period, Malek, did not attempt to calculate the time it would have taken Ford to "replicate" each of Versata's four alleged trade secrets independently, but instead sought only to determine "how long it would have taken Ford to develop PDO" "without having

had access to the trade secrets." Appx56387; Appx56439. Malek testified that "it would have taken Ford approximately 8.3 years to implement an equivalent software as ACM and Versata's MCA" without using the alleged trade secrets. Appx56387. His methodology, based on the total number of "lines of code in ACM and MCA" and numerous other input parameters specific to Ford, Appx56387; Appx28625-28636, never separated or offered any way for jurors to determine separate development times for each trade secret. His 8.3-year estimate simply assumed the jury would find misappropriation of all four trade secrets.

By taking this approach, Versata left the jury with no way to calculate the time "it would have taken Ford to independently develop" just the three ACM trade secrets. Appx56986. "Malek said nothing about how long it would have taken Ford to develop less than all of the trade secrets," "[n]or did he tell the jury how long it would have taken Ford to develop any of the trade secrets individually." Appx145. Malek also "did not give the jury the tools to make those determinations" for itself. Appx145. He "did not tell the jury how many lines of code were in each individual trade secret," leaving the jury no way to adjust the million lines of code based on the trade secrets it found misappropriated. Appx145. McMahon's estimation of annual *royalty fees* for each trade secret did not cure Malek's failure to estimate *development time* for each trade secret, because the jury had no way to determine the period by which to multiply each of McMahon's royalty fees.

Damages were thus entirely speculative—and may have been zero. Because McMahon credited Ford for roughly 3.3 years of payments to Versata between October 2011 and the MSSA's expiration in January 2015, Appx56560; Appx67720, if the estimated development time for the three ACM trade secrets was 3.3 years or less, McMahon's model would return zero damages. Appx56560; Appx67720.

This Court has warned against this exact failure, explaining that a "monetary award for trade secret misappropriation must be vacated" when liability rests only on a subset of the grounds presented but the "calculation of monetary relief did not distinguish among those grounds." *Tex. Advanced*, 895 F.3d at 1317. This Court has likewise affirmed a grant of JMOL where the plaintiff "provided the jury with a damages calculation based on an assumption that all of the trade secrets were misappropriated," then the jury found that only a subset of the asserted trade secrets were misappropriated. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076 (N.D. Cal. 2005), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007) (per curiam) (mem.). And the Sixth Circuit has cautioned against pursuing an "all-or-nothing approach" to trade-secret damages where the "model turned on misappropriation of all the trade secrets without offering the jury a way to attribute value to each individual trade secret." *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 389 (6th Cir. 2022) (per curiam). The *Caudill* court upheld the damages award only because plaintiff's "expert gave the jury options"

for attributing value "to each individual trade secret"—exactly what Versata failed to do.[1]

Versata's approach was particularly unjustified given that "Versata was on notice that pursuing an all-or-nothing approach on damages questions could fatally undermine an award of damages if the jury found that Ford misappropriated less than all of Versata's trade secrets." Appx147-148. Citing *O2 Micro*, the District Court excluded "Versata's damages experts on the ground that they 'fail[ed] to calculate damages on a trade-secret-by-trade-secret basis.' " Appx147-148 (quoting Appx33); *see also* Appx35755 (excluding revised expert reports on similar grounds). The District Court "warned [Versata] of the dangers of bundling all of its alleged trade secret damages together." *O2 Micro*, 399 F. Supp. 2d at 1076. Versata nevertheless "presented evidence of damages based on misappropriation of all trade secrets," leaving the jury "without sufficient evidence, or a reasonable basis," to determine damages, meaning that damages were "based on speculation and guesswork, not on evidence." *Id.* at 1076-77; *cf. id.* at 1077-78.

[1] *Accord Northgauge Healthcare Advisors, LLC v. Constellation, Inc.*, No. 1:21-cv-00373, 2024 WL 1807952, at *11 (D. Colo. Apr. 25, 2024) (finding "no way to determine the value" of the subset of trade secrets found misappropriated where the plaintiff "employed an all-or-nothing damages approach"); *Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*, No. 1:18-cv-03298, 2021 WL 3883597, at *16 (D. Md. Aug. 12, 2021); *LivePerson, Inc. v. [24]7.AI, Inc.*, No. 3:17-cv-01268, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018).

