**Nos. 24-1140, 24-1206, 24-1234**

---

**IN THE**

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

VERSATA SOFTWARE, INC., fka Trilogy Software, Inc.,
VERSATA DEVELOPMENT GROUP, INC., TRILOGY, INC.,
*Plaintiffs-Appellants*,

v.

FORD MOTOR COMPANY,
*Defendant-Cross-Appellant*.

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 2:15-cv-10628, Hon. Matthew F. Leitman

---

**RESPONSE AND REPLY BRIEF FOR PLAINTIFFS-APPELLANTS VERSATA SOFTWARE, INC., VERSATA DEVELOPMENT GROUP, INC., AND TRILOGY, INC.**

---

Dan K. Webb
Matthew R. Carter
Samuel Zuidema
Monica T. Kociolek
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600

Jeffrey A. Lamken
*Counsel of Record*
Michael Gregory Pattillo, Jr.
Jennifer Elizabeth Fischell
Lois Ahn*
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

*Counsel for Plaintiffs-Appellants Versata Software, Inc., Versata Development Group, Inc., and Trilogy, Inc.*

*(Additional Counsel Listed on Inside Cover)*

Jaye Quadrozzi
VARNUM LLP
480 Pierce Street, Suite 300
Birmingham, MI 48009
(248) 567-7836

Steven J. Mitby
MITBY PACHOLDER JOHNSON PLLC
1001 McKinney Street, Suite 925
Houston, TX 77002
(713) 234-1446

Eugene Alexis Sokoloff
Thomas P. Schubert
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
(312) 450-6700

Sharoon Saleem
JONES & SPROSS, PLLC
1605 Lakecliff Hills Lane, Suite 100
Austin, TX 78732
(713) 446-0217

** Admitted only in New York; practice limited to matters before federal courts and federal agencies*

*Counsel for Plaintiffs-Appellants Versata Software, Inc., Versata Development Group, Inc., and Trilogy, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................1

ARGUMENT ........................................................................................1

I. The District Court Abused Its Discretion by Precluding Versata from Seeking Unjust-Enrichment Damages ....................................................1

A. The District Court Erred in Holding That a Licensing History Forecloses Unjust-Enrichment Damages as a Matter of Law ..............2

B. The District Court Had No Discretion To Deny Versata Its Statutory Choice of Remedy ..................................................4

C. The Decision Below Defies the Purpose of Unjust-Enrichment Damages ..........................................................................8

D. The Error Entitles Versata to a New Damages Trial ............................9

E. The Court's Other Objections to Elson's Unjust-Enrichment Opinion Do Not Withstand Scrutiny ...............................................11

1. Malek's Report Shows That the Asserted Trade Secrets Were Entirely Responsible for Ford's Unjust Enrichment ..........................................................................11

2. Elson and Malek Properly Identified and Distinguished Between Various Components of the Asserted Secrets ...........13

3. Reliance on the Best Available Data Is Not Grounds for Exclusion ..........................................................................15

F. The District Court Abused Its Discretion by Limiting Versata's Reasonable-Royalty Theories ...................................................15

II. The District Court Erred in Negating the $22 Million Trade-Secret Damages Award ........................................................................19

III. The District Court Erred in Slashing the $82 Million Breach-of-Contract Award to $3 ... 24

A. The Verdict Reasonably Estimated Contract Damages ... 25

B. There Is No "Unfairness" That Could Justify Reducing the Award to $3 ... 29

IV. Any Issues Concerning Election of Remedies Should Be Left for Remand ... 31

CONCLUSION ... 31

RESPONSE TO CROSS-APPEAL ... 32

JURISDICTIONAL STATEMENT ON CROSS-APPEAL ... 33

STATEMENT OF THE ISSUES ON CROSS-APPEAL ... 33

STATEMENT ON CROSS-APPEAL ... 33

I. Trial Evidence ... 34

A. Versata Fully Discloses Its Trade Secrets to Ford—Subject to Confidentiality Restrictions ... 34

B. Ford's Use of Versata's Trade Secrets ... 37

II. Verdict and Post-Trial Proceedings ... 39

A. The Jury Instructions and Verdict ... 39

B. The District Court Finds Sufficient Evidence of Disclosure and Misappropriation ... 39

SUMMARY OF ARGUMENT ... 40

STANDARD OF REVIEW ... 42

ARGUMENT ... 42

I. Ford's "Conditional Cross-Appeal" Should Be Dismissed....................42

A. Ford's Conditional Cross-Appeal Is Improper Because It Attempts To Preserve Rather than Alter the Parties' Rights Under the Judgment....................42

B. Ford's Conditional Cross-Appeal Does Not Seek To Change the Legal Relationship Between the Parties....................45

II. Ford's "Conditional Cross-Appeal" Fails on the Merits....................50

A. The Jury Reasonably Found Ford Had "Knowledge" of Versata's Trade Secrets....................51

B. Ford's Efforts To Impose a Heightened "Knowledge" Requirement Are Unfounded....................53

1. The DTSA and MUTSA Do Not Require That Plaintiffs Disclose, or That Defendants Know, the Precise Definition of the Trade Secrets at the Time of Misappropriation....................53

2. There Is No Heightened Standard of Knowledge for "Combination" Trade Secrets....................57

C. Ford Is Not Entitled to JMOL Even Under Its Erroneous View of the Law....................61

CONCLUSION....................64

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. & Foreign Ins. Co. v. Bolt*,
106 F.3d 155 (6th Cir. 1997) ....................................................................30

*Aventis Pharma S.A. v. Hospira, Inc.*,
637 F.3d 1341 (Fed. Cir. 2011) ..............................................................*passim*

*Bailey v. Dart Container Corp. of Mich.*,
292 F.3d 1360 (Fed. Cir. 2002) ..............................................................*passim*

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*,
1 F. Supp. 3d 224 (S.D.N.Y. 2014) ...............................................58, 59, 60, 61

*C&F Packing Co. v. IBP, Inc.*,
224 F.3d 1296 (Fed. Cir. 2000) ..................................................................20

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*,
53 F.4th 368 (6th Cir. 2022) ..................................................................56, 57, 59

*Coleman v. Johnson*,
566 U.S. 650 (2012)..............................................................................19, 20

*Corl v. Huron Castings, Inc.*,
544 N.W.2d 278 (Mich. 1996)......................................................................26

*Digidyne Corp. v. Data Gen. Corp.*,
734 F.2d 1336 (9th Cir. 1984) ....................................................................11

*Doe v. Henry Ford Health Sys.*,
865 N.W.2d 915 (Mich. Ct. App. 2014)...................................................... 25

*Farmer v. Brennan*,
511 U.S. 825 (1994)....................................................................................52

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
7 F.4th 1320 (Fed. Cir. 2021) ................................................................21, 27

*Granite Mgmt. Corp. v. United States*,
416 F.3d 1373 (Fed. Cir. 2005) ...........................................................47, 48, 49

*In re Hanford Nuclear Rsrv. Litig.*,
292 F.3d 1124 (9th Cir. 2002) ....................................................................10

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*,
706 N.W.2d 843 (Mich. Ct. App. 2005)...........................................................28

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017)...........................................................................................55

*Heyman v. AR. Winarick, Inc.*,
325 F.2d 584 (2d Cir. 1963) ......................................................................59, 60

*Info-Hold, Inc. v. Muzak LLC*,
2013 WL 6008619 (S.D. Ohio Nov. 13, 2013) ..............................................23

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*,
912 F.3d 316 (6th Cir. 2018) ..........................................................................13

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
589 U.S. 178 (2020)....................................................................................51, 52

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020) ..........................................................................56

*Jahn v. Equine Servs., PSC*,
233 F.3d 382 (6th Cir. 2000) ..........................................................................15

*Jennings v. Stephens*,
574 U.S. 271 (2015)......................................................................43, 46, 49, 50

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .....................................................10, 11, 12, 13

*Marcatante v. City of Chicago*,
657 F.3d 433 (7th Cir. 2011) ..........................................................................49

*McNeil v. Cmty. Prob. Servs., LLC*,
945 F.3d 991 (6th Cir. 2019) ............................................................................4

*Mid-Michigan Comput. Sys., Inc. v. Marc Glassman, Inc.*,
416 F.3d 505 (6th Cir. 2005) ..............................................................5, 16, 18

*Muskegon Agency, Inc. v. Gen. Tel. Co. of Mich.*,
85 N.W.2d 170 (Mich. 1957)....................25, 26

*Next Commc'ns, Inc. v. Viber Media, Inc.*,
758 F. App'x 46 (2d Cir. 2018)....................60, 61

*Noble v. Brinker Int'l, Inc.*,
391 F.3d 715 (6th Cir. 2004)....................42

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
399 F. Supp. 2d 1064 (N.D. Cal. 2005)....................22, 23, 24

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
575 F.2d 1152 (6th Cir. 1978)....................9, 16, 19

*Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*,
35 F.3d 1226 (8th Cir. 1994)....................3, 7

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
849 F.3d 1360 (Fed. Cir. 2017)....................18

*Russello v. United States*,
464 U.S. 16 (1983)....................5

*Russo v. Ballard Med. Prods.*,
550 F.3d 1004 (10th Cir. 2008)....................*passim*

*Schulz v. Pa. R.R. Co.*,
350 U.S. 523 (1956)....................20

*Sharpe v. Sec'y of Health & Hum. Servs.*,
964 F.3d 1072 (Fed. Cir. 2020)....................50

*Shivers v. Schmiege*,
776 N.W.2d 669 (Mich. Ct. App. 2009)....................23

*Silvaco Data Sys. v. Intel Corp.*,
184 Cal. App. 4th 210 (2010)....................55

*Sit-Up Ltd. v. IAC/InterActiveCorp.*,
2008 WL 463884 (S.D.N.Y. Feb. 20, 2008)....................59

*Smith & Nephew, Inc. v. Arthrex, Inc.*,
355 F. App'x 384 (Fed. Cir. 2009) .......... 13

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
926 F.2d 1161 (Fed. Cir. 1991) .......... 22

*Taylor v. TECO Barge Line, Inc.*,
517 F.3d 372 (6th Cir. 2008) .......... 24

*Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
895 F.3d 1304 (Fed. Cir. 2018) .......... 7, 24

*Therasense, Inc. v. Becton, Dickinson & Co.*,
593 F.3d 1325 (Fed. Cir. 2010) .......... 46

*Thomas v. Hughes*,
27 F.4th 995 (5th Cir. 2022) .......... 3, 7

*Tisdale v. Fed. Express Corp.*,
415 F.3d 516 (6th Cir. 2005) .......... 20, 27, 42, 63

*TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*,
966 F.3d 46 (1st Cir. 2020) .......... 56

*TNS Media Rsch., LLC v. Tivo Rsch. & Analytics, Inc.*,
629 F. App'x 916 (Fed. Cir. 2015) .......... 23

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
374 F.3d 1151 (Fed. Cir. 2004) .......... *passim*

*UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
617 F. Supp. 2d 938 (N.D. Cal. 2007) .......... 57, 58, 62

*United States v. Am. Ry. Express Co.*,
265 U.S. 425 (1924) .......... 43, 49

*United States v. Cummings*,
858 F.3d 763 (2d Cir. 2017) .......... 21

*Univ. Comput. Co. v. Lykes-Youngstown Corp.*,
504 F.2d 518 (5th Cir. 1974) .......... 6

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
342 F.3d 1298 (Fed. Cir. 2003) ....................................................................7

*V&M Star Steel v. Centimark Corp.*,
678 F.3d 459 (6th Cir. 2012) ....................................................................3, 16

*Ventas, Inc. v. HCP, Inc.*,
647 F.3d 291 (6th Cir. 2011) ....................................................................20

*Versata Software, Inc. v. Internet Brands, Inc.*,
902 F. Supp. 2d 841 (E.D. Tex. 2012)....................................................11

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ..................................................................11

*Vitro Corp. of Am. v. Hall Chem. Co.*,
292 F.2d 678 (6th Cir. 1961) ....................................................................7

*Vojdani v. Pharmsan Labs, Inc.*,
741 F.3d 777 (7th Cir. 2013) ....................................................................28, 29

*Wheeler v. City of Lansing*,
660 F.3d 931 (6th Cir. 2011) ....................................................................46