2. Versata does not dispute (at 46, 48) that the jury was correctly "instructed that Versata had to prove the royalty it would have earned for each misappropriated trade secret based on the time Ford would have needed to develop" it. Nor does Versata dispute (at 49) that Malek's 8.3-year calculation was an "estimate of Ford's total development time" and offered no basis for apportionment. Versata's efforts to save the verdict fail.

*First*, Versata (at 47) downplays its evidentiary failure as a lack of "mathematical precision." But as the District Court explained, "the problem here is that there was a *complete lack of evidence* on the critical issue of how long it would have taken Ford to develop less than all of Versata's trade secrets." Appx150. Although "damages need not be ascertained with mathematical precision, *a reasonable basis must exist for their computation*." *Shivers v. Schmiege*, 776 N.W.2d 669, 675 (Mich. Ct. App. 2009); *see also Attard v. Citizens Ins. Co. of Am.*, 602 N.W.2d 633, 639 (Mich. Ct. App. 1999) (JMOL on damages proper "if the jury was permitted to speculate concerning the amount of those damages").

None of Versata's cases (at 47, 54) are remotely comparable. None involved a plaintiff's failure to offer any basis to compute damages tied to the grounds for liability. Nor is this a case where "precision is unattainable" because the "defendant's own act" is what "caused the imprecision." *Godwin v. Ace Iron & Metal Co.*, 137 N.W.2d 151, 156 (Mich. 1965) (citation omitted). Ford did not, as

Versata claims (at 53), "prevent[ ]" Malek from apportioning properly. Malek could have conducted that analysis, but he confirmed that "apportion[ing] lines of code to particular trade secrets" was "not an assignment that I've been given." Appx28605. Nor is this a case of justifiable imprecision. *See Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 590 (1974). Instead, this is a case where the "plaintiff could have provided a more reasonable estimation of its damages" but "presented limited proof," and "it is clear that the jury would have had to speculate as to plaintiff's damages," making JMOL proper. *Excel Indus. Elecs., Inc. v. Blanco*, No. 196899, 1998 WL 1991268, at *2-3 (Mich. Ct. App. June 30, 1998) (per curiam).

*Second*, Versata attempts (at 49) an after-the-fact apportionment of Malek's 8.3-year estimate by insisting that the jury could have "isolate[d]" the time to develop the ACM trade secrets by subtracting the time Versata says it took *Versata* to develop MCA—"somewhere between 1.5 and 3 years." But Versata never presented that range to the jury, let alone as bearing on damages. Versata reaches that range only by knitting together disparate threads of testimony from its fact witnesses: statements from one witness that "somewhere in th[e] range" of 2003-2004 he was "involved in discussions with Ford that led to the development" of MCA, Appx56093, and testimony from another that MCA was rolled out in October or November 2005, Appx56174. The jury had no reason to suspect those facts may be relevant to damages. And if Versata had attempted at trial to offer these cobbled-

together statements as bearing on Malek's analysis, Ford would have objected on the ground that revising Malek's analysis required expert testimony. *See O2 Micro*, 399 F. Supp. 2d at 1077 (rejecting similar gambit as basis for allocating damages); *Info-Hold, Inc. v. Muzak LLC*, No. 1:11-cv-283, 2013 WL 6008619, at *2 & n.2 (S.D. Ohio Nov. 13, 2013) (noting that "lay witness testimony would not be admissible to show reasonable royalty damages" and collecting cases).

In any event, testimony about *Versata's* development time does not map onto Versata's damages model, which was based on *Ford's* development time. Versata offered no evidence linking its own development time to its estimation of Ford's development time six years later. It could be that Versata's actual development time for MCA was entirely disproportionate to MCA's share of lines of code in Malek's calculation. At trial, Malek never said either way. Malek also said nothing at trial about whether any of the other input parameters for Ford would mirror input parameters for Versata. But *before* trial, Malek testified that Versata's software development capability was significantly greater than Ford's, Appx28630, and that Versata, as a "software company," was more adept at software development than Ford, as an "automotive company," Appx28708. Malek's pretrial explanation undermines Versata's claim on appeal (at 49) that it would have been reasonable for the jury to assume "Ford and Versata had similar capacities to staff software-development teams."