## STATUTES AND RULES

18 U.S.C. § 1836(b)(3)(A)(ii)....................................................................5

18 U.S.C. § 1836(b)(3)(B)........................................................................4

18 U.S.C. § 1836(b)(3)(B)(ii)....................................................................6

18 U.S.C. § 1836(b)(3)(C)........................................................................9

18 U.S.C. § 1839(3)................................................................................54

18 U.S.C. § 1839(5)(B)............................................................................54

18 U.S.C. § 1839(5)(B)(i)........................................................................54

18 U.S.C. § 1839(5)(B)(ii)(II) ....................................................51, 54, 55, 56

18 U.S.C. § 1839(5)(B)(iii)........................................................................55

18 U.S.C. § 1839(5)(B)(iii)(I) .......... 55

18 U.S.C. § 1839(5)(B)(iii)(II) .......... 55

Mich. Comp. Laws § 445.1902(b)(i) .......... 54

Mich. Comp. Laws § 445.1902(b)(ii) .......... 54

Mich. Comp. Laws § 445.1902(b)(ii)(A) .......... 54

Mich. Comp. Laws § 445.1902(b)(ii)(B) .......... 51, 54, 55, 56

Mich. Comp. Laws § 445.1902(b)(ii)(C) .......... 55

Mich. Comp. Laws § 445.1902(d) .......... 55

Mich. Comp. Laws § 445.1903(2) .......... 5

Mich. Comp. Laws § 445.1904 .......... 4, 6

Mich. Comp. Laws § 445.1905 .......... 9

Fed. R. Civ. P. 50(a)(1) .......... 21

Fed. R. Evid. 702(a) .......... 22

**OTHER AUTHORITIES**

11 A.L.R. 4th (1982) .......... 8

2 Jager, *Trade Secrets Law* (2023 update) .......... 8

*Restatement (Third) of Restitution & Unjust Enrichment* (2011) .......... 8, 9

*Restatement (Third) of Unfair Competition* (1995) .......... 8, 56

Webster's Seventh New Collegiate Dictionary (1967) .......... 52

# INTRODUCTION

Time and again, the district court erected groundless barriers that prevented Versata from recovering damages for Ford's misappropriation of its trade secrets and breach of the parties' license agreement. Pre-trial, the court barred Versata from seeking unjust-enrichment damages—even though the trade-secrets statutes ***expressly*** authorize plaintiffs to do so. After limiting Versata to a reasonable-royalty damages model for trade-secret misappropriation, the court then precluded Versata from seeking compensation for the full value of the misappropriated trade secrets, contravening Sixth Circuit precedent. When Versata won at trial regardless, the court ignored the deferential JMOL standard to slash the jury's $82 million contract-damages award to $3, and to eliminate the $22 million trade-secret award entirely.

Ford does not defend the district court's rationales so much as it repeats them. The court's legal errors cannot be overlooked as putative exercises of "discretion."

# ARGUMENT

## I. THE DISTRICT COURT ABUSED ITS DISCRETION BY PRECLUDING VERSATA FROM SEEKING UNJUST-ENRICHMENT DAMAGES

Ford urges that, at "common law," courts decided which remedies a plaintiff may seek for trade-secret misappropriation. Ford.Br.26. No such common-law rule exists. Regardless, the ***statutes*** under which Versata brought suit give the "***plaintiff***" the "express choice of seeking unjust enrichment damages to remedy trade secret misappropriation." *Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1021 (10th Cir.

2008). The district court's legal error in barring Versata from pursuing unjust-enrichment damages alone warrants reversal and remand for a new trial on damages.

### A. The District Court Erred in Holding That a Licensing History Forecloses Unjust-Enrichment Damages as a Matter of Law

Despite Ford's effort to rationalize the district court's bar on unjust-enrichment damages as an exercise of "discretion," Ford.Br.26, the court disavowed having discretion: Whatever "flexibility . . . courts may otherwise have to eschew the reasonable royalty approach," it stated, "***simply does not apply***" where the parties have previously agreed on a license price. Appx27 (emphasis added). The court held that plaintiffs are limited to "the reasonable royalty method of calculating damages," as a matter of law, whenever the parties have a "licensing history." Appx27-28. The only appellate decision to address that question, *Russo*, held precisely the opposite. Versata.Br.27-28.

The defendant in *Russo*, like the district court here, urged "that unjust enrichment damages are inappropriate as a matter of law for the misappropriation of a trade secret where . . . the plaintiff was willing to license" it for a particular amount. 550 F.3d at 1020. The Tenth Circuit rejected that argument. *Id.* Uniform Trade Secrets Acts, the court explained, give the "***plaintiff***" the "***express choice*** of seeking unjust enrichment damages," ***regardless*** of the plaintiff's willingness to license their idea to the defendant. *Id.* at 1021 (emphasis added). The district court committed rever-

sable error in adopting a contrary rule here. *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 466 (6th Cir. 2012).

Ford protests that, "unlike here," the parties in *Russo* "never previously licensed the technology at issue." Ford.Br.32-33. But the parties ***had*** agreed on "a 3% royalty rate"; their deal collapsed for other reasons. 550 F.3d at 1008. *Russo* refused to limit damages to that agreed-upon rate, instead approving an unjust-enrichment award that put the plaintiff "in a much better position than if he had entered a licensing agreement." *Id.* at 1021. Ford suggests unjust enrichment was appropriate in *Russo* because the defendant's sales of its infringing product made damages easier to calculate. Ford.Br.33. But *Russo* rejected the argument that "unjust enrichment damages are appropriate only when" a defendant's profits from sales of a product can "serve as a proxy for the plaintiff's lost profit." 550 F.3d at 1021.

The authorities cited by the district court are unsupportive. Versata.Br.29-31. Ford concedes that those authorities, at most, "upheld" a party's use of a reasonable-royalty model based on licensing history; they did not compel that damages measure. Ford.Br.28. So too with Ford's additional authorities, *e.g.*, *Thomas v. Hughes*, 27 F.4th 995, 1009 (5th Cir. 2022), and *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1244 (8th Cir. 1994). None holds that unjust-enrichment damages are categorically unavailable where the parties have a licensing history.

Ford tries to recast the district court's decision as a case-specific determination that Versata's model was "'speculative'" or "'unreliable.'" Ford.Br.27-28, 30. That ignores the court's reasoning. In the court's view, ***any*** "alternative" to "the reasonable royalty approach" is speculative and unreliable compared to the purportedly "'exact measurement'" of damages a licensing history offers. Appx27. Ford does not, and cannot, defend that ruling.

### B. The District Court Had No Discretion To Deny Versata Its Statutory Choice of Remedy

As *Russo* held, Uniform Trade Secrets Acts, like the one at issue here, give the "plaintiff" the "express choice of seeking unjust enrichment damages." 550 F.3d at 1021. Courts are not "free to substitute [their] judgment for that" of the "legislature on this score." *Id.*

1. Ignoring *Russo*'s holding, Ford asserts that "the statutes" allow courts to overrule a plaintiff's choice of remedy. Ford.Br.32-33. As Ford concedes, however, the statutes authorize three damages theories—actual damages, unjust enrichment, and reasonable royalties. Ford.Br.26 (citing 18 U.S.C. § 1836(b)(3)(B); Mich. Comp. Laws § 445.1904). Ford insists that judges decide which of those remedies plaintiffs may pursue; Congress, it says, must speak "expressly" if it intends for "plaintiffs rather than courts to select the damages model." Ford.Br.31. That is upside down: The default rule is that "'the plaintiff is the master of the complaint' and free to choose between legal theories" it will pursue. *McNeil v. Cmty. Prob.*

*Servs., LLC*, 945 F.3d 991, 996 (6th Cir. 2019). Ford points to nothing in the DTSA or Michigan's UTSA that upends that rule. Quite the opposite: Where those statutes vest judges with discretion to "determine[ ]" issues, they say so expressly. 18 U.S.C. §1836(b)(3)(A)(ii) (authorizing injunctions "if determined appropriate by the court"); Mich. Comp. Laws §445.1903(2). By omitting a similar reference to judicial choice in the statutes' damages provisions, the legislatures left the choice of remedies to plaintiffs. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

Nor does "[p]recedent" give courts "'discretion'" to override a plaintiff's choice of remedy. Ford.Br.31. Ford cites no case holding that the DTSA or any state UTSA allows courts to decide which remedy the plaintiff must pursue. In the only case Ford cites involving statutory remedies, the plaintiff "proposed" a reasonable-royalty model, and the defendant "proposed" a lost-profits model. *Mid-Michigan Comput. Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 511 (6th Cir. 2005). The court did ***not*** choose between those measures. Rather, "consistent with" Ohio's UTSA, the court instructed the ***jury*** to "'determin[e] which method'" would "'fully compensate'" the plaintiff. *Id.* at 510. The Sixth Circuit affirmed. *Id.* at 511-13. Versata had the same right, "consistent with" the DTSA and MUTSA, to "propose" its choice of damages model and to let the jury decide whether it proved its entitlement to that relief.

Ford's argument that the statutes "do not ***mandate*** unjust-enrichment damages in all cases," Ford.Br.30, proves nothing. It is the plaintiff's choice whether to seek a reasonable royalty "in lieu of" unjust enrichment. 18 U.S.C. § 1836(b)(3)(B)(ii); Mich. Comp. Laws § 445.1904. Respecting that choice does not require courts to "abandon" their "gatekeeping role." Ford.Br.31. Courts may vet evidence and instruct juries on damages law. What courts may ***not*** do is foreclose a measure of damages authorized by statute by imposing their view of what is appropriate. *Russo*, 550 F.3d at 1021.

2. Ford urges that the DTSA and MUTSA implicitly incorporate a common-law rule that "[c]ourts," rather than plaintiffs, get to "select the damages model." Ford.Br.27, 33-34. Even if such a common-law rule existed—it does not—the DTSA and MUTSA take a different tack, giving the "plaintiff" the "express choice" of which statutorily authorized damages to pursue. *Russo*, 550 F.3d at 1021. Ford's plea that terms like "unjust enrichment" retain their common-law "'meaning[s],'" Ford.Br.33-34, is beside the point. The question is not the "meaning" of the term "unjust enrichment." It is whether the statute allows judges to override plaintiffs' choices among statutory remedies. It does not.

Nor do Ford's authorities support the common-law "rule" it urges. In *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974), "the ***parties*** . . . agree[d]" that "the 'reasonable royalty' standard" was "the appro-

priate standard" for damages. Ford's other cases involved courts, sitting in equity, acting as factfinders. Thus, in *University of Colorado Foundation, Inc. v. American Cyanamid Co.*, 342 F.3d 1298, 1311 (Fed. Cir. 2003), the court decided whether, "based on the evidence presented at trial," the plaintiff had proved "entitle[ment] to equitable relief on [its] unjust enrichment claim." The court in *Vitro Corp. of America v. Hall Chemical Co.*, 292 F.2d 678, 682-83 (6th Cir. 1961), adjudicated an "accounting"—equitable relief resolved by courts not juries. And *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics America, Inc.*, 895 F.3d 1304, 1319 (Fed. Cir. 2018), ruled that the plaintiff lacked a jury-trial right "for disgorgement"—another equitable remedy. Those cases have nothing to do with whether, in an unjust-enrichment ***damages*** case, the court can impose a reasonable-royalty measure instead. Appx29.[1]

Ford's other authorities (Br.27) do not help it either. The default rule under the Restatement is that a misappropriator is "liable for the pecuniary loss to the other

[1] Other cases are further afield. In *Thomas v. Hughes*, 27 F.4th 995, 1010 (5th Cir. 2022), an earlier jury had awarded reasonable royalties; the Fifth Circuit held it was not an abuse of discretion to instruct another jury, in a later suit, to base the award on the unpaid portion. And while *Pioneer Hi-Bred International v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226, 1244 (8th Cir. 1994), suggested that "reasonable royalty" damages are "most appropriate" where "the parties actually had or contemplated a royalty arrangement," damages there were tried to the court; both sides presented their preferred measures; and the court selected the "measure 'which affords the plaintiff the greatest recovery.'" Here, the court did the opposite, allowing only the lowest-recovery measures to reach the jury.

caused by the appropriation or for the actor's own pecuniary gain resulting from the appropriation, ***whichever is greater***." *Restatement (Third) of Unfair Competition* § 45 (1995) (emphasis added). Ford's 40-year-old case-law summary does not remotely imply that a reasonable-royalty measure is required whenever parties have a licensing history. *See* 11 A.L.R. 4th 12 § 2[a] (1982). And the trade-secrets treatise Ford quotes, for the proposition that an established royalty "may be" an appropriate measure, describes approaches ***expert witnesses*** might take. 2 Jager, *Trade Secrets Law* § 7:21 (2023 update).

### C. The Decision Below Defies the Purpose of Unjust-Enrichment Damages

Even if the district court had authority to deem unjust-enrichment damages inappropriate—it did not—its rationale was legally incorrect. The court thought unjust-enrichment damages were improper because they would give Versata more than it would have earned from licensing the software. Appx23. Attempting to defend that, Ford urges that courts have common-law authority to limit a plaintiff's recovery where "'it would be inequitable to award the plaintiff' a larger sum." Ford.Br.29, 34. As the Tenth Circuit has explained, "the problem with [that] argument" is that the "legislature has rejected it" in statutes like the DTSA and MUTSA. *Russo*, 550 F.3d at 1021.