Versata's argument (at 53) that it is "hard to see" "better evidence for estimating Ford's development time than the actual time it took Versata to develop the software" is refuted by the fact that Versata's own expert did not estimate damages this way. Malek's model did not use Versata's actual development time, but instead estimated development time using lines of code and other input parameters. Without any evidence allocating those lines of code and parameters between the different trade secrets, there was no basis for the jury to find similar development times between Ford and Versata, or to conduct an apportionment analysis that Malek never completed. And "it may not be presumed that the jury found facts on which there is no evidence." *Nite Glow Indus. Inc. v. Cent. Garden & Pet Co.*, No. 20-1897, 2021 WL 2945556, at *9 (Fed. Cir. July 14, 2021) (quoting *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 767-768 (Fed. Cir. 1988)).

Versata makes a convoluted argument (at 52) that the jury may have "*undercompensated* Versata," but this Court has rejected a similar argument, reversing an award of "speculative" damages where the plaintiff "provided no evidence to support" its critical "assumption"—even where the plaintiff claimed the assumption produced "an overly-conservative estimate." *Sonoma Apartment Assocs. v. United States*, 939 F.3d 1293, 1300 & n.9 (Fed. Cir. 2019). This Court similarly rejected the argument that "the breaching party[] should bear the burden of imprecision," explaining that even where a breach "created the circumstances"

making it necessary to calculate damages, that does not "absolve[ ] [the plaintiff] of its burden of proof." *Id.* at 1301.

*Third*, Versata is wrong (at 48-50) that this case involved "competing estimates" of development time from Malek and Ford's damages expert, Julie Davis, and that the jury was free to land somewhere in between. Malek's testimony was "useless" to the jury. *O2 Micro*, 399 F. Supp. 2d at 1077. As the District Court recognized, Versata's "assertion starts from a faulty premise": Davis only "predicted" that another Ford expert "would offer such testimony," but that expert "never testified at trial about how long it would have taken Ford to develop all four of Versata's trade secrets (or any of Versata's trade secrets)." Appx150 (citing Appx56806). The District Court also rightly noted that even if this nonexistent evidence had been presented, it would have "suffer[ed] from the same problem as Dr. Malek's development-time testimony: namely, it would not have fit with the jury's finding that Ford misappropriated less than all of Versata's trade secrets." Appx150-151. While Versata cites (at 50) *Unisplay, S.A. v. American Electronic Sign Co.* for the proposition that the jury chose from within a permissible "range" of damages, *Unisplay* actually supports Ford, as it held that the jury's "royalty determination was not supported by *relevant* evidence," in part because expert "testimony was not directed to the proper reasonable royalty criterion," 69 F.3d 512, 518 (Fed. Cir. 1995). The same is true here.

*Finally*, Versata's insistence (at 48) that its trade secrets "had value" is irrelevant. Versata is not the first to make "much of the fact that the jury's liability finding necessarily included a finding that [its asserted trade secrets] had value and therefore [Versata] must be awarded some damages." *MSC.Software Corp. v. Altair Eng'g, Inc.*, 281 F. Supp. 3d 660, 662 (E.D. Mich. 2017). But "finding that the trade secrets had value does not mean that [Versata] was damaged or that it can prove the amount of damage." *Id.* (citation omitted). Even where "it is reasonably certain" a plaintiff sustained damages, if the "plaintiff presented no evidence from which the jury could calculate such damages," the trial court must grant "judgment notwithstanding the verdict." *Shivers*, 776 N.W.2d at 675-676. And "after ten years of litigation, exhaustive discovery, and [numerous] expert damages reports, [Versata] has certainly been 'afforded every opportunity to prove damages.'" *MSC.Software*, 281 F. Supp. 3d at 662 (citation omitted). Versata simply failed to do so.

### C. Versata Is Not Entitled To Duplicative Damages.

Versata's request (at 66) that this Court "reinstate" the jury's damages awards is meritless, even if this Court were to reverse on trade-secret or breach-of-contract damages. In addition to moving for JMOL, Ford also asked the District Court to require Versata to elect a single remedy because the jury's awards represented an "impermissible double recovery." Appx41864-41896; Appx41931-41944. The

District Court terminated Ford's election-of-remedies motion as moot given its conclusion that Versata failed to prove damages. Appx154. Reversal would thus reinstate Ford's motion, not damages.