Regardless, the common law envisions that a plaintiff may recover more than the "value of a license authorizing the defendant's conduct." *Restatement (Third) of*

*Restitution & Unjust Enrichment* § 3 cmt.c (2011). Indeed, courts and commentators recognize that limiting damages to an ordinary license price would "incentiv[ize]" misappropriation. *Id.*; *see Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978). Ford protests that the DTSA's provision for "double-damages," and the MUTSA's fee-shifting provision, are "sufficient" deterrents. Ford.Br.34-35. But those provisions apply only to "willful[ ] and malicious[ ]" conduct. 18 U.S.C. § 1836(b)(3)(C); Mich. Comp. Laws § 445.1905. They fail to address ordinary misappropriation.

### D. The Error Entitles Versata to a New Damages Trial

The district court's decision to preclude Versata from pursuing unjust-enrichment damages requires vacatur and remand. Versata.Br.33-34. Ford protests that the court also cited " 'independent grounds to support' " its exclusion of Elson's unjust-enrichment model. Ford.Br.35 (emphasis omitted) (quoting Appx30). But this Court need not address that theory because, absent the legal error, Versata could have and would have been given an opportunity to make any necessary corrections. Versata is entitled to be restored to the position it would have occupied but-for the court's legal error.

The record is clear. The court gave Elson an opportunity to file a supplemental report addressing supposed defects that are otherwise indistinguishable in connection with the ***reasonable-royalty*** theory, which Elson did. Versata.Br.33. The

only reason the court did not allow Elson to do so for unjust enrichment was its erroneous conclusion that unjust-enrichment damages are not available where the parties have a licensing history. Appx22, Appx94-95. Versata should be "allowed to supplement [its] expert reports" on remand to address any other criticisms. *In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1139 (9th Cir. 2002).

Ford asserts that Elson's supplemental report never addressed the purported alternate grounds for excluding his original report. Ford.Br.42-43. Ford is mistaken. Ford quotes language from the district court's discussion of Versata's motion to ***reconsider*** exclusion of Elson's ***first*** report. Appx83-84. That discussion faults "Versata's motion" to reconsider for failing to address alternative grounds for excluding that ***original*** report. Appx84. The court identified no such issues with the ***supplemental*** report. Instead, the court struck only those " 'scenarios' " that "related to the ***value to Ford*** of using the trade secrets to create its own automotive configuration software," based on its earlier decision confining Versata to damages "based solely on the parties' licensing history." Appx95 (emphasis added). Absent that erroneous ruling, Versata's right to file a supplemental report on unjust enrichment would have been clear. Versata.Br.33-34.

Ford insists that, in the event of remand, both liability and damages must be retried. Ford.Br.47. But where an error affects only damages, this Court routinely orders damages-only retrials. *See LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694

F.3d 51, 76-78 (Fed. Cir. 2012); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326-28 (Fed. Cir. 2014).

Ford invokes exceptions for cases where damages are so "'interwoven'" with liability that trying damages alone would create "'confusion and uncertainty,'" or where the prior "'verdict may represent a compromise among jurors' with different views on liability." Ford.Br.47. But Ford does not even try to show those standards are met here. Ford's "general assertion" that damages and liability must be retried together does not suffice. *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984).

### E. The Court's Other Objections to Elson's Unjust-Enrichment Opinion Do Not Withstand Scrutiny

#### 1. *Malek's Report Shows That the Asserted Trade Secrets Were Entirely Responsible for Ford's Unjust Enrichment*

Versata's expert, Elson, showed that each trade secret was "a condition precedent to achieving" the "benefits" Ford obtained from misappropriation. Appx9418. Ford's unjust enrichment was "therefore entirely attributable" to its misappropriation of those secrets. *Versata Software, Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841, 857 (E.D. Tex. 2012), *aff'd*, 550 F. App'x 897 (Fed. Cir. 2014); *see LaserDynamics*, 694 F.3d at 67-68; Versata.Br.36-38. The district court thus erred in faulting Elson for not "apportion[ing] damages" to each trade secret individually. Appx31.

Ford argues that it is not enough to show the secrets were necessary to "the broader technology." Ford.Br.38. But Versata showed more. Malek's technical analysis—incorporated in Elson's report—showed how ACM and MCA enabled the ***specific*** "functionality" that "motivate[d]" Ford to contract with Versata "in the first place," *LaserDynamics*, 694 F.3d at 68, supplying "the key elements" that made Versata's software "superior to" Ford's pre-existing systems, Appx11752(¶51). Ford's assertion that "nothing" in Malek's report supported that conclusion, Ford.Br.39, ignores Malek's extensive explanation of how the Grid, Buildability, and Workspaces, working together and with MCA as required, reduced Ford's costs, Versata.Br.4-8, 34-37, 38-40. Ford protests that Versata's evidence fell short of the necessary "'degree of proof.'" Ford.Br.38. But the question at the *Daubert* stage was not whether Versata ***proved*** unjust enrichment to the court. It was whether Versata was entitled to present evidence of Ford's unjust enrichment to a jury. Versata.Br.39-40.

Ford does no better by urging that certain passages concerning apportionment in Elson's supplemental report contradict Elson's first report. Ford.Br.39-40. Insofar as Elson's reports differed, that is because the supplemental report relied on a ***different apportionment***. Elson's original report did not quantify the savings attributable to Versata's other intellectual property because Malek demonstrated that the trade secrets "drove [Ford's] demand" for Versata's vehicle-configuration software.

*LaserDynamics*, 694 F.3d at 68. After the court rejected that conclusion, Elson prepared a supplemental report based on Krauss's alternative methodology. Appx91-92. That methodology attributed some of the software's value to non-trade-secret elements because the court ***required*** it. Appx93; Appx27848 (¶¶38-39). The comments Ford cites reflect Elson's compelled reliance on this new methodology. Where, as here, a party has made its position clear and lost, it does not waive appellate rights regarding its original position by making new arguments within the confines of the court's adverse ruling. *See Innovation Ventures, LLC v. Custom Nutrition Labs., LLC,* 912 F.3d 316, 340 (6th Cir. 2018); *Smith & Nephew, Inc. v. Arthrex, Inc.*, 355 F. App'x 384, 386 n.2 (Fed. Cir. 2009).

2. *Elson and Malek Properly Identified and Distinguished Between Various Components of the Asserted Secrets*

Ford errs in arguing that Versata "makes no effort to justify" Elson's purported "failure to apportion value among ***the asserted trade secrets themselves***." Ford.Br.40. Versata's opening brief addressed that point at length. Versata.Br.34-36. Insofar as Ford contends that Elson was required to apportion among "individual trade secrets" that make up the "***combinations*** [Versata] later adopted[,]" Ford.Br.40 (emphasis added), Ford's argument is waived. After the court excluded Elson's initial report, Versata submitted supplemental reports based on Krauss's apportionment, which allocated value to each of Versata's four secrets. Ford moved to exclude that analysis, arguing that the Grid, Buildability, Workspaces, and MCA were

merely "headings" under which Malek's report identified other individual trade secrets. Appx28287. The court agreed, excluding Krauss on that basis. On Versata's motion to reconsider, however, ***Ford*** "accept[ed]" Versata's position that the asserted secrets were the four "combinations of all the parts that are listed" in Malek's report. Appx55144(81:16-21). Based on that, the court held that Krauss's four-secret apportionment was admissible. Appx87-88. Ford cannot argue that the same four-secret analysis it "accept[ed]" justifies exclusion of Elson's opinion now.

Ford contends that Elson failed to "distinguish between" the ACM and MCA trade secrets and two related pieces of software—ACS and ACR—that Elson described as "Versata Technology." Ford.Br.41. As Versata explained, however, those programs only work when paired with ACM; neither could produce cost savings on its own. Versata.Br.37-38. Ford denies that the record supports that conclusion. Ford.Br.41. But Ford ignores Elson's description of ACS as a "'[r]untime service,'" Appx9353 n.22, which relies entirely on data from ACM, Appx11919-20(¶¶380-382); Versata.Br.38-39. And it overlooks Elson's definition of ACR as a mere tool to distribute information generated by ACM, rather than software with independent value. Appx9353 n.22.

Ford suggests that Elson was required to apportion between Versata's software and Ford's PDO, both described as "At-Issue Technology." Ford.Br.41. But it makes no sense to assign independent value to PDO, because PDO was a copy of

Versata's software. Versata.Br.38 n.5; Appx11753 (¶¶52, 54). Ford disputes that characterization. Ford.Br.41. But that is a jury argument, not a basis for excluding Elson's opinions.

#### 3. *Reliance on the Best Available Data Is Not Grounds for Exclusion*

Ford nowhere disputes that Elson relied on the best data available given Ford's poor record-keeping. Versata.Br.41-42. Ford says the data was incomplete. Ford.Br.41-42. But Ford does not address Sixth Circuit precedent holding that it is "'patently unfair'" to exclude an expert's testimony for relying on the defendant's own deficient data. Versata.Br.42 (quoting *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000)). Ford's authorities do not say otherwise.

Ford asserts that the data predates Versata's "defin[ition]" of the asserted secrets, but it never explains why that is relevant. Ford.Br.41. Elson relied on the 2003 document Ford cites only as one indication that "Ford, at least at one point, estimated that the At-Issue Technology was expected to result in significantly reduced warranty expenses." Appx9393. He never claimed that document alone established the trade secrets' value.

### F. The District Court Abused Its Discretion by Limiting Versata's Reasonable-Royalty Theories

Even as to the reasonable-royalty measure, the district court erred. Sixth Circuit law holds that reasonable-royalty damages must account for the "'value of

what the defendant wrongfully obtained.' " *Mid-Michigan*, 416 F.3d at 511. Where, as here, the defendant steals software trade secrets, that includes an "estimation of what [the defendant] would have paid in exchange for the right to rely on the [software's] protected contents to develop its [own] software." *Id.* The court nonetheless excluded Elson's second and third royalty scenarios ***because*** they included Elson's estimation of what Ford would have paid to "us[e] the trade secrets to create its own automotive configuration software." Appx95. It was error to exclude Elson for doing what Sixth Circuit law requires. Versata.Br.43-44.

Ford urges that Elson's royalty models "violated" a prior ruling barring Versata from " 'seek[ing] damages based upon the alleged value of benefits obtained by Ford through its use of the relevant software.' " Ford.Br.43-44 (quoting Appx29). Any such ruling itself defies Sixth Circuit precedent ***mandating*** that royalties account for the value the defendant obtained through misappropriation. *See Mid-Michigan*, 416 F.3d at 511; *Panduit*, 575 F.2d at 1158-59. Ford cannot defend the court's reliance on a legally erroneous prior ruling as an exercise of "discretion." Ford.Br.44; *V&M*, 678 F.3d at 466.

Ford protests that Elson's scenarios "would have doubled or tripled Versata's damages" compared to the price Ford would have paid to extend its prior license. Ford.Br.44. But Elson explained that a royalty limited to the prior license price would fail to account for the use Ford "***actually made***" of the misappropriated trade

secrets—creating PDO—which "exceeded restrictions contained in the historical licenses." Appx28311-12 (¶¶ 19, 21). Ford nowhere disputes that Versata "would reasonably have been expected to obtain a premium" for a license that ***allowed*** such use. Appx28357-58 (¶ 136).

Ford denies that its theft of Versata's trade secrets gave it " '***perpetual*** ownership' " of those secrets, claiming that "conflicts with" the notion that Ford could have developed PDO in 8.3 years without using the secrets. Ford.Br.44-45; Versata.Br.45. But even if Ford ***could*** have developed PDO without stealing Versata's trade secrets, the fact is it did ***not***. Ford's "use of PDO" is therefore nothing more than an extension of its "***unauthorized*** use of Versata's technology"—a use Ford can continue in perpetuity. Appx28355 (¶ 132).

Ford invokes the court's assertion—in the decision excluding Elson's ***unjust-enrichment*** report—that there was no "evidence" Ford's misappropriation violated the restrictions of its license " 'in a manner that has damaged Versata in any material way.' " Ford.Br.44 (quoting Appx28-29 & n.8). But the court never invoked that (defective) theory to exclude Elson's ***reasonable-royalty*** report. Regardless, the jury found that Versata proved that Ford breached the MSSA's restriction on reverse-engineering. Appx98, Appx121-22. And Elson supplied evidence that the right to reverse-engineer had enormous value. Appx28342-53 (¶¶ 100-124).

Ford argues that it would not have agreed to pay a premium for the right to copy Versata's software beyond the period it took Ford to develop PDO using Versata's trade secrets without permission—3.5 years. Ford.Br.45. But Elson testified that Ford would have been willing to pay up to the total costs Ford avoided by stealing Versata's software instead of developing PDO ***independently***. Versata.Br.44; Appx28358-59 (¶¶137-140). Because it would have taken Ford 8.3 years to develop PDO independently, those costs included 4.8 additional years of standard royalties Ford would have had to pay Versata to ensure continued access to Versata's software until PDO was ready. Appx28378-79 (¶¶195-196). And Ford would also have had 4.8 additional years' worth of "development costs"—paying engineers, programmers, etc.—needed to create PDO independently. Appx28378 (¶195). Stealing Versata's software allowed Ford to cut ***both*** types of costs. Elson thus properly considered both as part of the " 'value of what [Ford] wrongfully obtained' " to estimate what Ford would have paid in a hypothetical negotiation over an expanded license. *Mid-Michigan*, 416 F.3d at 511; *see Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017).