"Double recovery for the same injury is inappropriate." *Tex. Advanced*, 895 F.3d at 1328 (citation and alteration omitted). Impermissible double recovery occurs where, as here, the damages awarded "flow[ ] from the same operative facts." *Id.* (citation omitted). As Versata acknowledged, its "theory of breach damages overlapped with its theory of trade secret misappropriation damages," Appx38392, because "[b]oth" sought an "annual license fee" as compensation, Appx38402. Versata served multiple expert reports acknowledging that "breach of contract damages represent an alternative remedy" to trade-secret-misappropriation damages. Appx39925 n.7; *see* Appx9350 n.4; Appx28312 n.11. And Versata conceded that its three breach-of-contract claims were independently duplicative. Appx41920. Therefore, if this Court reverses the District Court's JMOL order, Versata must elect *either* trade-secret damages *or* one of the three overlapping breach-of-contract awards, as set out in Ford's motion below.

Even Versata acknowledged at trial that it sought double (or triple) recovery; it told the jury not "to worry about rendering duplicate damages" because "the Court will make that decision later." Appx57009-57010. If the judgment is reversed, the

District Court must be permitted "to make appropriate adjustments to the damages to avoid double recovery" that Versata admitted were necessary. Appx56961.

## III. THE DISTRICT COURT ERRED IN DECLINING TO GRANT JMOL ON TRADE-SECRET LIABILITY.

If this Court affirms the District Court's exclusion of Versata's unjust-enrichment-damages model and grant of JMOL, it need not address Ford's conditional cross-appeal. But if this Court reverses either ruling, Ford should prevail on appeal for an independent reason: Versata provided insufficient evidence at trial to support the jury's verdict that Ford was liable for trade-secret misappropriation.

1. Versata's misappropriation theory was that it voluntarily provided alleged *combination* trade secrets to Ford by disclosing individual elements scattered throughout user guides and manuals, and that Ford deduced each combination from those materials and improperly used them to create PDO. To prevail on that theory, Versata was required to show that "at the time of disclosure or use," Ford had "knowledge of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II); Mich. Comp. Laws § 445.1902(b)(ii)(B); *see* Restatement (Third) of Unfair Competition § 40(b) (1995) (defendant can be liable only if it "knows or has reason to know that the information is a trade secret"); Appx56985-56986; Appx67381.

Versata's claims involve only "combination trade secrets"—*i.e.*, a "new combination of known steps or processes." *Caudill*, 53 F.4th at 380 (citation omitted). "[B]y itself," any individual component within a combination trade secret

is *not* legally protected. *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1339 (Fed. Cir. 2002) (citation omitted). A plaintiff raising a combination trade-secret claim does not seek protection for "one specific" component, but rather for the advantage generated when "all of the components" are "integrat[ed]." *Caudill*, 53 F.4th at 380 (citation omitted).

Proving a defendant's knowledge of a combination trade secret poses unique challenges: Where a trade secret is a combination of distinct (and individually unprotected) components, the defendant must—at the time of the alleged misappropriation—"understand[] the contours" of the combination. *Big Vision Priv., Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257-262 (S.D.N.Y. 2014) (citation omitted). Otherwise, the defendant is not "on notice" of the combination and cannot be liable "as a matter of law." *Id.*; *see Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590 (2d Cir. 1963) (rejecting trade-secret-misappropriation claim where plaintiff did not "disclose[]" the secret to defendant with sufficient "particularity"). Courts are particularly wary of *post hoc* litigation attempts to generate a trade secret that was never "defined and used in the ordinary course of business." *TSMC, N. Am. v. SMIC Ams.*, No. RG06-286111, 2008 Cal. Super. LEXIS 521, at *9-10 (Cal. Super. Ct. Aug. 8, 2008).

Versata prevailed at trial on three of its four repackaged combination trade secrets—Grid, Buildability, and Workspaces—which are bundles of three to six

distinct software features selected from the many hundreds of features in the ACM software. Appx67765. Versata was required to provide evidence from which a reasonable jury could conclude that Ford had "knowledge" of the precise combination of those supposedly protected three to six features. Mich. Comp. Laws § 445.1902(b)(ii)(B); 18 U.S.C. § 1839(5)(B)(ii)(II). But Versata did not do so. Versata provided no evidence that it specifically identified these protected bundles of features to Ford. Instead, it pointed to a 600-plus-page Engineering User Guide (Guide) and other documents it sent Ford over the years and argued that each of the disaggregated components of its various combination trade secrets was mentioned *somewhere* within those documents—sometimes many pages and years apart and in different documents altogether.