Finally, Ford argues there is no issue here because the court ultimately "keyed the royalty to $17 million, which was ***more than*** Ford was willing to pay" to renew the license. Ford.Br.46. How much Ford was willing to pay is an argument for the jury, not a defense of the court's legal ruling limiting Versata to damages "based

solely on the parties' licensing history." Appx95. Because the court erroneously required that a royalty be calculated under the "pretense that the infringement never happened," reversal is warranted. *Panduit*, 575 F.2d at 1158.

## II. THE DISTRICT COURT ERRED IN NEGATING THE $22 MILLION TRADE-SECRET DAMAGES AWARD

There was no dispute that Versata's ACM trade secrets had value—Ford paid $8.45 million to use them in the final year of its license. *See* Versata.Br.18. The jury awarded Versata $22 million for Ford's misappropriation of those secrets, less than half what Versata requested. Appx100-02. Yet the district court slashed even that to zero. The "deferential" JMOL standard "does not permit the type of fine-grained factual parsing in which the [court] engaged." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012); *see* Versata.Br.46-54. Ford fails to show otherwise.

A. Ford concedes the jury's damages award must be upheld if there is ***any*** "'***reasonable basis***'" for it in the record. Ford.Br.59. Ford further concedes that juries need not assess damages with "'mathematical precision.'" Ford.Br.59. Yet the court demanded precisely the mathematical precision the law eschews. The court held that Versata failed to prove "how long it would have taken Ford to develop less than all of Versata's trade secrets." Appx150. But there was ample evidence of that time period.

As Ford acknowledges, Versata's expert, Malek, showed it would have taken Ford 8.3 years to develop the ACM and MCA trade secrets together. Ford.Br.56.

As Ford likewise acknowledges, two lay witnesses, Little and Krauss, testified Versata took 1.5 to 3 years to develop MCA alone. Ford.Br.60. The jury could perform "'simple arithmetic,'" subtracting an estimated time for MCA (1.5-3 years) from the combined ACM-and-MCA time period (8.3 years), to yield the time required to develop ACM. *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 328 (6th Cir. 2011); Versata.Br.49-50. The jury is allowed to make such "reasonabl[e] extrapola-tion[s]." *C&F Packing Co. v. IBP, Inc.*, 224 F.3d 1296, 1304 (Fed. Cir. 2000). Viewed "'in the light most favorable to'" Versata, there was ample evidence from which the jury could have approximated Ford's development time for the ACM trade secrets. *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005).

B. Ford urges that "testimony about ***Versata's*** development time does not map onto Versata's damages model, which was based on ***Ford's*** development time." Ford.Br.61. But the jury could "fairly" "infer[]" that Ford's development time would have been similar. *Schulz v. Pa. R.R. Co.*, 350 U.S. 523, 526 (1956). Ford cast itself as Versata's equal, employing thousands of software developers, Appx56738(8:17-23), managing sophisticated "computer systems," Appx57015 (154:1-22), and "innovat[ing]" with a "team of Ford engineers" to assemble PDO's "modern architecture," Appx57012(143:7-145:1). It was within the jury's "broad discretion" to conclude from that, and from other evidence, that Ford and Versata had similar development capabilities. *Coleman*, 566 U.S. at 655; Versata.Br.49.

While Ford urges that Versata "never presented" the evidence of Versata's development time for ACM as "bearing on damages," Ford.Br.60, juries can consider evidence "for any purpose." *United States v. Cummings*, 858 F.3d 763, 777 (2d Cir. 2017). JMOL turns on whether there is "a legally sufficient evidentiary basis," Fed. R. Civ. P. 50(a)(1)—not on the content of lawyer arguments.

Besides, if Ford were able to develop its MCA copy ***faster*** than Versata created MCA, as the district court speculated, that would have increased damages, increasing the portion of Malek's 8.3 years attributable to the misappropriated ACM trade secrets. *See* Versata.Br.52. Ford does not contend otherwise. It is hard to justify eliminating the jury's damages award based on a theory that, if correct, shows Versata should have been awarded greater damages.

Ford invokes statements Malek made "***before*** trial" about Versata's software-development capabilities as undermining Versata's arguments. Ford.Br.61. But courts "review the jury's verdict for substantial evidence based upon the record" at trial—what the jury saw. *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1336 (Fed. Cir. 2021). Ford "cannot hunt outside the record to find evidence to try to contradict the verdict." *Id.*

C. Ford errs in arguing that "revising Malek's analysis" to determine the development time for ACM alone "required expert testimony." Ford.Br.60-61. Juries may deviate from experts' bottom-line opinions "as a matter of [their] judgment

from ***all*** of the evidence." *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991) (emphasis added); Versata.Br.49-50. The jury was properly instructed that it was not "limited to" the experts' "opinions" and that it was "entitled to consider any other evidence that you believe is relevant." Appx67360. Ford cannot claim that subtracting Versata's development time for MCA from Malek's 8.3-year period requires an expert's "specialized knowledge." *See* Fed. R. Evid. 702(a).

Nor is Ford correct to suggest that, because Malek's model "estimated development time using lines of code and other input parameters," the jury could not apportion the development time for the ACM trade secrets unless it had "evidence allocating those lines of code and parameters between the different trade secrets." Ford.Br.62. Malek's ***conclusion*** was expressed in years—8.3. A jury could take that conclusion and adjust it, using lay evidence and basic math, without wading into Malek's methodology.

Ford's cases (Br.61) do not suggest otherwise. In *O2 Micro International Ltd. v. Monolithic Power Systems, Inc.*, 399 F. Supp. 2d 1064, 1076 (N.D. Cal. 2005), the plaintiff's expert presented damages for misappropriation of multiple trade secrets, but the jury found misappropriation of only one. The plaintiff tried to defend the damages award on the theory that the jury "could have relied on" lay-witness testimony "to determine that the value of Trade Secret 1 was seventy-five percent of

the value of all asserted trade secrets." *Id.* The court rejected that argument, not because the lay witness failed to replicate the expert's methodology, but because the witness "did not" actually "state that Trade Secret 1 is worth seventy-five to ninety percent of monetary value of all the trade secrets, nor can that be inferred from his testimony." *Id.* at 1077. Here, Ford does not dispute the content of Little and Krauss's testimony about Versata's development time for MCA, and the jury could reasonably infer Ford's development time would have been similar.

Ford cites *Info-Hold, Inc. v. Muzak LLC*, 2013 WL 6008619, at *2 & n.2 (S.D. Ohio Nov. 13, 2013), for the proposition that "lay witness testimony would not be admissible to show reasonable royalty damages." Ford.Br.61. But Little and Krauss's development-time testimony is not expert opinion on reasonable-royalty damages. They addressed a historical fact—how long it took Versata to develop MCA—the jury could consider when deciding Ford's development time for the ACM trade secrets. The law permits such "lay witness testimony . . . to support" damages claims. *TNS Media Rsch., LLC v. Tivo Rsch. & Analytics, Inc.*, 629 F. App'x 916, 935 (Fed. Cir. 2015).

D. That Versata's expert "could have conducted" an apportionment of development time, Ford.Br.60, is irrelevant. As Ford concedes, JMOL is appropriate only where there is "'***no evidence*** from which the jury could calculate'" damages. Ford.Br.64 (emphasis added) (quoting *Shivers v. Schmiege*, 776 N.W.2d 669, 675-

76 (Mich. Ct. App. 2009)). Ford cites cases granting JMOL or vacatur (Br.57) where there literally was ***no*** evidence the jury could use to apportion damages among trade secrets. *See Tex. Advanced*, 895 F.3d at 1317 ("On this record, we have no basis to conclude that the remaining ground for liability . . . supports the entire award."); *O2 Micro*, 399 F. Supp. 2d at 1076-77 (no evidence to support award where witness's testimony "did not" assign "monetary value" to misappropriated trade secret). Not so here. Because the jury's award falls "within the range of proof" encompassed by the record, it should be reinstated. *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 387 (6th Cir. 2008).

## III. THE DISTRICT COURT ERRED IN SLASHING THE $82 MILLION BREACH-OF-CONTRACT AWARD TO $3

The district court agreed that Versata "show[ed] that Ford's breaches" of the MSSA caused Versata "to suffer damages." Appx122. Apparently crediting evidence that Versata lost at least $14.95 million in licensing revenue annually, the jury awarded Versata $82 million in breach-of-contract damages. Appx98-99; Versata.Br.55-57. The court slashed that to $3, Appx154, because it thought the jury's award might "overcompensate" Versata, Appx128-29 & n.4. Contract damages, however, need only represent a "'reasonable estimate'" of injury, excluding "'saving[s]'" from costs avoided by the breach. Versata.Br.55. The evidence here met that standard. Versata.Br.55-57. The "slight risk of giving somewhat more than actual compensation" cannot justify precluding an award of damages "actually sus-

tained." *Muskegon Agency, Inc. v. Gen. Tel. Co. of Mich.*, 85 N.W.2d 170, 174 (Mich. 1957).

### A. The Verdict Reasonably Estimated Contract Damages

The parties agree that breach-of-contract damages must place Versata in as good a position as if Ford had performed under a renewed MSSA. The parties also agree that the measure of those contract damages is the contract price, less Versata's savings from not having to perform. *Compare* Versata.Br.55, *with* Ford.Br.48. There was ample evidence to support both components—and a resulting award that reflects Versata's damages with "reasonable certainty." *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 922 (Mich. Ct. App. 2014).

1. Unrebutted testimony showed that $10.95 million of the parties' annual license arrangement was for a " 'base' " license that would have allowed Ford to use Versata's software " '***without***' " support services from Versata. Versata.Br.56-57. It is undisputed that Ford was paying $14.95 million for a license ***with*** those services. Versata.Br.55-57. The jury was entitled to infer that the $4-million difference between those amounts reasonably reflected the costs Versata saved when Ford breached. Versata.Br.55-62; Appx57008(126:13-127:3). Indeed, the jury's award maps almost ***precisely*** to the $10.95-million-per-year base-license figure. Versata.Br.57.

2. Ford urges that the $10.95 million base-license figure is " 'a gross revenue number,' " Ford.Br.49 (quoting Appx127), " 'what ***Ford would have paid*** for

the renewed [base] MSSA,'" Ford.Br.52 (quoting Versata.Br.55-56). That makes no difference. $10.95 million is what Ford was paying (and would have paid) for a bare license that costs Versata ***nothing*** to perform—Versata had already developed the software, and no support services were included. Versata.Br.56-57. Even if $10.95 million was Versata's "gross revenue" on that naked license, it was also Versata's "net-profit," Ford.Br.52, or near enough to meet the deferential standard for damages awards, *see Muskegon*, 85 N.W.2d at 174; *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278, 280 (Mich. 1996). Ford cannot show that the jury was required to find otherwise.

Ford urges that "Versata does not dispute the base license 'require[d] Versata to provide some level of technical support[.]'" Ford.Br.53. Versata ***does*** dispute that. Its opening brief cited evidence showing the jury had "good reason" to find Versata would have had no material support obligations or costs under the base license. Versata.Br.60. There was testimony that the "base license fee" gave Ford the right to use Versata's software, "without any of the support or services or extra extras" Versata otherwise would have provided. Appx56576(12:8-13:20). Ford's ***own expert*** testified the $10.95 million base "takes out . . . services and support and maintenance." Appx56805(96:23-97:4).[2]

[2] Versata never "withdrew" a "request to 'present lay witness testimony' regarding 'Versata's expenses.'" Ford.Br.52 (citing Appx40561-64; Appx41251-56;

Ford responds that Versata "'hired expensive software engineers and costs go up every year.'" Ford.Br.54 (quoting Appx56493). But Versata needs no engineers for a license that requires no support. Ford cites the ***district court's*** statement that Versata's obligations under the base license "'cannot be dismissed as a mere *de minimis* expense because Ford presented evidence at trial that it experienced frequent errors while using Versata's software.'" Ford.Br.54 (quoting Appx128). But that vague assertion hardly shows Versata would have been obligated to provide fixes, or that it would incur non-*de minimis* costs doing so. "'[V]iewing the evidence in the light most favorable to'" Versata, a reasonable jury could conclude that Versata did not have materially significant support obligations under the base license. *Tisdale*, 415 F.3d at 527.

Without support in the trial record, Ford looks beyond it, invoking the McMahon report the court excluded before trial. Ford.Br.54. But documents outside the trial record ***cannot*** be used to "contradict the verdict." *GlaxoSmithKline*, 7 F.4th at 1336. Regardless, McMahon's report offers no support for Ford's support-costs theory. It assumed that the full contract would continue, ***including*** full-service support that was ***excluded*** from the base-license figure (as the trial evidence showed). Versata.Br.61-62. Ford offers no response.

---

Appx55710). Versata merely "withdrew" a request for clarification of the ruling excluding McMahon's testimony. Appx40561-64.