"Versata only pointed over and over to a mountain of user guides and other documents and asserted that all the elements of each combination were individually in there somewhere." Appx133 (cleaned up). Thus, the District Court explained that if it "had been sitting as a juror," it "would have found that Versata did not sufficiently disclose each combination trade secret" because "Versata did not persuasively establish that it ever meaningfully disclosed the trade secrets—as the combinations identified at trial—to Ford." Appx133-134. The District Court's view of the record is correct. Versata's needle-in-a-haystack approach to disclosure did not provide Ford the knowledge it needed to "understand[ ] the contours" of any of

the three alleged combination trade secrets, and Ford is thus not liable "as a matter of law." *Big Vision*, 1 F. Supp. 3d at 258, 261 (citation omitted).

Beginning with the Grid combination, which Versata claims comprises five interrelated software features, Versata provided Ford with thousands of pages of technical documents over nearly a decade, none of which identify five software features composing an overarching bundle called "Grid." The document on which Versata relies most heavily—the Engineering User Guide—scatters those five features across hundreds of pages. *See* Appx83394 (dynamic grid); Appx83703-83711 (error resolution); Appx83627-83629 (rule splays); Appx83624-83625 (local summary codes); Appx83729-83730 (grid templates). The Guide neither identifies these features as protected nor describes them as being related. Worse, the Guide associates some of the alleged "Grid" features with Versata's *other* combinations. For instance, the "Rule Splays" feature supposedly falls in the "Grid" bucket—but the Guide's section on "Rule Splays" does not mention the word "Grid" and states that "Splaying is extensively used while synchronizing a workspace," even though "Workspaces" is a *different* alleged combination altogether. Appx83629.

So too for the "Buildability" combination. The Guide has a section titled "Buildability," but that section *does not mention* five of the six software features that Versata claims compose the Buildability combination trade secret. Appx83642-83643. Four are mentioned in other sections, but none are identified as part of an

overarching software bundle called "Buildability," and none are identified as protected. Appx83625-83627 (polar sets); Appx83629-83631 (rule layers); Appx83772-83778 (DAG); Appx83811-83818 (retiming). The Guide's sections on three of those features—rule layers, retiming, and DAG—do not mention the word "Buildability," but discuss how the features interact with "Grid." *See* Appx83629; Appx83777; Appx83817.

The third alleged combination—Workspaces—purportedly includes three software features. The Guide has a section discussing "Workspace," but it confusingly describes numerous software features that are *not* part of the Workspace combination Versata presented at trial, Appx83390-83392, while omitting two other features that purportedly *are*—"modelling processing" and "flowthrough," Appx83390-83392.

At trial, several of Versata's high-level employees struggled to identify which features composed each combination. For instance, Patrick Nichols—the purported chief "inventor" of ACM—testified that Workspaces has "probably less than a hundred" software features, that Grid has "hundreds," and that Buildability "could be associated to many different features." Appx56074; *see* Appx56077 (District Court observing that "if anybody in the world should know what the content of [Versata's] trade secrets are," it should be Nichols, yet "[h]e has no idea"). Similarly, Versata's Account Manager Kenneth Ratton could not remember the

features composing Grid, Buildability, and Workspaces. Appx55970-55972. He admitted that no one at Versata told him what each combination's elements were, and he did not recall telling anyone at Ford about the trade secrets or their components. Appx55970-55972. This testimony is unsurprising given that the combination trade secrets were invented for litigation by Versata's experts. *See* Appx54848-54849 ("Versata's own experts seem to be describing trade secrets that are different from the ones that Versata described."). If Versata did not know about its combination trade secrets before litigation commenced, there is no way Ford could know.