Ford urges that the extra $4 million "***Ford paid***" under the prior license for services is not a "measure[ ] of ***Versata's costs to perform***." Ford.Br.53. Ford is correct that the $4 million was not just the cost "for 'extra services,'" Ford.Br.53—it also included Versata's profits on such services, Versata.Br.58-59. That at most shows Versata might have been entitled to recover ***more***. Insofar as the $4-million figure overestimates Versata's costs, subtracting that from the $14.95 million Ford paid for a full-service license artificially ***reduces*** Versata's damages. That the jury might have given Versata too ***little*** in damages is no grounds for reducing Versata's award to nothing.

3. Ford insists "Versata ***never*** told the jury to deduct costs," and so "cannot defend the verdict on the theory that the jury may have done so." Ford.Br.52-53. Versata's counsel, however, clearly told the jury that "tak[ing] out" or "strip[ping] out" payments for support and maintenance would bring the $14.95-million figure "down to 10.95" million. Appx57008(126:21-127:3); *cf.* Appx56620-21 (11:22-23, 16:12-17:1). Whether Versata "told the jury to deduct costs" ***as such*** is irrelevant. The question is whether "a reasonable ***basis*** for computation ***exists***." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 852 (Mich. Ct. App. 2005) (emphasis added). As explained above, it does.

Ford cites *Vojdani v. Pharmsan Labs, Inc.*, 741 F.3d 777 (7th Cir. 2013), Ford.Br.53, 55, but that case proves Versata's point. There, the Seventh Circuit

explained that, when assessing JMOL on damages, the "decisive issue . . . is whether the jury could have applied the instructions it received to the evidence in the record" and reached the verdict it did. 741 F.3d at 785. It did not say JMOL turns on ***how*** the evidence was presented to the jury. Here, the jury could have reached its verdict by considering the evidence and applying the court's instructions to "put [Versata] in as good a position as it would have been in had the contract been fully performed." Appx56984(31:22-32:5).

### B. There Is No "Unfairness" That Could Justify Reducing the Award to $3

The district court stated, in a sentence, that "it would be unfairly prejudicial to Ford to uphold the contract damages award on [a lost-profits] basis" because Versata "never disclosed" such a "theory of contract damages during discovery." Appx130-31. Versata explained why that is not so. Versata.Br.64-66. Ford lacks real answers.

1. Despite the court attaching a "lost profits" moniker to Versata's evidence, Versata presented a run-of-the-mill, benefit-of-the-bargain theory—as the parties' briefing here attests and as the jury instructions required. *See* Ford.Br.48; Versata.Br.55, 65; Appx56984(31:22-32:5); *but see* Ford.Br.51 (incorrectly asserting Versata conceded this is a "lost-profits" theory). Before trial, Ford was aware of the straightforward theory the jury apparently accepted—that, of the $14.95 million Ford paid Versata in 2014, $10.95 million was attributable to a base license and

$4 million compensated for support-and-services costs. *See* Versata.Br.56-57. ***Ford itself*** presented that breakdown to the jury. *See* Appx56805 (96:14-97:4).

Ford cannot identify any resulting "unfairness." Ford quotes itself as having told the court that its "'whole pretrial prep would have been very different' had Versata timely disclosed" such a theory sooner. Ford.Br.51 (quoting Appx57137 (21:24-25)). But Ford made that statement in urging the court to preclude Versata from presenting a "reasonable royalty" theory—not its benefit-of-the-bargain damages theory. Appx57137-38 (21:24-22:13). Regardless, Ford offers no reason to believe additional discovery would have unearthed costs exceeding $4 million annually, let alone the $82,259,997 the court stripped from the verdict.

Nor can Ford show it raised "unfairness" as grounds for JMOL under Rule 50(a) or 50(b). Versata.Br.65. Ford's JMOL motions argued that Versata failed to ***prove*** lost-profits damages, not that Ford was ***prejudiced*** by Versata's benefit-of-the-bargain theory. Appx41840-44; Appx41956-69; Appx42054-61; Appx56619-22 (6:23-18:5). It was improper for the court "to *sua sponte* raise" that ground for granting JMOL. *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159 (6th Cir. 1997).

2. Ford pivots, arguing that the court issued a "pretrial discovery sanction" that categorically "barred Versata from attempting at trial to 'back out costs and expenses.'" Ford.Br.49 (quoting Appx55673). That is wrong. The court did not ban all "evidence of [Versata's] costs." Ford.Br.50-51. It merely "exclude[d] the

reply opinions on lost profits damages" from Versata's expert, McMahon. Appx55675; *see* Appx39893, Appx39915. Versata's benefit-of-the-bargain theory does not rest on that report. Versata thus was not required to "challenge" the exclusion of McMahon's report on appeal. Ford.Br.51.

## IV. ANY ISSUES CONCERNING ELECTION OF REMEDIES SHOULD BE LEFT FOR REMAND

Ford urges that, in the event of remand, Versata must "make an election of damages remedy" between the jury's breach-of-contract and trade-secret-misappropriation awards. Appx41871. The district court never decided that issue. Appx154. Versata agrees that any election-of-remedies issues must be decided on remand in the first instance. Ford.Br.65.

## CONCLUSION

The district court's exclusion of Versata's unjust-enrichment damages theory for trade-secret misappropriation should be reversed, and the case remanded for the submission of supplemental expert reports and a new trial on trade-secret damages. Alternatively, the jury's trade-secret and breach-of-contract damages awards should be reinstated.

## RESPONSE TO CROSS-APPEAL

This Court's precedent prohibits so-called "conditional" cross-appeals like Ford's. Ford's cross-appeal does not seek to reverse the district court's judgment on Versata's trade-secret claims, which requires Ford to pay nothing for its misappropriation. Ford instead seeks to preserve that judgment, so it still pays Versata nothing. Because Ford does not seek to change the result but to preserve it, Ford was required to present its arguments as "alternative grounds for affirming," within the confines of its "responsive briefing." *Aventis Pharma S.A. v. Hospira, Inc.*, 637 F.3d 1341, 1343 (Fed. Cir. 2011). Ford was "not free . . . to game the system by filing a cross-appeal," *id.*, thereby taking for itself an additional 9,500 words and "an unfair opportunity to file the final brief and have the final oral argument," *Bailey v. Dart Container Corp. of Mich.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002). Ford's conditional cross-appeal should be dismissed.

Ford's cross-appeal lacks merit regardless. Ford urges that Versata did not prove trade-secret misappropriation because Versata, when it disclosed its ACM trade secrets to Ford, never "specifically identified" their "precise combination"—*i.e.*, they were not presented as ***combination trade secrets*** to Ford. Ford.Br.68. That fails as a matter of law. Neither the DTSA nor MUTSA impose such a requirement on trade-secret plaintiffs. But Ford's sufficiency-of-the-evidence challenge fails even under its own view of the law. The district court correctly held that a reasonable

jury could conclude "that Versata disclosed the combination trade secrets to Ford." Appx134.

## JURISDICTIONAL STATEMENT ON CROSS-APPEAL

This court lacks jurisdiction over Ford's conditional cross-appeal because Ford was not "adversely affected by" the judgment on Versata's trade-secret-misappropriation claims. *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1156 (Fed. Cir. 2004).

## STATEMENT OF THE ISSUES ON CROSS-APPEAL

1. Whether Ford's conditional cross-appeal on Versata's trade-secret-misappropriation claims should be dismissed because Ford does not seek to expand its own rights or lessen Versata's under the judgment.

2. Whether a reasonable juror could conclude that Versata proved Ford had "knowledge" of Versata's asserted trade secrets.

## STATEMENT ON CROSS-APPEAL

Versata's opening brief describes Versata's trade secrets, the parties' contract, and the case's procedural history. Versata.Br.4-22. This statement addresses only facts relevant to Ford's "conditional cross-appeal" on trade-secret liability.

# I. TRIAL EVIDENCE

## A. Versata Fully Discloses Its Trade Secrets to Ford—Subject to Confidentiality Restrictions

For more than a decade, Ford licensed Versata's ACM software and received information about its technical details in myriad forms, including copies of the software itself, "manuals, . . . technical documentation, . . . functional walkthroughs, launch acceptance documents, system requirement specifications," and "presentations." Appx56174(103:23-104:17); Appx56329(54:3-16); Appx67504. Because Versata was entrusting Ford with core confidential information, the parties' Master Subscription and Services Agreement contained critical protections for Versata's trade secrets. Appx55865(106:11-108:11); Appx55866(110:4-112:1); *see* Appx56090-91(121:11-122:12); Appx56328-29(52:23-54:2).

The MSSA prohibited Ford from copying or disclosing Versata's "confidential information." Appx55865(106:11-108:11). The MSSA also prohibited Ford from "reverse engineer[ing] the Software or confidential information." Appx55866(110:4-112:1). The contract made clear that Ford had "no ownership interest" in Versata's "Software" or "Deliverables"—including any "trade secret" therein. Appx55863-64(101:24-102:23); Appx55864-65(105:11-106:10).

When working with Ford, Versata adhered to a "culture" of confidentiality. Appx56085-86(101:19-102:8); *see* Appx56086-87(103:8-106:5); Appx56088-89 (113:20-114:5); Appx56090(118:22-120:8). Versata "did all [it] could" to mark its

trade-secret information as confidential. Appx56328-29(52:23-54:2). That included communications with Ford in which Versata disclosed technical details about the three combination trade secrets embedded within its ACM software: Grid, Buildability, and Workspaces.

Various witnesses at trial explained how and under what circumstances Versata communicated details about the ACM trade secrets to Ford. Longtime Versata employee Pat Nichols guided the jury through a "[f]unctional [w]alkthrough" document he had sent to Ford that illustrated Grid, Buildability, and Workspaces. Appx56012-19(118:11-125:8); Appx84013-62. Seth Krauss identified 27 documents in which Versata disclosed "the [three] combination trade secrets and all of their elements" to Ford. Appx56174-75(105:19-109:18); Appx67480. Versata's technical expert, Sam Malek, agreed Versata disclosed "each of its [three] trade secrets in detail" in documents sent to Ford. Appx56328(51:24-52:22); Appx67502. Malek and Krauss offered additional details regarding each combination secret's disclosure:

**Grid**. Malek explained that Versata disclosed "the entire Grid, as well as every element of the Grid," through "user guides," "manuals," "presentations," and the "software" itself. Appx56367(30:15-31:9); *see* Appx67566. He identified disclosures of each Grid component, including "dynamic grid," "rule splaying," and more. Appx56337(88:19-25); Appx56365(22:22-23:18); *see* Appx56363(16:18-

17:23), Appx67540; Appx56365-66 (25:8-27:19), Appx67557; Appx56366-67 (29:4-30:3). Krauss discussed a "design document" reflecting key Grid features and an "engineering user guide" reflecting ACM's proprietary features. Appx56167 (74:2-25); Appx56175-76 (109:19-110:17); *see* Appx78066-71.

**Buildability**. Malek explained that Versata disclosed "every element of . . . Buildability" and "all of Buildability" to Ford through "user guides" and "presentations." Appx56377 (71:5-72:3); *see* Appx56367 (32:11-23); Appx67632. He identified disclosures of each Buildability component, including "minimized tries," "filtering nonbuildable rules," and more. Appx56369 (38:22-40:19); Appx56372 (52:24-53:16); *see* Appx56371 (47:19-48:10); Appx56373 (57:3-15); Appx56375 (62:3-63:8); Appx56376 (68:24-69:8). Krauss added testimony about a Versata presentation disclosing key Buildability features to Ford. Appx56170-71 (86:20-91:5); *see* Appx80095-143.

**Workspaces**. Malek testified that Versata "disclosed Workspaces and the elements of Workspaces" to Ford, including through "user guides" and "the software[ ] itself." Appx56383 (94:2-23); *see* Appx56378 (74:22-75:3); Appx67670. He identified disclosures of each Workspaces component, including "workspaces," "views," and more. Appx56379 (78:21-80:2); Appx56380-81 (85:8-86:20); *see* Appx56382 (91:6-19). Krauss also discussed a "design document" and an "engineering user guide" that Ford received reflecting key Workspaces features.

Appx56167 (74:2-8, 75:20-76:4); Appx56175-76 (109:19-110:4, 110:18-24); *see* Appx78066-71.

### B. Ford's Use of Versata's Trade Secrets

The jury also heard evidence that, years into the parties' relationship, Ford began "secretly" developing its "like-for-like" replacement of ACM, known as PDO. Appx56332 (69:1-9); Appx56277 (102:6-17); Appx56278 (107:12-108:12); Appx87619; *see* Appx56758 (88:9-89:10). While the MSSA prohibited Ford from copying Versata's "confidential information," Appx55865 (106:11-108:11), or "reverse engineer[ing] the Software or confidential information," Appx55866 (110:4-112:1), Ford had no internal "policy" against "us[ing] Versata's confidential information" when building PDO, Appx87549-50; Appx87600; Appx87618; *see* Appx56277-78 (104:5-107:8); Appx56279-80 (111:2-114:25, 116:1-117:12); Appx87518-19; Appx87571. Some PDO developers, Ford's witness conceded, "had access to ACM." Appx56901-02 (124:20-126:2, 127:2-24). Indeed, evidence showed at least 21 PDO developers "had access to Versata's confidential information about ACM," and 33 had ACM software code files ***on their computers***. Appx56329-30 (54:17-61:22); *see* Appx56647-49 (120:3-126:11).