In *Big Vision*, the court held that a defendant cannot be liable when the plaintiff does not "identify its alleged trade secret with particularity at the time of disclosure." 1 F. Supp. 3d at 257-262. There, the plaintiff printing company claimed that DuPont had misappropriated the company's chemical process, a five-element combination trade secret. But the plaintiff had not "inform[ed] anyone [at DuPont] orally or in writing of its alleged trade secret." *Id.* at 261. Instead, the plaintiff claimed that each of the elements could be found in "70 pages of laboratory materials" it had provided DuPont. *Id.* at 271. The court held that "DuPont had no way of knowing *which* structure" in the disclosed materials embodied the trade secret. *Id.* at 260. The plaintiff could not establish knowledge by "cherry-picking five concepts" from "dozens of pages of undifferentiated" documents, and, "as a

matter of law, DuPont could not have been on notice of [the] alleged trade secret." *Id.* at 261, 271. The same conclusion follows even more clearly here, where the alleged trade secrets were disclosed in thousands of pages of documents with no way to distinguish what was protected from what was not. *See UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 942-943 (N.D. Cal. 2007) ("if the Coca-Cola formula consists of a combination of ten nonsecret ingredients, then a document which lists those ten ingredients in the middle of a sea of other chemicals might not constitute adequate disclosure of the formula").

2. Despite its skepticism of Versata's claim, the District Court denied Ford JMOL because it believed that a juror could find that Ford could scour Versata's "mountain" of documents and piece together Versata's asserted combinations. Appx133-135. That was error.

The District Court relied primarily on Malek, who testified that Versata disclosed to Ford "all of" the features within its trade-secret combinations. *See* Appx56367; Appx56377; Appx56382-56383. But when pressed, Malek explained that Ford could have learned of the trade-secret combinations in only three ways: (1) "[t]hrough the user guides," Appx56383, (2) by "using the software," Appx56367, or (3) "through presentations" Versata's employees allegedly conducted at Ford, Appx56377. That testimony was insufficient to support the jury verdict. The user guides did not put Ford on notice of any trade-secret *combinations*.

Nor could Ford learn about the combinations simply by "using the software"—the software itself does not identify which components combined to form a trade secret. As for the alleged "presentations," none of Versata's witnesses identified a presentation in which Versata identified the combination trade secrets. At most, Malek testified that Versata conducted a presentation about the "Trie" software feature that Versata now combines with five unconnected features in the "Buildability" bucket. Appx56367. But that proves only that Versata taught Ford how to use a singular feature of one combination; it does not suggest Ford knew that the "Buildability" bundle consisting of six software features was akin to the formula for Coca-Cola.

The District Court also relied on the testimony of Versata employee Seth Krauss, who claimed that Versata disclosed to Ford "all of the information" about the trade-secret combinations. Appx56174. But beyond pointing to the same user guides and presentations as Malek, Krauss referenced only "functional walkthroughs," "e-mails," and "discussions," without explaining the content of those communications. Appx56174. His conclusory testimony was likewise insufficient. Where a plaintiff alleges that it "voluntarily shared" a document containing a trade secret, the plaintiff is "in the best position to demonstrate how and when its trade secret was conveyed." *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 50 (2d Cir. 2018). In such a case, a plaintiff must provide evidence to

show that it disclosed the secret to the defendant "with particularity." *Big Vision*, 1 F. Supp. 3d at 259. "[V]ague and indefinite" evidence is not enough. *Id.* at 257, 261. Here, Versata is best positioned to "demonstrate how and when its trade secret [combinations were] conveyed," *Next Commc'ns*, 758 F. App'x at 50, and its vague references to unspecified communications not in evidence are insufficient.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's exclusion of Versata's unjust-enrichment-damages model for trade-secret misappropriation and affirm the grant of JMOL on trade-secret damages and breach-of-contract damages. Should the Court reach Ford's conditional cross-appeal, it should reverse the denial of JMOL on trade-secret-misappropriation liability.

Respectfully submitted,

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth
William E. Havemann
Dana A. Raphael
Eric Roytman
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5886
jessica.ellsworth@hoganlovells.com

John S. LeRoy
Thomas A. Lewry
Christopher C. Smith
BROOKS KUSHMAN P.C.
1000 Town Center, 22nd Floor
Southfield, MI 48075
(248) 358-4400

*Counsel for Defendant-Cross-Appellant Ford Motor Company.*

June 20, 2024

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing with the United States Court of Appeals for the Federal Circuit through the CM/ECF system on June 28, 2024. All case participants are registered CM/ECF users, and the Notice of Docketing Activity generated by this filing constitutes service under Fed. Cir. R. 25(e)(1).

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

*Counsel for Defendant-Cross-Appellant Ford Motor Company*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. Cir. R. 28.1(b)(2). Excluding the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b), this brief contains 16,481 words.

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman, a proportionally-spaced font.

Dated: June 20, 2024

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

*Counsel for Defendant-Cross-Appellant Ford Motor Company*