Malek explained at trial, moreover, that Ford developers used Versata's software code files to ensure "the output from PDO matches the output from ACM"—"classic[]" reverse-engineering. Appx56331 (62:15-64:4). And Malek's

analysis revealed that Ford "cop[ied]" each of Versata's combination trade secrets into PDO: Ford "cop[ied] the entire Grid," "cop[ied] Versata's entire Buildability trade secret," and "use[d] and cop[ied] the entire Versata Workspaces trade secret." Appx56367 (30:15-31:12); Appx56377 (71:5-72:7); Appx56383 (94:2-95:1).

Ford thereby achieved the "like for like" copy it had set out to create. Malek explained that ACM's "grid" interface (the Grid combination secret) and Ford's PDO "Rule Authoring Table" were "striking[ly] similar[]"; indeed, in the PDO source code, Ford's "Rule Authoring Table" was called the "Grid." Appx56339-40 (94:3-100:14). Among "thousands of possible" data structures, Malek continued, Ford chose one "functionally the same" as Versata's "minimized Trie," a "tree-based data structure" used to organize information about rule compatibility that is a core feature of Buildability. Appx56368-70 (36:5-44:21). And he noted that Ford's "sandboxes," which were analogous to Versata's "Workspaces," had "views" just like Versata's, among other proprietary similarities. Appx56379-80 (81:4-84:3); Appx56381 (86:24-89:12). Examples of Ford's copying abounded for each trade secret.[3]

---

[3] *See* Appx56363-64 (17:24-21:6), Appx56365 (23:19-25:7), Appx56366 (27:20-28:11), Appx56367 (30:4-14) (Grid); Appx56371-72 (48:11-50:2), Appx56372-73 (53:17-54:22), Appx56374 (59:19-61:2), Appx56375-76 (63:9-66:16), Appx56376-77 (69:9-70:20) (Buildability); Appx56382-83 (91:20-94:1) (Workspaces); *see also* Appx56911-15 (165:24-167:14, 172:3-181:20).

## II. Verdict And Post-Trial Proceedings

### A. The Jury Instructions and Verdict

The court instructed the jury that, to find Ford liable for misappropriation, it must find "Versata sufficiently disclosed each of its alleged combination trade secrets to Ford such that Ford had knowledge of each trade secret under the totality of the circumstances." Appx56985-86 (37:23-38:1). To make that determination, the jury could consider "all of Versata's relevant disclosures and the circumstances under which they were made." Appx56986 (38:1-5).

The jury found that Ford misappropriated the three ACM trade secrets (Grid, Buildability, and Workspaces), Appx100-02, but rejected the trade-secret misappropriation claim for the separate MCA trade secrets, Appx103-04; Appx108-09. The jury awarded $22,386,000 in trade-secret damages. Appx100-03.

### B. The District Court Finds Sufficient Evidence of Disclosure and Misappropriation

On JMOL, the district court upheld the jury's finding that Ford misappropriated Versata's trade secrets. Appx132-43. The court rejected Ford's argument that Versata failed to prove valid "combination" trade secrets. Appx135-39. And it rejected Ford's argument that Versata failed to prove Ford " 'misappropriated every element' " of Grid and Buildability. Appx139-43.

As relevant to Ford's "conditional cross-appeal," the court also concluded that "the evidence, taken in the light most favorable to Versata, was sufficient to support

a finding that Versata disclosed the combination trade secrets to Ford." Appx134. Malek, for example, had "repeatedly testified at trial that Versata disclosed the trade secrets ***as combinations*** to Ford through its user guides and presentations to Ford." Appx134-35. And Krauss testified about other communications, such as documents and presentations, through which Versata disclosed its combination trade secrets. Appx135. Accordingly, "the jury reasonably could have concluded that Versata disclosed the combination trade secrets to Ford in a manner that Ford, through its technically-proficient employees, would have been able to understand." Appx135.

The court, however, granted Ford JMOL on damages, concluding that Versata failed to prove precisely the amount of damages attributable to the misappropriated ACM trade secrets. Appx143-44. The court's final judgment thus ordered that "Versata shall recover from Ford $0 in damages" for "its claims for misappropriation of the Grid, Buildability, and Workspaces combination trade secrets." Appx160.

## SUMMARY OF ARGUMENT

**I.** This Court's precedent is clear: Cross-appeals are appropriate only if the cross-appellant is aggrieved by the judgment and seeks to enlarge its rights or lessen its adversary's. Ford's so-called conditional cross-appeal does not meet that standard. It seeks to preserve, rather than to change, the district court's $0 trade-secret judgment. Such arguments can only be raised as alternative grounds for

affirmance, within the space limitations of the party's responsive brief. Ford's conditional cross-appeal should be dismissed.

**II.A-B.** Ford's cross-appeal is meritless regardless. It narrowly challenges the sufficiency of the evidence on one issue: whether Ford had "knowledge of the trade secrets" at issue in Versata's misappropriation claims under the DTSA and MUTSA. But the evidence showed that Versata disclosed its trade-secret information to Ford, that Ford knew the information was secret, and that Ford used and copied each trade secret to develop PDO, Ford's like-for-like replacement of ACM. That was more than sufficient.

Ford urges that Versata needed to notify Ford of the precise "contours" of the ACM combination trade secrets, and inform Ford they were ***combination trade secrets***, at the time it disclosed them to Ford. But the DTSA and the MUTSA impose no such requirements. The law merely requires that the defendant have knowledge of the information constituting the trade secret and its confidential nature. Nothing about the fact that this case involves "combination" trade secrets changes that.

**C.** Even if there were some requirement that Versata disclose its combination trade secrets to Ford as combination trade secrets, the jury had ample ground to conclude Versata did so. The district court agreed. Multiple witnesses explained how Versata disclosed every combination trade secret to Ford. And Ford's technically proficient staff learned and used the secrets as a result. Ford's contrary argu-

ments ask the Court to reweigh the evidence and question the jury's assessment of witness credibility. That is prohibited on JMOL.

## STANDARD OF REVIEW

This Court decides the propriety of a cross-appeal as a matter of law. *See Aventis Pharma S.A. v. Hospira, Inc.*, 637 F.3d 1341, 1344 (Fed. Cir. 2011). JMOL orders are reviewed *de novo*. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). A jury's verdict must be upheld unless, "'viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact,'" and "'reasonable minds'" could rule only in the movant's favor. *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005).

## ARGUMENT

### I. FORD'S "CONDITIONAL CROSS-APPEAL" SHOULD BE DISMISSED

This Court should dismiss Ford's "conditional cross-appeal." Ford.Br.66. Parties may not use "a conditional cross-appeal as a means to raise additional arguments" that—like Ford's arguments here—"do not expand the scope of the judgment." *Aventis*, 637 F.3d at 1343. Even if "other circuits" allow such arguments by cross-appeal, this Court does not. *Id.*

#### A. Ford's Conditional Cross-Appeal Is Improper Because It Attempts To Preserve Rather than Alter the Parties' Rights Under the Judgment

For a century, the law has been clear that "[i]t is only necessary and appropriate to file a cross-appeal when a party seeks to ***enlarge its own rights*** under the

judgment or ***to lessen the rights of its adversary under the judgment***." *Bailey v. Dart Container Corp. of Mich.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002) (emphasis added) (citing *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924)); *see also Jennings v. Stephens*, 574 U.S. 271, 276 (2015); *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1156-57 (Fed. Cir. 2004). So-called "'conditional' cross-appeal[s]" do not meet that standard. *Bailey*, 292 F.3d at 1362. Rather than seeking to alter the parties' rights under the judgment, they instead raise alternative grounds to ***preserve*** the status quo, "in the event that this [C]ourt reverses" on another ground. *Id.* This Court thus has "consistently warn[ed] against" the use of conditional cross-appeals as "improper." *Aventis*, 637 F.3d at 1343.

Ford's conditional cross-appeal is precisely the type of procedural maneuver this Court has warned against. Ford's arguments would neither expand Ford's rights nor lessen Versata's. Ford urges that the district court erred by not granting JMOL on Versata's trade-secrets claim on the ground that Versata failed to prove Ford had "knowledge" of Versata's "combination" trade secrets. Ford.Br.66. But the court "grant[ed] Ford judgment as a matter of law as to damages on Versata's trade secret claims." Appx157. As a result, the court's final judgment ordered that "Versata shall recover from Ford $0 in damages" for its trade-secret claims. Appx160. If Ford were to prevail on its cross-appeal, the parties' rights under the trade-secrets judgment would not change: Ford still would be required to pay nothing, and

Versata still would be entitled to receive nothing. Arguments that would alter the ***rationale*** for a result, without changing ***the result itself***, cannot be raised as cross-appeals. They must be raised as alternative grounds for affirmance. *Aventis*, 637 F.3d at 1343; *Bailey*, 292 F.3d at 1362.

Ford's filings confirm that it is entirely satisfied with the court's judgment on Versata's trade-secrets claims, and that it believes the judgment should be affirmed as-is. Ford's "Notice of Conditional Cross-Appeal" unequivocally states that Ford "***does not believe there is any basis to disturb the final judgment***." Appx42523 (emphasis added). And its appeal brief urges that this Court "***need not address*** Ford's conditional cross-appeal" if it "affirms the District Court's exclusion of Versata's unjust-enrichment-damages model and grant of JMOL." Ford.Br.66 (emphasis added). Ford, moreover, describes its conditional-cross appeal as providing an "independent" basis for "Ford [to] prevail" if the Court otherwise were going to "reverse[]" the district court's trade-secret judgment. Ford.Br.66. In other words, Ford offers its conditional-cross appeal as an "alternative ground[] for ***affirming*** the judgment." *Aventis*, 637 F.3d at 1343 (emphasis added). But a cross-appeal is proper only when it "would result in a ***reversal*** or modification of the judgment rather than an affirmance." *Bailey*, 292 F.3d at 1362 (emphasis added). It could hardly be clearer that this Court's precedent forecloses Ford's conditional cross-appeal.

Nor can Ford's assertion of a conditional cross-appeal be waved away as a harmless procedural error. This Court has made clear that "[a]ttorneys are free to devote as much of their ***responsive briefing*** as needed to flesh out . . . alternative grounds for affirming the judgment on appeal." *Aventis*, 637 F.3d at 1343 (emphasis added). "They are not free, however, to game the system by filing a cross-appeal[.]" *Id.* Ford's improper cross-appeal "unnecessarily expands the amount of briefing that is otherwise allowed, as well as giving [Ford] an unfair opportunity to file the final brief and have the final oral argument, contrary to established rules." *Bailey*, 292 F.3d at 1362. It should be dismissed.

### B. Ford's Conditional Cross-Appeal Does Not Seek To Change the Legal Relationship Between the Parties

Ford may argue that its conditional cross-appeal has the potential to change the decision below from "grant[ing] Ford judgment as a matter of law as to damages on Versata's trade secret claims," Appx157, to granting Ford judgment as a matter of law as to ***liability*** on Versata's trade-secrets claim. *See* Ford.Br.4. But a desire to assert a different rationale for the judgment is insufficient to support a cross-appeal.

Prevailing parties are not entitled to cross-appeal just because they might prefer to have their win approved under a different legal theory. A defendant that has achieved its desired result at trial—*e.g.*, it pays nothing and need not alter its conduct—is not "adversely affected" by the judgment and cannot appeal. *Type-*

*Right*, 374 F.3d at 1157; *see Wheeler v. City of Lansing*, 660 F.3d 931, 939-40 (6th Cir. 2011). Indeed, the Supreme Court has held cross-appeals unnecessary even though "judgment on an alternative ground" would "change[] the judgment's issue-preclusive effects." *Jennings*, 574 U.S. at 278. It does not matter ***why*** judgment was entered for a party; a cross-appeal is proper only if it would "'enlarg[e]'" or "'lessen[]'" the parties' "***rights under*** the judgment." *Id.* at 276 (emphasis added).

This Court hews to that principle. For example, the Court has repeatedly dismissed putative cross-appeals "seek[ing] review of either non-infringement or alternative invalidity arguments" where the would-be cross-appellant prevailed below through a judgment holding the asserted patent claims "invalid." *Aventis*, 637 F.3d at 1342; *see, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1337 (Fed. Cir. 2010); *TypeRight*, 374 F.3d at 1156. That makes sense. Even if this Court were to hold the defendant did not infringe a patent that was held invalid, that would not alter the parties' rights under the judgment: Because the patent is invalid, the defendant need not pay or do anything; a non-infringement ruling adds nothing to its rights. *TypeRight*, 374 F.3d at 1156. So too here. Under the judgment, Ford walked away owing $0 because the district court held the damages evidence insufficient. If this Court were to overturn the jury's finding that Versata proved liability, Ford would still owe nothing.

Ford cites *Granite Management Corp. v. United States*, 416 F.3d 1373 (Fed. Cir. 2005), as supporting cross-appeal jurisdiction. Ford.Br.4. But *Granite* does not allow every party that won below—that pays nothing—under a no-damages theory to cross-appeal adverse liability rulings to safeguard that result. To the contrary, the majority opinion acknowledges that, "ordinarily a litigant cannot appeal from a [final] judgment in his favor." *Granite*, 416 F.3d at 1379. And *Granite* nowhere suggests—and could not suggest—that it somehow overturns this Court's extensive precedents prohibiting cross-appeals by parties who prevailed below and do not seek to change their rights (or their opponent's) under the judgment.

*Granite* involved a breach-of-contract claim against the government. The Court of Federal Claims had ruled, in two separate summary-judgment orders, that (1) the government had breached its contract with Granite, and (2) Granite failed to prove damages. 416 F.3d at 1377-78. Because Granite failed to prove damages, final judgment was entered for the government. *Id.* at 1378-79. As appellee, the government defended the damages ruling but added that "the judgment of the trial court should be reversed with respect to" the court's ruling that the government had breached the contract. *Id.* at 1378.

The panel majority's decision speculated that, "[u]nder the peculiar circumstances of this case, where the government ***challenges only part of the earlier order granting partial summary judgment***, it ***might*** have been able to appeal" the ruling

on contract breach. 416 F.3d at 1379 (emphasis added). It also noted that the government "***could*** have made its argument as an alternative ground for affirmance of the final judgment without seeking a modification of it." *Id.* at 1379-80 (emphasis added). But because the government asked for a "modification" of the judgment, the panel majority held a cross-appeal was required. *Id.* at 1379.

Ford's cross-appeal does not present the "peculiar circumstances" in *Granite*. 416 F.3d at 1379. While the *Granite* majority does not illuminate why a prior partial summary-judgment order against the government on breach "might" have made a cross-appeal proper, there is no such separate, prior summary-judgment order here. Here, in a single judgment, Ford obtained judgment in its favor: It pays nothing. Ford merely prevailed on one theory (no damages) rather than another (no misappropriation).

Unlike in *Granite*, moreover, Ford does not ask that the ***judgment*** "'be reversed.'" 416 F.3d at 1379. Instead, Ford urges that, "[s]hould the Court reach Ford's conditional cross-appeal, it should reverse the ***denial of JMOL*** on trade-secret-misappropriation liability." Ford.Br.75 (emphasis added). Seeking "reversal of denial of JMOL" on some alternative legal theory is not the same as seeking "reversal of the judgment." By singling out and challenging one portion of the JMOL decision, Ford's cross-appeal "'attack[s] . . . the ***reasoning*** of the lower court'" on one issue for the express purpose of ***safeguarding*** the $0 judgment it won

on other grounds. *Bailey*, 292 F.3d at 1362 (emphasis added). To have a proper appeal, Ford must attack the judgment—"'the bottom line, not the grounds or reasoning'" of the decision below. *Marcatante v. City of Chicago*, 657 F.3d 433, 438 (7th Cir. 2011). As *Granite* recognized, such challenges to the district court's rationale are merely alternate grounds for affirmance, 416 F.3d at 1378—which is how Ford should have presented its argument here, *Aventis*, 637 F.3d at 1343.

Ford's effort to read *Granite* more broadly—beyond the "peculiar circumstances" of a prior summary-judgment ruling against the government—would place that decision in direct conflict with Supreme Court and Circuit precedent. The Supreme Court has repeatedly held that an appeal (or cross-appeal) is improper unless it seeks to enlarge the appellant's rights or diminish the appellee's. *See Jennings*, 574 U.S. at 276; *Am. Ry. Exp.*, 265 U.S. at 435. As Judge Clevenger explained in dissent in *Granite*, application of that ordinary rule should have precluded a cross-appeal there. 416 F.3d at 1385. The government would have won "the same prize" under its alternative no-breach theory as under the no-damages theory on which it prevailed below—"dismissal" of the case. *Id.*

The majority in *Granite* could not displace the longstanding standard—recognized by the Supreme Court since at least 1924 in *American Railway*, 265 U.S. at 435, and by this Court since at least 2002 in cases like *Bailey*, 292 F.3d at 1362, and *TypeRight*, 374 F.3d at 1156-57. Insofar as *Granite* applies a different rule, this

Court must follow the cases that "predate[]" it. *Sharpe v. Sec'y of Health & Hum. Servs.*, 964 F.3d 1072, 1082 n.2 (Fed. Cir. 2020). Indeed, later cases, like *Jennings*, 574 U.S. at 276, and *Aventis*, 637 F.3d at 1343, confirm that cross-appeals are proper only where they seek to enlarge the party's rights under the judgment, or lessen an opponent's. Ford's "conditional cross-appeal" does not seek to do so. It should be dismissed.

## II. FORD'S "CONDITIONAL CROSS-APPEAL" FAILS ON THE MERITS

While this Court should not reach the issue, Versata presented more than sufficient "evidence at trial to support the jury's verdict that Ford was liable for trade-secret misappropriation." Ford.Br.66. Ford's conditional cross-appeal does not challenge the jury's verdict that Grid, Buildability, and Workspaces are valid combination trade secrets. Appx100-02. It does not dispute that Ford received confidential information disclosing every element of those combination trade secrets, or that Ford had obligations to protect the confidentiality of that information. Appx98. Nor does it dispute that Ford "misappropriated every element" of those trade secrets by using them to develop its own software, PDO. Appx56985(34:2-15); *see* Appx100-02.

Instead, Ford stakes its cross-appeal on the argument that Versata did not prove trade-secret misappropriation because Versata was required to notify Ford of the precise "contours" of its ACM combination trade secrets, and inform Ford they

were ***combination trade secrets***, when disclosing them to Ford. Ford.Br.68. But that is not an element of a trade-secrets claim under the DTSA or the MUTSA. The statutes require only that Ford had "knowledge of the trade secret[s]," 18 U.S.C. § 1839(5)(B)(ii)(II) (DTSA); *see* Mich. Comp. Laws § 445.1902(b)(ii)(B) (MUTSA), in the sense of knowing the ***information comprising*** the trade secrets.

Ford knew Versata's software and disclosures were replete with confidential information—including trade secrets—and that, as a result, Ford was proscribed from reverse-engineering and using them to build its own system. Versata was not required to draw big red circles around the information and say to Ford, "this set constitutes my Grid trade secret, this constitutes my Buildability trade secret, and this constitutes my Workspaces trade secret" for those combination trade secrets to be protectable. Regardless, as the district court found, there is sufficient evidence to uphold the jury's verdict even under Ford's view of the law. The jury's verdict that Ford misappropriated Versata's trade secrets should be affirmed.

### A. The Jury Reasonably Found Ford Had "Knowledge" of Versata's Trade Secrets

Ford challenges only one element of Versata's case on trade-secrets liability: Whether Versata proved that "Ford had 'knowledge of the trade secret[s].'" Ford.Br.66 (quoting 18 U.S.C. § 1839(5)(B)(ii)(II); Mich. Comp. Laws § 445.1902(b)(ii)(B)). "[T]he word 'knowledge'" simply "means 'the fact or condition of being aware of something.'" *Intel Corp. Inv. Policy Comm. v. Sulyma*, 589

U.S. 178, 184 (2020) (quoting Webster's Seventh New Collegiate Dictionary 469 (1967)). And "knowledge can be proved through 'inference from circumstantial evidence.'" *Id.* at 189 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Versata's trial evidence was amply sufficient to prove—to support the "inference"—that Ford was "aware" of Versata's trade secrets.

The evidence showed Versata confidentially disclosed to Ford the "entire[ty]"—as well as "every element"—of Grid, Buildability, and Workspaces. Appx56367 (30:15-31:9, 32:11-23); Appx56383 (94:2-23); *see* pp. 35-37, *supra*. It showed Ford's engineers "had access" to the critical secret information while developing PDO. *E.g.*, Appx56329 (54:17-57:20). It showed at least 21 PDO developers "had access to Versata's confidential information about ACM," and 33 had ACM software code files ***on their computers***. Appx56329-30 (54:17-61:22). And it showed every element of every ACM combination secret was "cop[ied]" in PDO. Appx56367 (30:15-31:12); Appx56377 (71:5-72:7); Appx56383 (94:2-95:1). *See* pp. 37-38, *supra*.

The evidence also showed Ford knew the information was secret. Ford fully understood it was contractually obligated to protect the information's confidentiality—the MSSA plainly required that. Appx55863-64 (101:24-102:23); Appx55864-65 (105:11-108:11); Appx55866 (110:4-112:1). Versata, moreover, "continually told Ford and others that its information is confidential," and made

confidentiality "evident" with "confidentiality markings" on every document containing trade-secret information. Appx56328-29 (52:23-54:2); *see* Appx56090-91 (121:11-122:12).

Ford disputes none of that. That should end the matter. Versata's evidence was more than sufficient for a reasonable jury to infer Ford's knowledge of Grid, Buildability, and Workspaces.

### B. Ford's Efforts To Impose a Heightened "Knowledge" Requirement Are Unfounded

Unable to seriously deny it had "knowledge" of Grid, Buildability, and Workspaces, Ford attempts to raise the legal bar. It urges that, because those were so-called "combination" trade secrets, "Versata was required to provide evidence from which a reasonable jury could conclude that Ford had 'knowledge' of the ***precise combinations*** of those" protected features. Ford.Br.68 (emphasis added). It urges that JMOL is warranted because "Versata provided no evidence that it ***specifically identified*** these protected bundles of features to Ford" as protected bundles. Ford.Br.68 (emphasis added). The law imposes no such requirements.

#### 1. *The DTSA and MUTSA Do Not Require That Plaintiffs Disclose, or That Defendants Know, the Precise Definition of the Trade Secrets at the Time of Misappropriation*

Ford argues that the "knowledge" requirement turns on whether Versata "specifically identified" its combination trade secrets as combination trade secrets when Versata disclosed its protected information. Ford.Br.68. That view of "knowl-

edge" has no basis in the DTSA or MUTSA. Those statutes contain no requirement that plaintiff trade-secret owners provide defendants with pre-misappropriation "notice" of trade secrets ***at all***, let alone that plaintiffs specifically identify trade secrets' "particular[ ]" "contours," or "bundles" of features. *See* Ford.Br.67-68. The statutes focus on the ***misappropriator's*** "knowledge" of the trade secrets, which can be "acquired" by various means, including by "improper means" or from "person[s]" ***other*** than the trade-secret owner. 18 U.S.C. §1839(5)(B); Mich. Comp. Laws §445.1902(b)(i)-(ii).

Nor do the DTSA and MUTSA otherwise require that defendants have "knowledge" of the "precise" ***definition*** of trade secrets at the time of misappropriation, as Ford suggests. Ford.Br.67-68. Those statutes define "misappropriation" to include the unconsented-to "use of a trade secret" by a person who (i) "used improper means to acquire knowledge of the trade secret" or (ii) "knew or had reason to know that [its] knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain [its] secrecy . . . or limit [its] use." 18 U.S.C. §1839(5)(B)(i), (ii)(II); *see* Mich. Comp. Laws §445.1902(b)(ii)(A)-(B). "[T]rade secret" is broadly defined to include "all forms" of "business," "technical," and certain other "***information***" that the owner "has taken reasonable measures to keep . . . secret," and that derives "economic value" from "not being generally known" to others who might use the information. 18 U.S.C. §1839(3) (emphasis added); *see*

Mich. Comp. Laws § 445.1902(d). Thus, all the statutory text requires is that the defendant had knowledge of "the ***information constituting*** the trade secret." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 225 (2010) (construing California's materially indistinguishable UTSA) (emphasis added). "A requirement of 'knowledge of the trade secret' simply is not a requirement that the defendant 'comprehend' the secret" as such. *Id.*

Indeed, where the DTSA and MUTSA intend to require that a defendant have knowledge that "the trade secret ***was a trade secret***" at the time of the misappropriation, they say so expressly. 18 U.S.C. § 1839(5)(B)(iii)(I) (emphasis added); *see* Mich. Comp. Laws § 445.1902(b)(ii)(C). That requirement, however, applies ***only*** where the information about the trade secret was obtained by "accident or mistake." 18 U.S.C. § 1839(5)(B)(iii)(II); Mich. Comp. Laws § 445.1902(b)(ii)(C). The statutory provisions under which Versata sought to recover here include no such language. *See* 18 U.S.C. § 1839(5)(B)(ii)(II); Mich. Comp. Laws § 445.1902(b)(ii)(B). The Court must "presume" that those "differences in language" within the same statutory section "convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017).

The distinction makes sense. A person who acquires information by "accident or mistake" should not be faulted for using that information if they did not know that "the trade secret was a trade secret." 18 U.S.C. § 1839(5)(B)(iii); *see* Mich. Comp.

Laws § 445.1902(b)(ii)(C). By contrast, persons who acquire sensitive information "under circumstances giving rise to a duty to maintain [its] secrecy . . . or limit [its] use," 18 U.S.C. § 1839(5)(B)(ii)(II); *see* Mich. Comp. Laws § 445.1902(b)(ii)(B), are on notice that they should not use or disclose that information without consent, regardless of whether they know at the time that the information is a particular "trade secret."

The statutes thus do not require that defendants have pre-misappropriation knowledge of the "precise" definition of the trade secret that plaintiffs will later assert in litigation. Ford.Br.68. Consistent with that, the case law accepts that defendants will "not necessarily [be] on notice of" the definition of "the trade secret ***before*** litigation." *TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 52 (1st Cir. 2020) (emphasis added); *see Restatement (Third) of Unfair Competition* § 41 cmt.b (1995) (plaintiff need not provide any "specific form of notice"). Instead, the litigation process ***itself*** is what "lead[s] to a refined and sufficiently particularized trade secret identification." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 662 (9th Cir. 2020); *see Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022).

Here, moreover, Ford ***knew*** it was obtaining Versata's trade secrets. *E.g.*, Appx55863-64 (101:24-102:23); Appx55864-65 (105:11-106:10). It expressly agreed to protect them. Appx55865 (106:11-108:11); Appx56328-29 (52:23-54:2). It was

barred from reverse-engineering Versata's software. Appx55866(110:4-112:1). But it nonetheless used those trade secrets to build its own competing platform—conduct it was prohibited from doing. Appx56901-02(124:20-126:2, 127:2-24); Appx56329-30(54:17-61:22); Appx56331(62:15-64:4); Appx56647-49(120:3-126:11).

#### 2. *There Is No Heightened Standard of Knowledge for "Combination" Trade Secrets*

Ford attempts to distinguish this case because it involves "combination" trade secrets. Ford.Br.66. "Combination" trade secrets protect a "'new combination'" of "'steps or processes,'" even where "'some or all of the components'" of the combination might have been "well-known." *Caudill*, 53 F.4th at 380, 384-85. Ford urges that, because combination trade secrets are comprised of multiple components, some of which may not be independently protectable, "a defendant cannot be liable when the plaintiff does not 'identify its alleged [combination] trade secret with particularity at the time of disclosure.'" Ford.Br.71. But the DTSA and MUTSA do not distinguish between trade-secret types, much less impose a heightened standard for proving "knowledge" of combination trade secrets. And Ford was on notice it was stealing trade secrets. *See* pp. 34-35, 52-53, *supra*. Ford did not need to know boundaries down to an inch.

Courts have thus rejected the argument Ford makes here. In *UniRAM Technology, Inc. v. Taiwan Semiconductor Manufacturing Co.*, 617 F. Supp. 2d 938

(N.D. Cal. 2007)—a case involving California's indistinguishable UTSA—the court rejected the contention that, "when an alleged trade secret consists of a combination of nonsecret elements, plaintiffs have a claim only if they can prove they disclosed to defendants the precise combination that constitutes the secret." *Id.* at 942. The court found "no authority for [that] proposition." *Id.* There is no requirement, the court explained, that plaintiffs provide a "unified description" of the combination. *Id.* at 943. Instead, the court held, "knowledge of the combination may be imputed" to a party that "had knowledge of the individual features." *Id.* Whether such a finding is appropriate in any given case is a "fact-intensive" question for "the jury" to decide. *Id.* at 944.

Ford's contrary argument that "a defendant cannot be liable when the plaintiff does not 'identify its alleged [combination] trade secret with particularity at the time of disclosure,'" Ford.Br.71, rests almost entirely on a single, out-of-circuit, district court case: *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224 (S.D.N.Y. 2014). That slender reed cannot bear the load Ford would place upon it. *Big Vision* did not involve any State's UTSA, much less purport to interpret its "knowledge" requirement. *See id.* at 257 (applying New York common law). It is inapposite for that reason alone. Statutory text controls here.

Regardless, Ford overreads *Big Vision*. The court there did state that a plaintiff must have "described its trade secret with sufficient particularity, both at the time

of disclosure" to the defendant and during the "litigation." 1 F. Supp. 3d at 257. The court then abstractly discussed "The Law on Particularity" in trade-secrets cases. *Id.* at 257-59. It cited numerous cases for the proposition that a trade-secrets plaintiff must define its trade secret with particularity ***during litigation***. *Id.* That requirement exists " 'so that the defendant can defend himself adequately . . . and so that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation.' " *Id.* at 258 (quoting *Sit-Up Ltd. v. IAC/InterActiveCorp.*, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008)).[4]

But the district court in *Big Vision* cited only one case to support the view Ford presses here—that a plaintiff also must "identify its alleged trade secret [as such] with particularity at the time of ***disclosure***": *Heyman v. AR. Winarick, Inc.*, 325 F.2d 584 (2d Cir. 1963). *Big Vision*, 1 F. Supp. 3d at 257, 259 (emphasis added). *Heyman* likewise was not a UTSA case. And it does not support the rule *Big Vision* derived from it.

---

[4] Versata does not dispute plaintiffs must disclose trade secrets with "particularity" ***during litigation***. To make out a claim under the UTSA, "a trade-secrets plaintiff must 'defin[e] the information for which protection is sought with sufficient definiteness ***to permit a court*** to apply the criteria for protection described in this Section and to determine the fact of an appropriation.' " *Caudill*, 53 F.4th at 380-81 (emphasis added). But there is no dispute that Versata met that "particularity" requirement here. *See* Appx55144-45 (81:1-82:6) (Ford withdrawing opposition to Versata's combination-trade-secrets theory); Appx67390-93 (Versata's identification and description of combination trade secrets).

While the plaintiff in *Heyman* asserted theft of a trade secret to "liquid fingernail hardener," the evidence showed the plaintiff had told the defendant "the active ingredient in his fingernail hardener was a 'quaternary' or a 'non-toxic surface agent,' " but nothing more. 325 F.2d at 586, 588. The court held that the "plaintiff's casual reference to a quaternary was not the disclosure of a trade secret." *Id.* at 590. It explained that, "if plaintiff had disclosed the actual formula for his product, or if he had informed defendants with more particularity of its ingredients, there would have been a disclosure of a trade secret," but merely referring "to a 'quaternary' was so vague and indefinite as not to be entitled to protection" as a trade secret. *Id.*

*Heyman* thus did not hold that plaintiffs have an obligation to "specifically identif[y]" to defendants how the various pieces of information disclosed add up to a "combination" trade secret. Ford.Br.68. Instead, *Heyman* merely held that the plaintiff had not "actually disclosed to defendants [any] trade secret ***information***" at all. 325 F.2d at 588 (emphasis added). That is an entirely different proposition.

Ford cites no other case, before or since *Big Vision*, requiring plaintiffs to set out the metes and bounds of combination trade secrets at the time of disclosure—much less requiring such specificity despite notice that individual elements are confidential and proprietary.[5] Nor is such a rule wise. Innovators know that, to

---

[5] Ford also cites *Next Communications, Inc. v. Viber Media, Inc.*, 758 F. App'x 46 (2d Cir. 2018). Ford.Br.73-74. That non-UTSA case mentioned a "specificity" requirement only in the context of litigation. *See* 758 F. App'x at 48-49. It further

protect their trade secrets, they must take measures such as requiring non-disclosure agreements before sharing their sensitive information with potential customers or collaborators. Under Ford's view of *Big Vision*, however, innovators would have to do far more just to engage in business discussions—they would have to hire counsel to perfectly define for them the contours of any and all trade secrets they might possess so they can present that analysis at the time the information is disclosed. The law does not impose that burden on businesses just to ensure confidential information remains protectable against misappropriation.

### C. Ford Is Not Entitled to JMOL Even Under Its Erroneous View of the Law

Ford cannot show it is entitled to JMOL even under its own erroneous heightened-knowledge requirement. Ford urged below that it was entitled to JMOL because " '[n]o witness testified that Versata identified the elements of any asserted combination ***as a combination*** to Ford.' " Appx133. The district court rejected that argument on its own terms, holding that, "taken in the light most favorable to Versata," the evidence "support[ed] a finding that Versata disclosed the combination trade secrets to Ford." Appx134.

---

held that "[e]ven if" the plaintiff had identified its "trade secret with specificity," its claims would still fail because it had not shown that the "protected materials were disclosed to" the defendant at all. *Id.* at 50.

Citing *UniRAM*, Ford urges that it could not possibly have had knowledge of the trade secrets "where the alleged trade secrets were disclosed in thousands of pages of documents with no way to distinguish what was protected from what was not." Ford.Br.72. But even if that were an accurate description of the facts of this case—it is not—*UniRAM* confirms "there is no threshold of specificity" for determining whether trade secrets were " 'disclosed' as a matter of law." 617 F. Supp. 2d at 943. Instead, whether defendants "piece[d] together" combination trade secrets from broader disclosures is a "question of fact" for the jury. *Id.*

Here, the jury—following instructions based on *UniRAM* that Ford nowhere challenges—properly decided the issue. *See* Appx56878 (30:8-32:10). And the district court examined the record and found the jury reasonably could have inferred that "Versata disclosed the combination trade secrets to Ford," and that Ford would have been able to "understand" them. Appx135. In particular, the court noted that Malek "repeatedly testified at trial that Versata disclosed the trade secrets ***as combinations*** to Ford through its user guides and presentations to Ford." Appx134. And it cited Krauss's testimony about similar disclosures. Appx134-35. The court concluded the jury could have reasonably inferred from that evidence, and from Ford's employment of "technically-proficient" staff, Ford's knowledge of each combination as a combination. Appx135. The jury thus rightly could have relied

on the "totality of the circumstances" to find Ford had the requisite knowledge. Appx56985-86(37:23-38:5).

Ford's counter-arguments violate the basic JMOL principle that "[t]he evidence should not be weighed, and the credibility of the witnesses should not be questioned." *Tisdale*, 415 F.3d at 531. For example, Ford urges that some Versata employees "struggled" to define the combinations themselves, Ford.Br.70-71, but if so, the jury weighed that. Ford urges that Malek limited the evidence to "three ways" Ford could learn Versata's combinations. Ford.Br.72. But Malek's testimony was not so limited: He referenced "user guides," "functional walkthroughs," "trainings and education sessions," "presentations," "software code files," "release notes," and "the software[ ] itself" (which Ford impermissibly reverse-engineered). Appx56329 (54:3-16); Appx56383(94:2-23). None of that was out-of-bounds. Krauss's additional testimony was not (as Ford argues) "conclusory," Ford.Br.73—he explained "the content" of communications disclosing Versata's trade secrets. Ford.Br.73; *see, e.g.*, Appx56167(74:2-25), Appx56175-76(109:19-110:17) (Grid); Appx56170-71(86:20-91:5) (Buildability); Appx56167(75:20-76:4), Appx56176 (110:18-24) (Workspaces). " '[V]iewing the evidence in the light most favorable to' " Versata, it cannot be said that a reasonable jury could " 'come to but one conclusion in favor of' " Ford on this issue. *Tisdale*, 415 F.3d at 527.

## CONCLUSION

Ford's conditional cross-appeal should be dismissed. Alternatively, the Court should affirm the district court's ruling that Versata proved Ford is liable for trade-secret misappropriation.

September 30, 2024

Respectfully submitted,

/s/ Jeffrey A. Lamken

Jeffrey A. Lamken
*Counsel of Record*
Michael Gregory Pattillo, Jr.
Jennifer Elizabeth Fischell
Lois Ahn*
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

Eugene Alexis Sokoloff
Thomas P. Schubert
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
(312) 450-6700

Sharoon Saleem
JONES & SPROSS, PLLC
1605 Lakecliff Hills Lane, Suite 100
Austin, TX 78732
(713) 446-0217

Dan K. Webb
Matthew R. Carter
Samuel Zuidema
Monica T. Kociolek
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600

Jaye Quadrozzi
VARNUM LLP
480 Pierce Street, Suite 300
Birmingham, MI 48009
(248) 567-7836

Steven J. Mitby
MITBY PACHOLDER JOHNSON PLLC
1001 McKinney Street, Suite 925
Houston, TX 77002
(713) 234-1446

** Admitted only in New York; practice limited to matters before federal courts and federal agencies*

*Counsel for Plaintiffs-Appellants Versata Software, Inc., Versata Development Group, Inc., and Trilogy, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1140, 2024-1206, 2024-1234

**Short Case Caption:** Versata Software, Inc. v. Ford Motor Company

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,949 words.

- [ ] the filing has been prepared using a monospaced typeface and includes ____________ lines of text.

- [ ] the filing contains ____________ pages / ____________ words / ____________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ____________).

Date: 09/30/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken